# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

---

MARCOS RODRIGUEZ,

               Plaintiff,

      v.                                  9:22-CV-181
                                              (GTS/MJK)

DR. MIKHAIL GUSMAN,

               Defendant.

---

MARCOS RODRIGUEZ, Plaintiff, pro se
MARK G. MITCHELL, Asst. Attorney General, for Defendant
ERIN P. MEAD, Asst. Attorney General, for Defendant

MITCHELL J. KATZ, United States Magistrate Judge

TO THE HONORABLE GLENN T. SUDDABY, United States District Court Judge:

## REPORT-RECOMMENDATION

     In this *pro se* civil rights action, plaintiff alleges that he was denied

constitutionally adequate medical care while he was an inmate in the custody of Eastern

Correctional Facility ("Eastern C.F."). Presently before this court is plaintiff's motion

for partial summary judgment as to liability only (Dkt. No. 65), and

defendant Dr. Gusman's cross-motion for summary judgment (Dkt. No. 71). Also

before the court is plaintiff's motion to compel discovery pursuant to Fed. R. Civ. P.

37(a)(1) (Dkt. No. 70), and motion to defer consideration of defendant's cross-

1

motion for summary judgment (Dkt. No. 84).

This matter has been referred to me for Report and Recommendation by United States District Court Judge Glenn T. Suddaby, pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. Local Rule ("Local Rule") 72.3(c). For the following reasons, this court recommends that defendant Dr. Gusman's cross-motion for summary judgment be granted, that plaintiff's motion for partial summary judgment be denied, that plaintiff's motion to compel discovery be denied, and that plaintiff's motion to defer consideration of defendant's cross-motion for summary judgment be denied.

## DISCUSSION

## I.  PROCEDURAL HISTORY

Plaintiff commenced this action on February 28, 2022 by filing a complaint. (Dkt. No. 1). On July 7, 2022, plaintiff filed an amended complaint (Dkt. No. 17), which is the operative complaint in this action. On December 16, 2022, defendants filed a motion to dismiss for failure to state a claim. (Dkt. No. 26). United States Magistrate Judge Andrew T. Baxter issued a Report-Recommendation which was accepted and adopted in its entirety by United States District Court Judge Glenn T. Sudabby on May 4, 2023, dismissing plaintiff's section 1983 claims against defendant Dr. Bhavsar with prejudice, and dismissing plaintiff's state law claims without prejudice but without leave to amend. (Dkt. Nos. 39, 40). Defendants' motion to dismiss the amended complaint as against defendant Dr. Gusman was denied. Thus, what remains is

plaintiff's cause of action against Dr. Gusman for alleged Eighth Amendment violations.

On November 21, 2023, Judge Baxter issued a text order resetting the discovery deadline to February 22, 2024. (Dkt. No. 54). Local Rule 16.2 provides in relevant part that "[p]arties shall file and serve motions to compel discovery no later than fourteen (14) days after the discovery cut-off." Plaintiff filed his Motion To Compel Discovery (Dkt. No. 70) on March 22, 2024, twenty-nine days after the discovery deadline.

## II.  FACTS

### A. Defendant's Contentions

Dr. Gusman was employed as a physician at Eastern C.F. from October 1999 until his retirement in June 2021. (Def.'s Stmt. of Mat. Facts ¶ 3) (Dkt. No. 71-1).  Dr. Gusman returned to working at Eastern C.F. in September 2021, on a per diem basis. (*Id.* ¶ 4).  Plaintiff was incarcerated at Eastern C.F. from December 2013 to March 2022.  (*Id.* ¶ 11).

On February 25, 2014, plaintiff complained of difficulty urinating and requested a medical call out to be seen by a physician. (Def.'s Stmt. of Mat. Facts ¶ 14; Dkt. No. 73-1 at 337).[1] On March 6, 2014, plaintiff was evaluated by Dr. Bhavsar[2] for "urinary issues," at which time Dr. Bhavsar observed plaintiff's prostate to be enlarged upon a

---

[1] All page references are to CM/ECF's pagination system except for the medical records (Dkt. Nos. 73, 73-1, 73-2, 73-3), which are to the bates numbers located on the bottom of each page.

[2] As previously set forth, Dr. Bhavsar was terminated as a defendant from this action pursuant to Judge Suddaby's May 4, 2023 Decision and Order.  (Dkt. No. 40).

digital rectal examination ("DRE"). (Def.'s Stmt. of Mat. Facts ¶¶ 15-16; Dkt. No. 73-1 at 334). Dr. Bhavsar thereafter ordered a Prostate Specific Antigen ("PSA") test for plaintiff. (Def.'s Stmt. of Mat. Facts ¶ 18; Dkt. No. 73-1 at 334). "A PSA test is a blood test used to screen for prostate cancer . . . [and] measures the amount of PSA in the patient's body." (Gusman Decl. ¶¶ 13-14; Dkt. No. 72-3). The results of plaintiff's test showed that his PSA level was 2.44 ng/ml, which was "within normal range." (Gusman Decl. ¶¶ 13-14; Dkt. No. 73-1 at 72). According to Dr. Gusman, "[t]he normal range for PSA varies depending on age; the normal range for PSA for men 50-59 years old is a result less than 3.5 ng/ml and less than 4.5 mg/ml for men 60-69 years old." (Gusman Decl. ¶ 14).[3] Dr. Bhavsar diagnosed plaintiff with Benign Prostatic Hyperplasia ("BPH"), "or an enlarged prostate," and prescribed Tamsulosin (generic for Flomax) to treat the symptoms associated with this condition. (Def.'s Stmt. of Mat. Facts ¶¶ 24-25; Dkt. No. 73-1 at 334).

Approximately one year later, on February 4, 2015, plaintiff complained of difficulty urinating during a call out, and a PSA test was ordered. (Def.'s Stmt. of Mat. Facts ¶ 29; Dkt. No. 73-1 at 311). At that time, plaintiff reported that the Tamsulosin was helpful, and a new prescription was provided. (*Id.* ¶ 30; Dkt. No. 73-1 at 311). The PSA test was performed on March 10, 2015 and indicated results within the normal range at 2.71 ng/ml. (Def.'s Stmt. of Mat. Facts ¶ 31; Dkt. No. 73-1 at 90). Thereafter, routine PSA tests were performed to monitor plaintiff's prostate, and Tamsulosin

---

[3] Plaintiff was fifty years old in March 2014.

continued to be prescribed for symptoms associated with plaintiff's enlarged prostate. (Def.'s Stmt. of Mat. Facts ¶¶ 32-33).

In 2016, plaintiff was seen for pain in his right testicle and an ultrasound was performed. (Gusman Decl., ¶ 17; Dkt. No. 73 at 224, 237, 248, 250). Plaintiff was diagnosed with hydrocele (swelling caused by fluid). (*Id.*). Plaintiff also complained of groin pain in 2016 which was diagnosed as a hernia after an ultrasound was performed. (Gusman Decl., ¶ 18; Dkt. No. 73 at 257-258; Dkt. No. 73-3 at 901). On August 29, 2016, plaintiff reported that he was able to urinate without difficulty. (Gusman Decl., ¶ 19; Dkt. No. 73 at 249). Another PSA test was performed on January 10, 2017 and was reported at 2.43 ng/ml, within the normal range. (Gusman Decl., ¶ 21; Dkt. No. 73-1 at 389).

On May 9, 2017, plaintiff was seen by a urologist at Eastern C.F. who ordered a PSA test, the result of which was within the normal range at 2.71 ng/ml. (Gusman Decl., ¶ 21; Dkt. No. 73 at 220; Dkt. No. 73-2 at 654; Dkt. No. 73-3 at 956). Plaintiff was seen again by a urologist in July 2017 for a hernia and continued complaints of right testicular pain. (Gusman Decl., ¶ 22; Dkt. No. 73 at 218; Dkt. No. 73-3 at 955). During the July 2017 exam, plaintiff's prostate was noted to be "benign." (*Id.* ¶ 22; Dkt. No. 73 at 218).

On October 17, 2017 and April 12, 2018, plaintiff reported normal urination. (Def.'s Stmt. of Mat. Facts ¶¶ 41-42; Dkt. No. 73 at 195, 209). An additional PSA test performed on November 27, 2018 was within normal range at 2.81 ng/ml (Gusman Decl., ¶ 24; Dkt. No. 73-1 at 401). On March 19, 2019, plaintiff again reported

5

normal urination. (Def.'s Stmt. of Mat. Facts ¶ 45; Dkt. No. 73 at 165). Plaintiff's

December 27, 2019 PSA test result was within normal range at 2.02 ng/ml (Gusman

Decl., ¶ 25; Dkt. No. 73-1 at 412).

On October 6, 2020, plaintiff was evaluated by Dr. Gusman for complaints of

pain in the penis, incontinence, and blood in his urine. (Def.'s Stmt. of Mat. Facts ¶ 49;

Dkt. No. 73 at 133). This was the first time Dr. Gusman saw plaintiff for these

symptoms, and the first time plaintiff complained of issues with urination since

February 2015. (Def.'s Stmt. of Mat. Facts ¶¶ 50-51). Dr. Gusman "performed a

[Digital Rectal Exam] and noted two nodes in [plaintiff's] prostate." (*Id.* ¶ 52). Dr.

Gusman prescribed antibiotics, ordered a PSA test, and referred plaintiff for a urology

consultation. (Gusman Decl., ¶ 27; Dkt. No. 73 at 133). Referral requests made by

physicians are electronically sent to the facility's Scheduling Unit which obtains the

necessary approval and handles the scheduling of the referral upon approval. (Def.'s

Stmt. of Mat. Facts ¶ 56). Plaintiff's PSA test result came back on October 21, 2020

within normal range at 2.2 ng/ml. (Gusman Decl., ¶ 30, Dkt. No. 73-1 at 503).

While treating plaintiff for an unrelated medical issue on February 16, 2021, Dr.

Gusman noted that plaintiff's urology referral was still pending. (Gusman Decl., ¶ 32;

Dkt. No. 73 at 126). On May 21, 2021, plaintiff was seen by urologist Dr. Janis, who

performed a Digital Rectal Exam confirming Dr. Gusman's findings. (Def.'s Stmt. of

Mat. Facts ¶ 61; Dkt. No. 73-1 at 526). Dr. Janis ordered a PSA test and a biopsy of

plaintiff's prostate. (Gusman Decl., ¶ 33; Dkt. No. 73-1 at 526, 533-34). Dr. Gusman "had no control over when the biopsy was performed." (Def.'s Stmt. of Mat. Facts ¶ 62). Plaintiff's PSA test result was reported on June 10, 2021 at 2.46 ng/ml, within the normal range. (Def.'s Stmt. of Mat. Facts ¶ 63; Dkt. No. 73-1 at 426). Plaintiff's biopsy was performed on August 17, 2021 and he was instructed to follow up in one month for the results. (Def.'s Stmt. of Mat. Facts ¶¶ 64-65).

Plaintiff's biopsy results returned on August 31, 2021, indicating the presence of prostate cancer. (Def.'s Stmt. of Mat. Facts ¶ 66; Dkt. No. 73 at 110; Dkt. No. 73-1 at 518-19). Plaintiff's Gleason score, "a grading system used by pathologists for prostate cancer," was "6," which is the lowest grade of prostate cancer and indicates that the cancer is "stage 1 with very low to low risk (group 1), … slow moving and unlikely to spread, and is treatable . . . ." (Def.'s Stmt. of Mat. Facts ¶¶ 67-69). Plaintiff had a follow up appointment with Dr. Janis on October 8, 2021 at which time they discussed plaintiff's diagnosis and treatment options. (*Id.* ¶ 73; Dkt. No. 73 at 104; Dkt. No. 73-1 at 524). In November 2021, plaintiff advised Dr. Gusman that he wanted to proceed with radiation therapy. (Def.'s Stmt. of Mat. Facts ¶ 76; Dkt. No. 73 at 98). Dr. Gusman submitted a referral for plaintiff to see a radiologist on November 16, 2021. (*Id.*). Plaintiff's radiology consultation took place on December 2, 2021, with radiation therapy beginning on December 21, 2021 and concluding on January 28, 2022. (Def.'s Stmt. of Mat. Facts ¶ 77; Dkt. No. 73 at 70, 79, 96; Dkt. No. 73-1 at 461-64). Plaintiff's

treatment was successful, rendering him "cancer-free" upon completion. (Def.'s Stmt. of Mat. Facts ¶ 78; Dkt. No. 73-2 at 645).

### B. Plaintiff's Contentions

Plaintiff asserts that his PSA test results reflected in the clinical reports he received on April 7, 2014, March 10, 2015, January 10, 2017, May 26, 2017, July 11, 2017, November 27, 2018, December 27, 2019, October 22, 2020, June 9, 2021 (Pl.'s Stmt. Of Mat. Facts ¶¶ 5, 8, 11, 14, 16, 21, 23, 27, 30) were not within normal range as Dr. Gusman contends. In support of his contention, plaintiff relies on the following language found on his reports:

> The PSA assay should not be the only test used for diagnostic purposes. Additional evaluation using DRE, ultrasound, TUR or similar procedures may be used for this purpose. Predictions of disease recurrence should not be based solely upon values obtained from serial PSA values obtained on the patient.

(Dkt. 65-1 at 11).

Plaintiff further claims that he had trouble urinating even while taking Tamsulosin, and that he would not be able to do so at all if he did not take it. (Plaintiff Aff., ¶ 6). Plaintiff further claims that he reported instances of pain in various parts of his body from 2017 through 2020. (Plaintiff's Aff. Generally).

## III.  **SUMMARY JUDGMENT**

### A. Legal Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Salahuddin v. Gourd*, 467 F.3d 263, 272-73 (2d Cir. 2006). A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing there is a genuine issue for trial. *Salahuddin*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Jeffreys*, 426 F.3d at 554

9

("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful."). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). Statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding pro se, the court is obligated to "read [the pro se party's] supporting papers liberally, and … interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

When considering cross-motions for summary judgment, a court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."

10

*Hotel Employees & Rest. Employees Union, Local 100 of New York, N.Y. & Vicinity v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir. 2002) (quoting *Heublein v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993) (internal quotation marks omitted)).

### B. Local Rule 56.1

Local Rule 56.1(a) requires a party moving for summary judgment to file and serve a Statement of Material Facts with a specific citation to the record where the fact is established. L.R. 56.1(a). "The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits." *Id.* In turn, Local Rule 56.1(b) mandates that the party opposing a motion for summary judgment "file a separate Response to the Statement of Material Facts. The opposing party's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs." L.R. 56.1(b). "Each denial shall set forth a specific citation to the record where the factual issue arises." *Id.*; *see also Lee v. City of Troy*, 520 F. Supp. 3d 191, 198 (N.D.N.Y. 2021) ("Because a naked denial of a fact the movant claims to be undisputed would do little to help the Court, the opposing party must support every denial with a citation to record evidence supporting a genuine dispute of material fact."). "The Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." L.R. 56.1(b) (emphasis omitted).

11

Here, Dr. Gusman filed and served an 81-paragraph Rule 56.1 Statement of Material Facts. (Dkt. No. 71-1). In opposition, plaintiff filed a Response To Defendant's Statement of Material Facts in which he denied 27 of the 81 assertions in Dr. Gusman's Statement of Material Facts.  (Dkt. No. 92 at 10-29).  Plaintiff's failure to provide a response in accordance with Local Rule 56.1(b) to the remaining 54 factual assertions in Dr. Gusman's Statement of Material Facts permits this court to deem admitted Dr. Gusman's properly supported facts that plaintiff does not specifically controvert. *See* L.R. 56.1(b); *see also T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (citations omitted) ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible.").

## IV.  <u>STATUTE OF LIMITATIONS</u>

### A. Legal Standard

"The statute of limitations for claims brought under Section 1983 is governed by state law, and in this case, is the three-year period for personal injury actions under New York State law." *Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009); *see also Owens v. Okure*, 488 U.S. 235, 250-51 (1989); N.Y.C.P.L.R. § 214(5). Unless the limitations period is tolled for some reason, a plaintiff must file his Section 1983 civil rights action within three years of the accrual of each cause of action.

"Federal law governs the question of when a [Section 1983] claim accrues." *M.D. v. Southington Bd. of Educ.*, 334 F.3d 217, 221 (2d Cir 2003) (quoting *Leon v.*

*Murphy*, 988 F.2d 303, 309 (2d Cir.1993)). Generally, under federal law, a cause of action accrues when "the plaintiff knows or has reason to know of the injury which is the basis of his action." *Pearl v. City of Long Beach*, 296 F.3d 76, 80 (2d Cir. 2002) (citations omitted).

Although federal law determines when a Section 1983 claim accrues, state tolling rules determine whether the limitations period has been tolled. *See Abbas v. Dixon*, 480 F.3d 636, 641 (2d Cir. 1997). A single violation with continuing "consequences" does not extend the accrual of the statute of limitation. *See Melendez v. Schneiderman*, No.13-CV-622 (GLS/ATB), 2014 WL 2154536, at *12 (N.D.N.Y. May 22, 2014) (citing, inter alia, *Doe v. Blake*, 809 F. Supp. 1020, 1025 (D. Conn. 1992) (a "continuing violation" which would change the accrual date is occasioned by continuing unlawful acts, not by continued ill effects from the original violation)).

In "rare and exceptional" cases, the doctrine of equitable tolling may apply to defeat an argument that the action was not timely filed. *See Abbas,* 480 F.3d at 642; *see also Veltri v. Bldg. Serv. 32B-J Pension Fund*, 393 F.3d 318, 322 (2d Cir. 2004) ("Equitable tolling is an extraordinary measure that applies only when plaintiff is prevented from filing despite exercising that level of diligence which could reasonably be expected in the circumstances."). "Equitable tolling allows the court to extend the statute of limitations past the time of expiration as necessary to avoid inequitable circumstances." *Johnson v. Nyack Hosp.*, 86 F.3d 8, 12 (2d Cir. 1996) (citation

omitted). To apply equitable tolling, the court must find that "extraordinary circumstances" prevented the plaintiff from performing the required act, and that plaintiff acted "with reasonable diligence" during the period that he seeks to toll. *Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005) (quoting *Doe v. Menefee*, 391 F.3d 147, 159 (2d Cir. 2004)).

### B. Analysis

Plaintiff filed this action on February 28, 2022.[4] (Dkt. No. 1). This court previously ruled that absent equitable or other tolling, any claim which accrued prior to February 23, 2019 is time-barred. (Dkt. No. 39 at 6). In his motion papers, plaintiff appears to concede that "claims of [d]eliberate indifference before February 23rd 2019 are time barred." (Pl. Mem. Of Law at 7). As set forth below, plaintiff has failed to raise a material question of fact establishing Dr. Gusman's deliberate indifference to his medical care after February 2019, and summary judgment is warranted.[5]

---

[4] In *Dory v. Ryan*, 999 F.2d 679, 682 (2d Cir. 1993), *modified on other grounds*, 25 F.3d 81 (2d Cir. 1994), the Second Circuit discussed the prison-mailbox rule, in which the court deems a pro se prisoner's complaint filed on the date that the prisoner delivered the complaint to prison officials for transmittal to the court.

[5] Even if the allegations preceding February 23, 2019 were subject to tolling and not time-barred, there is no material question of fact as to whether Dr. Gusman was deliberately indifferent *prior* to February 2019, and plaintiff's amended complaint should still be dismissed in its entirety.

14

## V.    DENIAL OF MEDICAL CARE

### A. Legal Standard

Claims that prison officials have intentionally disregarded an inmate's

serious medical needs fall under the Eighth Amendment umbrella of protection

from the imposition of cruel and unusual punishments. *See Farmer v. Brennan*,

511 U.S. 825, 832 (1994).  Prison officials must ensure that inmates receive

adequate medical care. *Id*. (citing *Hudson v. Palmer*, 468 U.S. 517, 526-27

(1984)).

In order to state a claim based on constitutionally inadequate medical treatment,

the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate

indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

There are two elements to the deliberate indifference standard. *See Smith v. Carpenter*,

316 F.3d 178, 183-84 (2d Cir. 2003). The first element is objective and measures the

severity of the deprivation, while the second element is subjective and ensures that the

defendant acted with a sufficiently culpable state of mind. *Id*. (citing *Hathaway v.

Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)).

#### 1.  Objective Element

To meet the objective requirement, the alleged deprivation of adequate medical

care must be "sufficiently serious." *Salahuddin,* 467 F.3d at 279 (citing *Farmer*, 511

U.S. at 834). "Determining whether a deprivation is an objectively sufficiently serious

deprivation entails two inquiries." *Id*. The first question is whether the plaintiff was

15

actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to the inmate's health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Id.* (citing *Farmer*, 511 U.S. at 844-47).

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious." *Id.* at 280. The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Id*. (citing *Helling v. McKinney*, 509 U.S. 25, 32-33 (1993)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id*. (citing *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003)).

However, in cases where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id*. If the issue is an unreasonable delay or interruption of ongoing treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Id*. (citing *Smith*, 316 F.3d at 185). The court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as the basis for a constitutional claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Salahuddin*, 467 F.3d at 280.

## 2.  Subjective Element

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Id*. (citing *Wilson v. Seiter*, 501 U.S. 294, 300, (1991)). To satisfy the second element, a plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Id*. (citing *Farmer*, 511 U.S. at 835-37). Instead, a plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id*. Deliberate indifference is equivalent to subjective recklessness. *Id*. (citing *Farmer*, 511 U.S. at 839-40).

To rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Id*. (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)). The defendant must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Chance*, 143 F.3d at 702 (quoting *Farmer*, 511 U.S. at 837). The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer*, 511 U.S. at 844. The court in *Salahuddin* stated that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin*, 467 F.3d at 281.

"The totality of an inmate's medical care must be considered in order to determine whether a prison official has acted with deliberate indifference to serious

medical needs." *Wandell v. Koenigsmann*, 99-CV-8652, 2000 WL 1036030, *3 (S.D.N.Y. 2000). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *See Sonds v. St. Barnabas Hosp. Corr. Health Servs*., 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) (citations omitted). An inmate does not have the right to treatment of his choice. *See Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986). Medical decisions will constitute "indifference" only when they are contrary to accepted medical standards. *See Harding v. Kuhlmann*, 588 F. Supp. 1315, 1316 (S.D.N.Y. July 19, 1984). It is well established that an inmate who disagrees with his physician over the appropriate course of treatment has no claim under §1983 if the treatment provided is adequate. *See Chance*, 143 F.3d at 703.

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle v. Gamble*, 429 U.S. 97, 107 (1976)). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is incarcerated. *Id*.; *see also Daniels v. Williams*, 474 U.S. 327 (1986) (noting that negligence is not actionable under Section 1983); *Palacio v. Ocasio*, No. 02-CV-6726, 2006 WL 2372250, at *11 (S.D.N.Y. Aug. 11, 2006), *aff'd*, 345 Fed. App'x 668 (2d Cir. 2009) ("It is well settled that the negligent failure to diagnose a serious medical condition does not create a cause of action under 42 U.S.C. § 1983."). "To succeed in showing deliberate indifference, [the plaintiff] must show that the acts of defendants involved more than lack of due care, but rather involved

18

obduracy and wantonness in placing his health in danger." *LaBounty v. Coughlin*, 137 F.3d 68, 72-73 (2d Cir. 1998); *see also Cuoco v. Moritsugu,* 222 F.3d 99, 107 (2d Cir.2000) ("Mere medical malpractice is not tantamount to deliberate indifference, but it may rise to the level of deliberate indifference when it involves culpable recklessness, i.e., an act or a failure to act ... that evinces a conscious disregard of a substantial risk of serious harm.") (citations omitted).

## B. Analysis

Plaintiff's Eighth Amendment claim against Dr. Gusman is based on the following allegations of deliberate indifference to medical needs: a) ignoring complaints of difficulty urinating; b) improperly prescribing Tamsulosin; c) ignoring plaintiff's allegedly abnormal PSA test; d) failing to "oversee" the care and treatment provided by other physicians; e) delay in having plaintiff examined by a urologist; f) delay in scheduling a biopsy; and g) failing to advise plaintiff of his biopsy results for six weeks. (Dkt. Nos. 17, 65).

All of plaintiff's claims are belied by the record which supports a recommendation that plaintiff's motion for partial summary judgment be denied and that Dr. Gusman's cross-motion for summary judgment be granted.

### 1. Objective Element

Plaintiff cannot demonstrate that he was actually deprived of adequate medical care or that the purported inadequacy was "sufficiently serious." *Salahuddin*, 467 F.3d at 279. As set forth below, the record establishes that the care provided to plaintiff by Dr. Gusman was reasonable, and, therefore, adequate under the Eighth Amendment.

19

First, plaintiff's allegations that his complaints of difficulty urinating from 2014 to 2020 were ignored and not properly treated are not factually accurate and are therefore without merit. The medical records establish that after March 2014, plaintiff only complained of difficulty urinating on one other occasion, February 4, 2015, in response to which a PSA test was ordered and a new prescription for Flomax was written. (Gusman Decl., ¶ 16; Dkt. No. 73-1 at 12). In fact, after February 4, 2015, plaintiff reported normal urination on numerous occasions. (Dkt. No. 73 at 166, 196, 210, 250).

It was not until October 6, 2020, more than five and a half years after plaintiff's last complaint, that he again complained of difficulty urinating. (Gusman Decl., ¶ 26). Considering its efficacy, Dr. Gusman continued prescribing Tamsulosin for plaintiff's symptoms. Plaintiff's unsubstantiated lay opinion to the contrary is without merit and is tantamount to nothing more than a disagreement with Dr. Gusman's medical judgment which does not give rise to an Eighth Amendment claim for medical indifference. *See Reyes v. Gardener,* 93 Fed. App'x 283, 285 (2d Cir. 2004) ("[Plaintiff] has offered no evidence . . . showing that the prescribed medication regimen deviated from reasonable medical practice for the treatment of his condition.").

Next, plaintiff incorrectly claims that his consistently "abnormal" PSA test results evidenced a sufficiently serious condition for which Dr. Gusman deprived him care. Plaintiff's contention that his PSA levels of 2.44 ng/ml on April 7, 2014 (Dkt. No. 73-1 at 72), 2.71 ng/ml on March 10, 2015 (Dkt. No. 73-1 at 75), 2.43 ng/ml on January 10, 2017 (Dkt. No. 73-1 at 90), 2.71 ng/ml on May 9, 2017 (Dkt. No. 73 at 221), 2.81

ng/ml on November 27, 2018 (Dkt. No. 73-1 at 102), 2.02 ng/ml on December 27, 2019

(Dkt. No. 73-1 at 113) and 2.22 ng/ml on October 22, 2020 (Dkt. No. 73-1 at 204) all

support a finding of medical indifference in violation of his Eighth Amendment rights is

without merit. However, the repeated PSA screenings, without more, negate plaintiff's

contention that he was deprived of adequate medical care, and evidence that his

condition was in fact being monitored by his health care providers. Furthermore,

plaintiff does not advance any evidence refuting Dr. Gusman's statement that further

testing was not medically indicated given plaintiff's PSA results, lack of positive

findings upon performing a Digital Rectal Exam, and lack of symptomology. (Gusman

Decl. ¶ 67). Plaintiff's unsubstantiated lay opinion that Dr. Gusman should have

ordered additional testing or referred him to a urologist sooner based on the PSA results

is conclusory and at best, seems to be based upon the benefit of hindsight  which is

insufficient to implicate the Eighth Amendment "and is not properly the subject of a

Section 1983 action." *Groves v. Davis*, 11-CV-1317 (GTS/RFT), 2012 WL 651919, at

*5 n. 9 (N.D.N.Y. Feb. 28, 2012).

Nor does plaintiff's perceived delay in Dr. Gusman having diagnosed and/or

treated his prostate cancer raise any genuine issues of material fact sufficient to defeat

defendants' cross-motion for summary judgment. Insofar as there is no medical

evidence, notwithstanding regular medical care, in the record suggesting that plaintiff

suffered from prostate cancer before October 2020, the court cannot find a

corresponding delay in diagnosing and/or treating the same. To the contrary, the record

establishes that prior to October 2020, Dr. Gusman adequately treated plaintiff's

complaints and chose a course of treatment which, in his professional medical opinion, was supported based on plaintiff's symptomology and presentation. In response to Dr. Gusman's uncontroverted medical opinion (*see* Gusman Decl., generally) and the evidence contained in the medical records (Dkt. Nos. 73, 73-1, 73-2, 73-3), plaintiff presents no evidence other than his own self-serving and conclusory statements to establish that he had cancer prior to October 6, 2020 and that Dr. Gusman should have prescribed a different course of treatment. *See Scott v. Koenigsmann*, 12-CV-1551 (MAD), 2016 WL 1057051, at *12 (N.D.N.Y. Mar. 14, 2016) (The record lacked facts supporting plaintiff's contention that her condition was "fast degenerating," "life threatening"); *see also Abreu v. Farley*, 11-CV-06251, 2019 WL 1230778 at *12 (W.D.N.Y. Mar. 15, 2019) (plaintiff's contention that he suffered a "sufficiently cardiovascular event" rejected where "plaintiff faile[d] to provide any evidence, medical or otherwise", . . . "to associate his alleged symptoms with any other cardiovascular health-related issues").

In any event, plaintiff's assertion that Dr. Gusman should have diagnosed plaintiff's cancer sooner, without more, does not support plaintiff's Section 1983 claim. *See Whitfield v. O'Connell*, 402 Fed. App'x 563, 566 (2d Cir. 2010) (determining that "even assuming that Whitfield's earlier laboratory reports suggested that he might be suffering from a urinary tract infection, any failure on the part of the Defendants to properly diagnose this condition would not constitute deliberate indifference, but rather,

22

at worst, medical malpractice."), *cert. denied*, 563 U.S. 952 (2011); *Haynes v. City of New York*, 19-CV-1925, 2020 WL 4926178, at *11 (S.D.N.Y. August 20, 2020) (observing that "allegations of negligent misdiagnosis … do not suggest that the defendant acted with a conscious disregard to inmate health or safety").

As to plaintiff's claim based on the purported delay in being seen by a urologist following his October 6, 2020 visit with Dr. Gusman, the record clearly establishes that Dr. Gusman made a referral request for plaintiff to see a urologist that same day. (Gusman Decl. ¶ 71). Dr. Gusman and Nurse DePalo assert that, after having made the referral request, Dr. Gusman was no longer involved in the referral process. (Gusman Decl., ¶ 3); *see also Joyner v. Greiner*, 195 F. Supp. 2d 500, 506 (S.D.N.Y. 2002); *see also Burton v. Lynch*, 664 F. Supp. 2d 349, 359–60 (S.D.N.Y. 2009). Nurse DePalo further stated that seven months for an inmate to wait for an appointment with a urologist during COVID-19 was not unreasonable. (Dkt. No. 72-5, ¶¶ 6, 7).

In opposition to Dr. Gusman's contention that he is not liable for any alleged delay in plaintiff seeing a urologist after the October 6, 2020 examination, plaintiff relies on *Loyd v. Lee,* 570 F.Supp. 2d 556 (S.D.N.Y. August 14, 2008) (motion to dismiss denied where the amended complaint plausibly alleged that doctors knew that plaintiff was experiencing extreme pain and loss of mobility, knew that the course of treatment being prescribed was ineffective and declined to do anything to improve plaintiff's submission beyond re-submitting MRI request forms), *Hathaway v.*

*Coughlin,* 37 F.3d 63 (2d. Cir. 1994) (court held that a prison doctor could be found to have been deliberately indifferent to a prisoner's serious medical needs because of constant complaints and failure to make a referral to a specialist until after the lawsuit was commenced), *Stevens v. Goord*, 535 F.Supp. 2d. 373 (S.D.N.Y. 2008) (the court concluded that the doctor's decision not to pursue a course of treatment given plaintiff's pain and discomfort for approximately eight months served as a basis for plaintiff's constitutional claim), *Price v. Reilly*, 697 F.Supp. 2d. 344, 362 (E.D.N.Y. March 8, 2010) (a rational jury could find that the defendants acted with deliberate indifference to plaintiff's serious medical needs where there was at least a nine month delay in arranging a kidney transplant test despite plaintiff's repeated requests and defendant's statement that they had "other priorities right now"), *Harrison v. Barkley*, 219 F.3d 132, 138 (2d Cir. 2000) (court reversed grant of summary judgment, holding that a rational jury could find that the named defendants were deliberately indifferent to plaintiff's serious medical needs where plaintiff's cavity was left untreated for one year in the absence of a court order or plaintiff's consent to the extraction of the non-implicated tooth). Plaintiff's reliance on these cases is misplaced, as the facts in this case are easily distinguishable.

Unlike the plaintiffs in *Loyd*, *Hathaway*, *Stevens*, *Price,* and *Barkley* who either complained of continuing pain for a prolonged period of time before receiving further treatment, did not see a specialist despite numerous requests until after an action was

commenced, or repeatedly inquired about the status of their medical testing, Dr. Gusman referred plaintiff to a urologist **the same day** that he had cause to believe that plaintiff needed additional medical care.

Moreover, although plaintiff did seek medical attention between October 6, 2020 and May 21, 2021, while waiting to be seen by the urologist, he did not report a continuation, let alone a worsening, of the symptoms which necessitated plaintiff's October 6, 2020 examination in the first instance. Rather, plaintiff sought medical attention for prescription refills (Dkt. No. 73 at 123, 124, 125, 126, 127, 128, 132, 133), COVID testing (Dkt. No. 73 at 130; Dkt. No. 73-1 at 424, 459), blood work (Dkt. No. 73-1 at 425, 426), back pain (Dkt. No. 73 at 123; Dkt. No. 73-1 at 484), and wrist pain (Dkt. No. 73 at 132; Dkt. No. 73-2 at 737). Only on February 16, 2021 during a sick call to discuss a medication dosing, did plaintiff inquire about the status of his urology referral. (Dkt. No. 73 at 127). The record does not evidence that plaintiff reported any pain or other symptoms related to his prostate condition at any of his encounters with the medical staff during this timeframe. (Dkt. No. 73 at 127).  Notably, when plaintiff was finally seen by the urologist and received a diagnosis for prostate cancer, it was noted to be at the lowest risk category, and, as evidenced by the record, treatable. The cancer was diagnosed because of the care provided to plaintiff. Based on these facts, even if there was objectively any  avoidable delay between October 6, 2020 and May 21, 2021 (noting the impact of the Covid pandemic), the delay was not "substantially

serious," and plaintiff has not raised a genuine issue satisfying the objective factor. *See Motta v. Wright,* No. 9:06-CV-1047 (NAM/GJD), 2009 WL 1437589, at *16 (N.D.N.Y. May 20, 2009) (finding alleged three-and-a-half year delay in treatment did not satisfy objective factor of Eighth Amendment analysis where defendants presented evidence that delay was not "substantially serious," including evidence of the slow progression of the disease and the minimal effect of the delay on plaintiff's condition).

Similarly, the court finds that there was no actionable delay in performing the biopsy ordered by Dr. Janis following plaintiff's May 21, 2021 consultation. The biopsy ordered was performed on August 17, 2021, less than three months after the May 21, 2021 consultation. The record establishes that Dr. Gusman neither ordered the biopsy nor had any control over when it was performed, precluding imposing any liability on him for lack of any personal involvement. Dr. Gusman retired from DOCCS in June 2021, shortly after the May 21, 2021 consultation with Dr. Janis and before the biopsy was performed. (Gusman Decl., at ¶ 1).

Finally, plaintiff's claim that his Eighth Amendment rights were violated because of a perceived delay in communicating his biopsy results to him is not supported by the record. Dr. Gusman was still retired when plaintiff's biopsy results were received on August 31, 2021 by Dr. Loricchioandola at Eastern C.F. and therefore, Dr. Gusman cannot be held liable. (Declaration of Dr. Gusman at ¶¶ 1, 77). Upon receipt of plaintiff's biopsy results, a follow-up appointment was scheduled for plaintiff to see Dr. Janis on October 8, 2021 to discuss the same. In November 2021, plaintiff advised Dr.

Gusman, who had returned from retirement in September 2021 on a per diem basis, that he wanted to treat his prostate cancer with radiation (Gusman Decl., at ¶¶ 37-38). Dr. Gusman promptly submitted a referral request for plaintiff to see a radiologist. (Gusman Decl., at ¶¶ 37-38). Plaintiff's radiation therapy began on December 21, 2021 and concluded on January 28, 2022. (Gusman Decl., ¶ 38).

### 2. Subjective Element

Even if plaintiff were found to have satisfied the objective prong of deliberate indifference, the record does not support a finding that Dr. Gusman acted recklessly with respect to a known risk of harm, or that he "was subjectively aware that his conduct created a substantial risk of harm to the inmate." *Gazzola v. Cnty of Nassau*, 16-CV-909, 2022 WL 2274710, *8 (E.D.N.Y. June 23, 2022). Having been diagnosed with an enlarged prostate in March 2014 (Gusman Decl., ¶ 12; Dkt. No. 73-1 at 5), plaintiff's routine PSA test results were recorded on an approximate yearly basis. At all times, plaintiff's PSA test results were within the normal range. Plaintiff was also prescribed Tamsulosin which plaintiff acknowledged alleviated his urination difficulties. (Dkt. No. 73 at 165, 195, 209, 249). He also received digital rectal exams when medically indicated.

Plaintiff's misunderstanding of his laboratory result does not support a finding that Dr. Gusman knew that the course of treatment he provided to plaintiff was ineffective or that Dr. Gusman disregarded "an excessive risk to [plaintiff's] health or safety." *Farmer*, 511 U.S. at 827. Plaintiff's lay interpretation of his PSA lab reports

27

was sufficiently explained by Dr. Gusman who, unlike plaintiff, has the requisite training and education to properly interpret such results. (Gusman Decl., ¶ 7).

Nor could a jury conclude on this record that Dr. Gusman's purported failure to ensure that plaintiff was seen for a urology consultation earlier than seven months after his original referral constituted deliberate indifference. As previously discussed, Dr. Gusman continued to treat plaintiff between October 2020 and May 2021, during which time plaintiff failed to complain of any exacerbation of his symptoms. Plaintiff has failed to otherwise advance what substantial risk of serious harm Dr. Gusman purportedly knew of and disregarded while the referral was pending. Absent any indication that Dr. Gusman was reckless in failing to ensure that plaintiff was seen any sooner for his urology consultation, plaintiff's claim cannot survive summary judgment. *See Kemp v. Wright*, No. 01-CV-562 (JG), 2005 WL 893571, at *6 (E.D.N.Y. Apr. 19, 2005) ("Dr. Halko's failure to follow-up sooner on the referral did not 'evince[ ] a conscious disregard of a substantial risk of serious harm.' ") (citing *Hernandez*, 341 F.3d at 144); *Oh v. Saprano*, No. 3:20-CV-237, 2020 WL 4339476, at *6 (D. Conn. July 27, 2020) ("Even if RN Tutu should have followed up on [plaintiff's] requests to ensure that [he received his referral], her failure to do so, at most, constituted negligence, which cannot support an Eighth Amendment deliberate indifference claim.").

The record is clear that Dr. Gusman treated plaintiff and responded to his complaints. The record does not indicate that Dr. Gusman ignored, or left untreated, any complaints of acute pain or symptom exacerbation relative to plaintiff's condition.

Plaintiff received frequent medical care, as his voluminous medical records demonstrate. Based on this record, plaintiff cannot satisfy the state of mind prong of an Eighth Amendment claim, as he cannot show that Dr. Gusman "acted intentionally to impose the alleged condition or recklessly failed to act with reasonable care." *Darnell*, 849 F.3d at 35. **Even if** Dr. Gusman "misdiagnosed" plaintiff, which the court is not suggesting occurred, and that misdiagnosis caused plaintiff unintended harm, or if Dr. Gusman failed to seek out some other course of treatment, such conduct was at most negligent, as the record indicates he had no reason to suspect that plaintiff had prostate cancer prior to October 6, 2020.

The court concludes that there is no genuine dispute of material fact with respect to either the objective or subjective prongs of plaintiff's Eighth Amendment deliberate indifference claim. Accordingly, it is recommended that plaintiff's motion for summary judgment be denied and that Dr. Gusman's cross-motion for summary judgment be granted.

## VI.    Qualified Immunity

Dr. Gusman contends that if the court were to find that his actions violated plaintiff's Eighth Amendment rights, he is nevertheless shielded from liability by the doctrine of qualified immunity. (Def. Mem. of Law at 23-25). Inasmuch as the court is recommending that Dr. Gusman's cross-motion for summary judgment be

granted on other grounds, it finds it unnecessary to reach the qualified immunity argument.

## VII.  **Motion to Compel**[6]

On November 21, 2023, Judge Baxter issued a text order resetting the discovery deadline to February 22, 2024. (Dkt. No. 54). Local Rule 16.2 provides in relevant part that "[p]arties shall file and serve motions to compel discovery no later than fourteen (14) days after the discovery cut-off." Plaintiff filed his Motion To Compel Discovery (Dkt. No. 70) on March 22, 2024, twenty-nine days after the discovery deadline. Plaintiff's motion is therefore untimely.[7]

Even if timely filed, plaintiff's Fed. R. Civ. P. 37 motion to compel, which the court will treat as a motion pursuant to Fed. R. Civ. P. 56(d), is nevertheless denied. Under Rule 56(d), "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ.

---

[6] On April 18, 2024, plaintiff filed a Motion to Defer Consideration of Defendant's Cross-Motion for Summary Judgment (Dkt. No. 89) which the court will also treat as motion pursuant to Fed. R. Civ. P. 56(d) even though it is arguably duplicative of plaintiff's motion to compel.

[7] Plaintiff's Motion To Compel is perplexing considering the sequence in which it was filed. Plaintiff filed his motion for partial summary judgment on February 1, 2024, approximately seven weeks prior to filing his discovery motion. Having filed a motion for partial summary judgment, logic dictates that plaintiff must have determined that he did not require any additional information to advance his legal and/or factual arguments.

P. 56(d). District courts have discretion over discovery rulings, including under Rule

56. *See Moccia v. Saul,* 820 F. App'x 69, 70 (2d Cir. 2020) (summary order); *see also*

*Walden v. Sanitation Salvage Corp.,* No. 14-CV112, 2015 WL 1433353, at *2

(S.D.N.Y. Mar. 30, 2015) (same). "A party seeking to delay resolution of a summary

judgment motion on grounds that he has been deprived of certain discovery materials

'must show that the material sought is germane to the defense, and that it is neither

cumulative nor speculative, and a bare assertion that the evidence supporting a

plaintiff's allegations is in the hands of the defendant is insufficient.'" *Alphonse Hotel*

*Corp. v. Tran*, 828 F.3d 146, 151 (2d Cir. 2016) (quoting *Paddington Partners v.*

*Bouchard*, 34 F.3d 1132, 1138 (2d Cir. 1994)).

Here, plaintiff has made no showing that he has been deprived of any information

that is germane to the prosecution of his motion for partial summary judgment or to the

defense of Dr. Gusman's cross-motion for summary judgment. Absent from plaintiff's

submissions is any plausible explanation as to how the information he seeks is relevant

to the alleged deprivation of his constitutional rights and how Dr. Gusman was

indifferent to his medical needs. The information plaintiff seeks production of is not

material to whether Dr. Gusman knew or should have known that plaintiff was suffering

from prostate cancer and/or intentionally failed to treat him, let alone evidence that Dr.

Gusman delayed treatment to punish plaintiff, or intentionally ignored a life-threatening

condition. Instead, the record shows that as soon as plaintiff presented with symptoms

suggestive of prostate cancer on October 6, 2020, he was properly examined, tested, and referred to a urologist for consultation. *See Taft v. Fricke,* 17-CV-0346 (GTS/CFH), 2019 WL 5197180, at *14 (N.D.N.Y. July 26, 2019) (holding that even if the plaintiff was misdiagnosed and that the misdiagnoses caused the plaintiff unintended harm, and the defendant doctor was negligent, the subjective element is still lacking since the defendant doctor had no reason to suspect that the plaintiff had diabetes).

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that plaintiff's motion for summary judgment (Dkt. No. 65) be **DENIED IN ITS ENTIRETY**, and it is

**RECOMMENDED,** that defendant's cross-motion for summary judgment (Dkt. No. 71) be **GRANTED IN ITS ENTIRETY**, and it is

**RECOMMENDED,** that plaintiff's motion to compel discovery (Dkt. No. 70) and motion to defer consideration of defendant's cross-motion for summary judgment (Dkt. No. 84) be **DENIED IN THEIR ENTIRETY**, and it is

**RECOMMENDED** that plaintiff's Amended Complaint (Dkt. No. 17) be **DISMISSED IN ITS ENTIRETY WITH PREJUDICE**; and it is

**ORDERED** that the Clerk provide Plaintiff with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed

with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT**

**WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated: July 24, 2024

Mitchell J. Katz
U.S. Magistrate Judge

KeyCite Yellow Flag - Negative Treatment
Distinguished by Ogunkoya v. County of Monroe, E.D.N.Y., November 11, 2017

2014 WL 2154536
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Edgardo MELENDEZ, Plaintiff,

v.

Eric T. SCHNEIDERMAN, et al., Defendants.

Civil Action No. 9:13–cv–622 (GLS/ATB).
|
Signed May 22, 2014.

**Attorneys and Law Firms**

Edgardo Melendez, Marcy, NY, pro se.

Hon. Eric T. Schneiderman, Bruce J. Boivin, Esq., Assistant Attorney General, of Counsel, Albany, NY, for the Defendants.

***ORDER***

GARY L. SHARPE, Chief Judge.

**\*1** The above-captioned matter comes to this court following a ReportRecommendation by Magistrate Judge Andrew T. Baxter, duly filed April 24, 2014. Following fourteen days from the service thereof, the Clerk has sent the file, including any and all objections filed by the parties herein.

No objections having been filed, and the court having reviewed the Magistrate Judge's Report–Recommendation for clear error, it is hereby

ORDERED that the Report–Recommendation of Magistrate Judge Andrew T. Baxter filed April 24, 2014 (Dkt. No. 27) is ACCEPTED in its entirety for the reasons stated therein; and it is further

ORDERED that the defendants' motion to dismiss (Dkt. No. 17) is GRANTED, and the complaint is DISMISSED in its entirety WITH PREJUDICE; and it is further

ORDERED that the Clerk close this case and provide a copy of this Order to the parties in accordance to the local rules.

IT IS SO ORDERED.

**REPORT–RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

This matter has been referred for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c), by the Honorable Gary L. Sharpe, Chief United States District Judge.

In this civil rights complaint, plaintiff alleges that he was denied due process in conjunction with his involuntary commitment to the Central New York Psychiatric Center ("CNYPC") as a sex offender requiring civil management, pursuant to Article 10 of the N .Y. Mental Hygiene Law ("MHL"). (Compl.) (Dkt. No. 1). Plaintiff also claims that the defendants violated a federal court preliminary and permanent injunction in confining him past his mandatory release date. Plaintiff seeks a substantial amount of money damages. (Compl. at CM/ECF pp. 8, 10).[1]

[1] The court notes that the complaint is written in two distinctly different handwriting styles. (*Compare* Compl. at 1–2, 7–8 *with* Compl. at 3–6). On page 6, the complaint requests punitive damages of 5.5 million dollars from each defendant per year that plaintiff was in custody pursuant to the civil commitment, and 5.5 million dollars per year in compensatory damages from each defendant. However, on page 8, in different handwriting, in the section entitled "Prayer for Relief," the complaint asks for 7 million dollars per year in punitive and compensatory damages from each defendant, totaling $42 million dollars.

Presently before the court is the defendants' motion to dismiss for failure to state a claim and for lack of subject matter jurisdiction, pursuant to Fed.R.Civ.P. 12(b)(1) and (b)(6). (Dkt. No. 17). Plaintiff has responded in opposition to defendants' motion, and defendants filed a reply. (Dkt. Nos.25, 26). For the following reasons, this court agrees with defendants and will recommend dismissal of the complaint.

2014 WL 2154536

## I. *Motion to Dismiss*

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice. *Id.* (citing *Bell Atl. Corp.,* 550 U.S. at 555). Plaintiff's factual allegations must also be sufficient to give the defendant " 'fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atl. Corp.,* 550 U.S. at 555 (citation omitted).

When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 71 (2d Cir.1995). The court must heed its particular obligation to treat pro se pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (*per curiam* ).

**\*2** In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d at 72 (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment). Finally, the court may consider matters of which judicial notice may be taken, such as public filings and administrative decisions. *See Kavowras v. New York Times, Co.,* 328 F.3d 50, 57 (2d Cir.2003) (citing *inter alia County Vanlines, Inc. v. Experian Info. Solutions, Inc.,* 205 F.R.D. 148, 154 (S.D.N.Y.2002) (taking judicial notice of NLRB decisions)). *See also Combier–Kapel v. Biegelson,* 242 F. App'x 714, 715 (2d Cir.2007) (taking judicial notice of the Impartial Hearing Officer's decision as well as certain other documents in the administrative record of an IDEA case); *In re Howard's Exp., Inc.,* 151 F. App'x 46, 48 (2d Cir.2005) (taking judicial notice of Bankruptcy Court docket); *Caro v. Fidelity Brokerage Services, LLC,* No. 3:12–CV1066, 2013 WL 3299708, at \*6 (D.Conn. July 26, 2013) (taking judicial notice of record in prior litigation between the same parties).

## II. *Background of Relevant Caselaw*

In order to better understand the plaintiff's claims, it is necessary to discuss the background of the specific cases he relies upon for his due process challenge. Effective on April 13, 2007, the New York Sex Offender Management and Treatment Act ("SOMTA"), codified in Article 10 of the MHL, authorizes the "civil management" of certain sex offenders after completion of their prison terms, parole terms, or other periods of state custody. *Mental Hygiene Legal Service v. Cuomo ("MHLS–II"* ), 785 F.Supp.2d 205, 209 (S.D.N.Y.2011). This "civil management" is based upon the danger to society that is posed by recidivist sex offenders . [2] *Id.* "Civil management" can include placement and treatment in a secure facility, akin to incarceration as well as other "strict and intensive supervision." SOMTA provides for procedures to be followed when an individual who has been convicted of a sex offense is nearing the end of his sentence of incarceration or other state custody in order to determine whether civil commitment is necessary.

[2]  In *Mental Health Legal Services v. Spitzer ("MHLS–I"* ), No. 07 Civ. 2935, 2007 WL 4115936 (S.D.N.Y. Nov. 16, 2007), the court elaborated upon the purposes for SOMTA, stating that the New York Legislature found that recidivistic sex offenders pose a danger to society that should be addressed through comprehensive programs of treatment and management, and that some sex offenders have mental abnormalities that predispose them to engage in repeated sex offenses. 2007 WL 4115936 at \*1 (citing MHL §§ 10.01(a), 10.01(b)). Treatment of these offenders begins during their incarceration on the criminal charges, but the legislature found that the treatment should continue when that incarceration comes to an end, and that in "extreme cases," confinement will need to be extended by civil process in order to provide treatment while protecting the public from recidivist conduct. *Id.*

MHLS filed a "pre-enforcement" facial challenge to certain provisions of the SOMTA, only one of which is relevant to this case. *Id.* MHL Section 10.06(k) mandates involuntary civil detention, pending a commitment trial, based upon a finding at a probable cause hearing that the individual may have a mental abnormality, without a finding of current

dangerousness. *Id.* In general, the MHL provides that when a convicted sex offender nears release from confinement or parole, a "multidisciplinary staff" provides a "preliminary review" to determine whether the individual should be referred for further evaluation. *MHLS–II,* 785 F.Supp.2d at 211 (citing MHL § 10.05(d)). If the staff determines that additional evaluation is necessary, a case review team ("CRT"), consisting of three individuals, at least two of whom are mental health professionals, must determine whether that person (the "respondent") requires additional civil management. *Id.* (citing MHL § 10.06(a)). The respondent is afforded notice of the referral. *Id.* (citing MHL § 10.05(e)).

**\*3** The CRT determines whether the respondent suffers from a mental abnormality and is either a "dangerous sex offender requiring confinement," or "a sex offender requiring strict and intensive supervision." *Id.* at 212 (citing MHL §§ 10.03(1), 10.03(q), 10 .03(e), 10.03(r)). If it appears that the individual will be released prior to the time the CRT makes its determination, the Attorney General ("AG") is authorized to file a "securing petition," preventing the individual's release from custody while the review is ongoing. *Id.* (citing MHL § 10.06(f)).

If the CRT determines that the individual requires additional "civil management," the AG files a "sex offender civil management petition" in New York State Court. The court must conduct a hearing to determine whether there is probable cause to believe that the individual requires civil management. *Id.* (citing §§ 10.06(a), (g), and (k)). The hearing must commence withing 72 hours of the anticipated release date unless the individual consents or the AG shows good cause for the delay. MHL §§ 10.06(g), (h). Upon the court's finding of probable cause, SOMTA provides that the individual must be committed to a secure treatment facility pending resolution of a full commitment trial. MHL § 10.06(k). The statute provides that the trial must begin within 60 days of the probable cause hearing. MHL § 10.07(a).

In *MHLS–1,* the court granted a preliminary injunction, prohibiting the enforcement of MHL § 10.06(k), without an individualized finding that the individual was "dangerous," and that no condition or combination of conditions of supervision could allow the respondent to be at liberty pending the final adjudication. *See* 2007 WL 4115936, at \*15. The court in *MHLS–II* found that section 10.06(k) was facially unconstitutional and granted a permanent injunction, with the same conditions. The court must note that neithe[3] court invalidated the section altogether as plaintiff seems to

argue. Rather that prohibiting use of the section altogether, the court specifically enjoined enforcement of section 10.06(k) *"absent a specific, individualized finding of probable cause to believe that a person is sufficiently dangerous to require confinement, and that lesser conditions of supervision will not suffice to protect the public during the pendency of the proceedings ."*[4] *Id.*

[3]   The judge who issued the preliminary injunction in *MHLS–I* was Judge Gerard E. Lynch. Judge Lynch was subsequently appointed to the Second Circuit Court of Appeals, and the case was assigned to Judge Deborah A. Batts, who issued the permanent injunction in *MHLS–II* in 2011.

[4]   In making this determination, the court likened the analysis under the MHL to the section of the Bail Reform Act which provides for pretrial detention of a criminal defendant upon a finding of probable cause to believe that the defendant has committed the crime, and that the individual poses a danger to the community that no conditions or combination of conditions of release will prevent. *See* 785 F.Supp.2d at 225 (citing *United States v. Salerno,* 481 U.S. 739, 750, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)). Probable cause alone will not suffice. *Id.*

The court notes that although the Second Circuit affirmed the preliminary injunction, it later reversed the court's order granting a permanent injunction and remanded the case to the district court to determine whether MHLS had standing to pursue the action on behalf of its clients, who were respondents in the MHL proceedings.[5] *MHLS v. Schneiderman,* 472 F. App'x 45 (2d Cir.2012). On remand, the District Court found that MHLS did not have standing to pursue the respondents' claims and dismissed the action. *MHLS v. Cuomo* (*"MHLS–III"* ), No. 07 Civ. 2935(DAB), 2014 WL 1345891 (S.D.N.Y. Mar.31, 2014).

[5]   The standing issue arose from the Second Circuit's decision in *Disability Advocates, Inc. v. New York Coalition for Quality Assisted Living, Inc.,* 675 F.3d 149 (2d Cir.2012). The issue was whether MHLS could establish any of the "indicia of membership" required for a membership organization to assert associational standing. *Id.* The dismissal based upon standing does not change the court's analysis of the merits of the claims, but the permanent injunction is no longer in effect.

## III. *Facts and Contentions*

**\*4** Plaintiff alleges that he was arrested on March 18, 2002, was subsequently convicted, and was sentenced to serve three to six years of incarceration, with a maximum release date of March 18, 2008. Plaintiff states that he was held beyond his maximum release, without a hearing, based upon MHL § 10.06(k), in violation of due process and in violation of the injunctions issued in *MHLS–I*, and *MHLS–II* (Compl. at 7). Plaintiff takes an overly simplified view of the court's rulings and argues that the AG violated the injunctions, as well as the constitution, by applying section 10.06(k).

The plaintiff relies heavily on the decisions in the *MHLS* cases, rather than discussing facts in his own case, and he seeks only damages for the alleged violations. Defendants have submitted the court documents that were filed in plaintiff's MHL Article 10 proceeding, and they argue that the complaint should be dismissed on various bases, some unrelated to the merits of the due process claim, including the statute of limitations and absolute immunity. Defendants also argue that plaintiff has failed to state a claim on the merits of this action, that he received due process, and that he is properly confined under the MHL. The following facts are taken from the defendants' exhibits of which this court takes judicial notice.

Defendants' Exhibit A is the AG's "Petition for Civil Management" filed in plaintiff's case.[6] The petition is dated March 13, 2008 and states that plaintiff, Edguardo[7] Melendez was arrested on May 6, 2003[8] and charged with one count of Rape, First Degree; five counts of Sodomy, First Degree; five counts of Sexual Abuse, First Degree; and five counts of Endangering the Welfare of a Child. (Boivin Decl. ("Def.s' ")[9] Ex. A at 4, 11) (Dkt. No. 17–1). He was subsequently indicted on May 27, 2003[10] for two counts of Rape, First Degree; one count of Sodomy, First Degree; and one count of Endangering the Welfare of a Child. (*Id.* at 5) These charges involved sexual intercourse and related conduct with four of the plaintiff's children, aged ten, seven, and four years, respectively. (*Id.*) Plaintiff pled guilty to the entire indictment on May 28, 2003 and was sentenced to an indeterminate sentence of three to six years incarceration. (*Id.*) The petition was filed in Richmond County because plaintiff was incarcerated therein (Arthur Kill Correctional Facility), and MHL § 10.06(a) provides for venue in the county of incarceration. (*Id.*)

[6] The AG at the time of the signing of the petition was Andrew M. Cuomo, and the AAG was Donald Leo. (Def. s' Ex. A at 4).

[7] Plaintiff signed his name "Edgardo Melendez," (Compl. at 8), not "Eduardo Melendez," and other than this reference, the court will use the spelling as plaintiff has it in the complaint.

[8] This is contrary to the plaintiff's statement that he was arrested on March 18, 2002. (Compl. at ¶ 4). This discrepancy is irrelevant to this court's decision.

[9] All of defendants' exhibits in this case are attached to defense counsel's declaration. (Dkt. No. 17–1). Thus, the court will refer only to the exhibits as Def. s' Exhibits, rather than repeat Boivin Decl. Notwithstanding that some of defendants' exhibits have their own page numbers, when the court refers to a specific page, unless otherwise noted, the page will be the one assigned by the court's electronic filing system, CM/ECF.

[10] The petition states that plaintiff was indicted on May 27, 2004, but this may be a typographical error because the following paragraph states that plaintiff pled guilty to the entire indictment on May 28, 2003. (Def. s' Ex. A at 5, ¶ 2).

On February 25, 2008, pursuant to MHL § 10.05(b), the New York State Office of Mental Health ("OMH") gave the AG and the Commissioner of Mental Health notice that plaintiff was nearing the end of his sentence and was about to be released into the community. (*Id.* at 5, ¶ 5). A copy of the notice was attached to the AG's Petition. (*Id.*) OMH referred plaintiff's case to a CRT, and served the notice of referral on plaintiff. (*Id.* ¶ 6). The petition states that on March 10, 2008, plaintiff and the AG were served with the CRT's determination that plaintiff was a " 'sex offender requiring civil management.' " (*Id.* ¶ 7). A copy of the CRT's determination was attached to the petition. (*Id* .) The petition reviewed the Article 10 provisions and requirements. (*Id.* ¶¶ 9–18).

**\*5** The AG then outlined the CRT's Article 10 specific evaluation of plaintiff. (*Id.* at 8–10, ¶¶ 19–26). Plaintiff was examined by Mark Cederbaum, Psy. D., who conducted the examination for the purpose of assessing plaintiff's "risk for dangerousness and for sexual recidivism in order to determine

2014 WL 2154536

whether plaintiff was a " 'sex offender requiring civil management.' " (*Id.* at 8, ¶ 19). Dr. Cederbaum diagnosed plaintiff as suffering from Pedophilia ... "Limited to Incest, Nonexclusive Type," and concluded with a reasonable degree of certainty that plaintiff was suffering from a mental abnormality as defined by the MHL, predisposing plaintiff to the commission of a sex offense, and he would have serious difficulty in controlling such behavior. (*Id.* ¶¶ 20–21) The petition further states that Dr. Cederbaum found that plaintiff did not acknowledge his behavior and failed to complete sex offender treatment, demonstrating a lack of empathy for the harm that he caused his victims, and this suggested "a lack of insight or internal resources with which to control his sexual urges toward children." (*Id.* ¶ 21). For these, and other reasons, plaintiff was assessed to be at a "moderate to high risk for sexual recidivism." (*Id.* ¶ 22). Among other requests, the AG asked that plaintiff be retained pursuant to MHL § 10.06(h) [11] until the probable cause hearing was held. (*Id.* at 11).

[11] Section 10.06(h) was not challenged in *MHLS–I and II* and provided proper authority to hold the plaintiff pending the probable cause hearing. *See MHLS–II, 785 F.Supp.2d at 210* (listing the sections challenged in the complaint).

On March 14, 2008, the day after the AG's petition, New York Supreme Court Justice Robert J. Collini issued an Order to Show Cause, returnable before him on March 20, 2008. (Def.s' Ex. B). An attorney from MHLS was appointed to represent plaintiff, and plaintiff was ordered to show cause why he should not be declared a sex offender suffering from a mental abnormality requiring civil management. (*Id.* at 13). Both plaintiff and counsel were served with the order, and plaintiff was ordered held beyond his release date, pending the probable cause hearing, pursuant to MHL § 10.06(h). (*Id.* at 14).

The probable cause hearing was held on May 2, 2008 before New York Supreme Court Justice Michael A. Gross. (Def.s' Ex. C) (Dkt. No. 17–1 at 16–24). Dr. Cederbaum testified at the hearing for the AG. (*Id.* at 16). Justice Gross issued his order pursuant to MHL § 10.06(k) on July 1, 2008. (*Id.* at 16, 24). Justice Gross issued a detailed opinion outlining the hearing testimony and other evidence of record, much of which was contained in Dr. Cederbaum's report. [12] (*Id.*) One of the issues discussed by the court was the plaintiff's apparent denial and/or failure to accept responsibility notwithstanding that he pled guilty to sexual

conduct with his own small children. The court also noted that during plaintiff's incarceration, he was diagnosed with schizophrenia, anxiety disorder, psychotic disorder, and polysubstance dependence. (*Id.* at 18–19). Dr. Cederbaum expressed his conclusion that the plaintiff was in need of civil management and would be a danger to the community if released pending trial. (*Id.* at 20). Plaintiff's counsel was afforded the opportunity to cross-examine Dr. Cederbaum and made various arguments in opposition to a probable cause/ dangerousness finding. (*Id.*) Counsel attempted to explain why plaintiff failed to finish the sex offender program while he was incarcerated, that his diagnosis was "limited to incest," and that neither of the two older children had been the victim of any sexual acts. (*Id.*)

[12]     Dr. Cederbaum relied on "numerous" records, including New York City Police Department investigative and arrest reports, pre-sentence reports, Department of Corrections (now the Department of Corrections and Community Supervision "DOCCS") records, Division of Parole records, and Bronx County District Attorney documents. (Dkt. No. 17–1 at 17).

**\*6** The court's opinion contained a lengthy section on "Conclusions of Law." (*Id.* at 21–23). In this section, the court discussed MHL § 10.06(k) and specifically focused upon the preliminary injunction issued in *MHLS–I,* correctly stating that the federal court had enjoined detention under MHL § 10.06(k) "based only on a finding of mental abnormality," and noted that the "District Court reasoned ... that due process will not tolerate the involuntary confinement of the individual not determined to pose a danger." (*Id.* at 22). Justice Gross concisely stated the problem with section 10.06(k). In general, a probable cause hearing could result in one of two relevant conclusions: either the individual is a sex offender requiring strict and intensive supervision, but would not require confinement, or that the individual is a dangerous sex offender requiring confinement. (*Id.* citing MHL §§ 10.03(r), (e)). After the probable cause hearing, under section 10.06(k), either of those findings required that the individual be civilly confined prior to the trial. (*Id.*) This could result in the confinement of an individual who was found to have a mental abnormality, without a finding that the person was also a danger to the community. (*Id.*) (citing *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975)). Justice Gross acknowledged that the preliminary injunction in *MHLS–I* required that the court detaining an individual pursuant to section 10.06(k), after the probable cause hearing, but before the commitment trial, also

find that the individual was "sufficiently dangerous to require confinement, and that lesser conditions of supervision would not protect the public during the pendency of the proceedings. (*Id.* at 23).

Justice Gross then specifically found that the requisite showing of mental abnormality **and** dangerousness had been made in plaintiff's case, even though plaintiff had raised "some" claims on which the findings of the government expert could be challenged. (*Id.*) The court specifically found that plaintiff's "lack of remorse, the absence of treatment during his incarceration, and his refusal to acknowledge that he has a mental abnormality indicates a lack of insight and lack of self-control that establishes reasonable cause to believe that he is a danger to others and likely to commit sex offenses if not confined to a secure treatment facility." (*Id* .) Justice Gross ordered confinement pending trial and ordered that the parties appear before him to schedule the trial. (*Id.* at 23–24). On June 6, 2008, Justice Gross set the matter down for trial on June 30, 2008. (Def.s' Ex. D) (Dkt. No. 17–1 at 26–27).

The jury trial did not take place until June 8, 2011 and continued on several days thereafter, concluding on June 20, 2011, before New York State Supreme Court Justice Colleen Duffy. (Def.s' Ex. E) (Dkt. No. 17–1 at 29–34). Psychiatrist Roger M. Harris testified for the AG, and Dr. Roy Aranda, a Psychologist, testified for the plaintiff. (*Id.* at 29–30). Both witnesses were qualified by the Court as experts in the field of forensic psychiatry and psychology respectively. (*Id.*) Justice Duffy stated that the jury returned its verdict on June 20, 2011, finding that plaintiff was a detained sex offender who now suffers from a mental abnormality in that he has a congenital or acquired condition, disease or disorder, affecting his emotional, cognitive or volitional capacity, such that it predisposes him to commit a sex offense and results in his having serious difficulty in controlling such conduct. (*Id.* at 30)

 **\*7** Because of the jury's finding, Justice Duffy provided the parties an opportunity to present additional evidence to determine whether plaintiff was in need of confinement or whether he could be released under strict and intensive supervision. (*Id.*) This "Dispositional Hearing" was held before Justice Duffy on October 25, 2011. (*Id.*) Dr. Harris testified again at the Dispositional Hearing. (*Id.*) Plaintiff also testified at the hearing. Based on the evidence, the court found that the AG had proven by "clear and convincing" evidence, that plaintiff was a dangerous sex offender requiring

confinement. (*Id.* at 30–34). Based, *inter alia,* upon the finding that plaintiff would have an inability to control his behavior if released, the court ultimately found that he was a danger to others if not confined to a secure facility. (*Id.* at 34). On November 15, 2011, plaintiff was ordered confined, but Justice Duffy also ordered that he be provided with written notice of his right to petition the court for discharge pursuant to MHL § 10.09, and that he also retained the right to petition the court for discharge or release under strict and intensive supervision in the future. (*Id.*)

### IV. *Absolute Immunity/Personal Involvement*

#### A. Legal Standards

It is well-settled that prosecutors enjoy absolute immunity from suit under section 1983 in matters associated with their prosecutorial functions, regardless of motivation. *Dory v. Ryan,* 25 F.3d 81, 83 (2d Cir.1994) (prosecutorial immunity covers virtually all acts associated with the prosecutor's function, including conspiracies to present false evidence); *Bernard v. County of Suffolk,* 356 F.3d 495 (2d Cir.2004) (absolute immunity shields prosecutors from suit pursuant to section 1983 for their alleged malicious or selective prosecution as well as for any misconduct in the presentation of evidence to the Grand Jury).

Absolute immunity is defeated only when the prosecutor is engaging in investigative functions. *Bernard v. County of Suffolk,* 356 F.3d at 502–503 (citation omitted). The initiation and pursuit of prosecution, regardless of any alleged illegality, is protected by absolute prosecutorial immunity. *Peay v. Ajello,* 470 F.3d 65, 67–68 (2d Cir.2006). It has also been held that a prosecutor is entitled to absolute immunity for his or her decision not to prosecute, regardless of the motivation for that decision. *Schloss v. Bouse,* 876 F.2d 287, 292 (2d Cir.1989).

Prosecutorial immunity is extended to government attorneys who initiate civil suits or administrative proceedings. *Cornejo v. Bell,* 592 F.3d 121, 127–28 (2d Cir.2010). An agency official who decides to institute an administrative proceeding is entitled to prosecutorial immunity because this decision is " 'very much like the prosecutor's decision to initiate or move forward with a criminal prosecution.' " *Id.* at 127 (citing *Butz v. Economou,* 438 U.S. 478, 515, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)). *See also Contreras v. Perimenis,* No. 13–3337, 2014 WL 1409495, at \*1 (2d Cir. April 14, 2014) (AAG afforded absolute immunity when sued in his capacity as a government advocate, prosecuting child welfare cases).

**\*8** Notwithstanding the availability of absolute immunity, in order to recover damages in a civil rights action, plaintiff must allege a defendant's direct or personal involvement in the alleged constitutional deprivations. *Farrell v. Burke,* 449 F.3d 470, 474 (2d Cir.2006). There are various ways to establish personal involvement articulated in *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986) (a supervisory official is said to have been personally involved if that official directly participated in the infraction; if after learning of a violation through a report or appeal, he or she failed to remedy the wrong; if he or she created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue; or if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event).

### B. Application

In this case, plaintiff is seeking only damages against two AG defendants. Any suit for damages against these defendants is barred by absolute immunity because the AG was initiating a proceeding against plaintiff on behalf of the government. In addition, neither of the two named defendants were personally involved in the alleged violation of which plaintiff complains. Eric Schneiderman is the current AG who was not even in office at the time in question,[13] and the Assistant AG ("AAG") involved in plaintiff's Bronx County probable cause hearing was Elaine K. Yacyshyn, not defendant James Williams. (Def.s' Ex. D). AAG Yacyshyn was also the government counsel for the commitment trial, which was also held in Bronx County. (Def.s' Ex. E) (Dkt. No. 17–1 at 35). Defendant Williams's name does not appear on any of the relevant papers, nor does it appear that he was in any way personally responsible at any relevant time in the plaintiff's case.

[13]    The court notes that for purposes of injunctive or declaratory relief, the supervisory official who has the authority to bring about the specific injunctive relief plaintiff seeks, is an appropriate defendant. *See Kuck v. Danaher,* 822 F.Supp.2d 109, 137–40 (D.Conn.2011) (discussing proper defendants for various types of relief). Likewise, Eleventh Amendment immunity does not preclude suits for prospective declaratory and injunctive relief against state officers in their "official" capacities, while the Eleventh amendment does prohibit suits for damages against those officers in their official capacities. *Neroni v. Zayas,* No. 3:13–CV–127,

2014 WL 1311560, at \*7 (N.D.N.Y. March 31, 2014) (citing *inter alia Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)). Plaintiff in this case has confused the *MHLS* case which was a pre-enforcement action for declaratory and injunctive relief with an action for damages against an official in his or her "individual capacity."

In plaintiff's response to the motion to dismiss, he agrees that neither defendant Schneiderman, nor defendant Williams were involved in his case and states that he will submit the proper names: Andrew Cuomo and Elaine Yacyshyn. (Dkt. No. 25 at 1–2). Plaintiff does attempt to claim that defendant Schneiderman was somehow personally involved because he is the current AG, and he "consented to the consent of enforcing the petition and other orders in this case." (*Id.* at 2). Even if plaintiff had named or is moving to amend his complaint to name individuals who were involved in his commitment proceedings, as stated above, they would be entitled to absolute immunity from damages.[14]

[14]    Generally, one cannot amend a complaint in response to a motion to dismiss. *See Chamberlin v. City of White Plains,* No. 12–CV–5142, 2013 WL 6477334, at \*25 n. 19 (S.D.N.Y. Dec.10, 2013) (citing *Wright v. Ernst & Young. LLP,* 152 F.3d 169, 178 (2d Cir.1998)). However, in pro se cases in which the court liberally construes plaintiff's pleadings, the court could dismiss the action with the opportunity to amend, which the court will discuss below.

In *Roache v. Attorney General's Office,* No. 9:12–CV–1034, 2013 WL 5503151, at \*13–15 (N.D.N.Y. Sept.30, 2013),[15] Magistrate Judge Peebles recommended that the court dismiss a very similar action for damages as against the AG defendants in both their official and their individual capacities, based on absolute immunity, lack of personal involvement, and Eleventh Amendment immunity. Because Magistrate Judge Peebles liberally construed plaintiff's claims in *Roache* to give rise to a due process claim, Judge Peebles recommended dismissing the action, but affording "plaintiff an opportunity to amend his complaint to name a defendant that may be properly sued for this alleged violation, *if such an individual exists." Id.* at \* 15 (emphasis added). As will be discussed below, this court finds that to allow an amendment would be futile because even if a claim existed as against some individual, the statute of limitations has run as to the potential claims.

15    District Court Judge Lawrence Kahn adopted Judge Peebles' Report–Recommendation in is entirety. 2013 WL 5503151, at *1–3.

**\*9** Thus, the complaint may be dismissed as against the existing defendants, without leave to amend to add other AAGs in their individual or official capacity who would be equally immune to suit. [16]

16    To the extent that he is attempting to sue the defendants in their official capacities for damages, the Eleventh Amendment would also bar the action. The state itself cannot be sued under section 1983. *Komlosi v. New York State OMRDD,* 64 F.3d 810, 815 (2d Cir.1995) (citing *Will v. Michigan Department of Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)). This is true whether the court is considering Eleventh Amendment immunity or a statutory interpretation of section 1983. *Id.* at 815 n. 3. An action against state officers in their official capacities is tantamount to an action against the state. *Yorktown Medical Laboratory, Inc. v. Perales,* 948 F.2d 84, 87 & n. 1 (2d Cir.1991) (citations omitted). Thus, the Eleventh Amendment would have precluded a claim for damages under section 1983 against defendants in their official capacities.

## V. Due Process [17]

17    Plaintiff also claims that his Fifth Amendment rights were violated by defendants in this action. As defense counsel points out, the Fifth Amendment is applicable to federal actors, not state actors. *Snow v. Village of Chatham,* 84 F.Supp.2d 322, 326 (N.D.N.Y.2000) (citing *Brock v. North Carolina,* 344 U.S. 424, 426, 73 S.Ct. 349, 97 L.Ed. 456 (1953)). *See also Ahlers v. Nowicki,* No. 9:12–CV–539, 2014 WL 1056935, at *4 (N.D.N.Y. Mar.18, 2014). Plaintiff in this case combines the Fifth Amendment with the Fourteenth Amendment "Due Process" clauses. To the extent that plaintiff is attempting to raise the Fifth Amendment as against the state defendants, that claim must be dismissed with prejudice.

### A. Legal Standards

To begin a due process analysis, the court must determine whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges, and then determine whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001); *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). The parties do not question that plaintiff has a liberty interest in remaining free from involuntary commitment to a mental hospital. *See Vitek v. Jones,* 445 U.S. 480, 493, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980). The issue is whether he was afforded the appropriate procedural safeguards in conjunction with his civil commitment.

### B. Application

The due process requirements regarding Article 10 commitment and treatment have been extensively discussed in the *MHLS* line of cases. The procedural protections afforded by the statute have been stated in this report above. The only problem, relevant to plaintiff's case, with the statute thus far has been found in section 10.06(k), which allowed detention of the individual after a probable cause hearing, but before a full trial, without an "individualized" finding that the individual was dangerous. However, a review of the decision by Justice Gross after plaintiff's probable cause hearing shows that Justice Gross was well aware of the preliminary injunction issued in *MHLS–I.* He cited the federal court decision, analyzed it in his order, found plaintiff to be a danger to the community, and specifically worded his decision in order to avoid violating either the injunction or plaintiff's constitutional rights.

As stated above, the *MHLS* cases did **not** enjoin the application of section 10.06(k), the injunctions (now no longer in effect), merely prohibited section 10.06(k) from being enforced to detain an individual after his probable cause hearing and prior to the commitment trial **without an individualized finding that he was dangerous and that confinement was the only way to protect the public.** Justice Gross made that specific finding, and thus, he did not violate the preliminary injunction that was issued in *MHLS–I.* Plaintiff was properly detained pending his commitment trial.

## VI. *Opportunity to Amend*

### A. Legal Standards

In addition to the requirement that pro se complaints must be "liberally construed," the court should generally not dismiss without granting leave to amend at least once. *Contreras v. Perimenis,* No. 13–3337, 2014 WL 1409495 at *1 (citing *Cuoco v. Moritsugu,* 222 F.3 99, 112 (2d Cir.2000)). The court

may deny leave to amend when the amendment would be futile. *Id.* (citing *Pangburn v. Culbertson,* 200 F.3d 65, 70–71 (2d Cir.1999)).

### B. Application

**\*10** The court notes that Magistrate Judge Peebles recommended dismissal as against two named AG defendants, with leave to amend to add "other" defendants who might have been "personally responsible" for the due process violation upon which Judge Peebles recommended denying the defendants' motion to dismiss. 2013 WL 5503151, at \* 15. He found it premature to dismiss the plaintiff's ***claim*** that he was not afforded a timely probable cause hearing and trial according to the statute, even though the ***named defendants*** had to be dismissed based on absolute immunity. 2013 WL 5503151, at \*9, 12. Magistrate Judge Peebles recommended dismissing the action to the extent that it challenged the application of section 10.06(k). 2013 WL 5503151 at \*10–12.

The court notes that the only due process issue retained by the court in *Roache* involved an interpretation of plaintiff's complaint as raising an issue regarding the delay in his probable cause hearing and trial as not in compliance with the time limits of the MHL. *Id.* at \* 12.[18] In this case, I do not interpret plaintiff's complaint ***itself*** as raising any issue other than the enforcement of section 10.06(k), and there would be no amendment that plaintiff could propose that would allow him to bring an action against any defendant based upon a violation of a statute that was clearly not violated as discussed above.

[18]    Magistrate Judge Peebles stated that "[i]n summary, only the allegation that plaintiff's due process rights were violated by the failure to conduct a probable cause hearing and trial in accordance with the time frames prescribed in MHL article 10 are sufficient to state a cognizable section 1983 claim."

However, plaintiff's response papers make some additional factual assertions, some of which do not appear related to the matters asserted in the complaint. Other statements made by plaintiff in his response require further consideration in order to determine whether the court should allow the plaintiff the opportunity to amend.[19]

[19]    Although new claims may generally not be raised in opposition to a summary judgment motion, a motion to dismiss comes early enough in the action to justify allowing plaintiff to amend the complaint to assert the viable claim. *See Jackson v. Onondaga County,* 549 F.Supp.2d 204, 219–20 (N.D.N.Y.2008) (discussing the difference between asserting new claims in opposition to a summary judgment motion versus new factual assertions in response to a motion to dismiss).

### 1. "Jurisdictional Issue"

In plaintiff's response to defendants' motion to dismiss, he states that he was an inmate in Oneida County, but that papers were signed by a Justice in Onondaga County, raising a "jurisdictional" issue in his case. (Dkt. No. 25 at 6). Plaintiff also states that he "had" to sign a motion to transfer his proceedings from Oneida County to the Bronx, but there [was no] "motion(s)" to transfer the action from Oneida County to Onondaga County. It is quite clear that the state court petition in this case was filed in Richmond County where plaintiff was incarcerated at the time and then removed to Bronx County where plaintiff was convicted. (Def.s' Ex. A & B). There is no indication that any orders during the relevant time period were signed in Onondaga or Oneida County. These factual allegations do not raise any issue that would require the court to allow an amendment of the complaint regarding any "jurisdictional" issue.[20]

[20]    The factual statements may be unrelated to plaintiff's original complaint because it appears that plaintiff's papers, similar to various other actions filed in the Northern District of New York, which challenge the application of the same MHL section, are "form" documents, written by inmates other than the named plaintiff, and cobbled together to create pleadings. It appears that these "forms" involve the inmates/plaintiffs filling in blanks that have been left for them to insert their individualized information.

### 2. Delay in Commitment Proceedings

In his response papers, plaintiff also alleges that he did not "sign a waiver" of his right to a timely probable cause hearing or a timely trial "to commence within (60) days of the Probable Cause Hearing." (Dkt. No. 25 at 7). This claim appears similar to the issue that Judge Peebles interpreted the complaint in *Roache* as raising. Based on the defendants'

exhibits filed in this case, the court cannot determine whether the time limits in the MHL were followed.[21] The AG's petition was filed on March 1, 2008, and plaintiff's anticipated release date was March 18, 2008. The MHL provides that the probable cause hearing must be held within thirty days of the date of the petition or within 72 hours after the plaintiff's release date if he is due to be released prior to the 30 day period. MHL §§ 10.06(a) (30–day limit), 10.06(h) (72–hour limit). The probable cause hearing should have been held before March 21, 2008. In fact, the Order to Show Cause, signed by the Justice Collini on March 14, 2008, originally scheduled the probable cause hearing for March 20, 2008. (Def.s' Ex. B) (Dkt. No. 17–1 at 13–14). The Order to Show Cause also stated that "pending the resolution of the probable cause hearing by the Court ... the New York State Office of Mental Health is authorized to retain [plaintiff] past his scheduled release date pursuant to [MHL] Section 10.06(h) for good cause shown." (*Id.* at 14). This statement **alone** does not authorize detention past the 72–hour time limit.

[21] I must note that this court does **not** make a finding that the time limits were not followed, merely that there is insufficient evidence presented for the court to find otherwise, and because this is a motion to dismiss, the court must accept plaintiff's factual statements as true.

**\*11** The next exhibit is Justice Gross's decision stating that the probable cause hearing was held on May 2, 2008. (Def.s' Ex. C) (Dkt. No. 17–1 at 16–24). The decision was dated July 1, 2008. (*Id.* at 24). However, in a separate Order, issued June 6, 2008, Justice Gross stated that he found probable cause, and he scheduled the commitment trial for June 30, 2008 (a date prior to the issuance of his formal probable cause decision). He stated that the plaintiff would not be released pending the completion of the trial. (Def.s' Ex. D) (Dkt. No. 17–1 at 27). There was a clear finding of dangerousness in Justice Gross's formal decision, even though there was no such finding in the short order. As stated above, there was no violation of the *MHLS–I* preliminary injunction or the constitution. However, the next exhibit shows that the commitment jury trial did not begin until June 8, 2011 (almost three years later). (Def.s' Ex. E) (Dkt. No. 17–1 at 29–34). Justice Duffy did not sign her decision until November 15, 2011. (*Id.* at 34). The trial was clearly held beyond the 60–day time limit contained in the statute.

The MHL makes it clear that the inmate may waive the time limits in the statute,[22] although in his response to defendants'

motion to dismiss, he states that he did not "sign" a waiver of his rights under the statute. There is no requirement in the statute that the inmate "sign" a waiver, but based on the documents presented there is no evidence of any waiver, signed or otherwise. The problem for plaintiff is that his lack of a waiver would be either the responsibility of the court, the AG, or his attorney.

[22] MHL § 10.08 is entitled "Procedures under this article." Section 10.06(f) provides as follows:

Time periods specified by provisions of this article for actions by state agencies are goals that the agencies shall try to meet, but failure to act within such periods shall not invalidate later agency action except as explicitly provided by the provision in question. The court may extend any time period at the request, or on the consent, of the respondent. No provision of this article shall be interpreted so as to prevent a respondent, after opportunity to consult with counsel for respondent, from consenting to the relief which could be sought by an agency with jurisdiction by means of a court proceeding under this article. This section clearly states that the time limits are "goals," and that the failure to abide by those limits will not invalidate any later action taken. The language also makes it clear that the court may extend the time limits on consent, and that an individual may "consent[ ] to the relief" which the agency seeks to have granted by the court. Thus, the ability to waive is clear and there is no indication that the "waiver" must be in writing.

This court cannot find that plaintiff could amend his complaint to name a defendant or defendants who would have been responsible for the delay, and/or the lack of proper waiver who would properly be subject to a damage claim. To the extent that plaintiff would name his attorney as a defendant, he or she would not have acted under color of state law, even if the attorney was appointed by the court and was an MHLS employee. Public defenders, legal aid attorneys, and private counsel, representing an individual, do not act under color of state law, as required to support a section 1983 action. *See Brewster v. Nassau County,* 349 F.Supp.2d 540, 546–47 (E.D.N.Y.2004) (Legal Aid attorney); *Green v. Bartek,* No. 3:05–CV–1851, 2007 WL 4322780, at \*2–3 (D.Conn.2007) (attorney representing Green in a family court neglect petition). To the extent that the delay was attributable to the AG or to the court, they would be protected by absolute immunity. *See Mireless v. Waco,* 502 U.S. 9, 9–10, 112 S.Ct.

286, 116 L.Ed.2d 9 (1991) (with minor exceptions, judges are entitled to absolute immunity for actions relating to the exercise of their judicial functions). In any event, there are further reasons to deny the plaintiff the opportunity to amend in this case.

## VII. *Statute of Limitations*

### A. Legal Standards

Federal courts borrow the state law personal injury statute of limitations period for purposes of filing section 1983 actions. *Wilson v. Garcia,* 471 U.S. 261, 276, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). In New York State, the relevant limitations period is three years. *Owens v. Okure,* 488 U.S. 235, 250–51, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989). *See* N.Y. Civ. Prac. L & R. § 214(5). Thus, unless the limitations period is tolled for some reason, a plaintiff must file his section 1983 civil rights action within three years of the accrual of each cause of action. Federal law, governs the question of when a section 1983 claim accrues. *Covington v. City of New York,* 171 F.3d 117, 121 (2d. Cir.1999) (citing *Morse v. University of Vermont,* 973 F.2d 122, 125 (2d. Cir.1992)). Generally, under federal law, a cause of action accrues when "the plaintiff knows or has reason to know of the injury which is the basis of his action." *Id.* (quoting *Singleton v. City of New York,* 632 F.2d 185, 191 (2d Cir.1980) (internal quotation marks omitted)). Although federal law determines when a section 1983 claim accrues, state tolling rules determine whether the limitations period has been tolled. *Abbas v. Dixon,* 480 F.3d 636, 641 (2d Cir.1997).

### B. Application

**\*12** In this case, even if the court were to find that there was a named defendant that plaintiff could add, his claims would likely be barred by the statute of limitations. Plaintiff claims that he never signed a waiver of the time limits for his probable cause hearing or his trial. As stated above, the MHL provides that, after a finding of probable cause, and absent waiver or court order extending the time, the trial must be held within sixty (60) days of the probable cause determination. The decision on probable cause in this case was issued on July 1, 2008. The original probable cause finding was dated June 6, 2008, and the order indicated that the court scheduled the trial for June 30, 2008. (Def.s' Ex. D & E) (Dkt. No. 17–1 at 24, 26–27).

When sixty days passed from the time of the probable cause finding, and plaintiff had not had a trial, he and his attorney

would presumably have been aware that the statute's time limits had been violated, and any cause of action, to the extent that one existed would have accrued at that time. Even if the court begins to count the sixty days from the date that Justice Gross issued his probable cause decision on July 1, 2008, sixty days would have expired on September 1, 2008. Although plaintiff's trial did not begin until three years later in 2011, plaintiff would have been aware of his cause of action on, or shortly after, September 1, 2008. Adding three years to September 1, 2008 would bring plaintiff to September 1, 2011. Plaintiff dated his complaint in this case on May 29, 2013, well more than two years after the statute ran. The court is well aware that plaintiff's trial was not held until June of 2011, but plaintiff was represented by counsel at the probable cause hearing and at the time of trial, so presumably when the court failed to hold the trial within 60 days of the probable cause decision, plaintiff would have been aware of the statutory violation.

Even though the trial did not occur until 2011, a single violation (the failure to hold a trial within 60 days of the probable cause determination), with continuing "consequences" does not extent the accrual of the statute of limitation. *See Ruane v. County of Suffolk,* 923 F.Supp.2d 454, 460 (E.D.N.Y.2013) (distinguishing a due process case in which the constitutional injury included the failure to provide a hearing allowing the plaintiff to challenge the continued retention of his vehicle with a case where the claim was based on one unconstitutional hearing with continuing consequences); *Shannon v. Recording Industry Ass'n of Amer.,* 661 F.Supp. 205, 210 (S.D.Ohio 1987) (single violation with continuing consequences is insufficient to extend the accrual past the original act); *Doe v. Blake,* 809 F.Supp. 1020, 1025 (D.Conn.1992) (a "continuing violation" which would change the accrual date is occasioned by continuing unlawful acts, not by continued ill effects from the original violation). In this case, plaintiff's cause of action would have accrued at the time that he was not afforded his commitment trial within 60 days of the probable cause determination.[23] This occurred more than three years before plaintiff signed his complaint.

23    Any claim based on the delay in holding a probable cause hearing would have certainly accrued, at the latest, at the time the probable cause hearing was held on May 2, 2008. Three years from that date would have been May 2, 2011.

**\*13** There is no indication that there would be any cause for equitable tolling, particularly because plaintiff

2014 WL 2154536

was represented by counsel during the pendency of the proceedings under the MHL. Thus, allowing plaintiff to amend would be futile, assuming that he could even determine a proper individual to sue, because any claim would barred by the statute of limitations. In addition, since any viable amendment would involve adding new defendants who could be liable for damages, any attempt to add these individuals would also run afoul of the statute of limitations. Thus, this court will recommend granting defendants' motion to dismiss and dismissing the complaint with prejudice.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that the defendants' motion to dismiss (Dkt. No. 17) be **GRANTED,** and the complaint dismissed in its entirety **WITH PREJUDICE.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

Filed April 24, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 2154536

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2000 WL 1036030
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Richard WANDELL, Plaintiff,

v.

Dr. KOENIGSMANN, Medical Director, Miss Mclean,
Physician Assistant, Don Lichtenfeld, Nurse, Defendants.

No. 99 CIV. 8652 WHP.
|
July 27, 2000.

**Attorneys and Law Firms**

Mr. Richard Wandell, Green Haven Correctional Facility,
Stormville, for Plaintiff Pro se.

William H. Bristow III, Esq., Assistant Attorney General,
New York, for defendants.

MEMORANDUM AND ORDER

PAULEY, District J.

**\*1** Plaintiff *pro se* Richard Wandell ("Wandell")
filed this civil rights action against defendants Dr.
Koenigsmann [1] ("Koenigsmann"), Medical Director of
Green Haven Correctional facility; Physician Assistant
McLean ("McLean"); and Nurse Don Lichtenfeld
("Lichtenfeld"), alleging that defendants violated his Eighth
Amendment rights by failing to provide him with adequate
medical treatment. Defendants moved to dismiss plaintiff's
complaint pursuant to Fed.R.Civ.P. 12(b)(6) on the following
grounds: (1) plaintiff failed to allege facts sufficient to state
a claim for deliberate indifference to serious medical needs;
(2) plaintiff failed to exhaust his administrative remedies;
and (3) plaintiff failed to allege that defendant Koenigsmann
was personally involved in the denial of medical treatment to
plaintiff. Thereafter, plaintiff agreed to dismiss Koenigsmann
as a defendant in this action, [2] *see* Pl.'s Aff. in Opp. at ¶ 10,
and defendants agreed to withdraw their motion to dismiss on
the ground that plaintiff failed to exhaust his administrative
remedies, *see* Defs.' Reply Br. at 4 n. 1. For the reasons set
forth below, defendants' motion to dismiss is granted.

[1]   Plaintiff did not plead the first names of defendants
Koenigsmann and McLean.

[2]   On January 24, 2000, plaintiff filed an amended
complaint which dropped Koenigsmann as a
defendant. In an order dated May 30, 2000,
this Court struck plaintiff's amended complaint
for failure to comply with Fed.R.Civ.P. 15(a).
However, for purposes of this motion, this Court
considers plaintiff's amended complaint as a
proposed amended complaint.

*Factual Background*

The following facts are alleged in plaintiff's complaint and
assumed to be true for purposes of defendants' motion to
dismiss. On May 9, 1999 at approximately 4:30 p.m., plaintiff
injured his right ankle while housed in the Green Haven
Correctional Facility Special Housing Unit. Plaintiff reported
the incident to the correctional officer on duty, Correctional
Officer Taylor ("C.O.Taylor"), who informed the medical
unit. Within a half-hour, defendant Lichtenfeld, a nurse,
arrived. Lichtenfeld gave plaintiff ibuprofen and told him
that a doctor would conduct a more thorough examination of
his ankle. Approximately fifteen minutes later, C.O. Taylor
informed plaintiff that he would have to wait until the next
day to receive further medical attention. However, when
C.O. Taylor noticed that plaintiff's ankle had swollen to
approximately "four (4) times its normal size," he contacted
the facility infirmary again. C.O. Taylor was told that the
infirmary would retain an outside physician's assistant to
examine plaintiff. (Compl.¶ IV)

At approximately 10:00 p.m., C.O. Taylor arranged for
plaintiff to be taken to the prison hospital. Upon plaintiff's
arrival at the hospital, defendant McLean, a physician
assistant, examined him. Despite the fact that plaintiff claimed
to be in extreme pain, McLean refused to give to him any
type of pain medication except over-the-counter ibuprofen.
McLean put a half-cast on plaintiff's right ankle and scheduled
plaintiff for x-rays the following morning. Plaintiff asked
McLean for crutches, but she refused to provide them.
(Compl.¶ IV)

After plaintiff returned to his cell, he continued to experience
extreme pain. Plaintiff alleges that because of his injury, he
was unable to walk to the toilet and was forced to urinate on
himself during the night. (Compl.¶ IV)

**\*2** At approximately noon the following day, plaintiff was taken to the prison hospital for x-rays. The x-rays revealed that he had a broken ankle. Plaintiff was sent back to his cell without crutches or prescription pain medication. At 5:00 p.m. that day, plaintiff was taken to Saint Agnes Hospital in White Plains, New York, where additional x-rays revealed that his right fibula was fractured. The hospital doctor placed plaintiff's foot in a cast and ordered him crutches. Upon his return to Green Haven, plaintiff was seen by a prison nurse and given crutches. (Compl.¶ IV)

Plaintiff alleges that various aspects of his treatment were inadequate. Specifically, plaintiff contends that defendants Lichtenfeld and McLean responded with deliberate indifference to his injury because, although both suspected his ankle to be broken, they did not provide him with crutches or prescription pain medication or immediately admit him to the prison hospital. (Compl.¶ IV–A, V) Defendants McLean and Lichtenfeld argue that the complaint should be dismissed because plaintiff has failed to state a claim of inadequate medical treatment in violation of the Eighth Amendment.

## Discussion

### A. *Applicable Standards*

When ruling on a motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6), a court must accept all material facts alleged in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *See Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998); *Cohen v. Koenig,* 25 F.3d 1168, 1171–72 (2d Cir.1994). A court will only grant a 12(b)(6) motion when "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102 (1957). A *pro se* litigant's complaint, "however inartfully pleaded," must be held to a "less stringent standard[ ] than formal pleadings drafted by lawyers ...." *Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 596 (1972). If a court grants a motion to dismiss, leave to amend under Fed.R.Civ.P. 15(a) should be "freely given when justice so requires." However, the decision to grant leave to amend falls within the discretion of the trial court, *see Zenith Radio Corp. v. Hazeltine Research Inc.,* 401 U.S. 321, 330, 91 S.Ct. 795, 802 (1971), and may be denied where amendment would be futile. *See Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 55 (2d Cir.1995).

In order to establish an Eighth Amendment claim for inadequate medical treatment, a prisoner must show "deliberate indifference to serious medical needs." *Chance,* 143 F.3d at 702. The standard for an Eighth Amendment claim contains both an objective and subjective prong. *See Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Objectively, a plaintiff's medical need must be "sufficiently serious," meaning " 'a condition of urgency, one that may produce death, degeneration, or extreme pain exists." ' *Hemmings,* 134 F.3d at 108 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)).

**\*3** A plaintiff must also show that the defendant subjectively "act[ed] with a sufficiently culpable state of mind." *Hathaway,* 99 F.3d at 553. A government official acts with deliberate indifference when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 1979 (1994). Proof of deliberate indifference may be found where a prison official or employee "intentionally den[ies] or delay[s] access to medical care or intentionally interfer[es] with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104–05, 97 S.Ct. 285, 291 (1976).

Deliberate indifference requires intentional or criminally reckless conduct; negligence or even gross negligence will not suffice. *See Farmer,* 511 U.S. at 835–40, 114 S.Ct. at 1977–80; *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of mistreatment under the Eighth Amendment."); *Chance,* 143 F.3d at 703 ("Negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim."). Moreover, "it is well established that mere differences in opinion regarding medical treatment do not give rise to an Eighth Amendment violation." *Muhammad v. Francis,* No. 94 Civ. 2244(SS), 1996 WL 657922, at \*6 (S.D.N.Y. Nov. 13, 1996) (citing cases). So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation. *See Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) ("The Constitution does not command that inmates be given medical attention that judges would wish to have for themselves."). The totality of an inmate's medical care must be considered in order to determine whether a prison official has acted with deliberate indifference to serious

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 48 of 201
Wandell v. Koenigsmann, Not Reported in F.Supp.2d (2000)

2000 WL 1036030

medical needs. *See Gutierrez v. Peters,* 111 F.3d 1364, 1375 (7th Cir.1997). In order to avoid dismissal, plaintiff must allege conduct that "shocks the conscience." *Williams v. Vincent,* 508 F.3d 541, 544 (2d Cir.1974).

### B. *Plaintiff's Claims*

This Court assumes, without deciding, that plaintiff's ankle injury involved the possibility of degeneration and enough pain so as to constitute a serious medical condition. *See Chance,* 143 F.3d at 702 ("excruciating pain" for six months from abscessed teeth rises to level of sufficiently serious condition); *Hemmings,* 134 F.3d at 109 (ruptured Achilles tendon may be "sufficiently painful to satisfy the objective prong"); *Brown v. Hughes,* 894 F.2d 1533, 1537 (11th Cir.1990) (per curiam) ("broken foot can be a serious and painful injury"); *but see Hutchinson v. United States,* 838 F.2d 390, 393–94 (9th Cir.1988) (kidney stone does not rise to sufficient level of urgency); *Jones v. Lewis,* 874 F.2d 1125, 1128 (6th Cir.1989) (mild concussion and broken jaw not serious medical need); *Henderson v. Doe,* No. 98 Civ. 5011(WHP), 1999 WL 378333, at *2 (S.D.N.Y. June 10, 1999) (broken finger does not rise to sufficient level of urgency); *Veloz v. New York,* 35 F.Supp.2d 305, 312 (S.D.N.Y.1999) (foot condition involving fracture fragment, bone cyst and degenerative arthritis not sufficiently serious); *Malsh v. Austin,* 901 F.Supp. 757, 762 (S.D.N.Y.1995) (dental problems not serious medical need).

**\*4** However, even when liberally construed in a light most favorable to plaintiff, his complaint does not state a claim of deliberate indifference. Broadly interpreting the complaint, plaintiff complains about two aspects of his medical treatment: first, delay in receiving medical treatment; and second, not receiving prescription pain medication and crutches as part of his initial treatment.

Intentional denial or delay in receiving medical treatment may evidence deliberate intent. *See Estelle,* 429 U.S. at 104, 97 S.Ct. at 291. However, even when drawing every inference in favor of plaintiff, his allegations of delay are legally insufficient. Plaintiff alleges that he received medical attention from a nurse within half-an-hour of his injury, he was examined by a physician assistant in the prison hospital within six hours, and he received medical attention from a doctor at the prison hospital and a doctor at Saint Agnes Hospital within 24 hours of his injury. *See* Compl. ¶ IV. He was given pain medication, albeit over-the-counter, within half-an-hour of his injury and provided with additional pain medication throughout the first day of his injury. *See* Compl.

¶ IV. His leg was placed in a half-cast within six hours of his injury and placed in a full-cast within 24 hours. *See* Compl. ¶ IV. Finally, plaintiff's ankle was x-rayed on two separate occasions within 24 hours of his injury. *See* Compl. ¶ IV. Rather than showing deliberate indifference, plaintiff's complaint demonstrates that defendants attended to him with "sufficient speed." *Simons v. Artuz,* No. 94 Civ. 6777(DLC), 1996 WL 233504, at *4 (S.D.N.Y May 8, 1996) (plaintiff's injuries were treated with "sufficient speed" when he was injured in the morning and treated by evening-duty nurse).

Plaintiff's claim that his Eighth amendment rights were violated by defendants' failure to provide him with crutches and prescription pain medication also fails. Whether an injured prisoner should be provided crutches is a medical judgment as to the appropriate course of treatment, and disagreement with that decision is not actionable under the Eighth Amendment. *See Davis v. Hall,* 992 F.2d 151, 153 (8th Cir.1993) (per curiam) (claim of denial of access to crutches characterized as "displeasure with the judgment of the medical and prison personnel" which "is not sufficient to state a claim for deliberate indifference to medical needs"); *Veloz v. New York,* 35 F.Supp.2d at 312–13 (claim that doctor should have prescribed crutches was merely a difference of opinion as to correct course of treatment and was not actionable); *Skinner v. Bloschak,* 1988 WL 96799, at *1 (E.D.Pa. Sept. 14, 1988) (allegations of failure to provide crutches "describe a medical malpractice claim, and not the deliberate and harmful indifference to [plaintiff's] medical needs required to support a § 1983 claim under Estelle"); *see also Walker v. Butler,* 967 F.2d 176, 178 (5th Cir.1992) (per curiam) (making prisoner with two ankle fractures walk to hospital, rather than calling for medical personnel, did not state claim for deliberate indifference to medical needs). Plaintiff has not alleged a situation where defendants maliciously took away crutches that a doctor had already prescribed to plaintiff. *See Hemmings,* 134 F.3d at 107. In fact, as soon as a doctor prescribed crutches for plaintiff, he was given them. The fact that plaintiff believes he should have been prescribed crutches earlier, *i.e.* immediately, may state a claim for medical malpractice, but does not rise to the level of a constitutional violation.

**\*5** Defendants' decision to provide plaintiff with over-the-counter pain medication rather than prescription pain medication also can only be described as a disagreement over a medical regimen. Again, such a dispute may be actionable as a claim of malpractice but does not rise to the level of a constitutional violation. *See LaBounty v. Coombe,*

2000 WL 1036030

No. 95 Civ. 2617(DLC), 1996 WL 684168, at *8 (S.D.N.Y. Nov. 26, 1996) (allegation that pain medication ineffective "amount[s] to a difference in opinion about medical treatment and do[es] not state a claim for deliberate indifference to a serious medical condition"). Thus, plaintiff's claims regarding crutches and pain medication are claims of improper medical judgment, which do not trigger a Section 1983 cause of action for medical mistreatment. *See Martinez v. Mancusi* 443 F.2d 921, 923–24 (2d Cir.1970).

This Court reviews plaintiff's proposed amended complaint in determining whether this Court should dismiss plaintiff's complaint with or without prejudice. Although plaintiff's proposed amended complaint makes additional allegations,[3] it does not remedy the infirmities that exist in his original complaint. Because amendment of the complaint would be futile, this Court dismisses plaintiff's complaint with prejudice.

[3]     Plaintiff's proposed amended complaint alleges that when he asked defendant McLean for crutches, she stated "Come on—be a man—it's only a broken ankle." (Prop.Am.Compl.¶ IV) This comment, while offensive, does not evidence intentional or criminally reckless conduct. Additionally, in an affidavit in opposition to defendants' motion to dismiss, plaintiff alleges that his injury was aggravated by defendants' failure to immediately provide crutches. (Wandell Aff. ¶ 7) As discussed above, while defendants' medical decision not to provide crutches may state a claim of medical malpractice, it does not rise to the level of a constitutional violation.

Accordingly, defendants' motion to dismiss plaintiff's complaint for failure to state a claim is granted.

*Conclusion*

For the reasons set forth above, defendant motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) is granted, and his complaint is dismissed with prejudice.

The Clerk of the Court is directed to close this action.

SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 1036030

---

End of Document                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 50 of 201
Palacio v. Ocasio, Not Reported in F.Supp.2d (2006)
2006 WL 2372250

KeyCite Yellow Flag - Negative Treatment
Distinguished by   Hunter v. City of New York,   S.D.N.Y.,   September 28, 2015

2006 WL 2372250
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Heriberto PALACIO, Plaintiff,

v.

Jorge OCASIO, et al., Defendants.

No. 02Civ.6726(PAC)(JCF).
|
Aug. 11, 2006.

**Attorneys and Law Firms**

Mr. Heriberto Palacio, Coxsackie Correctional Facility, Coxsackie, New York, pro se.

*MEMORANDUM DECISION AND ORDER*

CROTTY, J.

 *1  *Pro se* plaintiff Heriberto Palacio ("Palacio" or "Plaintiff"), currently incarcerated at the Coxsackie Correctional Facility, brings this civil rights action pursuant to 42 U.S.C. § 1983 [1] for compensatory and punitive damages and equitable relief in connection with claims of deliberate indifference by the defendants. [2] Palacio alleges that Defendants improperly classified him as a centrally monitored case ("CMC"), failed to protect him from inmate-on-inmate assaults on two occasions, and denied him adequate medical care. Palacio also claims that Defendants failed to comply with discovery requests and asks that the Court permit further discovery. Defendants now move for summary judgment. For the reasons set forth below, the Court grants Defendants' motion and denies Plaintiff's request for further discovery.

[1]    Title 42 U.S.C. § 1983 provides:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen

of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

[2]    Palacio's claims all relate to his detention five to six years ago at the Manhattan Detention Center ("MDC") and the Queens Detention Center ("QDC") during the period from on or about April 28, 2000 to March 28, 2001 and are asserted against numerous New York City Department of Correction ("DOC") officials and personnel. According to the docket report, defendants include the City of New York, MDC Warden Richard Pagan, MDC Superintendent Jorge Ocasio, QDC Warden Mark Farsi, MDC Correction Officer ("CO") Orlando Thomas, QDC Doctor S. Edano, CO Captain McMillan, Michael Hess and numerous John/Jane Doe CO and correction official defendants (collectively "Defendants"). The Court notes that Palacio has four other actions on file in the Southern District of New York.

BACKGROUND

I. The Complaint [3]

[3]    The Court follows this Circuit's mandate to construe *pro se* complaints "liberally [and to] interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F .3d 787, 790 (2d Cir.1994).

Palacio makes four distinct claims under 42 U.S.C. § 1983 that Defendants violated his right to due process as protected by the Eighth Amendment.

First, Palacio alleges that Defendants the City of New York and Department of Correction ("DOC") officials John/Jane Does violated his right to due process by classifying him as a CMC. (Compl.¶¶ 4-6.) Palacio claims that he tried to challenge his classification but that his appeal was denied, again in violation of constitutional rights. (*Id.* ¶¶ 6, 8, 33.) Since CMC prisoners are housed together, separate from the general prison population, and since some CMC prisoners are gang members or have prior convictions, both with histories of "penological violence," Palacio maintains that his CMC status was assigned with deliberate indifference to his safety. (*Id.* ¶ 20.)

2006 WL 2372250

Second, Palacio alleges that Defendant Correction Officer ("CO") Thomas ("Thomas") and several other Defendant John/Jane Doe COs were deliberately indifferent in that they failed to protect Palacio from an inmate-on-inmate assault on December 16, 2000 at the Manhattan Detention Center ("MDC"). (*Id.* ¶¶ 17-27.) According to Palacio's Complaint, Defendant CO Jane Doe left open the cell doors of MDC's 6 South Tier "for hours" during which time Defendant Thomas "abandon[ed] his post, leaving the entire 6 South population unmonitored and unsecured." (*Id.* ¶ 21.) Palacio claims that he was subsequently attacked in his cell by two inmates, one of whom-Palacio claims it was Benjamin Lowman [4] ("Lowman")-slashed Palacio with a razor. (*Id.* ¶¶ 22-27.) Palacio was transferred to the Queens Detention Center after this incident to separate him from his assailants. (*Id.* ¶ 32.)

[4]     Lowman is alternately spelled as "Loehman" and "Lowmann" in the record.

Third, Palacio alleges that Defendants-he does not specify whom-were deliberately indifferent in failing to protect him from a second inmate-on-inmate assault on January 26, 2001 in the Queen's Detention Center's ("QDC") infirmary. (*Id.* ¶¶ 34, 36-37.) According to the Complaint, Defendant CO Captain McMillan ("McMillan") sent Palacio to the infirmary unescorted where Lowman again assaulted him, this time punching him in the jaw. (*Id.*) Palacio claims that this second assault occurred in spite of Defendant John/Jane Doe correction officials' alleged promise to protect Palacio from Lowman "in the form of a separation order." (*Id.* ¶¶ 28-30.) Palacio also appears to claim that John/Jane Doe correction officials were deliberately indifferent to his safety in allowing him and Lowman to be transferred to the same prison in spite of this alleged separation order.

**\*2** Fourth, Palacio alleges that, after the January 26 assault, Defendants McMillan, Dr. S. Edano ("Edano") and the City of New York acted with deliberate indifference by delaying medical treatment, misdiagnosing his injury and providing inadequate medication. (*Id.* ¶¶ 39-54.) Palacio maintains that, after the assault, "the Captain from the Plaintiff's housing area"-apparently McMillan-refused to provide him with medical attention "for several hours" despite the "plethora of blood streaming from his gums and intense pain and numbness." (*Id.* ¶¶ 39-40.) Palacio claims that, when he was finally treated, Edano failed to diagnose what was later revealed to be a broken jaw and prescribed only aspirin. (*Id.* ¶¶ 42-43, 50-51.) Consequently, Palacio alleges that he

"complained for weeks about the pain to no avail," and that, when the fracture was finally detected by a New York State Department of Corrections doctor, "it was too late to properly treat the injury." (*Id.* ¶¶ 44, 50-53.)

## II. Statement of the Facts

Unless otherwise noted, the following facts are undisputed. [5]

[5]     The facts are taken from the Defendants' Statement Pursuant to Local Rule 56.1 ("Local Rule 56.1 Statement") (Docket No. 63); exhibits attached to the June 20, 2005 Declaration of Phillip Kim ("Kim Decl."); the February 23, 2005 Deposition of Palacio ("Palacio Dep."); and Plaintiff's Opposition to Defendant's Motion for Summary Judgment. The Court notes that Plaintiff failed to submit any affidavits in opposition to Defendants' summary judgment motion. The Rules of Civil Procedure provide that affidavits submitted in opposition to summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e). Furthermore, "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." *Id.*

### A. The Parties

Plaintiff, a pretrial detainee during all relevant times (Local Rule 56.1 Statement ¶ 5), is a state prisoner and has been incarcerated at the Coxsackie Correctional Facility since at least May 17, 2006 to the present (Docket No. 83). Prior to that, Plaintiff was incarcerated at MDC from on or about April 10, 2000 and was then transferred to QDC in December of 2000 or January of 2001. (Compl.¶¶ 4, 32.) Plaintiff was transferred again on or about February 2, 2001 to the North Infirmary Command ("NIC") at Rikers Island. (Compl. ¶ 46; Kim Decl. Ex. C.) On or about March 29, 2001, Plaintiff was moved to an unspecified New York State correctional facility and then moved to the Auburn Correctional Facility sometime before June 5, 2003. (Compl. ¶ 50; Docket no. 16 .)

2006 WL 2372250

Defendants include the City of New York, MDC Warden Richard Pagan, MDC Superintendent Jorge Ocasio, QDC Warden Mark Farsi, MDC CO Orlando Thomas, CO Captain McMillan, QDC Dr. S. Edano, Michael Hess and numerous John/Jane Doe defendants. [6]

[6]      Neither the Plaintiff nor Defendants provide further information about the Defendants, such as the time periods that they worked in these capacities. The "Doe" defendants refer to several unnamed COs involved in the December 16, 2000 assault, the unnamed correction officials who allegedly instituted the order of separation and the unnamed correction officials who transferred both Lowman and Palacio to the same prison.

   B. Procedural History of this Action

Palacio's Complaint was filed on August 22, 2002 and the action was assigned to Magistrate Judge James C. Francis of this District. (Docket No. 2.) Palacio had previously submitted an application to the Court for appointment of counsel, which was denied. (Docket No. 12.) Palacio filed his Amended Complaint on October 21, 2002 (Docket No. 5) [7] and the case was reassigned to Judge Kimba M. Wood of this District. (Docket No. 7.) Judge Wood asked that the case be referred to a magistrate judge, and Magistrate Judge Francis was so designated. (Docket No. 9.) Defendants filed their Answer on June 16, 2003. (Docket No. 19.)

[7]      Chief Judge Michael Mukasey instructed Palacio on the importance of identifying "Doe" defendants when he issued his August 22, 2002 Order giving Palacio leave to file an amended complaint. Specifically, Chief Judge Mukasey wrote:
        Plaintiff is advised that the naming of John Doe defendants does *not* toll the statute of limitations period governing actions under § 1983, and that plaintiff shall be responsible for ascertaining the true identity of any 'John Doe' defendants and amending his complaint to identify any 'John Does' before the statute of limitation expires.
        (Docket No. 3 at 7 n. 2)

On November 26, 2003, the Court ordered Defendants to comply with Plaintiff's request for production of documents and set December 19, 2003 as a deadline. (Docket No. 26.) On February 11, 2003, Plaintiff submitted an omnibus motion in which he claimed that Defendants had not produced "one-tenth" of the documents requested and asked that the

Court again order Defendants to comply. (Docket No. 27.) Magistrate Judge Francis denied the order "without prejudice to being renewed if accompanied by copies of the discovery demands and responses at issue." (*Id.*)

 **\*3** On April 26, 2004, Plaintiff submitted an omnibus motion requesting that time to complete discovery be enlarged and that Defendants be compelled to identify the John/Jane Doe defendants. (Docket No. 31.) On May 7, 2004, the Court denied the motion, noting that "Defendants have produced the relevant incident reports from which plaintiff can himself identify the alleged wrongdoers." [8] (Docket No. 32.) On June 2, 2004, the Court denied as untimely Plaintiff's motion for reconsideration of the May 7, 2004 order as well as his request for permission to depose the Defendants and certain witnesses. [9] (Docket No. 35.)

[8]      Magistrate Judge Francis appears to be referring to the DOC investigative materials generated as a result of the inmate-on-inmate assaults and Palacio's medical treatment. (Kim Decl. Ex. G.)

[9]      Specifically, Palacio sought to depose individuals he identified as COs Thomas, Wright, L. Rosado, J. Romero, R. Lopez, K. Thomas, Captain McMillan, Warden Richard Pagan, Dr. S. Edano, the "Doe" defendants and unidentified prisoner witnesses.

On July 10, 2004, the Plaintiff submitted a request for a conference to resolve discovery issues and again requested permission to depose the Defendants and certain witnesses. (Docket No. 39.) Then, on July 12, 2004, the Plaintiff filed a motion for reconsideration of the June 2, 2004 order. (Docket No. 38.) The Court denied these motions "without prejudice to renewal after [D]efendants have responded to [Plaintiff's] new demands and after [Plaintiff] has been deposed." [10] (Docket No. 36.)

[10]      By this point, Defendants claimed to have provided Plaintiff with "documentation concerning the CMC classification, plaintiff's injury to inmate investigations concerning the incidents with Mr. Lowman and Mr. Elliot, along with Department of Correction directives." (Docket No. 36.) Specifically, it appears that Defendants produced the DOC directive on CMCs; several blank template forms used for CMC designation; a January 4, 1999 memorandum on CMCs from Commissioner Kerik (Kim Decl. Ex. A); the DOC

record of Palacio's CMC Due Process Hearing; Palacio's DOC CMC Information Sheet; two forms reviewing Palacio's CMC status (Kim Decl. Ex. C); the Daily News articles regarding Palacio (Kim Decl. Ex. D); multiple grievance forms filed by Palacio, none of which are relevant to these claims; (Kim Decl. Ex. F); numerous investigative reports regarding the December assault individually filed by CO Captains Dobson and Ranieri, COs Thomas, Johnson, Breeze, Hernandez and Wright, CO Supervisor Catherine Gabbin, MDC Deputy Warden Thomas S. Cossean, and MDC Warden Richard Pagan; "Voluntary Inmate Statement" forms regarding the December assault (all of the inmates solicited declined to make a statement); and several investigative reports regarding the January assault and subsequent medical treatment individually filed by CO Captain McMillan, a CO Supervisor (the name is illegible), CO Jasmine Romero and Dr. S. Edano.

Defendants did acknowledge that the Plaintiff had made some "new discovery requests" in his most recent motion with which they would comply. (*Id.*) It is unclear what these requests were, however.

On September 23, 2004, Plaintiff again submitted a motion to compel Defendants to provide "all of the discovery demanded heretofore." (Docket No. 41.) The Court again denied the motion "without prejudice to being renewed accompanied by copies of the discovery requests and responses at issue." (*Id.*) Palacio then submitted a second motion for the enlargement of time to complete discovery in which he alleged that "respondents have not provided most of the discovery demanded by this plaintiff." (Docket No. 42.) Magistrate Judge Francis again denied the order. (*Id.*)

On February 23, 2005, Plaintiff was deposed. (Docket No. 52.) On May 4, 2005, Plaintiff submitted a motion to compel production of his deposition transcript and "the discovery sought heretofore by this Plaintiff." (Docket No. 58.) The Court ordered Defendants to provide Palacio with a copy of his deposition transcript but denied Plaintiff's other request since "[Palacio] has not proffered copies of the discovery demands to which he refers, nor of any response by [D]efendants." (*Id.*)

On June 21, 2005, Defendants filed their motion for summary judgment. (Docket No. 60.) This action was reassigned to this Court on September 9, 2005. (Docket No. 75.) On September 30, 2005, Plaintiff filed his motion in opposition

to Defendants' motion for summary judgment. (Docket No. 76.) In it, Plaintiff alleged that "he has been precluded from obtaining evidence ... by the [Defendants'] failure and refusal to provide ... the discovery ... requested heretofore." (*Id.* at 9.) The Plaintiff also wrote that "a hearing on discovery issues needs to be conducted, [and] this Plaintiff needs to be given the opportunity to depose the witnesses he has sought to depose heretofore." (*Id.* at 25.)

### C. Plaintiff's CMC Classification

**\*4** Plaintiff was classified as a CMC on or about April 28, 2000 and designated for maximum security housing. (Local Rule 56.1 Statement ¶ 7.) "It is the policy of the New York City Department of Correction to establish and maintain procedures to effect central monitoring of selected inmates so that the agency is continually aware of the housing, transport and case status of such inmates." (Kim Decl. Ex. A.) Inmates are selected for such monitoring based on their "notoriety" and "interest in the inmate on the part of other law enforcement agencies," among other factors. (*Id.*) Once they are classified as a CMC, inmates receive a "Notice of C.M .C. Designation" within seventy-two hours. (*Id.*) CMC inmates can then appeal their classification by writing to the Deputy Chief of Security Operations or the Chief of Department who, in turn, must respond with a written determination within fifteen business days. (*Id.*) The Deputy Chief of Security Operations also conducts a twenty-eight day or "monthly" review of all CMCs. (*Id.*)

On April 27 and 28 of 2000, the New York Daily News published stories in which it reported that Palacio was a possible suspect in the disappearance of his girlfriend. (Kim Decl. Ex. D.) According to the DOC's Record of Due Process Hearing on December 22, 2000, Palacio was classified as a CMC because his "girlfriend is missing and there has been extensive news media coverage." (Kim Decl. Ex. C .) On this same form, Palacio stated: "There is no evidence against me. I would like to be taken out of [CMC maximum security]. I've been punished enough." (*Id.*) The hearing officer ordered that Palacio remain classified as a CMC. (*Id.*) Palacio, however, disputes that an actual hearing occurred. (Palacio Dep. at 166:2-12.) [11]

[11]  According to Palacio,
This wasn't a hearing. What happened was that they sent around a captain or an officer, one person, they pulled a bunch of us out of the housing area, showed us a paper and asked us to sign it, and that

was it. There was supposed to be, according to my understanding, a hearing after this. This was not the hearing itself. I was not given a hearing. That's why I said I do not waive my right to be present at my hearing. The hearing was supposed to be subsequent to this paper, this document. And that's what I was informed. That interview by that one person, I don't remember if it was an officer or a captain, that wasn't the hearing itself."

(Palacio Dep. at 166:2-12.)

Palacio challenged his CMC classification on numerous occasions. (*Id.* at 74:23-85:10.) He testified that he first complained to COs (*Id.* at 75:15-24) and then began to file formal written grievances "approximately, ... twice a week" in "basically every [correctional] facility [he was] housed in." (*Id.* at 76:8-22.) [12] Palacio testified that he also wrote a letter in or about December of 2000 to the MDC superintendent [13] in which he appealed his classification. [14] (*Id.* at 78:5-79:22.)

[12]     The Defendants note that there is no record of grievances filed by Palacio concerning his CMC classification. (Local Rule 56.1 Statement ¶ 13.)

[13]     Palacio believed this individual was Richard Pagan. (Palacio Dep. 79:3-6.)

[14]     The Defendants note that there is no record of a letter sent by Palacio to any Defendant regarding his CMC classification. (Local Rule 56.1 Statement ¶ 13.)

On February 1, 2001, Palacio's CMC designation was reviewed at QDC and continued for the same reasons as before. (Kim Decl. Ex. C ("Subject is a suspect in a case that his girlfriend is missing [sic]. The case is receiving extensive news and media coverage.").) One day later, on February 2, 2001, Palacio's CMC designation was reviewed again, this time at NIC (after he was apparently transferred), and it was again continued. (Kim Decl. Ex. C.)

**D. December 16, 2000 Inmate-on-Inmate Assault**
On December 16, 2000, Palacio was slashed with a razor and suffered injuries to his back and head during an inmate-on-inmate assault at MDC. (Local Rule 56.1 Statement ¶ 15.) Just before the time of the assault, CO Thomas, who was assigned to the 9 South Post where Palacio was housed, observed Palacio walking toward fellow inmate Mark Elliot's ("Elliot")

cell. (*Id.* ¶ 15; Kim Decl. Ex. G.) CO Thomas then observed Plaintiff and Elliot in a physical altercation and ordered them to stop fighting. (Local Rule 56.1 Statement ¶¶ 16-17; Kim Decl. Ex. G.) When Palacio and Elliot refused to comply, CO Thomas sounded an alarm summoning additional COs, and the fighting stopped. (Local Rule 56.1 Statement ¶ 18; Kim Decl. Ex. G.) No other inmates were identified as being involved in the altercation by either COs or other inmates. (Local Rule 56.1 Statement ¶ 19; Kim Decl. Ex. G.)

**\*5** Palacio disputes CO Thomas's account of the December 16, 2000 assault. (Palacio Dep. 91:13-118:2.) In fact, Palacio contends that CO Thomas was not at his assigned post when the assault occurred. (*Id.* at 91:15-92:1.) According to Palacio, he did not approach Elliot's cell, but rather was hit on the back of his head while watching television in the recreation area. (*Id.* at 88:8-13.) Palacio was then dragged to a cell where he was "cut with a razor" and then beaten and stomped while he attempted to fight his way out. (*Id.* at 94:13-21.) Palacio also contends that "approximately six inmates," as opposed to just one, took part in his assault. (*Id.* at 88:5-6; 97:3-7.) [15] He claims that a fellow inmate and Defendants Corrections Officials John Does later told him that Lowman was one of those involved. (*Id.* at 114:19-115:18; Compl. ¶ 29.)

[15]     Palacio stated that he "was involved in a situation where [he] was jumped by approximately six inmates." (Palacio Dep. at 88:5-6.) He further testified:
I believe that there were other people waiting in the cell for the ambush. And I know for a fact, because the way I was positioned when they dragged me in the cell that at least one or two more people came from outside and joined in the attack.
(*Id.* at 97:3-7.)

Both parties agree that Palacio had no relationship with Elliot prior to the assault. (Local Rule 56.1 Statement ¶ 22; Palacio Dep. at 110:9-12.) Palacio also testified that, though he may have had reason to fear Elliot since Elliot may have robbed another inmate a week before, he never informed any Defendant of this fear. (Local Rule 56.1 Statement ¶ 23; Palacio Dep. at 110:13-17.)

**E. January 26, 2001 Inmate-on-Inmate Assault**
Palacio testified that, at approximately noon on January 26, 2001, he was sent to QDC's health clinic for "sick call." [16]

2006 WL 2372250

(Palacio Dep. at 123:15-125:17.) Lowman was also at the clinic at that time and "got into [Palacio's] face" the moment Palacio arrived. (*Id.* at 128:10-15.) The CO stationed at the clinic ordered the two inmates to separate, at which point Palacio turned to leave. (*Id.* at 133:16-21.) Palacio testified that Lowman then struck him in the right side of his "mandible" from behind. (*Id.* at 121:3-15; 133:20-21.)

[16]    In their summary judgment filings, the parties argue at some length over whether Palacio was escorted to the clinic. This Court notes that Palacio testified: "I believe an officer took me up." (Palacio Dep. at 125:5.)

Palacio testified that prior to the January 26, 2001 assault but after the December 16, 2000 assault, two John Doe correction officials met with Plaintiff. (*Id.* at 115:7-18; 120:12-121:6.) According to Palacio, these officials took photographs of Palacio's injuries from the December 16, 2000 assault and informed him that Lowman had been one of his attackers. (*Id.* at 115:7-18.) Palacio testified that they then told him that they would enter a separation order against both Lowman and Elliot. (*Id.* at 120:13-22.) [17] As previously indicated, Palacio was transferred to the Queens Detention Center on December 17, 2000.

[17]    According to Palacio,

[T]he two gentlemen that came and interviewed me in the New York City Department of Correction told me that they knew that [Lowman] was one of the assailants. He was a gang member. They are familiar with him. And they told me they were going to put a separation order, an order for separation, which I believe they did because when I came back, when I was going to trial for the gun case, I heard that the personnel mentioned the orders on several occasions; they mentioned that there was a separation order, that I could not be around him or Elliot. So they knew that me and this guy had a problem and when I walked into the infirmary, he was there.

(Palacio Dep. at 120:13-22.)

F. Medical Treatment after the January 26, 2001 Assault [18]

[18]    Plaintiff has not brought a claim regarding the medical treatment he received after the December 16, 2000 assault.

After the January 26, 2001 assault, Palacio was sent back to his housing area. (*Id* at 136:5-7.) He testified that he was permitted to return to the clinic to receive treatment for his injured jaw "a couple hours later." (*Id.* at 136:10-11.) According to DOC documentation, Palacio first complained about his injured jaw to Defendant CO Captain McMillan at "approximately 1445 hrs." (Kim Decl. Ex. G.) Defendant Edano then treated Palacio at "1635 hrs." (*Id.*)

**\*6** Palacio testified that he told Edano that he thought his jaw was broken. (Palacio Dep. at 136:12.) In his "Injury to Inmate Report," Edano noted that "[Palacio] is alert, awake, not in distress. Able to talk without difficulty. Has some discomfort on opening mouth, but range normal. No discoloration/laceration." (Kim Decl. Ex. G.) Palacio disputes that he was able to talk without difficulty and disagrees with the characterization of his discomfort on opening his mouth. (Palacio Dep. 170:13-17.) Edano treated Palacio's injury with Motrin. (Kim Decl. Ex. G.)

Palacio testified that, after January 26, 2001, he returned to sick call "numerous times" and continued to receive Motrin. (Palacio Dep. 137:19-21.) After being transferred to NIC on or about February 2, 2001, Palacio claims that a "City doctor" [19] x-rayed his jaw and failed to find a fracture. (*Id.* at 138:1-6.) Palacio testified that he remained in pain at this point and had difficulty chewing. [20] (*Id.* at 138:7-18.)

[19]    This individual is not named as a Defendant.

[20]    Palacio testified: "I couldn't chew on the right side for like two months. It was really bad." (Palacio Dep. 138:15-16.)

Palacio testified that, on or about March 28 or 29 of 2001, he was transferred into New York State custody and received a "very comprehensive and thorough [medical] examination." (*Id.* at 138:25-139:2.) According to Palacio, a state doctor x-rayed him as a part of this examination and discovered that Palacio's jaw was broken. (*Id.* at 139:3-20.) The doctor informed him that his jaw had already started healing and that it was "too late to do anything." (*Id.* at 139:24-140:2.) Other than his own assertion, Palacio does not submit the x-ray, a doctor's statement, or the relevant medical records.

DISCUSSION

I. Standard of Review

A motion for summary shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Moreover, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Thus, summary judgment should only be granted if "the nonmoving party 'has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." ' *Berger v. United States,* 87 F.3d 60, 65 (2d Cir.1996) (citation omitted). The Court "resolve[s] all ambiguities, and credit[s] all rational factual inferences, in favor of the plaintiff ." *Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 122 (2d Cir.2004) (citation omitted). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994) (citation omitted). The Court should, thus, grant summary judgment only "[w]hen no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight." *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

**\*7** "When considering motions to dismiss the claims of plaintiffs proceeding pro se, courts in this Circuit are instructed to construe the pleadings liberally," and "[t]his is especially true when dealing with civil rights complaints" like the one at the bar. *Weinstein v. Albright,* 261 F.3d 127, 132 (2d Cir.2001) (citations omitted). Thus, "[a]lthough the same summary judgment rules are applicable when a party is proceeding pro se, 'special latitude' is appropriate to ensure that a meritorious claim is not foreclosed simply because the papers submitted in opposition to the motion are worded inartfully." *Cherry v. Edwards,* No. 01 Civ. 7886, 2005 WL 107095, at *7 (S.D.N.Y. Jan. 18, 2005) (citations omitted). Nevertheless, "a pro se party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Odom v. Keane,* No. 95 Civ. 9941, 1997 U.S. Dist. LEXIS 14077, at *8 (S.D.N.Y. Sept. 15 1997) (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d

Cir.1995)). A nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.,* 247 F.3d 423, 428 (2d Cir.2001) (citation omitted), or create a genuine issue of material fact by presenting contradictory or unsupported statements. *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978) ("The party opposing the motion must set forth 'concrete particulars' ... [;][i]t is not sufficient merely to assert a conclusion without supplying supporting arguments or facts in opposition to the motion." (citations omitted)).

While Palacio contradicts much of what Defendants prove, it is always done on his "say so," without affidavit, documentary support, or other proof.

## II. Plaintiff's Claims Against Unnamed Defendants are Time-Barred

As a preliminary matter, this Court finds Palacio's claims against the "Doe" Defendants [21] are time-barred. The applicable limitations period for an action under 42 U.S.C. § 1983 is three years. *See Owens v. Okure,* 488 U.S. 235, 251 (1989). Further, this Circuit has held that " 'John Doe' pleadings cannot be used to circumvent statutes of limitations because replacing a 'John Doe' with a named party in effect constitutes a change in the party sued." *Barrow v. Westhersfield Police Dep't,* 66 F.3d 466, 468 (2d Cir.1995) (citing *Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067, 1075 (2d Cir.1993)); *accord Basile v. City of Albany,* No. 96-7880, 1997 U.S.App. LEXIS 2347, at * *2-3 (2d Cir. Feb. 10, 1997) (affirming the dismissal of a pro se plaintiff's claims for failing to properly amend his complaint to identify the "Doe" defendants during the three-year limitations period). As such, Palacio's claims against the "Doe" Defendants expired, at the very latest, on March 28, 2004, three years after Plaintiff was transferred out of DOC to State custody.

[21]     This refers to all unnamed Defendants, including the John/Jane Doe COs from the December 16, 2000 assault, the John Doe correction officials who allegedly instituted a separation order and the John/Jane Doe correction officials allegedly responsible for transferring Palacio and Lowman to the same prison.

Plaintiff asserts that his claims against the "Doe" Defendants can be maintained under "the relation back theory." (Pl. Mot. Opp'n Mot. Summ. J. at 25). Plaintiff appears to be referring to Rule 15(c)(3) of the Federal Rules of Civil Procedure, which allows Plaintiff to amend his complaint to change the name of

the party sued if the claim "relates back" to the claim initially pleaded. Specifically,

**\*8** [a]n amendment to a pleading that attempts to bring in a new party will "relate back" to the date of the original pleading when (1) the claim arises out of the same conduct originally pleaded and (2) within (ordinarily) 120 days of the original filing date, "the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party."

*Soto v. Brooklyn Corr. Facility,* 80 F.3d 34, 35 (2d Cir.1996) (quoting Fed.R.Civ.P. 15(c)(3)). This Circuit has held that "Rule 15(c)[ (3) ] does not allow an amended complaint adding new defendants to relate back if the newly-added defendants were not named originally because the plaintiff did not know their identities ." *Barrow,* 66 F.3d at 469. Furthermore, when the "[plaintiff] [is] informed by the court-within the limitations period ... that he need[s] to name the individual [defendants] ... [he][is] not 'mistaken' for purposes of rule 15(c)." *Id.* at 466; *cf. Soto,* 80 F.3d at 37 (granting pro se plaintiff leave to amend complaint under Rule 15(c)(3) where plaintiff was not informed that he needed to name defendants).

Palacio's claims against the "Doe" Defendants cannot be amended under Rule 15(c)(3). Palacio did not name the "Doe" Defendants during the limitations period because he did not know their identities and not because of a "mistake." As in *Barrow,* Plaintiff was informed in August 2002-almost two full years before the statute of limitations would expire-that his failure to identify the "Doe" Defendants before the claims expired would bar his suit. [22] Furthermore, it is unclear how Palacio could properly amend the Complaint since he still has not identified the "Doe" Defendants. [23]

[22]    *See supra* note 7.

[23]    Since Plaintiff has received materials in discovery (including the incident reports) from which he could identify the "Doe" Defendants (Docket No. 32), it would be inappropriate to allow at this late date the substitution of actual names for the John Does, *Walters v. N.Y. City Health Hosp. Corp.,* 02 Civ. 751, 2006 U.S. Dist. LEXIS 14959, at \*9-10 (S.D.N.Y. Mar. 30, 2006).

Since Palacio failed to identify the "Doe" Defendants during the limitations period and since he cannot amend his complaint under Rule 15(c)(3), this Court dismisses all of his claims against the "Doe" Defendants.

III. Centrally Monitored Case Claim

    A. CMC Classification
In evaluating whether Palacio's classification as a CMC violated his due process rights, the Court must first determine whether his prior non-CMC status is "a property or liberty interest protected by the Constitution." *Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001) (citation and internal quotation marks omitted); *accord Mack v. Artuz,* No. 01 Civ. 11832, 2002 U.S. Dist. LEXIS 24216, at \*21 (S.D.N.Y. Dec. 19, 2002). If Palacio had such an interest, the Court "must then consider whether the government deprived [him] of that interest without due process." *Narumanchi v. Bd. of Trs. of the Conn. State Univ.,* 850 F.2d 70, 72 (2d Cir.1988).

This Circuit has rejected the view that federal prisoners have a property or liberty interest in their non-CMC status protected by the Due Process Clause. *Pugliese v. Nelson,* 617 F.2d 916, 923 (2d Cir.1980) (holding that "a prisoner's interest in avoiding CMC classification does not entitle [the prisoner] to due process protections"). Since the federal CMC designation is similar to New York State's CMC designation "in all material respects," *Majid v.. Malone,* No. 95 Civ. 2545, 1996 U.S. Dist. LEXIS 3515, at \*8 (S.D.N.Y. Mar. 23, 1996), courts in this District have found that "New York State CMC designation is not a deprivation of a liberty interest triggering due process considerations." *Mack,* 2002 U.S. Dist. LEXIS 24216, at \*23; *accord Adams v. Galletta,* No. 96 Civ. 3750, 1999 U.S. Dist. LEXIS 16082, at \*13 (S.D.N.Y. Oct. 19, 1999) (holding that a New York State CMC designation for a pretrial detainee is not a deprivation of liberty interest); *Majid,* 1996 U.S. Dist. LEXIS 3515, at \*3 (same). This Court concurs with these findings. As such, Palacio's due process claim regarding his initial classification as a CMC must be dismissed. [24]

[24]    The conditions of pretrial detention are constitutional unless they amount to punishment of the detainee. *See Bell v. Wolfish,* 441 U.S. 520, 535-37 (1979). However, "not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense." *Bell,* 441 U.S. at 537. This Circuit has held that "the

transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is not a right protected by the due process clause itself." *Covino v. Vt. Dep't of Corr.,* 933 F.2d 128, 129 (2d Cir.1991) (internal quotations omitted); *accord McFadden v. Solfaro,* No. 95 Civ 1148, 1998 U.S. Dist. LEXIS 5765, at *16 (S.D.N.Y. Apr. 23, 1998) (finding that assignment of pretrial detainee to segregated housing based on his security classification did not violate Due Process Clause). As such, the conditions of Palacio's CMC classification were constitutional.

### B. CMC Review and Appeals Process

**\*9** Palacio also appears to claim that the manner in which his CMC status was reviewed and Defendants' failure to respond to his alleged letter of appeal also violate his due process rights. Whether the CMC review and appeals processes have due process implications is a question that the Second Circuit appears not to have considered, but this Court joins other District Courts in determining that the DOC directive outlining the CMC review and appeals process does not create a liberty interest. *See, e.g., Adams,* 1999 U.S. Dist. LEXIS 16082, at *18 ("[I]f the [CMC] designation is not the deprivation of a liberty interest, then the prison authorities were not constitutionally required to afford due process in imposing it."); *Korkala v. N.Y. City Dept. of Corr.,* No. 84 Civ. 5740, 1986 U.S. Dist. LEXIS 20820, at *16 (S.D.N.Y. Sept. 4, 1986) (holding that "the State's adoption of a procedural rubric does not create a liberty interest"). Palacio's due process claim regarding the review and appeals of his CMC classification is dismissed.[25]

[25]    In light of this determination, the Court does not evaluate the manner in which Defendants reviewed Palacio's CMC status and responded to his alleged letter of appeal.

### III. Inmate-on-Inmate Assaults

The Supreme Court has held that prison officials have a duty to protect prisoners from violent attacks by other inmates. *See Farmer v. Brennan,* 511 U.S. 825, 833 (1994). However, "the standard for prisoner failure to protect claims brought under 42 U.S .C. § 1983 is quite high." *Rivera v. New York,* No. 96 Civ. 7697, 1999 U.S. Dist. LEXIS 129, at *22 (S.D.N.Y. Jan. 6, 1999) (internal quotations omitted). Mere negligence in failing to protect the inmate will not support a constitutional claim. *See Davidson v.. Cannon,* 474 U.S.

344, 347 (1986) (holding "where a government official is merely negligent in causing the injury, no procedure for compensation is constitutionally required"). Prison officials are liable for harm incurred by an inmate if the officials acted with "deliberate indifference" to the safety of the inmate. *Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996). "To succeed on such a claim, the prisoner must establish both that a substantial risk to his safety actually existed and that the offending prison officials knew of and consciously disregarded that risk." *Baines v. City of New York,* No. 01 Civ. 2645, 2004 U.S. Dist. LEXIS 1461, at * *18-19 (S.D.N.Y. Feb. 5, 2004) (citing *Farmer,* 511 U.S. at 834, 837-39). The standard for demonstrating a defendant's awareness of the risk is high. *See Hines v. Lacy,* No. 98-2961, 1999 U.S.App. LEXIS 20206, at *8 (2d Cir.1999) ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.")

### A. The December 16, 2000 Inmate-on-Inmate Assault

Viewing the facts in a light most favorable to the Plaintiff, there may be a question of material fact as to whether Elliot posed a "substantial risk," since there is an allegation that Elliot robbed another inmate shortly before the December 16, 2000 incident. But nothing in the record suggests that Defendants either inferred that a substantial risk to Palacio existed from these facts, or consciously disregarded it. Therefore, Palacio's claims arising out of the December 16, 2000 assault are dismissed. *See Baines,* 2004 U.S. Dist LEXIS 1461, at *22 (summary judgment proper where there is no evidence that any of the individual defendants had any knowledge that plaintiff faced a substantial risk of harm).

### B. The January 26, 2001 Inmate-on-Inmate Assault

**\*10** Viewing the facts in a light most favorable to the Plaintiff, there may be a question of material fact on whether Defendant CO Captain McMillan was aware that Lowman posed a substantial risk to Palacio's safety. According to Palacio's testimony, shortly after the December assault, the two John Doe correction officials[26] allegedly met with Palacio and promised that they would institute a separation order to protect him from Lowman. Palacio testified that some COs mentioned the alleged separation order when transporting him to trial. The record does not foreclose the possibility that CO Captain McMillan was one of these officers.

26      As discussed above, Palacio's claims against all
        "Doe" Defendants have been dismissed as time-
        barred.

Even if CO Captain McMillan possibly may have been
aware of the risk that Lowman posed to Palacio, there is
nothing to suggest her deliberate indifference to that risk.
First, there is no evidence that CO Captain McMillan had
any control over the series of events that led to Palacio and
Lowman being transferred to the same health clinic. Second,
there is no evidence to suggest that she was negligent, let
alone deliberately indifferent, in sending Palacio to "sick
call," a process which Palacio himself apparently initiated.
Notably the CO on duty at "sick call" quickly separated
Palacio and Lowman and, as a result, only a single punch
was thrown. Therefore, this Court dismisses Palacio's claim
against CO Captain McMillan arising out of the January 26,
2001 assault. [27]

27      As noted previously, the Court has construed
        Palacio's complaint as making claims against only
        the two John Doe correction officials and CO
        Captain McMillan in regard to this assault. The
        Court notes, however, that there is no evidence
        from the record that anyone acted with deliberate
        indifference to Palacio during the January 26, 2001
        assault.

IV. Medical Claim
The Supreme Court has held that "deliberate indifference
to a prisoner's serious illness or injury states a cause of
action under [42 U.S.C. § 1983]." *Estelle v. Gamble,* 429
U.S. 97, 105 (1976) ("[D]eliberate indifference to serious
medical needs of prisoners constitutes the unnecessary
and wanton infliction of pain, proscribed by the Eighth
Amendment." (internal quotations and citation omitted)).
The Second Circuit has articulated a two-prong test to
evaluate such claims. The Plaintiff first must demonstrate as
a threshold matter "the objective seriousness of his medical
condition, i.e., that he was suffering from a condition of
urgency, [or] one that may produce death, degeneration, or
extreme pain." *Williams v. Wright,* 162 Fed. Appx. 69, 70
(2d Cir.2006) (internal quotations omitted). The Plaintiff must
then show that the Defendants acted "with a sufficiently
culpable state of mind." *Hathaway v. Coughlin,* 99 F.3d 550,
553 (2d Cir.1996). This subjective culpability prong "entails
something more than mere negligence ... [but] something less
than acts or omissions for the very purpose of causing harm

or with knowledge that harm will result ." *Farmer,* 511 U.S.
at 835.

A. Objective Seriousness of Palacio's Medical Condition
In this Circuit, "[t]here is no settled, precise metric to guide
a court in its estimation of the seriousness of a prisoner's
medical condition." *Brock v. Wright,* 315 F.3d 158, 162 (2d
Cir.2003). To aid district courts in making this determination,
this Circuit has articulated a "non-exhaustive list" of relevant
factors: "(1) whether a reasonable doctor or patient would
perceive the medical need in question as important and
worthy of comment or treatment, (2) whether the medical
condition significantly affects daily activities, and (3) the
existence of chronic and substantial pain." *Id.* at 162 (internal
quotations omitted). The Court assumes, without deciding,
that Palacio's broken jaw resulting from the January 26, 2001
assault constituted a serious medical condition. [28] *See, e.g.,
Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000) ("A
serious medical condition exists where the failure to treat a
prisoner's condition could result in further significant injury
or the unnecessary and wanton infliction of pain." (internal
quotations omitted)); *Brock,* 315 F.3d at 163-164 (finding
that a scar that caused chronic "annoying" or "extreme"
pain might constitute a serious medical condition); *Carter v.
Fagin,* 363 F.Supp.2d 661, 663 (S.D.N.Y.2005) (finding that
a jaw condition that caused "great pain" constituted a serious
medical condition); *but see Malsh v. Austin,* 901 F.Supp. 757,
763 (S.D.N.Y.1995) (noting that some courts have found that
"a mild concussion and broken jaw" do not constitute serious
medical conditions).

28      There is no evidence, other than Palacio's
        statement, that his jaw was in fact broken. He has
        submitted no affidavit or other evidence that a state
        doctor determined Palacio's jaw was broken.

B. Subjective Culpability of Defendants

1. Delay of Medical Treatment
**\*11** The Supreme Court has held that "intentionally denying
or delaying access to medical care" for a serious medical
condition can constitute deliberate indifference. *Estelle,* 429
U.S. at 104-105. This Circuit, however, has "reserved such
a classification for cases in which, for example, officials
deliberately delayed care as a form of punishment, ignored
a life-threatening and fast-degenerating condition for three
days, or delayed major surgery for over two years." *Demata
v. N.Y. State Corr. Dep't of Health Servs.,* No. 99-0066,

1999 U.S.App. LEXIS 22955, at *5 (2d Cir. Sept. 17, 1999) (internal quotations and citations omitted).

In the instant case, the delay of treatment was, at most, a little more than two hours. Furthermore, nothing in the record suggests that Palacio suffered from a life-threatening or fast-degenerating condition or that prison officials deliberately delayed his treatment as a form of punishment. Therefore, this Court finds that the delay does not rise to the level of deliberate indifference and Palacio's claim on this basis is dismissed.

2. Failure to Diagnose Broken Jaw

It is well settled that the negligent failure to diagnose a serious medical condition does not create a cause of action under 42 U.S.C. § 1983. *See Estelle,* 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."); *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) (holding that "negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim"); *Cuoco v. Moritsugu,* 222 F.3d 99, 107 (2d Cir.2000) ("Mere medical malpractice is not tantamount to deliberate indifference, but it may rise to the level of deliberate indifference when it involves culpable recklessness, i.e., an act or a failure to act ... that evinces a conscious disregard of a substantial risk of serious harm." (internal quotations omitted)). Furthermore, the Supreme Court has held that a doctor's choice of diagnostic techniques does not support a constitutional claim. *See Estelle,* 429 U.S. at 107.[29]

[29]    Specifically, the Supreme Court has held:
    [T]he question whether an x-ray-or additional diagnostic techniques or forms of treatment-is indicated is a classic example of a matter for medical judgment. A medical decision not to order an x-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice.
    *Estelle,* 429 U.S. at 107.

Defendant Edano's decision not to x-ray Palacio's jaw and his failure to diagnose the fracture do not support a claim under 42 U.S .C. § 1983. Viewed in a light most favorable to the Plaintiff, the record does not suggest that Edano evinced a culpable recklessness in the manner in which he diagnosed Palacio's injury. At most, the facts might support a claim of

medical malpractice. Therefore, Palacio's claim on this basis is dismissed.

3. Choice of Treatment

"It is well-established that mere disagreement over the proper treatment does not create a constitutional claim." *Chance,* 143 F.3d at 703. "So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Id.* The case law regarding adequacy of treatment "draws a clear distinction between situations in which the physician provides no medical care, which may amount to deliberate indifference, and those in which the physician provides merely substandard care, which amounts at most to negligence." *Nelson v. Rodas,* No. 01 Civ. 7887, 2002 U.S. Dist. LEXIS 17359, at *55 (S.D.N.Y. Sept. 17, 2002). In certain instances, however, a physician may be deliberately indifferent if he or she consciously chooses "an easier and less efficacious" treatment plan. *Williams v. Vincent,* 508 F.2d 541, 544 (2d Cir.1974) (finding that a prison doctor's decision not to reattach a prisoner's severed ear but instead to stitch up the wound constituted deliberate indifference). *But see Reyes v. Gardener,* 93 Fed. Appx. 283, 284-285 (2d Cir.2004) (finding no deliberate indifference where doctors conservatively prescribed Tylenol, Motrin and, eventually, Demerol to treat pain caused by Plaintiff's sickle cell condition).

*12 The facts in the instant case are far more analogous to *Reyes* than to *Williams.* Here, as in *Reyes,* Plaintiff claims that he received inadequate medication to treat his pain. Such a disagreement over the proper treatment does not support a constitutional claim. Furthermore, even if Edano committed medical negligence, he did not show the requisite "culpable recklessness," as exhibited by the doctor in *Williams v. Vincent.* Therefore, Palacio's claims on this basis are dismissed.

V. Inadequate Discovery Claim

Summary Judgment may be inappropriate prior to an adequate opportunity for discovery. *See Meloff v. N.Y. Life Ins. Co.,* 51 F.3d 372, 375 (2d Cir.1995); *Sutera v. Schering Corp.,* 73 F.3d 13, 18 (2d Cir.1995) (reversing summary judgment entered before any discovery had taken place). Under Rule 56(f) of the Federal Rules of Civil Procedure, courts may permit further discovery prior to ruling on a summary judgment motion in the interests of justice.[30] *Bank of Am. Nat'l Trust and Savings Ass'n v. Envases Venezolanos,*

*S.A.,* 740 F.Supp. 260, 269 (S.D.N.Y.1990), *aff'd* 923 F.2d 843 (2d Cir.1990). In this Circuit, a party claiming that he or she has been denied adequate discovery

30    Fed.R.Civ.P. 56(f) provides:

> Should it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

must make a four-part showing before further discovery should be granted prior to resolving a pending summary judgment motion: (1) the party must specify the nature of the uncompleted discovery; (2) the party must demonstrate how the facts sought are reasonably expected to create a genuine issue of fact; (3) the party must explain what efforts he has made to obtain those facts; and (4) the party must explain why those efforts were unsuccessful.

*Hutchinson v. Pangburn,* No. 95 Civ. 5449, 1998 U.S. Dist. LEXIS 4082, at * *25-26 (S.D.N.Y. Mar. 31, 1998) (citing *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1138 (2d Cir.1994)). A plaintiff's unsupported allegations do not pass this four-part test, however. *See Carney v. United States Dep't of Justice,* 19 F.3d 807, 813 (2d Cir.1994) (holding that the district court did not err in denying pro se plaintiff discovery pursuant to Rule 56(f) because plaintiff's allegations were "grounded in mere speculation").

A plaintiff must also comply with the appropriate procedural guidelines when making a claim of inadequate discovery. This Circuit had held that "the failure to file an affidavit under Rule 56(f) is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." *Paddington Partners,* 34 F.3d at 1137 (noting that even "a reference to Rule 56(f) and to the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for a Rule 56(f) affidavit"). However, "the Court must afford 'special solicitude' to pro se litigants confronted with summary judgment motions." *Sereika v. Patel,* 411 F.Supp.2d 397, 404 (S.D.N.Y.2006) (quoting *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988)) (nonetheless denying pro se plaintiff's request for further discovery partially because he did not submit a Rule 56(f) affidavit).

**\*13** Construed liberally, Plaintiff's Motion in Opposition to Defendant's Motion for Summary Judgment requests that this Court allow Palacio the opportunity to conduct further discovery. Specifically, Palacio requests permission to depose the Defendants and certain witnesses [31] and appears to ask the Court to compel production of "the discovery requested heretofore." These requests were not made through a Rule 56(f) affidavit as required. The Court can deny Palacio's request on this basis alone.

31    Officers Thomas, Wright, L. Rosado, J. Romero, R. Lopez, K. Thomas, Captain McMillan, Warden Richard Pagan, Doctor S. Edano, the "Doe" Defendants and unidentified prisoner witnesses. (Docket No. 35.)

The Court also finds that Palacio's request for further discovery does not pass this Circuit's four-part test. First, his request that the court compel production of "the discovery requested heretofore" does not adequately "specify the nature of the uncompleted discovery." [32] *Hutchinson,* 1998 U.S. Dist. LEXIS 4082, at *26. Second, his request for permission to depose specific witnesses does not "demonstrate how the facts sought are reasonably expected to create a genuine issue of fact." *Id.,* 1998 U.S. Dist. LEXIS 4082, at *26. Plaintiff claims that deposing Defendants and certain witnesses will allow him to show (1) that he filed multiple grievances regarding his CMC classification, or alternatively that the DOC's grievance system is flawed (Pl. Mot. Opp'n Defs.' Mot. Summ. J. ¶ 13); (2) that CO Thomas's account of the December 16, 2000 inmate-on-inmate assault is inaccurate (*Id.* ¶¶ 15, 17, 18, 20); (3) that Lowman was involved in the December 16, 2000 assault and then, in spite of a separation order, assaulted Palacio again on January 26, 2001 (*Id.* ¶ 28). This Court already viewed these disputed facts in the light most favorable to the Plaintiff in its analysis above. This Court nonetheless found that all of Plaintiff's claims fail as a matter of law. Therefore, Plaintiff's request for further discovery is denied.

32    The Court notes that, in denying three similarly broad requests, Magistrate Judge Francis instructed Palacio to submit the "discovery requests and responses at issue." (See Docket Nos. 27, 41, 58.)

## CONCLUSION

Defendants' motion for summary judgment is granted. [33] The Clerk of the Court is requested to close out this case.

**Palacio v. Ocasio, Not Reported in F.Supp.2d (2006)**

2006 WL 2372250

---

33    Having dismissed all of Palacio's claims on substantive grounds, this Court does not consider the issues of exhaustion of administrative remedies, liability of supervising officers, qualified immunity or municipal liability.

SO ORDERED

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2372250

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 651919
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kenneth Carl GROVES, Sr., Plaintiff,

v.

Brett DAVIS, Secure Care Treatment Aid; David W. Sill, Secure Care Treatment Aid; Thomas Nicolette, RN, Ward Nurse; Charmaine Bill, Treatment Team Leader; Jill E. Carver, Social Worker, Primary Therapist; Edwin Debroize, Psychologist Assist; Jeff Nowicki, Chief of Mental Health Treatment Serv.; Terri Maxmillian, Ph.D., Dir. of Mental Health Serv.; Sgt. Sweet, Security Services, CNYPC; Michael Hogan, Comm'r, Dep't of Mental Health, Defendants.

No. 9:11–CV–1317 (GTS/RFT).
|
Feb. 28, 2012.

**Attorneys and Law Firms**

Kenneth Carl Groves, Sr., Marcy, NY, pro se.

***MEMORANDUM DECISION and ORDER***

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil rights action filed by Kenneth Carl Groves, Sr. ("Plaintiff"), against numerous employees of New York State or the Central New York Psychiatric Center ("Defendants"), are Plaintiff's motion to proceed *in forma pauperis,* his motion for a temporary restraining order and preliminary injunction, and his motion for appointment of counsel. (Dkt.Nos.2, 3, 4.)[1] For the reasons set forth below, Plaintiff's motion to proceed *in forma pauperis* is granted; his motion for a preliminary injunction is denied; his motion for appointment of counsel is denied; Plaintiff's claims of deliberate indifference to his mental health needs against Defendants Bill, Carver and DeBroize are *sua sponte* dismissed with prejudice; Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxmillian, and Hogan arising from their alleged personal involvement in the August 8, 2011 assault are *sua sponte* dismissed without prejudice and with leave to amend in this action in accordance with Fed.R.Civ.P. 15; Sgt. Sweet is *sua*

*sponte* dismissed without prejudice as a Defendant in this action; the Clerk is directed to issue summonses, and the U.S. Marshal is directed to effect service of process on Defendants Davis, Sill, and Nicolette.

1    This is the fourth civil rights action filed by Plaintiff in this District. Generally, two of these actions arose out of Plaintiff's refusal to consent to a strip search and the subsequent actions taken against Plaintiff as a result of his refusal. *See Groves v. New York,* 09–CV–0406, Decision and Order (N.D.N.Y. filed May 11, 2009) (Hurd, J.) (*sua sponte* dismissing complaint pursuant to 28 U.S.C. § 1915[e][2][B] ); *Groves v. The State of New York,* 9:09–CV–0412, Decision and Order (N.D.N.Y. filed Mar. 26, 2010) (Sharpe, J.) (granting defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12[b][6] ). The third action alleged numerous violations of Plaintiff's constitutional rights during the period July 23, 2009, and August 26, 2009, and was dismissed without prejudice upon Plaintiff's request in October, 2010. *See Groves v. Maxmillian,* 9:09–CV–1002, Decision and Order (N.D.N.Y. filed Oct. 8, 2010) (Suddaby, J.). As a result, it does not appear that the current action is barred because of res judicata, collateral estoppel, and/or the rule against duplicative litigation.

**I. RELEVANT BACKGROUND**

On November 7, 2011, Plaintiff commenced this action *pro se* by filing a civil rights Complaint, together with a motion to proceed *in forma pauperis.* (Dkt. Nos.1, 2.)[2] Liberally construed, Plaintiff's Complaint alleges that the following constitutional violations against him occurred during his confinement at Central New York Psychiatric Center ("CNYPC"): (1) Defendants Davis and Sill used excessive force against him under the Eighth and/or Fourteenth Amendments; (2) Defendant Nicolette knew of and failed to take action to protect Plaintiff from the assault under the Eighth and/or Fourteenth Amendments; (3) Defendants Bill, Carver, and DeBroize were deliberately indifferent to his mental health needs under the Eighth and/or Fourteenth Amendments; and (4) Defendants Bill, Carver, DeBroize, Nowicki, Maxmillian, Bosco, and Hogan failed to "adequately train the staff under their supervision" and to take appropriate action in response to the incident. (*See generally* Dkt. No. 1.) For a more detailed description of Plaintiff's

claims, and the factual allegations giving rise to those claims, the reader is referred to Part III.B of this Decision and Order.

2        At that time, Plaintiff also filed motions for injunctive relief and for appointment of counsel. (Dkt.Nos.3, 4.)

## II. MOTION TO PROCEED *IN FORMA PAUPERIS*

Because Plaintiff sets forth sufficient economic need, the Court finds that Plaintiff may properly commence this action *in forma pauperis*. (Dkt. No. 2.)

## III. *SUA SPONTE* REVIEW OF PLAINTIFF'S COMPLAINT

In light of the foregoing, the Court must now review the sufficiency of the allegations that Plaintiff has set forth in his Complaint in light of 28 U.S.C. § 1915(e)(2)(B). This is because Section 1915(e)(2)(B) directs that, when a plaintiff seeks to proceed *in forma pauperis*, "(2) ... the court shall dismiss the case at any time if the court determines that—... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).[3]

3        The Court notes that, similarly, Section 1915A(b) directs that a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b).

### A. Governing Legal Standard

**\*2** It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed.R.Civ.P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson,* 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n .17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson,* 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp .2d at 213, n. 22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim

unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id* . at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

**\*3** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief." *Id.* at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy

the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12. [4] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. [5] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28 [citations omitted]. [6]

[4]    *See Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

[5]    *See Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

[6]    It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, *"Specific* facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Twombly*—that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson* ).

### B. Analysis of Plaintiff's Complaint

The Court prefaces its analysis of Plaintiff's Complaint by noting that, although Plaintiff is a civilly committed sex offender and no longer a prisoner, the Court will look to

2012 WL 651919

cases addressing prisoner's rights in analyzing Plaintiff's claims, because "confinement of civilly committed patients is similar to that of prisoners." *Holly v. Anderson,* 04–CV–1489, 2008 WL 1773093, at *7 (D.Minn. Apr.15, 2008); *see also Morgan v. Rabun,* 128 F.3d 694, 697 (8th Cir.1997) ("The governmental interests in running a state mental hospital are similar in material aspects to that of running a prison."). Thus, whereas claims of excessive force by convicted criminals are analyzed under the Eighth Amendment to the United States Constitution, because Plaintiff is a civilly committed sex offender and no longer a prisoner, his substantive rights to be free from unsafe conditions of confinement arise under the Due Process Clause of the Fourteenth Amendment. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Court stated "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional [under the Due Process Clause] to confine the involuntarily committed-who may not be punished at all-in unsafe conditions." *Youngberg,* 457 U.S. at 315–16. As have numerous other courts which have considered the issue, this Court has found that "the standard for analyzing a civil detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard." *Groves v. Patterson,* 09–CV–1002, Memorandum–Decision and Order at *15–16 (N.D.N.Y. filed Nov. 18, 2009).[7]

[7]   See *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) ("[W]hile the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner."); *Walton v. Breeyear,* 05–CV–0194, 2007 WL 446010, at *8, n. 16 (N.D.N.Y. Feb.8, 2007) (Peebles, M.J.) (noting that pretrial detainees enjoy protections under the due process clause of the Fourteenth Amendment parallel to those afforded to sentenced prisoners by the Eighth Amendment); *Vallen v. Carrol,* 02–CV–5666, 2005 WL 2296620, at ––––8–9 (S.D.N.Y. Sep.20, 2005) (finding that the Eighth Amendment standard of "deliberate indifference" is the correct one for Section 1983 claims brought by involuntarily committed mental patients based on alleged failures to protect them that violated their substantive due process rights); *Bourdon v. Roney,* 99–CV–0769, 2003 WL 21058177, at *10 (N.D.N.Y. Mar.6, 2003) (Sharpe,

M.J.) ("The standard for analyzing a pretrial detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard.").

**1. Excessive Force Claims Against Defendants Davis, Still and Nicolette**

**\*4**  Plaintiff alleges that on August 8, 2011, Defendant Davis entered Plaintiff's dorm room at CNYPC and "viciously attacked and brutally assaulted and battered" him. (Dkt. No. 1 at 4.) During the course of this assault, Defendant Sill is alleged to have entered Plaintiff's room and "jump[ed] on the plaintiff's legs holding and pinning them as Defendant Davis [continued to beat Plaintiff]." (*Id.*) As alleged in the Complaint, although Defendant Nicolette knew in advance that this assault was planned, he "remained in the Nurses Station" and "did nothing to intercede [sic] or stop the brutal attack on the plaintiff." (*Id.* at 5.)

To validly assert a violation of the Eighth Amendment through the use of excessive force, an inmate must allege the following: (1) subjectively, that the defendants acted wantonly and in bad faith; and (2) objectively, that the defendants' actions violated "contemporary standards of decency." *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (internal quotation marks omitted) (citing *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Here, construing the factual allegations of Plaintiff's Complaint with special leniency, the Court finds that Plaintiff appears to have alleged facts plausibly suggesting that he was subjected to excessive force by Defendants Davis and Sill. In addition, by alleging that Defendants Davis, Sill and Nicolette discussed the assault in advance of it occurring, and that Nicolette was in the vicinity of Plaintiff's room and had an opportunity to intervene to prevent it, the Complaint sufficiently alleges that Defendant Nicolette was personally involved and/or failed to protect Plaintiff from the assault. See *Bhuiyan v. Wright,* 06–CV–0409, 2009 WL 3123484, at *7 (N.D.N.Y. Sept.29, 2009) (Scullin, J.) ("The fact that defendant Davis was not in the room, but was acting as a 'lookout' so that no one came into the room while plaintiff was being beaten, would not absolve him from liability for the assault. An officer's failure to intervene during another officer's use of excessive force can itself constitute an Eighth Amendment violation unless the assault is "sudden and brief," and the defendant had no real opportunity to prevent it."); *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 474 (S.D.N.Y.2003) (holding that an officer may be personally involved in the

use of excessive force if he either directly participates in the assault or if he was present during the assault, yet failed to intervene on behalf of the victim, even though the officer had a reasonable opportunity to do so).

As a result, a response to these claims is required from Defendants David, Sill, and Nicolette. In so ruling, the Court expresses no opinion as to whether Plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

### 2. Deliberate Indifference Claims Against Defendants Bill, Carver and DeBroize

Plaintiff alleges that on August 9, 2011, the day after the alleged assault, he attempted to "discuss the incident and what transpired" with Defendants Bill and Carver. (Dkt. No. 1 at 5.) Plaintiff alleges that Defendant Bill told him, "I don't want to discuss this Mr. Groves, we're too busy for your foolishness and the matter is being investigated." (*Id.*) Plaintiff's effort to explain that he was frightened by the incident was rebuffed by Defendant Bill, who told Plaintiff to "grow up." (*Id.* at 5–6.) The following day, Plaintiff attempted to discuss the incident with Defendant Carver, his primary therapist, again without success. A further attempt at discussion later that day was met with Defendant Carver "stating to the plaintiff in a snotty tone 'grow the hell up!' " (*Id.* at 6.) On August 10, 2011, Plaintiff attempted to discuss the incident "and his current fears and feelings," during his Monday afternoon "Process Group," which is facilitated by Defendant DeBroize. As alleged, Defendant DeBroize told Plaintiff and the other group members that the matter was under investigation "so no one could discuss the incident with anyone." (*Id.* at 6.)

**\*5** To state a claim of deliberate indifference to a serious medical and/or mental health need under the Eighth Amendment, a plaintiff must first allege facts plausibly suggesting that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06). The "deliberate indifference standard embodies both an objective and a subjective prong," both of which the plaintiff must establish. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "First, the alleged

deprivation must be, in objective terms, 'sufficiently serious.' " *Id.* (citations omitted). Second, the defendant "must act with a sufficiently culpable state of mind." *Id.*

With regard to the first element, generally, to be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway,* 37 F.3d at 66; *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).). [8] Under the subjective component, a plaintiff must also allege facts plausibly suggesting that the defendant acted with "a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66. The requisite culpable mental state is similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A physician's negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a Section 1983 action. *Estelle,* 429 U.S. at 105–06; *Chance,* 143 F.3d at 703. [9]

[8]    Relevant factors informing this determination include whether the plaintiff suffers from an injury that a "reasonable doctor or patient would find important and worthy of comment or treatment," a condition that "significantly affects" a prisoner's daily activities, or "the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702.

[9]    Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under Section 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester Cnty. Dept. of Corr.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008). In addition, "disagreements over medications, diagnostic techniques (e .g., the need for X-rays), forms of treatment, or the need for specialists or

2012 WL 651919

the timing of their intervention are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting that Defendants Bill, Carver, and DeBroize acted with deliberate indifference to Plaintiff's serious mental health condition when they declined to discuss the incident of August 8, 2011. There is nothing in the Complaint that even remotely suggests that the requested conversations were integral to Plaintiff's treatment as a convicted sex offender involuntarily committed to CNYPC, or that Defendants' refusal to discuss the incident with Plaintiff when he requested to do so caused Plaintiff to suffer any harm or worsening of his condition. In addition, Plaintiff does not allege that any of these Defendants acted with the requisite culpable state of mind.

Moreover, the statements made by Defendants Bill and Carver that he should "grow up," even if construed as verbal harassment, do not give rise to a cognizable claim that may be pursued under Section 1983. Allegations of verbal harassment are insufficient to support a Section 1983 claim. *Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001); *see also Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) ("[A]llegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged .").

**\*6** For these reasons, Plaintiff's deliberate indifference claims against Defendants Bill, Carver, and DeBroize are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). Moreover, because the Court cannot imagine how Plaintiff might correct this claim through better pleading, he is not granted leave to attempt to do so in an amended pleading. [10] Rather, this claim is hereby dismissed with prejudice.

[10]     The Court notes that, generally, leave to amend pleadings shall be freely granted when justice so requires. Fed.R.Civ.P. 15(a). However, an opportunity to amend is not required where amendment would be futile. *John Hancock Mut.*

*Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d Cir.1994). *John Hancock Mut. Life Ins. Co.,* 22 F.3d at 462. The Second Circuit has explained that "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993); *see Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with [Plaintiff's] cause of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."). This rule is applicable even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103.

### 3. Failure to Supervise Claims Against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan

To prevail on a claim under 42 U.S.C. § 1983, a defendant must be personally involved in the plaintiff's constitutional deprivation. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Generally, for purposes of 42 U.S.C. § 1983, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. [11]

[11]     *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323–324 (2d Cir.1986) (setting forth four prongs).

Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement. *McKinnon,* 568 F.2d at 934. Rather, a plaintiff must demonstrate " 'a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas,* 04–CV–7263, 2008 WL 857528, at \*2 (S.D.N.Y. Mar.31, 2008) (quoting *Bass v. Jackson,* 790 F.2d 260, 263 [2d Cir.1986] ) (other citation omitted). An official's failure to respond to grievance letters from inmates, however, "does not establish supervisory liability." *Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997). [12] Moreover, "the law is clear that inmates do not enjoy a constitutional right to an

investigation of any kind by government officials." *Pine v. Seally,* 9–CV–1198, 2011 WL 856426, at *9 (N.D.N.Y. Feb.4, 2011). [13]

[12]    *See also Gillard v. Rosati,* 08–CV–1104, 2011 WL 4402131, at *7 (N.D.N.Y. Aug.22, 2011) (Peebles, J.) ("It is well-established that without more, 'mere receipt of letters from an inmate by a supervisory official regarding a medical claim is insufficient to constitute personal liability." [internal quotation marks and brackets omitted] ); *Greenwaldt v. Coughlin,* 93–CV–6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995) ("it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."); *Clark v. Coughlin,* 92–CV 0920, 1993 WL 205111, at *5 n. 2 (S.D.N.Y. Jun.10, 1993) ("Courts in this jurisdiction have consistently held that an inmate's single letter does not constitute the requisite personal involvement in an alleged constitutional deprivation to trigger the Commissioner's liability.")

[13]    *See also Bernstein v. N.Y.,* 591 F.Supp.2d 448, 460 (S.D.N.Y.2008) ("Courts within the Second Circuit have determined that there is no constitutional right to an investigation by government officials." [internal quotation marks, brackets and ellipsis omitted] ).

In his Complaint, Plaintiff alleges in wholly conclusory terms that Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan failed to "adequately train the staff under their supervision and fail[ed] to act within the scope and training of the position and job title they hold." (Dkt. No. 1 at 8.) Plaintiff alleges that he submitted a letter of complaint to Defendant Hogan and wrote to Defendant Nowicki on several occasions expressing concern his complaint had not been responded to, only to be advised that in September, 2011 that an investigation was ongoing. (*Id.* at 6–7.) Plaintiff does not allege that any of these Defendants personally participated in the alleged assault on August 8, 2011.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting any personal involvement by these Defendants in the alleged used of excessive force on August 8, 2011. As a result, Plaintiff's claims against Defendants Bill, Carver, DeBroize,

Nowicki, Maxymillian, and Hogan arising from this incident are *sua sponte* dismissed pursuant to 28 U.S.C. § 1915(e)(2) (B)(ii) and Fed.R.Civ.P. 12(b)(6). This dismissal is without prejudice to Plaintiff's right to file an Amended Complaint that corrects the above-described pleading defects, and states a viable claim against these Defendants. The Court notes that, at this early stage of the case, Plaintiff has the right— without leave of the Court—to file an Amended Complaint within the time limits established by Fed.R.Civ.P. 15(a)(1) (B). However, if he seeks to file an Amended Complaint after those time limits, he must file a motion for leave to file an Amended Complaint in accordance with Fed.R.Civ.P. 15(a) (2). In either event, Plaintiff is advised that *any Amended Complaint must be a complete pleading that will replace and supersede the original Complaint in its entirety, and that may not incorporate by reference any portion of the original Complaint. See* N.D.N.Y. L.R. 7.1(a) (4).

 **\*7**  Finally, although Plaintiff names Sgt. Sweet as a Defendant in the caption of the complaint and in the listing of the parties, he has not set forth in the Complaint any allegations of fact regarding the conduct of this Defendant complained of. (*See generally* Dkt. No. 1.) As a result, the Complaint fails to state a claim upon which relief may be granted and Sgt. Sweet is dismissed from this action without prejudice to Plaintiff's right to file an Amended Complaint as set forth above.

## IV. MOTION FOR INJUNCTIVE RELIEF

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." *Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986). In most cases, to warrant the issuance of a preliminary injunction, a movant must show (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits, and a balance of hardships tipping decidedly in favor of the moving party. *D.D. ex rel. V.D. v. New York City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (quotation omitted). "The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the ... merits.' " *Candelaria v. Baker,* 00–CV–912, 2006 WL 618576, at *3 (W.D.N.Y. Mar.10, 2006) (quoting *Devose v. Herrington,* 42 F.3d 470, 471 [8th Cir.1994] ). Preliminary injunctive relief " 'should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " *Moore v. Consolidated Edison Co. of New York, Inc.,* 409 F.3d 506, 510 (2d Cir.2005) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 [1997] ). "Where

2012 WL 651919

there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore,* 409 F.3d at 510 (citing *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). The same standards govern consideration of an application for a temporary restraining order. *Perri v. Bloomberg,* 06–CV–0403, 2008 WL 2944642, at *2 (E.D.N.Y. Jul.31, 2008) [citation omitted]. The district court has broad discretion in determining whether to grant a preliminary injunction. *Moore,* 409 F.3d at 511.

"The Second Circuit has defined 'irreparable harm' as 'certain and imminent harm for which a monetary award does not adequately compensate,' noting that 'only harm shown to be non-compensable in terms of money damages provides the basis for awarding injunctive relief.' " *Perri,* 2008 WL 2944642, at *2 (citing *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.,* 339 F.3d 101, 113–14 [2d Cir.2003] ); *see also Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir.2002) ("To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.") (internal quotation omitted). Speculative, remote or future injury is not the province of injunctive relief. *Los Angeles v. Lyons,* 461 U.S. 95, 111–12, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *see also Hooks v. Howard,* 07–CV–0724, 2008 WL 2705371, at *2 (N.D.N.Y. Jul.3, 2008) (citation omitted) ("Irreparable harm must be shown to be imminent, not remote or speculative, and the injury must be such that it cannot be fully remedied by monetary damages.").

**\*8** Plaintiff has submitted a document entitled "Order to Show Cause for Preliminary Injunction and Tempor[ary] Restraining Order." (Dkt. No. 3.) Construed liberally, Plaintiff's submission seeks a temporary restraining order and injunctive relief enjoining Defendants from "submitting and filing false and untrue statements and reports" regarding the August 11, 2011 incident, and to "stop all retaliatory actions against the plaintiff ...." (*Id.* at 1.) Plaintiff also seeks an "Order of Seperation [sic]" directing that Defendants Davis, Sill, Nicolette, Bill, Carver and DeBroize be "restrained from being within 100 feet from the plaintiff in any form or matter." (*Id.* at 2.)

The Court has reviewed Plaintiff's motion papers thoroughly and considered the claims asserted therein in the light most favorable to Plaintiff, as a *pro se* litigant. Based upon that review, the Court finds that the harm Plaintiff alleges is purely speculative and, therefore, not "irreparable." Plaintiff's motion is supported only by a recitation of the alleged assault in August, 2011. (*Id.* at 1–4.) Plaintiff has not supported the claims of ongoing misconduct set forth in his motion papers with any factual allegations, such as the dates on which the misconduct occurred, the nature of the injuries he claims to have suffered, the identities of the persons responsible for the conduct he seeks to enjoin, or the relationship between those actions and the claims asserted in his Complaint. Simply stated, Plaintiff's alleged fear of future wrongdoing by the Defendants is not sufficient to warrant the extraordinary remedy of preliminary injunctive relief.

The Court further notes that the requested injunctive relief cannot be granted unless there is also proof that Plaintiff has a likelihood of succeeding on the merits of his claim, or evidence that establishes sufficiently serious questions going to the merits of his claim and a balance of hardships tipping decidedly toward him. *See Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). Plaintiff has failed to submit *proof or evidence* that meets this standard. Plaintiff's allegations, standing alone, are not sufficient to entitle him to preliminary injunctive relief. *See Ivy Mar Co. v. C.R. Seasons Ltd.,* 907 F.Supp. 547, 561 (E.D.N.Y.1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction."); *Hancock v. Essential Resources, Inc.,* 792 F.Supp. 924, 928 (S.D.N.Y.1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals."). Without evidence to support his claims that he is in danger from the actions of anyone at CNYPC, the Court will not credit Plaintiff's conclusory allegations that he will be retaliated against or harmed in the future.

Plaintiff has failed to establish either of the two requisite elements discussed above. As a result, Plaintiff's request for a temporary restraining order and/or injunctive relief is denied.

## V. MOTION FOR APPOINTMENT OF COUNSEL

**\*9** Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin,* 114 F.3d 390, 392–93 (2d Cir.1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion:

> [T]he district judge should first determine whether the indigent's position seems likely to be of

substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 [2d Cir.1986] ). This is not to say that all, or indeed any, of these factors are controlling in a particular case. [14] Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Hodge,* 802 F.2d at 61).

[14]    For example, a plaintiff's motion for counsel must always be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector, and such a motion may be denied solely on the failure of the plaintiff to provide such documentation. *See Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994); *Cooper v. Sargenti Co., Inc.,* 877 F.2d 170, 172, 174 (2d Cir.1989) [citation omitted].

Upon due consideration, the Court finds that the relevant factors weigh decidedly against granting Plaintiff's motion at this time. For example, the Court finds as follows: (1) the case does not present novel or complex issues; (2) it appears to the Court as though, to date, Plaintiff has been able to effectively litigate this action; (3) while it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of the trial, as is the case in many actions brought under 42 U.S.C. § 1983 by *pro se* litigants, "this factor alone is not determinative of a motion for appointment of counsel," *Velasquez,* 899 F.Supp. at 974; (4) if this case survives any dispositive motions filed by Defendants, *it is highly probable that this Court will appoint trial counsel at the final pretrial conference;* (5) this Court is unaware of any special reasons why appointment of counsel at this time would be more likely to lead to a just determination

of this litigation; and (6) Plaintiff's motion for counsel is not accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

For these reasons, Plaintiff's motion for the appointment of counsel is denied without prejudice. After the Defendants have responded to the allegations in the Complaint which survive *sua sponte* review, and the parties have undertaken discovery, Plaintiff may file a second motion for the appointment of counsel, at which time the Court may be better able to determine whether such appointment is warranted in this case. Plaintiff is advised that any second motion for appointment of counsel must be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

**\*10  ACCORDINGLY,** it is

**ORDERED** that Plaintiff's motion to proceed *in forma pauperis* (Dkt. No. 2) is *GRANTED;* [15] and it is further

[15]    Plaintiff should note that he will still be required to pay fees that he may incur in this action, including but not limited to copying and/or witness fees.

**ORDERED** that Plaintiff's motion for injunctive relief (Dkt. No. 3) is *DENIED;* and it is further

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 4) is *DENIED* **without prejudice;** and it is further

**ORDERED** that Plaintiff's claims of deliberate indifference against Defendants Bill, Carver and DeBroize are *sua sponte DISMISSED* **with prejudice** pursuant to 28 U.S.C. § 1915(e) (2) (B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from their alleged personal involvement in the August 8, 2011 incident are *sua sponte DISMISSED* **without prejudice and with leave to amend** in this action in accordance with Fed.R.Civ.P. 15 (as described above in Part III.B.3. of this Decision and Order), pursuant to 28 U.S.C. § 1915(e)(2)(B) (ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Defendant Sweet is *sua sponte DISMISSED* **without prejudice and with leave to be reinstated** as a Defendant in this action in accordance with

2012 WL 651919

Fed.R.Civ.P. 15, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is otherwise accepted for filing (i.e., as to the claims against Defendants Davis, Sill, and Nicolette arising from the August 8, 2011 incident); and it is further

**ORDERED** that Plaintiff provide a summons, USM–285 form and a copy of the complaint for Defendant Davis, Sill and Nicollette for service, and upon receipt from Plaintiff of the documents required for service of process, the Clerk shall (1) issue summonses and forward them, along with copies of the Complaint to the United States Marshal for service upon the remaining Defendants, and (2) forward a copy of the summons and Complaint by mail to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED** that, after service of process on Defendants, a response to the Complaint shall be filed by the Defendants or their counsel as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261–7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a certificate of service showing that a copy was served upon all opposing parties or their attorneys will be stricken from the docket .** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to so may result in the dismissal of this action.** All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 651919

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 73 of 201

Scott v. Koenigsmann, Not Reported in Fed. Supp. (2016)

2016 WL 1057051

2016 WL 1057051
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Robyn D. SCOTT, f/k/a Robert D. Scott, Plaintiff,
v.
Carl KOENIGSMANN, M.D., Defendant.

9:12-CV-1551
|
Signed 03/14/2016

**Attorneys and Law Firms**

ROBYN SCOTT, 7 Mill Street, #5, Batavia, New York 14020,
Plaintiff, pro se.

HON. ERIC T. SCHNEIDERMAN, Attorney General for the
State of New York, The Capitol, OF COUNSEL: ADRIENNE
J. KERWIN, ESQ., Assistant Attorney General, Albany, New
York 12224-0341, Attorney for Defendant.

**MEMORANDUM-DECISION AND ORDER**

Mae A. D'Agostino, U.S. District Judge

**\*1  I. INTRODUCTION**

Plaintiff Robyn D. Scott, formerly known as Robert D. Scott
("Plaintiff"), who is proceeding *pro se* and *in forma pauperis*,
commenced this action alleging that Carl Koenigsmann,
M.D. [1]  ("Defendant") was deliberately indifferent to her
alleged inadequate medical care in violation of her Eighth
Amendment rights. [2]  *See generally* Dkt. No. 7. Currently
before the Court is Defendant's motion for summary judgment
pursuant to Rule 56 of the Federal Rules of Civil Procedure.
*See* Dkt. No. 65. Plaintiff has responded to the motion. *See*
Dkt. No. 71.

[1]     Upon review of the within motion, the Court notes
that Defendant's name is spelled incorrectly on the
docket report for this action. The Clerk of the Court
is directed to modify the docket accordingly.

[2]     As a result of previous motion practice, the only
remaining claim against Defendant is Plaintiff's
Eighth Amendment claim related to her medical

care between February 7, 2012 and October 24,
2012. Dkt. No. 41 at 21; Dkt. No. 43.

**II. BACKGROUND**

In support of the motion for summary judgment, Defendant
submitted a "Statement of Material Facts" pursuant to Local
Rule 7.1(a)(3) with exhibits including Plaintiff's deposition
transcript and copies of Plaintiff's medical records. [3]  Plaintiff
has not objected to the authenticity of any documents annexed
to Defendant's motion. Therefore, to the extent that the
"facts" asserted by Defendant are supported by the record,
the undersigned will consider the facts and relevant exhibits/
documents in the context of the within motion. *See U.S. v.
Painting known as Hannibal*, No. 07-CV-1511, 2010 WL
2102484, at *1, n.2 (S.D.N.Y. May 18, 2010) (citing *Daniel
v. Unum Provident Corp.*, 261 F. App'x 316, 319 (2d Cir.
2008) ("[A] party is not required to authenticate documents
on a summary judgment motion where, as here, authenticity
is not challenged by the other party)); *see also N.Y. Teamsters
Conference Pension & Ret. Fund v. Express Servs., Inc.*, 426
F.3d 640, 648–49 (2d Cir. 2005).

[3]     Local Rule 7.1(a)(3) states:

The opposing party shall file a response to the
Statement of Material Facts. The non-movant's
response shall mirror the movant's Statement
of Material Facts by admitting and/or denying
each of the movant's assertions in matching
numbered paragraphs. Each denial shall set forth
a specific citation to the record where the factual
issue arises. The non-movant's response may
also set forth any additional material facts that
the non-movant contends are in dispute. Any
facts set forth in the Statement of Material Facts
shall be deemed admitted unless specifically
controverted by the opposing party.

Plaintiff did not provide a response to Defendant's Statement
of Material Facts. Despite this omission, courts are flexible
with their interpretation of the Local Rules to, "prevent the
elevation of procedure over substance where the evidence
submitted by the parties has pointed to the existence of
disputed material of facts." *Rivera v. Nat'l R.R. Passenger
Corp.*, 152 F.R.D. 479, 483 (S.D.N.Y. 1993) (citations
omitted). The Court has broad discretion to decide whether to
overlook the failure to comply with local rules and perform
an independent review of the record. *Holtz v. Rockefeller
& Co.*, 258 F.3d 62, 73 (2d Cir. 2001); *see also Monahan*

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 74 of 201

Scott v. Koenigsmann, Not Reported in Fed. Supp. (2016)

2016 WL 1057051

*v. City of N.Y. Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000); *see also Cruz v. Church*, 2008 WL 4891165, at *3, n. 4 (N.D.N.Y. 2008) (collecting cases) (holding that the plaintiff was not so experienced at federal court litigation that the special leniency normally afforded to pro se litigants should have been diminished). If the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit in opposing a motion for summary judgment. *Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004). In considering whether there are material issues of fact "[a] verified complaint is to be treated as an affidavit for summary judgment purposes ... provided that it meets the other requirements for an affidavit" under Rule 56. *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995). To be sufficient to create a factual issue, "a verified complaint must be based on personal knowledge." *Gill v. Frawley*, No. 02-CV-1380, 2006 WL 1742738, at *4 (N.D.N.Y. June 22, 2006) ("An affidavit (or verified complaint) is not based on personal knowledge if, for example, it is based on mere 'information and belief' or hearsay"). The affidavit or verified pleading is insufficient to create a factual issue where it is "unsubstantiated by any other direct evidence." *Id.*

**\*2** Here, plaintiff's amended complaint includes the following language, "I declare under penalty of perjury that the foregoing is true and accurate." *See* Dkt. No. 7 at 10. "Ordinarily, [ ] sworn allegation[s] [ ... ] are sufficient to constitute evidence for purposes of a motion for summary judgment. " *See Taylor v. Artus*, No. 9:05-CV-0271, 2007 WL 4555932, at *6 (N.D.N.Y. Dec. 19, 2007). Accordingly, with the aforementioned caveats in mind, the amended complaint will be treated as an affidavit.

## A. Facts [4]

[4]    The facts, as discussed herein, are for the relevant time period as referenced in the amended complaint.

Plaintiff commenced this suit while she was an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Dkt. No. 7 at ¶ 3. Plaintiff has since been released from DOCCS' custody. Dkt. No. 30. At all times relevant to this action, Defendant was employed by DOCCS as Deputy Commissioner and Chief Medical Officer. Dkt. No. 65-4 at ¶ 1. He is responsible for the development and implementation of medical policies and practices for inmates in the custody of DOCCS. *Id.* at

¶ 3. Defendant does not provide medical care to individual inmates. *Id.* at ¶ 5.

In 2003, Plaintiff entered DOCCS. Dkt. No. 7 at ¶ 7. From February 2012 through October 2012, Plaintiff was treated by DOCCS medical staff at Mid-State Correctional Facility ("Mid-State C.F.") and Gowanda Correctional Facility ("Gowanda C.F."). Dkt. No. 66, *generally*. In February 2012, Plaintiff was confined at Mid-State C.F. and received the following prescription medications: Ultram/Tramadol (50 mg) [5], Neurontin (600 mg) [6], Elavil (10mg) [7], Fluocinonide topical cream [8] and Claritin-D (1 tablet per day). Dkt. No. 7 at ¶ 8; Dkt. No. 66-2 at 10; Dkt. No. 66-8 at 8. On February 16, 2012, plaintiff was treated by a nurse practitioner for ongoing sinus congestion with a chronic running nose. Dkt. No. 66-2 at 11. Plaintiff requested a renewal of her prescription for Robaxin and was advised that the medication was not "indicated for long term use." *Id.* Plaintiff was diagnosed with allergic rhinitis and received a prescription for Nasacort spray. *Id.*

[5]    Prior to 2012, while in DOCCS' custody, plaintiff received a prescription for Ultram/Tramadol for back pain. Dkt. No. 66-9 at 12; Dkt. No. 66-10 at 16; *see also* http://www.nih.gov (Last visited March 9, 2016) ("Ultram" is a brand name of Tramadol).

[6]    In 2004, DOCCS medical staff prescribed Neurontin for "neuropathy pains." Dkt. No. 66-11 at 16; Dkt. No. 66-13 at 9.

[7]    Prior to 2012, during her confinement at DOCCS, Plaintiff received a prescription for Elavil (a brand name for Amitriptyline), a muscle relaxer, to ingest at bedtime. Dkt. No. 66-5 at 20; Dkt. No. 66-5 at 24; *see also* http://www.nih.gov (Last visited March 9, 2016).

[8]    Prior to 2012, DOCCS medical staff prescribed Fluocinonide/Lidex topical cream for skin irritation. Dkt. No. 66 at 22; *see also* http://www.drugs.com (Last visited March 9, 2016).

In March 2012, Plaintiff received the following prescription medications: Prilosec (20 mg); Nasacort and Amitriptyline (10 mg) [9]. Dkt. No. 66-2 at 9. On March 3, 2012, Plaintiff wrote a letter to Defendant. Dkt. No. 65-5 at 1. As part of Defendant's office procedures, when inmate letters are received, they are reviewed by administrative staff who

Scott v. Koenigsmann, Not Reported in Fed. Supp. (2016)

2016 WL 1057051

determine which Division of Health Services official should receive the correspondence to prepare a response. Dkt. No. 65-4 at ¶ 6. In the March 3, 2012 correspondence, Plaintiff complained that she did not receive a TENS unit and requested a specialist that "know[s] my injuries and treated me from the beginning at the pain management center."[10] Dkt. No. 65-5 at 1.

[9]    *See* Footnote 7, *supra.*

[10]    Prior to 2012, while in DOCCS' custody, plaintiff received a prescription for a TENS Unit for "paraspinal muscle tenderness and upper neck and back areas." Dkt. No. 66-5 at 20.

**\*3** On March 6, 2012, plaintiff received a TENS Unit. Dkt. No. 66-2 at 10. On the same day, Plaintiff wrote a letter to Defendant stating, "I received the TENS Unit today. Thank you." Dkt. No. 65-5 at 8. Plaintiff also informed Defendant that her 1983 civil suit was "on hold" because she hoped to receive relief from her pain with the TENS unit. *Id*

On March 14, 2012, at Defendant's request, Peter Bogarski ("Bogarski"), Regional Health Services Administrator, responded to Plaintiff's "recent letters". Dkt. No. 65-5 at 5. Bogarski confirmed that Plaintiff received the TENS unit. *Id.* Bogarski also advised Plaintiff that her medications were ordered by a primary care provider and that any change in medication must be discussed with that provider. *Id.* Plaintiff was urged to bring her health concerns to the attention of the health care staff utilizing sick call procedures. *Id.*

On April 2, 2012, plaintiff attended Sick Call and requested batteries for her TENS Unit. Dkt. No. 66-2 at 8. On April 12, 2012, Plaintiff wrote a letter to Defendant requesting a battery and "pads" for the TENS Unit. Dkt. No. 65-5 at 11. Plaintiff claimed that she was "told" that she would receive one replacement battery every six weeks and "pads" once per year. *Id.* Plaintiff explained that this would allow her to use the TENS Unit on only one area, at a low to medium setting, every three to five days. *Id.* Plaintiff stated that she needed to use the unit on four areas every two to three days, at the "highest setting" as previously prescribed by her doctor. *Id.* Plaintiff complained that the medication was "half of what [her] doctor recommended." Dkt. No. 65-5 at 11. Plaintiff asked for the "needed" batteries and pads "from time to time." *Id.*

On April 13, 2012, plaintiff was diagnosed with acute sinusitis and given a "Z-pack" and Nasacort. Dkt. No. 66-2

at 6. Plaintiff also requested and received a renewal of her prescription for Motrin (600 mg). Dkt. No. 66-2 at 6.

On April 20, 2012, Plaintiff wrote a letter to Defendant.[11] Dkt. No. 7 at ¶ 28. In the April 20, 2012 correspondence, Plaintiff complained that she endured "small abuses, such as crushing one of her medications for no reason." *Id.* at 23. Plaintiff stated that the "little pain medication" she received was "taken away" and claimed that Defendant ordered staff to "take away half of the muscle relaxers I need." *Id.*

[11]    Defendant claims that his office has no record of the letter. Dkt. No. 65-4 at ¶ 10. The letter was annexed to Plaintiff's amended complaint. Dkt. No. 7 at 23.

In May 2012, Plaintiff received the following prescription medications: Fluocinonide topical cream, Nasacort, Claritin-D and Selenium Sulfide (for dandruff). Dkt. No. 66-2 at 4, 5. On May 15, 2012 Plaintiff received a replacement battery for her TENS Unit. *Id.* On May 22, 2012, plaintiff was treated by a nurse practitioner for facial pressure, sinus congestion and nasal discharge. Dkt. No. 66-2 at 5. Plaintiff was diagnosed with chronic sinusitis and prescribed Cipro. *Id.*

In June 2012, Plaintiff received the following daily prescription medications: Elavil (10 mg), Neurontin (600 mg), Ultram/Tramadol (50 mg) and Claritin-D (1 tablet). Dkt. No. 66-7 at 23; Dkt. No. 66-8 at 1, 6. On June 8, 2012, at Defendant's request, Bogarski responded to Plaintiff's "recent letters." Dkt. No. 65-5 at 9. Bogarski advised Plaintiff to report to Sick Call for batteries and pads for her TENS Unit. *Id.* Bogarski also suggested that Plaintiff discuss the frequency of replacements at that time. *Id.* On June 15, 2012, Plaintiff was seen at Sick Call and received topical cream to treat athletes' foot and batteries for her TENS Unit. *Id.*

**\*4** On June 20, 2012, Plaintiff was transferred to Gowanda Correctional Facility ("Gowanda C.F."). Dkt. No. 7 at ¶ 29. On the same day, plaintiff's prescriptions for Claritin-D, nasal spray, Amitriptyline, Omeprazole[12], Tramadol, Finastride[13] and Gabapentin[14] were transferred from Mid-State C.F. to Gowanda C.F. Dkt. No. 66-2 at 3. On June 25, 2012, upon arriving at Gowanda C.F., Plaintiff was examined by a nurse and diagnosed with lower back pain and neuropathy. *Id.* at 2. Plaintiff received a permit for a 12" elastic binder and TENS Unit and was directed to return the items to the Health Service Unit on July 16, 2012. Dkt. No. 66-8 at 4. An "Inmate Limitations" form was completed prohibiting Plaintiff from engaging in strenuous labor or sitting for prolonged periods

2016 WL 1057051

of time. Dkt. No. 66-8 at 5. The form indicated that the restrictions imposed would remain in effect until July 16, 2012. *Id.*

12    Prior to 2012, during her confinement at DOCCS, Plaintiff received a prescription for Omeprazole (Prilosec). http://www.nih.gov (Last visited March 9, 2016).

13    Prior to 2012, during her confinement at DOCCS, Plaintiff received a prescription for Finasteride. Dkt. No. 66 at 14. Finasteride is used to treat enlargement of the prostate gland and frequent/difficult urination. http://www.nih.gov (Last visited March 9, 2016).

14    Prior to 2012, during her confinement at DOCCS, Plaintiff received a prescription for Gabapentin for radicular pain. Dkt. No. 66-5 at 20; Dkt. No. 66-5 at 24.

In July 2012, Plaintiff received the following daily medications: Neurontin (600 mg), Ultram (50 mg), Finasteride and Elavil (10 mg). Dkt. No. 66-1 at 24-45; Dkt. No. 66-2 at 1; Dkt. No. 66-7 at 22. Plaintiff requested and received a battery for her TENS Unit, antifungal cream and dandruff shampoo. Dkt. No. 66-1 at 25. On July 9, 2012, plaintiff was examined and diagnosed with chronic nasal allergies, sinusitis and lower back pain. Dkt. No. 66-2 at 2. At that time, Plaintiff also received a permanent permit for "3 rd Floor or Lower Housing" due to "health/medical reasons." Dkt. No. 66-7 at 25. In addition, Plaintiff's medical limitations were modified. Plaintiff was restricted from strenuous labor and from lifting more than fifteen pounds for an "indefinite" period of time. *Id.* at 24.

In August 2012, Plaintiff received the following daily medications: Neurontin (600 mg), Elavil (10 mg) and Ultram (50 mg). Dkt. No. 66-7 at 21. On August 1, 2012, Plaintiff wrote to Defendant. Dkt. No. 65-5 at 15. Plaintiff advised that she could not walk due to Defendant's decision to "terminate" her muscle relaxers. *Id.* Plaintiff asked Defendant to return her medication. *Id.* Plaintiff also advised that she was denied skin cream for psoriasis. *Id.* On August 7, 2012, plaintiff was treated by a nurse for psoriasis and received a prescription for Lidex to address her skin condition. Dkt. No. 66-1 at 22.

On August 23, 2012, Eileen Dinisio ("Dinisio"), Regional Health Services Administrator, responded to Plaintiff's "recent letter" to Defendant. 15 Dkt. No. 65-5 at 12. Dinisio

advised that the Division of Health Services investigated Plaintiff's concerns regarding the staff at Gowanda C.F. *Id.* The investigation revealed that Plaintiff was evaluated by a primary care provider and prescribed Lidex for her skin and Tramadol, Neurontin and Elavil for her "discomfort." *Id.*

15    Dinisio is not a defendant in this action.

In September 2012, Plaintiff received the following daily medications: Neurontin (600 mg), Elavil (10 mg) and Ultram (50 mg). Dkt. No. 66-7 at 19. On September 20, 2012, plaintiff was treated by a nurse for psoriasis and a lesion on her nose. Dkt. No. 66-1 at 21. The nurse noted that Plaintiff's permits for her binder and TENS Unit had expired and that there was, "no clear indication for [the] binder." *Id.* Plaintiff received a new permit for the TENS Unit, a new battery and shampoo. *Id.*; Dkt. No. 66-7 at 20. The renewed permit indicated that the TENS Unit, "[i]s now part of the inmates property and should leave the facility with the inmate." *Id.*

*5  In October 2012, Plaintiff received the following daily medications: Neurontin (600 mg), Elavil (10 mg) and Ultram (50 mg). Dkt. No. 66-7 at 18. On October 16, 2012, plaintiff was treated at Sick Call for psoriasis and foot complaints. Dkt. No. 66-1 at 21. Plaintiff received four TENS pads, a 9-volt battery, anti-fungal cream and dandruff shampoo. *Id.*

**B. Procedural History**

On July 25, 2012, Plaintiff filed her complaint in this action. Dkt. No. 1. On October 29, 2012, Plaintiff filed an amended complaint. Dkt. No. 7. Upon review of Plaintiff's amended complaint, the Court directed Defendant to respond to the allegations in the amended complaint. Dkt. No. 11. On April 12, 2013, Defendant filed a motion to dismiss Plaintiff's amended complaint. Dkt. No. 23. On August 13, 2014, the Court adopted the Report-Recommendation of Magistrate Judge Randolph Treece and dismissed various claims. Dkt. No. 41, 43. Following the Order, the only claim that survived was Plaintiff's claim that Defendant was deliberately indifferent to the allegedly inadequate medical care that Plaintiff received between February 7, 2012 and October 24, 2012 at Mid-State C.F. and Gowanda C.F. Dkt. No. 41 at 21; Dkt. No. 43. In that regard, the Court noted, "[c]rucially, it is unclear what, if any, action Defendant Koenigsmann took in response to Plaintiff's June 20 and August 1 letters." Dkt. No. 41 at 15.

On July 31, 2015, Defendant moved for summary judgment pursuant to Rule 56. Dkt. No. 65. In support of the motion for

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 77 of 201

Scott v. Koenigsmann, Not Reported in Fed. Supp. (2016)

2016 WL 1057051

summary judgment, Defendant argues that Plaintiff failed to establish that he was personally involved in any constitutional violations. *See* Dkt. No. 65-7 at 6-12. In the alternative, Defendant contends that, based upon the record now before the court, no reasonable factfinder could conclude that Defendant violated Plaintiff's Eighth Amendment rights. *See id.* at 13-15. Plaintiff has opposed Defendant's motion seeking additional discovery and the appointment of counsel. *See* Dkt. No. 71.

### III. DISCUSSION

#### A. Standard of review

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c) (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2502, 2513-14, 91 L. Ed. 2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

**\*6** "[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.'" *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). "This liberal standard, however, does not excuse a pro se litigant from following the procedural formalities of summary judgment." *Id.* at 295 (citing *Showers v. Eastmond*, No. 00 CIV. 3725, 2001 WL 527484, \*1 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (quoting *Cary v. Crescenzi*, 923 F.2d 18, 21 (2 Cir. 1991)).

#### B. Personal Involvement

Defendant moves for summary judgment and dismissal of Plaintiff's complaint, in its entirety, arguing that he was not personally involved in any alleged constitutional deprivations. Plaintiff does not claim that Defendant personally treated Plaintiff or provide Plaintiff with any medical care. *See generally*, Dkt. No. 7. Rather, Plaintiff claims that Defendant was personally involved in the alleged deprivations because he has the "responsibility for his policies and procedures or the actions of his staff that were under his control." *See* Dkt. No. 71 at 2. Moreover, Plaintiff contends that Defendant must be aware of the facts surrounding Plaintiff's medical case due to the "twenty months of appeals sent directly to the Defendant." *See* Dkt. No. 7 at ¶ 6.

"It is well settled in [the Second Circuit] that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)). With respect to individuals who are sued in their capacities as supervisors, it is well-established that they cannot be liable for damages under section 1983 solely by virtue of being a supervisor. *See Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) ("[L]iability ... cannot rest on respondeat superior."); *Wright*, 21 F.3d at 501. To establish responsibility on the part of a supervisory official for a civil rights violation, a plaintiff must demonstrate that the individual (1) directly participated in the challenged conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4)

Case 9:22-cv-00181-GTS-MJK Document 96 Filed 07/24/24 Page 78 of 201
Scott v. Koenigsmann, Not Reported in Fed. Supp. (2016)
2016 WL 1057051

was grossly negligent in managing the subordinates who caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty*, 490 F.3d 143, 152–53 (2d Cir. 2007), *see also Richardson*, 347 F.3d at 435; *Colon*, 58 F.3d at 873.

Conclusory claims that a supervisory official has failed to provide proper training and supervision, without facts showing personal involvement, are legally insufficient to state a claim under any of the categories identified in Colon. *See Bridgewater v. Taylor*, 832 F.Supp.2d 337, 348 (S.D.N.Y. 2011); *White v. Fischer*, No. 9:09-CV-0240, 2010 WL 624081, at *6 (N.D.N.Y. Feb.18, 2010) ("Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability."); *see also Pettus v. Morgenthau*, 554 F.3d 293, 300 (2d Cir. 2009) (affirming dismissal of complaint against supervisor when the complaint did not allege any personal involvement and "lack[ed] any hint that [he] acted with deliberate indifference to the possibility that his subordinates would violate [the plaintiff's] constitutional rights); *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987) ("Dismissal of a section 1983 claim is proper where, as here, the plaintiff 'does no more than allege defendant was in charge of the prison' ") (citation omitted).

**\*7** The receipt of letters or grievances by a supervisor is insufficient to impute personal inovlvement. *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997); *see also Goris v. Breslin*, 402 F. App'x 582, 584 (2d Cir. 2010) (finding that the receipt of two letters, which were referred to other individuals for response does not establish personal involvement to overcome motion for summary judgment); *see also Smart v. Goord*, 441 F.Supp.2d 631, 643 (S.D.N.Y. 2006). It is within the purview of a superior officer to delegate responsibility to others. *See Vega v. Artus*, 610 F.Supp.2d 185, 198 (N.D.N.Y. 2009) (finding no personal involvement where "the only involvement of the supervisory official was to refer the inmate's complaint to the appropriate staff for investigation") (citing *Ortiz–Rodriguez v. N.Y. State Dep't of Corr. Servs.*, 491 F.Supp.2d 342, 347 (W.D.N.Y. 2007)). "Where a supervisor's involvement in a prisoner's complaint is limited to forwarding of correspondence to appropriate staff, the supervisor has insufficient personal involvement to sustain a § 1983 cause of action." *Liner v. Goord*, 310 F.Supp.2d 550, 555 (W.D.N.Y. 2004).

In this case, Defendant was never responsible for the primary care of Plaintiff, nor did he see Plaintiff in person for care, examination or referrals. Dkt. No. 65-4 at ¶ 5, 14, 15. Defendant acknowledges that Plaintiff wrote letters to him but contends that he did not personally investigate or respond to Plaintiff's correspondence. *Id.* at ¶ 12. Rather, Plaintiff's letters were referred, investigated and responded to by Bogarski and Dinosio. *Id.* at ¶9-11. During her deposition, Plaintiff claimed that she received correspondence directly from Defendant. [16] Dkt. No. 65-3 at 22. During Plaintiff's deposition, defense counsel inquired:

> Q. How did he respond to you?
>
> A. By written letter.
>
> Q. Directly from Dr. Koenigsmann?
>
> A. From him or in his stay by his assistants.
>
> Q. Do you recall any time in the history of the world where Dr. Koenigsmann personally responded directly to one of your letters?
>
> A. I don't recall.
>
> Q. You have a recollection, howeever, of subordinates of Dr. Koenigsmann responding to your complaints to him?
>
> A. And I believe he directly responded to the complaints.
>
> Q. Do you have any document that demonstrates that?
>
> A. I believe I do and I believe it's in your records, also.
>
> Q. And you have this document at your home?
>
> A. Yes.

Dkt. No. 65-3 at 22-23.

[16]    In her Affidavit in Opposition to Defendant's Motion for Summary Judgment, Plaintiff does not address the issue of whether Defendant personally responded to her letters in writing or any other manner.

Plaintiff was asked how many times Defendant wrote to her directly and, in response she testified that the answer to that question was in records that were in Defendant's possession and had not yet been produced. Dkt. No. 65-3 at 24.

Scott v. Koenigsmann, Not Reported in Fed. Supp. (2016)

2016 WL 1057051

Later in the examination, Plaintiff was again asked if she had "a specific recollection of writing Dr. Koengismann about complaints concerning your care and he responded directly to you?" Dkt. No. 65-3 at 26. Plaintiff responded, "Yes." *Id.* Counsel continued, "[a]nd is it your testimony that you have copies of his direct response to you at your home?" *Id.* Plaintiff responded, "I believe so." *Id.*

After a heated exchange with counsel, Plaintiff was asked the following question and gave the following response:

> Q. So I'm asking specifically with respect to documents that Dr. Koenigsmann has sent directly to you. You have shared that you have documents like that at home.
>
> A. Absolutely.

Dkt. No. 65-3 at 30.

A few moments later, Plaintiff was less adamant:

> Q. All right. It continues to be your testimony at home you have a letter directly written to you by the Deputy Commissioner and Chief Medical Officer of the Depratment of Corrections addressing a complaint that you directed to his attention and that was written sometime after February 6, 2012?
>
> **\*8** A. That's something I would have to research.

Dkt. No. 65-3 at 35.

At the conclusion of the deposition, Plaintiff indicated that communication from Bogarski and Dinisio was, in his opinion, "direct communication from [Defendant]." Dkt. No. 65-3 at 39-40.

In this instance, the record is devoid of evidence establishing that Defendant personally investigated or responded to Plaintiff's complaints. Plaintiff has not produced any written correspondence directly from Defendant or other documentation establishing that Defendant was personally involved in any decision related to her medical care. To the extent that Plaintiff attempts to establish that Defendant was personally involved because he was "responsible for his policies," the record before the Court lacks any evidence that Defendant created any policy or custom that resulted in a constitutional violation. Moreover, the allegation that Defendant was responsible for the staff "under his control," is conclusory and unsupported by the record. "Personal involvement may be imputed where a supervisor engaged in 'grossly negligent supervision of subordinates who committed a violation.' " *Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003). Here, there is no evidence of negligent supervision of any subordinate. Indeed, Plaintiff has not identified any subordinate who allegedly committed a wrongful act.

In cases with similar factual scenarios, Courts in this district have held that Defendant was not personally involved in the alleged Eighth Amendment violations. *See Lawrence v. Evans*, No. 14-CV-6444, 2015 WL 5824808, at \*4 (W.D.N.Y. Oct. 6, 2015) (finding that "[the] plaintiff's letters to Dr. Koenigsmann, and his responses (via his subordinates) do not satisfy the personal involvement requirement"); *DeMeo v. Koenigsmann*, No. 11 Civ. 7099, 2015 WL 1283660, at \*16 (S.D.N.Y. Mar. 20, 2015) (holding that prisoner letters sent to Dr. Koenigsmann, which were referred to and responded to by subordinates, did not establish Koenigsmann's personal involvement); *see also Yearney v. Sidorowicz*, No. 13 Civ. 3604, 2014 WL 2616801, at \*9 (S.D.N.Y. June 10, 2014) (reasoning that Dr. Koenigsmann's subordinate, writing on his behalf, was insufficient to establish Dr. Koenigsmann's personal involvement); *see also Brantley v. Fischer*, No. 12-CV-1051, 2013 WL 5466790, at \*9 (N.D.N.Y. Sept. 30, 2013) (holding that the receipt of a letter by Koenigsmann's subordinate which stated that, "Dr. Koenigsmann, Chief Medical Officer, has asked me to respond to your recent letter concerning your health care issue," was insufficient to establish supervisory liability).

Plaintiff also attempts to defeat Defendant's motion arguing that the matter should be "set for trial" because she has not been provided with the opportunity to conduct pre-trial depositions. *See* Dkt. No. 71 at 2. The Second Circuit has stated:

> [a] party resisting summary judgment on the ground that it needs additional discovery in order to defeat the motion must submit an affidavit pursuant to Federal Rule of Civil Procedure 56(d) (formerly Rule 56(f)), showing: "(1) what facts are sought and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts."

**\*9** *Lunts v. Rochester City Sch. Dist.*, 515 F. App'x 11, 13 (2d Cir. 2013) (quoting *Meloff v. N.Y. Life Ins. Co.*, 51 F.3d 372, 375 (2d Cir. 1995)). Pursuant to Rule 56(d), if a party opposing a motion for summary judgment "shows by affidavit

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 80 of 201

Scott v. Koenigsmann, Not Reported in Fed. Supp. (2016)

2016 WL 1057051

or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d).

Rule 56(d) "will not be liberally applied to aid parties who have been lazy or dilatory." *Allstate Ins. Co. v. Administratia Asigurarilor De Stat*, 948 F.Supp. 285, 294 (S.D.N.Y. 1996) (quoting 10A Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 2740, 535 (2d ed. 1983)). "A party who both fails to use the time available and takes no steps to seek more time until after a summary judgment motion has been filed need not be allowed more time for discovery absent a strong showing of need." *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 927–28 (2d Cir. 1985).

On August 25, 2014, the Court issued a Mandatory Pretrial Scheduling Order which provided that all discovery shall be completed on or before February 26, 2015. Dkt. No. 45. On May 22, 2015, Plaintiff was deposed. Dkt. No. 65-3 at 1. At the conclusion of the deposition, defense counsel demanded that Plaintiff produce letters, in her possession, that she "believed [...] [came] directly from Dr. Koenigsmann." Dkt. No. 65-3 at 41. Plaintiff asked defense counsel to "produce" Bogarski and Dinisio for depositions. *Id.* On May 29, 2015, defense counsel filed a letter motion requesting an extension of time to file dispositive motions in this action. Dkt. No. 63. Plaintiff was served with a copy of the letter. *Id.* On June 3, 2015, the Court issued a Text Order extending the deadline for dispositive motions until July 31, 2015. Dkt. No. 64. Plaintiff was served with a copy of the Text Order. *Id.* On July 31, 2015, Defendant filed the within motion. Dkt. No. 65.

Here, Plaintiff has not met her burden under Rule 56(d). Plaintiff made no attempt at discovery or depositions prior to the close of discovery or, more importantly, for the two month period between her deposition and the filing of the instant motion. Dkt. No. 63 and 64. Significantly, while Plaintiff claims she was unable to conduct any discovery due to financial constraints, Plaintiff does not explain why she failed to seek additional time for discovery or depositions after receiving notice of Defendant's intention to move for summary judgment in July 2015. *See Allstate Ins. Co.*, 948 F.Supp. at 295 (denying a party's objection to summary judgment under Rule 56(d) because the party failed to file an affidavit in support of its objection, did not explain why it had not commenced discovery, and failed to utilize available

discovery even after having actual notice of the opposition's intention to move for summary judgment). There is nothing in the record suggesting that plaintiff attempted to obtain any depositions while discovery was open or that she was somehow unaware of the identity of the witnesses she now seeks to depose. *See Justice v. Wiggins*, No. 9:11-CV-419, 2014 WL 4966896, at *6 (N.D.N.Y. Sept. 30, 2014) (denying the plaintiff's request for discovery because the plaintiff was aware that the "now sought after testimony" from an inmate had potential relevance before the discovery deadline).

*10 Moreover, Plaintiff has not established that "good cause" exists sufficient to reopen discovery. Plaintiff summarily states that she has, "a fundamental right to cross-examine the defendant." *See* Dkt. No. 71 at 2. Plaintiff did not provide an affidavit describing the evidence she seeks to obtain during a deposition or how the testimony she intends to elicit may create a genuine issue of material fact. *See DePaola v. City of New York*, No. 13 Civ. 315, 2013 WL 5597465, at *5 (S.D.N.Y. Oct. 9, 2013). Indeed, despite Defendant's demands, Plaintiff has not produced any evidence that of direct communications from Defendant. A district court may refuse to allow additional discovery if it deems the request to be based on speculation as to what potentially could be discovered." *Nat'l Union Fire Ins. Co. v. Stroh Cos.*, 265 F.3d 97, 117 (2d Cir. 2001) (citations omitted) (internal quotations omitted).

Contrary to Plaintiff's conclusory assertions, the Court finds that the undisputed facts establish that Defendant was not personally involved in any alleged constitutional deprivations. Therefore, the Court grants Defendant's motion for summary judgment on this issue.

### D. Deliberate Indifference
As an alternative ground for summary judgment, Defendant contends that, based upon the record now before the court, no reasonable factfinder could conclude that Defendant violated plaintiff's Eighth Amendment rights. Examining the evidence in a light most favorable to Plaintiff, Plaintiff contends that Defendant was deliberately indifferent to her medical needs in the following respects: (1) she did not receive her TENS Unit in a timely manner; (2) she was not provided with batteries and pads for the TENS Unit as previously prescribed; (3) she was not permitted to consult with a specialist; (4) she was not treated expeditiously for complaints related to psoriasis; and (5) her pain management care was "cut off." *See* Dkt. No. 7 at ¶ 7, 35, 37; Dkt. Nos. 65-5 at 1, 11, 15.

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 81 of 201

Scott v. Koenigsmann, Not Reported in Fed. Supp. (2016)

2016 WL 1057051

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. This includes the provision of medical care and punishments involving "the unnecessary and wanton infliction of pain." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (citations omitted). A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need. *See Wilson v. Seiter*, 501 U.S. 294, 297 (1991); *Hathaway*, 37 F.3d at 66. More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." *Hathaway*, 37 F.3d at 66.

The test for a § 1983 claim is twofold. First, the prisoner must show that there was a sufficiently serious medical need. *See Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *See id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

"'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) (quotation omitted). Since there is no distinct litmus test, whether a medical condition is serious depends on certain factors, such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright*, 315 F.3d 158, 162-63 (2d Cir. 2003) (citing *Chance*, 143 F.3d at 702). The court should also judge the severity of the denial of care within the context of the surrounding facts and circumstances of the case. *See Smith*, 316 F.3d at 185.

 *11 Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance*, 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104, (1976). "Mere disagreement over proper treatment does not create a constitutional claim," as long as the treatment was adequate. *Id.* at 703; *Chance*, 143 F.3d at 703 (finding

that mere disagreement with the prescribed treatment does not amount to deliberate indifference to a serious medical need). Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *See Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).

In the present matter, the undisputed facts in the record demonstrate the absence of any genuine issue of material fact as to Defendant's alleged deliberate indifference. Even assuming that Plaintiff suffered from a serious medical condition, *see* Dkt. No. 41 at 12, the medical record makes clear that Plaintiff's medical complaints were consistently addressed by facility medical personnel. *See* Dkt. 66, *generally*.

### 1. TENS Unit and Replacement Batteries/Pads

In her March 3, 2012 letter, Plaintiff complained that she had not received her TENS Unit. *See* Dkt. No. 65-5 at 1. Three days later, Plaintiff received her TENS Unit. *See* Dkt. No. 66-2 at 10. While "[c]ruel and unusual punishment may consist of prison officials delaying an inmate['s] access to needed medical care," *Kaminsky v. Rosenblum*, 929 F.2d 922, 926 (2d Cir. 1991), the case law of this Circuit "has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a 'life-threatening and fast-degenerating' condition for three days; or delayed major surgery for over two years." *Demata v. New York State Corr. Dep't of Health Servs.*, 198 F.3d 233 (2d Cir. 1999) (table); *see also Amaker v. Coombe*, No. 96 Civ. 1622, 2002 WL 523388, at *8 (S.D.N.Y. Mar. 29, 2002) ("A delay in medical treatment does not by itself violate an inmate's Eighth Amendment rights unless the delay reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment.") (citing cases); *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, No. 00 Civ. 4968, 151 F.Supp.2d 303, 312 (S.D.N.Y. 2001) (noting that some delays in receiving medical treatment are common even outside the prison context). Here, Plaintiff has failed to produce any evidence that the three-day delay in receiving her TENS Unit caused her to suffer "substantial harm." The record also lacks facts establishing that Plaintiff's condition was "fast degenerating," "life threatening" or that Defendant attempted to punish plaintiff.

In April 2012, Plaintiff complained that she could not use her TENS Unit in the prescribed manner because she was

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 82 of 201

Scott v. Koenigsmann, Not Reported in Fed. Supp. (2016)

2016 WL 1057051

"told" that she would only receive a replacement battery once every six weeks. Dkt. No. 65-5 at 11. Plaintiff's allegations are contradicted by the record. Indeed, Plaintiff's repeated requests for replacement batteries and pads were timely addressed by medical staff. To wit, on may 15, 2012, June 15, 2012 and July 26, 2012, Plaintiff requested and received replacement batteries and pads for the unit. Dkt. No. 66-1 at 25; Dkt. No. 66-2 at 4, 5. In September 2012, Plaintiff received a new permit for her TENS Unit with a 9-volt battery. Dkt. No. 66-7 at 20. On October 16, 2012, Plaintiff received new pads and batteries for the TENS Unit. Dkt. No. 66-1 at 21. Based upon the record presently before the Court, no reasonable factfinder could conclude that Defendant intentionally delayed supplying or denied Plaintiff's requests for batteries or pads.

### 2. Request for Specialist

 **\*12**  In her March 2012 correspondence, Plaintiff requested a consultation with a "specialist." *See* Dkt. No. 65-5 at 1. "Inmates do not have a right to choose a specific type of treatment." *Veloz v. New York*, 339 F.Supp.2d 505, 525 (S.D.N.Y. 2004). Based upon the factual contentions, Plaintiff's dispute is nothing more than a quarrel with the nature of her treatment. *See Wright v. Conway*, No. 05-CV-6723, 584 F.Supp.2d 604, 607 (W.D.N.Y. Nov. 5, 2008) ("[the plaintiff's] complaints demonstrate no more than his personal dissatisfaction with the level of care that he received, and these claims must therefore be dismissed."). The decision to refuse to refer a plaintiff to an outside specialist is not a violation of a constitutional right. *See Rowland v. Hildreth*, 1993 WL 287646, at \*12 (S.D.N.Y. July 27, 1993) (citing *Estelle*, 429 U.S. at 107) ("[A] medical decision not to order an x-ray, or like measures, does not represent cruel and unusual punishment."). Here, the record lacks any facts establishing that Defendant acted with deliberate indifference or deliberately ignored Plaintiff's complaints of pain. Indeed, Plaintiff received a plethora of prescription medication for chronic low back pain and was routinely treated at Sick Call, by nurse practitioners and consulted with medical providers. Defendant's alleged refusal to arrange for Plaintiff to see a "specialist," does not amount to deliberate indifference.

### 3. Treatment for Psoriasis

In Plaintiff's August 1, 2012 letter, she complained that she was denied skin cream for psoriasis. Dkt. No. 65-5 at 15. The record indicates that one week after writing the aforementioned letter, Plaintiff received a prescription for Lidex to address her skin condition. Dkt. No. 66-1

at 22. As discussed in Part III(D)(1) *supra*, Plaintiff has failed to produce any evidence that the one-week delay in receiving treatment for her skin condition caused her to suffer "substantial harm." *See Peterson v. Scully*, 707 F.Supp. 759, 761 (S.D.N.Y. 1989) (finding that a three-month delay in receiving lotion for dry skin did not provide a basis for a claim under § 1983). The record also lacks facts establishing that Plaintiff's condition was "fast degenerating," "life threatening" or that Defendant attempted to punish Plaintiff.

### 4. Medications

Plaintiff claims that her pills were "crushed." *See* Dkt. No. 7 at 7; Dkt. No. 65-5 at 15. Plaintiff does not identify which medication was "crushed" or when she received medication in this form. Nonetheless, even assuming this conduct occurred, it does not rise to the level of deliberate indifference. *Peace v. Caldwell*, 892 F.2d 1046 (9 th Cir. 1990). The record lacks any evidence suggesting that Plaintiff suffered any harm as a result of ingesting medication in this manner. *See DeLeon v. Dexter*, 2011 WL 1334411, at \*5 (C.D. Cal. April 5. 2011) (finding no Eight Amendment violation where the plaintiff failed to demonstrate that the defendant was aware of any substantial risk of harm from crushed Tramadol or that the defendants deliberately disregarded that risk).

In August 2012, Plaintiff complained that Defendant decided to "terminate" her muscle relaxers and pain medication. Dkt. No. 65-5 at 15. In the amended complaint, Plaintiff asserts that as of October 24, 2012, her medications have been "cut in half." Dkt. No. 7 at ¶ 35. Plaintiff does not specify what medication or medications were "taken away" or "terminated." Regardless, the medical record from June 2012 through October 2012 belies her claims. During the relevant time period, Plaintiff received daily doses of Neurontin (600 mg), Ultram (50 mg) and Elavil (10 mg) for her lower back pain. Dkt. No. 66-7 at 18-19, 21-23. The prescribed dosage of each medication remained unchanged and there is no evidence in the record to suggest that these medications were discontinued.

Furthermore, even assuming that Plaintiff's medications were altered, disagreements over medications, including the dosage or decision to discontinue medication, qualify as "an exercise of 'medical judgment' and do not give rise to a constitutional violation." *See Morrison v. Mamis*, No. 08 Civ. 4302, 2008 WL 5451639, at \*10 (S.D.N.Y. Dec. 18, 2008) (holding that the decision to switch the

2016 WL 1057051

plaintiff from Elavil to another prescription pain killer was "adequate" and reasonable) (collecting cases); *see also Patterson v. Lilley*, No. 02 Civ. 6056, 2003 WL 21507345, at *5 (S.D.N.Y. June 30, 2003) (holding that complaints regarding the defendant's decision to lower and discontinue the plaintiff's asthma medication, "are properly characterized as a difference of opinion-plaintiff's desired treatment versus [the doctor's] medical judgment-rather than deliberate indifference"). Moreover, to establish a claim for deliberate indifference with respect to prescription medication, a plaintiff must plead that a defendant was aware that withholding the medication would result in an excessive risk to plaintiff's health. *See Rivera v. Bhavsar*, No. 09-CV-1394, 2012 WL 8302229, at *5 (N.D.N.Y. March 13, 2012); *see also LaBounty v. Coombe*, No. 95 Civ. 2617, 1998 WL 2553, at *4 (S.D.N.Y. Jan. 5, 1998) (finding that the assertion that the prescription was due to be refilled is insufficient to raise an issue of fact that either defendant was deliberately indifferent to his need for medication).

*\*13* Here, the record is devoid of evidence that Defendant acted deliberately and discontinued Plaintiff's medications as a form of punishment. *See Washington v. Westchester County Dep't of Corrs.*, No. 13 Civ. 5322, 2014 WL 1778410, at *7 (S.D.N.Y. April 25, 2014). Indeed, from February 2012 through October 2012, Plaintiff made no complaints of pain related to her lower back. Plaintiff has failed to provide any evidence to suggest that any decision to discontinue medication "deviated from reasonable medical practice" to amount to deliberate indifference. *See Aikens v. Rao*, No. 13-CV-1088, 2015 WL 5919950, at *4-5 (W.D.N.Y. Oct. 9, 2015) (holding that the defendant's decision to wean the plaintiff from Ultram was based upon medical judgment). At best, Plaintiff's allegations suggest negligence or medical malpractice and are insufficient to establish any constitutional violation. *See Hernandez*, 341 F.3d at 137.

Upon review of the entire record, the Court concludes that Plaintiff's claims of deliberate indifference amount to nothing more than a disagreement with the prescribed medical treatment, which is not actionable under the Eighth Amendment. *See Chance*, 143 F.3d at 703. The record is devoid of any evidence even suggesting that Defendant acted maliciously in delaying or denying Plaintiff access to medical care, or to interfere with any course of treatment prescribed by the various medical professionals who treated Plaintiff while she was in DOCCS custody. The undisputed record before this Court establishes that from February 2012 through October 2012, Plaintiff was repeatedly treated by

DOCCS staff for a myriad of complaints including rhinitis, sinus congestion, athletes' foot, psoriasis, chronic low back pain, dandruff, lesions. Plaintiff received several different prescription medications on a daily basis, had a physical and underwent blood and urine tests. *See* Dkt. No. 66-2 at 5.

Based on the foregoing, the Court finds that the undisputed facts establish that no reasonable juror could find that Defendant acted with deliberate indifference to Plaintiff's serious medical needs; and, therefore, the Court grants Defendant's motion for summary judgment and as to Plaintiff's Eighth Amendment claims.

**E. Plaintiff's Motion for Counsel**
In further opposition to Defendant's motion, Plaintiff states that "without an attorney," she cannot answer the "alleged facts presented by the Defendant." Dkt. No. 71 at ¶ 6. Plaintiff requests an attorney to "prepare for trial" or "aid in pre-trial depositions." *Id.* During the course of this litigation, Plaintiff filed five motions for the appointment of counsel. Dkt. No. 4, 18, 32, 34 and 46. Plaintiff's requests were repeatedly denied, with leave to renew, because the Court was unable to conclude that Plaintiff's position was "likely to be of substance." Dkt. No. 11 at 7.

In light of the Court's decision to award summary judgment in favor of Defendant, Plaintiff's renewed motion for the appointment of counsel is denied.

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that the Clerk of the Court is directed to modify the docket to reflect the proper spelling of Defendant's name; and the Court further

**ORDERS** that Defendant's motion for summary judgment (Dkt. No. 65) is **GRANTED**; and the Court further

**ORDERS** that Plaintiff's claims are **DISMISSED with prejudice**; and the Court further

2016 WL 1057051

**ORDERS** that Plaintiff's request for additional discovery and appointment of counsel (Dkt. No. 71) are **DENIED** as moot; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; and the Court further

 **\*14  ORDERS** that, pursuant to 28 U.S.C. § 1915(a)(3), any appeal taken from this Memorandum-Decision and Order would not be taken in good faith; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2016 WL 1057051

---

**End of Document**                          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 1230778

2019 WL 1230778
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Carlos ABREU, Plaintiff,
v.
Eric FARLEY, et al., Defendants.

6:11-CV-06251 EAW
|
Signed 03/15/2019

**Attorneys and Law Firms**

Richard A. McGuirk, Nixon Peabody LLP, Andrew Peter
Zappia, LeClairRyan, Rochester, NY, for Plaintiff.

Hillel David Deutsch, NYS Attorney General's Office
Department of Law, Rochester, NY, for Defendants.

**DECISION AND ORDER**

ELIZABETH A. WOLFORD, United States District Judge

**INTRODUCTION**

**\*1** Plaintiff Carlos Abreu ("Plaintiff"), currently
incarcerated at the Marcy Correctional Facility, [1] filed this
action pursuant to 42 U.S.C. § 1983, alleging constitutional
violations arising out of his incarceration at the Five Points
Correctional Facility ("Five Points"). (Dkt. 1). After this
Court's initial screening of Plaintiff's first complaint, the
Court granted Plaintiff leave to proceed *in forma pauperis*
("IFP"). (Dkt. 3). Soon thereafter, Plaintiff was appointed
*pro bono* counsel to assist in the prosecution of this action.
(*See* Dkt. 9). Plaintiff has since filed voluminous pleadings,
alleging numerous grounds for which he believes he is
entitled to relief against an array of individuals.

[1]     Plaintiff's address has been ascertained from the
        most recent filing containing his location in this
        action (Dkt. 117 (notice of interlocutory appeal) ),
        and Plaintiff's address as provided in a different
        action, *see Abreu v. Brown*, Case No. 6:14-
        cv-06599, Dkt. 60 (W.D.N.Y. Mar. 12, 2018).

Presently before the Court is Defendants' motion to revoke
Plaintiff's IFP status and for partial summary judgment.

(Dkt. 61). For the reasons set forth below, the Court
holds Defendants' motion to revoke Plaintiff's IFP status in
abeyance pending the Second Circuit's decision in *Shepherd
v. Annucci*, No. 17-2261 (2d Cir. July 21, 2017), grants in part
and denies in part Defendants' motion for partial summary
judgment, and stays this action until the Court resolves
Defendants' motion for IFP revocation.

**BACKGROUND**

Plaintiff arrived at Five Points on or about March 25, 2010
(Dkt. 46 at ¶ 93), and alleges that he has been subject
to countless constitutional infractions, and other allegedly
wrongful conduct, which purportedly continued into 2012.
Despite *pro bono* counsel's efforts to refine Plaintiff's
allegations, the operative complaint remains voluminous
and is composed of 531 paragraphs. Plaintiff's counsel also
requests that the Court consider two supplemental *pro se*
filings submitted by Plaintiff as part of a related case that
has since been consolidated into this action. (Dkt. 93 at 25-26;
*see* Dkt. 40; Dkt. 93-5; Dkt. 93-6; Dkt. 93-7; Dkt. 93-8; Dkt.
93-9; Dkt. 93-10).

The following facts are taken from Defendants' and Plaintiff's
Rule 56 statements of undisputed facts. (*See* Dkt. 59-1;
Dkt. 93-1). Between 2010 and January of 2012, Plaintiff
was examined "well over 100 times" by medical staff at
Five Points. (Dkt. 59-1 at ¶ 1; Dkt. 93-1 at ¶ 1). Although
Plaintiff disputes that he was prescribed appropriate medical
treatment for back and neck pain on a number of occasions
(Dkt. 93-1 at ¶ 2; *cf.* Dkt. 59-1 at ¶ 2), he does not dispute
that he was prescribed "an albuterol inhaler for asthma and
Lipitor for elevated lipids" (Dkt. 93-1 at ¶ 2). It is also
undisputed that Plaintiff received medication, bloodwork,
physical examinations, and x-rays between March 25, 2010,
and January 23, 2012 (*see* Dkt. 59-1 at ¶ 6; Dkt. 93-1 at ¶
6), and that he refused to take medications and to undergo
physical examinations on several occasions while at Five
Points (*see* Dkt. 59-1 at ¶ 8; Dkt. 93-1 at ¶ 8).

**\*2** The parties dispute whether Plaintiff was of general good
health while housed at Five Points (Dkt. 59-1 at ¶ 4; Dkt.
93-1 at ¶ 4), and whether many of Plaintiff's alleged injuries
and ailments were ever properly diagnosed or observed by
Five Points medical staff (Dkt. 59-1 at ¶ 5; Dkt. 93-1 at ¶
5). Plaintiff also disputes Defendants' assertion that he was
"not in imminent danger of serious physical harm at any
point during the relevant period" underlying this action (Dkt.

2019 WL 1230778

59-1 at ¶ 3), and argues that he "endured repeated assaults, living under a constant and imminent danger [of] being subjected to ongoing threats of further physical assaults" while housed at Five Points (Dkt. 93-1 at ¶ 3). The parties do not dispute that only doctors, physicians assistants, and nurse practitioners may provide prescription medication to inmates at Five Points, that corrections officers and counselors may not do so, and that general nurses may provide limited medical treatment only in emergency circumstances. (*See* Dkt. 59-1 at ¶ 9; Dkt. 93-1 at ¶ 9).

The New York State Department of Corrections and Community Supervision ("DOCCS") maintains a policy that corrections staff seek a court order if an inmate loses 15% of his or her baseline weight, or even prior to that point if the inmate "appears in imminent need of hydration or nutrition." (Dkt. 59-1 at ¶ 10; Dkt. 93-1 at ¶ 10). In addition, it is undisputed that Plaintiff's baseline weight remained above 200 pounds between March 2010 and January 2012 (Dkt. 59-1 at ¶ 11; Dkt. 93-1 at ¶ 11), and at no point did it drop by 30 pounds, or 15% of Plaintiff's baseline weight (Dkt. 59-1 at ¶ 12; Dkt. 93-1 at ¶ 12).

At times, Plaintiff complained that he suffered from rectal bleeding, but on at least one occasion, Dr. Daniel Weinstock ("Dr. Weinstock") took Plaintiff's stool samples and discovered no blood after running hemoccult tests on April 18 and April 26, 2011. (Dkt. 59-1 at ¶ 16; Dkt. 93-1 at ¶ 16). Although Plaintiff disputes Defendants' assertion that he "frequently harassed medical staff" (Dkt. 59-1 at ¶ 17; Dkt. 93-1 at ¶ 17), it is undisputed that Five Points staff submitted written misbehavior reports regarding Plaintiff's conduct on several occasions (Dkt. 59-1 at ¶ 18; Dkt. 93-1 at ¶ 18; *but see* Dkt. 93-1 at ¶ 18 (also arguing that "false misbehavior reports were written in retaliation against [Plaintiff]") ).

While Plaintiff claims that Defendants' decision not to provide him with an interpreter during his Tier II and Tier III violation hearings violated his right to due process (Dkt. 93-1 at ¶ 19), he does not dispute that he was found guilty of Tier II and Tier III violations 17 times during the relevant period underlying this action (Dkt. 59-1 at ¶ 19; Dkt. 93-1 at ¶ 19). Relatedly, Plaintiff's fluency in the English language is a point of contention between the parties. (Dkt. 59-1 at ¶ 23; Dkt. 93-1 at ¶ 23). For example, Defendants contend that Plaintiff could meaningfully converse with corrections staff in English (Dkt. 59-1 at ¶ 23), but Plaintiff states that his understanding of the English language is limited and notes that Spanish is his native language (Dkt. 93-1 at ¶ 23). Despite

his disciplinary violations, Plaintiff received a "time cut" for each violation, save one, during the period extending from February 23, 2010, to July 5, 2013. (Dkt. 59-1 at ¶ 20; Dkt. 93-1 at ¶ 20). Plaintiff was not required to serve any time in the Special Housing Unit ("SHU") and did not lose any good time credits as a result of these violations. (Dkt. 59-1 at ¶ 20; Dkt. 93-1 at ¶ 20). Plaintiff did spend two months' time in the SHU for an incident occurring in May 27, 2010, but he did not serve this time until December 2013 because he had accumulated SHU time from other incidents predating 2010. (Dkt. 59-1 at ¶ 22; Dkt. 93-1 at ¶ 22).

DOCCS Directive 4421 sets forth DOCCS' policy regarding inmate mailings. (Dkt. 59-1 at ¶ 25; Dkt. 93-1 at ¶ 25). Directive 4421 permits inmates to mail five first-class legal letters free of charge per week and allows inmates an advance of up to $20 for additional legal mail. (Dkt. 59-1 at ¶ 25; Dkt. 93-1 at ¶ 25). Inmates also receive free postage for documents that "must be sent pursuant to a Court Order, statute of limitations or legal deadline, if, by rule, such correspondence must be sent prior to receipt of the next week's free postage allowance." (Dkt. 59-1 at ¶ 26; Dkt. 93-1 at ¶ 26). Plaintiff almost always exhausted his weekly allotment of five free legal letters and used up his $20 advance immediately upon arriving at Five Points. (Dkt. 59-1 at ¶ 27; Dkt. 93-1 at ¶ 27). However, Plaintiff disputes that he was afforded free postage when a deadline so entitled him —although "on several occasions, a court order or other deadline entitled him to free postage"—and states that certain correspondence he addressed to courts, government officials, and legal organizations was refused postage. (Dkt. 93-1 at ¶ 27).

## PROCEDURAL HISTORY

**\*3** On May 10, 2011, Plaintiff commenced this action by filing a voluminous 340-page complaint, alleging various injuries arising from the actions of over 130 defendants. (*See* Dkt. 1). Plaintiff also filed a motion for leave to proceed *in forma pauperis* (Dkt. 3) and a motion for appointment of counsel (Dkt. 4). By Order, dated May 25, 2011, Plaintiff was granted *in forma pauperis* status, and was directed to amend his complaint in compliance with Rule 8 of the Federal Rules of Civil Procedure. (Dkt. 5); *see* Fed. R. Civ. P. 8(a) (2) (providing that a pleading must contain "a short and plain statement of the claim"). On August 11, 2011, Plaintiff's motion for appointment of counsel was granted and *pro bono* counsel was assigned. (Dkt. 9). On April 1, 2013,

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 87 of 201

Abreu v. Farley, Not Reported in Fed. Supp. (2019)
2019 WL 1230778

Plaintiff filed a 101-page amended complaint (Dkt. 35), and on September 19, 2013, a related case—also instituted by Plaintiff—was merged with this matter (Dkt. 40). The *pro se* complaint and supplemental filings submitted in the related case constituted a Supplemental Complaint in the instant action. (*Id.* at 12; *see* Dkt. 41).

On February 21, 2014, Plaintiff filed a 103-page second amended complaint (the "SAC"), which, alongside the *pro se* Supplemental Complaint, remains the operative pleading in this matter. (Dkt. 46). This action was reassigned to the undersigned on January 5, 2015. (Dkt. 48).

On April 6, 2015, Defendants filed a motion for partial summary judgment in lieu of an answer. (Dkt. 59). Defendants also request that the Court revoke Plaintiff's IFP status. (*See* Dkt. 59-2 at 5-6). After several appearances and extensions of time, Plaintiff filed responsive papers on July 15, 2016, opposing Defendants' motion. (Dkt. 93). Defendants filed reply papers in further support of their motion on September 21, 2016. (Dkt. 105).

## DISCUSSION

### I. Defendants' Motion to Revoke Plaintiff's IFP Status is Held in Abeyance

A party commencing a civil action in this Court ordinarily must pay a $350.00 filing fee, as well as a $50.00 administrative fee.[2] *See* 28 U.S.C. § 1914. Of course, the Court may grant a party leave to proceed IFP if it determines that the party is unable to pay the filing fee. *See id.* § 1915. Nonetheless, not all litigants may be granted leave to proceed IFP. As set forth in 28 U.S.C. § 1915(g), the "three strikes" provision prevents prisoners from proceeding IFP if they have brought three or more lawsuits that have been dismissed as frivolous or for failure to state a claim:

> In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon

> which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g).

[2]   Effective May 1, 2013, the Judicial Conference of the United States added an administrative fee of $50.00 to the cost of filing a civil lawsuit in district court. *See* September 2012 Report of the Proceedings of the Judicial Conference of the United States, *available at* <http://www.uscourts.gov/about-federal-courts/reports-proceedings-judicial-conference-us>.

Thus, under that statute, a prisoner with three strikes may proceed IFP only if he can show that he is "under imminent danger of serious physical injury." *Id.* "An imminent danger is not one that has dissipated by the time a complaint is filed; rather it must be one existing at the time the complaint is filed." *Chavis v. Chappius*, 618 F.3d 162, 169 (2d Cir. 2010) (internal quotation marks and citation omitted).[3]

[3]   Whether the "imminent danger" must exist at the time the initial complaint was filed or whether it can arise at the time the complaint is amended has not been expressly resolved by the Second Circuit. One district court has noted that "at least some cases have indicated that even when amended complaints are filed, the imminent danger must have existed at the time the initial complaint is filed." *Antrobus v. Dapcevic*, No. 17-CV-5840 (KMK), 2018 WL 3242272, at *4 (S.D.N.Y. July 3, 2018) (citing *Harris v. City of New York*, 607 F.3d 18, 24 (2d Cir. 2010) (considering the allegations in both the initial and amended complaints, but concluding that the facts alleged did not "support a finding that [the plaintiff] was in imminent danger at the time he filed his initial complaint") ); *accord Jackson v. McPartland*, No. 06-CV-6524 CJS, 2008 WL 619364, at *1 (W.D.N.Y. Mar. 4, 2008) ("[E]ven construing the *pro se* Plaintiff's Complaint and Amended Complaint liberally, as the Court is required to do, it is clear that Plaintiff has not alleged that he was in imminent danger at the time he filed this lawsuit."). Nonetheless, the Second Circuit has not definitively ruled on this issue, and there is authority outside this Circuit that supports

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 88 of 201

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

2019 WL 1230778

placing the point of reference at the time the amended complaint is filed. *See Jonassen v. United States*, 671 F. App'x 668, 668 (9th Cir. 2016) ("The district court revoked Jonassen's in forma pauperis status without considering Jonassen's proposed Third Amended Complaint ('TAC'), which made plausible allegations that Jonassen was 'under imminent danger of serious physical injury' at the time he lodged the TAC."); *Burke v. St. Louis City Jails*, 603 F. App'x 525, 525-26 (8th Cir. 2015) ("[T]he District Court should have considered whether Burke met the imminent-danger exception when he filed his amended complaint, not when he filed his original complaint." (citing *Martin v. Shelton*, 319 F.3d 1048, 1051 (8th Cir. 2003) ) ).

**\*4** The Second Circuit has instructed that, when determining whether a prisoner has shown an imminent danger, a court should "not make an overly detailed inquiry into whether the allegations qualify for the exception, because § 1915(g) concerns only a threshold procedural question." *Id.* (internal quotation marks omitted). That instruction suggests that a court should consider only the allegations in the complaint when considering whether the imminent danger applies, although the Second Circuit has not specifically limited the imminent danger review to the four corners of the complaint. *See id.*; *see also Abreu v. Lira*, No. 9:12-CV-1385 (NAM/DEP), 2014 WL 4966911, at \*2 (N.D.N.Y. Sept. 30, 2014), *adopting report and recommendation*, 9:12-CV-1385 (NAM/DEP) (N.D.N.Y. Apr. 11, 2014).

But several courts in this Circuit—including some cases involving Plaintiff—have revoked the IFP status of a three-strikes litigant when the defendant challenges the court's preliminary finding that the litigant is entitled to the imminent danger exception, using evidence outside the four corners of the complaint to refute that preliminary finding. *See Abreu v. Brown*, 317 F. Supp. 3d 702, 705 (W.D.N.Y. 2018) ("The Court agrees with those courts that it may look beyond the complaint when considering a defendant's challenge to the preliminary finding that a three-strikes litigant is entitled to the imminent danger exception."); *Tafari v. Baker*, No. 6:16-cv-06427(MAT), 2017 WL 1406274, at \*2 (W.D.N.Y. Apr. 20, 2017) (collecting cases stating the same); *Bernier v. Koenigsmann*, No. 15-CV-209A, 2017 WL 603217, at \*4 (W.D.N.Y. Feb. 15, 2017) ("Although courts assessing imminent danger should not make an overly detailed inquiry, they are allowed to look at information outside the four corners of a complaint."); *Green v. Venettozzi*, No. 14-CV-1215 (BKS/CFH), 2016 WL 6902545, at \*3 (N.D.N.Y.

Oct. 31, 2016) ("To refute a preliminary finding with facts that satisfy the imminent danger exception, the Court may look outside the four corners of the complaint."), *report and recommendation adopted*, 2016 WL 6902180 (N.D.N.Y. Nov. 23, 2016); *Abreu v. Lira*, 2014 WL 4966911, at \*2 ("In reviewing the issues surrounding plaintiff's claim that at the time he filed the complaint, he was facing imminent danger of serious physical injury, the Court agrees ... that it is appropriate for the Court to review evidence outside the allegations of the complaint upon defendants' challenge to plaintiff's IFP status."); *Jackson v. Jin*, No. 12-CV-6445-FPG, 2014 WL 1323211, at \*1 (W.D.N.Y. Mar. 31, 2014) ("In determining whether the imminent danger exception applies, the Court may consider more recent medical evidence."). Some circuit courts have reached the same result. *See Stine v. U.S. Fed. Bureau of Prisons*, 465 F. App'x 790, 794 n.4 (10th Cir. 2012) ("[A]fter a district court provisionally grants IFP on the basis of a showing of imminent danger, the defendants are permitted to mount a facial challenge, based on full development of the facts, to the district court's provisional determination on the face of the complaint that the prisoner satisfies the imminent danger element." (quotation and alteration omitted) ); *Taylor v. Watkins*, 623 F.3d 483, 485 (7th Cir. 2010) ("[W]hen a defendant contests a plaintiff's claims of imminent danger, a court must act to resolve the conflict. A contrary conclusion would mean that a three-strikes plaintiff could proceed IFP whenever his allegations of imminent danger were facially plausible, even if the defendant had incontrovertible proof that rebutted those allegations."); *Gibbs v. Roman*, 116 F.3d 83, 86 (3d Cir. 1997) ("If the defendant, after service, challenges the allegations of imminent danger ..., the district court must then determine whether the plaintiff's allegation of imminent danger is credible ... in order for the plaintiff to proceed on the merits [IFP]."), *overruled on other grounds by Abdul-Akbar v. McKelvie*, 239 F.3d 307 (3d Cir. 2001).

**\*5** Although this Court recently agreed with this line of cases, *see Abreu v. Brown*, 317 F. Supp. 3d at 705, an appeal pending before the Second Circuit from a decision revoking IFP status after it was initially granted will likely clarify the law of this Circuit regarding this issue, *see Shepherd v. Annucci*, No. 17-2261 (2d Cir. July 21, 2017). A review of the briefs submitted on appeal in *Shepherd* reveals that the parties dispute, among other things, the weight afforded to any evidence contradicting a plaintiff's claim of imminent danger, the distribution of the burden of proof, and the quantum of evidence required to grant a motion to revoke IFP status. *See Shepherd*, No. 17-2261, Dkt. 90; Dkt. 98. Indeed, the

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 89 of 201
Abreu v. Farley, Not Reported in Fed. Supp. (2019)
2019 WL 1230778

Second Circuit has recently deferred any decision regarding Plaintiff's motion for leave to proceed *in forma pauperis* and for appointment of counsel on the appeal from this Court's decision in *Abreu v. Brown*, and that appeal is now held in abeyance pending the Second Circuit's decision in *Shepherd*. *See Abreu v. Brown*, No. 18-2722, Dkt. 30 (2d Cir. Sept. 14, 2018). Therefore, the Second Circuit appears poised to clarify the law in this Circuit as it relates to motions to revoke IFP status. Because the *Shepherd* decision is likely to establish principles that this Court will be bound to apply in ruling upon Defendants' motion for IFP revocation, the Court is disinclined to presume the Second Circuit's position before *Shepherd* is decided. Accordingly, in the interests of judicial economy, the Court holds Defendants' motion to revoke Plaintiff's IFP status in abeyance pending the Second Circuit's decision in *Shepherd*.

## II. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) ).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact...." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014). "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial." *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) ). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) ). Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown*, 654 F.3d at 358. Indeed, "the mere existence

of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

A party may file a motion for summary judgment "at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b). A party may move for summary judgment in lieu of an answer. *See, e.g., Anderson v. Rochester-Genesee Reg'l Transp. Auth.*, 337 F.3d 201, 202 (2d Cir. 2003); *Riehl v. Martin*, No. 9:13-CV-439 (GLS/TWD), 2014 WL 1289601, at *1-2 (N.D.N.Y. Mar. 31, 2014); *Beckford v. N.Y. State Office of Mental Health*, No. 06-CV-00561(SR), 2010 WL 1816689, at *1 (W.D.N.Y. May 3, 2010); *Crenshaw v. Syed*, 686 F. Supp. 2d 234, 236 (W.D.N.Y. 2010); *Wegman v. Grimmke*, No. 03-CV-234S, 2004 WL 2202642, at *2 (W.D.N.Y. Sept. 30, 2004). Although summary judgment is generally not appropriate until after some discovery has occurred in a case, *Nelson v. Deming*, 140 F. Supp. 3d 248, 257-58 (W.D.N.Y. 2015), a motion for summary judgment in lieu of an answer is appropriate where the facts are undisputed and no amount of discovery would change the outcome, *Parra v. Wright*, No. 11-CV-6270 CJS, 2013 WL 6669235, at *7 (W.D.N.Y. Dec. 18, 2013). The standard for granting summary judgment is the same whether the motion is made in lieu of an answer or after discovery has occurred—the moving party must demonstrate that no genuine issues of material fact exist and that it is entitled to judgment as a matter of law. *See Anderson*, 337 F.3d at 206. [4]

---

[4]     The Court notes that in various places throughout his opposition papers, Plaintiff argues that summary judgment is inappropriate because no discovery has taken place. (*See, e.g.*, Dkt. 93 at 23, 34-35, 54). However, the lack of discovery, in and of itself, cannot justify denial of a properly supported motion for summary judgment. Moreover, although Fed. R. Civ. P. 56(d) permits a party to oppose a motion for summary judgment on the grounds that it needs discovery, any such opposition must demonstrate "by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." *Whelehan v. Bank of Am. Pension Plan for Legacy Companies-Fleet-Traditional Ben.*, 5 F. Supp. 3d 410, 420 (W.D.N.Y. 2014) (quoting Fed. R. Civ. P. 56(d) ). "The affidavit must explain: '[ (1) ] the nature of the uncompleted discovery; [ (2) ]

Case 9:22-cv-00181-GTS-MJK   Document 96   Filed 07/24/24   Page 90 of 201

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

2019 WL 1230778

how the facts sought are reasonably expected to create a genuine issue of material fact; [ (3) ] what efforts the affiant has made to obtain those facts; and [ (4) ] why those efforts were unsuccessful.' " *Cont'l Cas. Co. v. Marshall Granger & Co., LLP*, 921 F. Supp. 2d 111, 127 (S.D.N.Y. 2013) (quoting *Hoffmann v. Airquip Heating & Air Conditioning*, 480 F. App'x 110, 112 (2d Cir. 2012) ). "The failure to file a Rule 56(d) affidavit sufficiently explaining the need for additional discovery 'is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.' " *hunts v. Rochester City Sch. Dist.*, 515 F. App'x 11, 13-14 (2d Cir. 2013) (quoting *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137 (2d Cir. 1994) ); *see Cross v. State Farm Ins. Co.*, 926 F. Supp. 2d 436, 446 (N.D.N.Y. 2013) (stating that if "a proper affidavit or declaration" is not submitted in support of a Rule 56(d) motion, the "application fails on this basis alone"); *see also Whelehan*, 5 F. Supp. 3d at 421 ("Merely referencing the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for a Rule 56(d) affidavit.").

Plaintiff has failed to submit an affidavit or declaration satisfying the requirements of Rule 56(d). Although the Court recognizes the early stage of this litigation, Plaintiff's conclusory requests for additional discovery in his opposition papers are insufficient to oppose Defendants' motion for summary judgment on that basis.

### III. Plaintiff's Due Process Claims Are Dismissed

**\*6** Plaintiff argues that he was deprived of a liberty interest without due process of law when he was not afforded an interpreter during several disciplinary hearings at which he was found guilty of the alleged wrongdoing. (*See* Dkt. 93 at 47-51). "The failure to provide interpretive services or assistive devices during disciplinary hearings has been found to be a denial [of] due process." *Young v. Polizzi*, No. 9:16-CV-0660 (FJS/CFH), 2018 WL 3949967, at \*8 (N.D.N.Y. July 11, 2018) (citing *Clarkson v. Coughlin*, 898 F. Supp. 1019, 1049 (S.D.N.Y. 1995) ), *report and recommendation adopted*, 2018 WL 3949942 (N.D.N.Y. Aug. 16, 2018). However, "[a]s a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property." *Ocasio v. Deluke*, No. 08-CV-51 GLS/DRH, 2010 WL 6001595, at \*16 (N.D.N.Y. Sept. 3, 2010) (citing *Perry v.*

*McDonald*, 280 F.3d 159, 173 (2d Cir. 2001) ), *report and recommendation adopted*, 2011 WL 864898 (N.D.N.Y. Mar. 8, 2011), *aff'd*, 468 F. App'x 89 (2d Cir. 2012).

"The Supreme Court held in *Sandin v. Conner*, 515 U.S. 472, 115 S. Ct. 2293, 132 L.Ed.2d 418 (1995), that to state a claim for a violation of due process, a prisoner first must identify a liberty interest protected by the Due Process Clause of which he was deprived." *Jenkins v. Haubert*, 179 F.3d 19, 28 (2d Cir. 1999). To prevail on a claim for a violation of procedural due process, a prisoner "must establish both that the confinement or restraint creates an 'atypical and significant hardship' under *Sandin*, and that the state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint." *Frazier v. Coughlin*, 81 F.3d 313, 317 (2d Cir. 1996). "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.' " *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (quoting *Wright v. Coughlin*, 132 F.3d 133, 136 (2d Cir. 1998) ).

While the parties dispute whether Plaintiff required an interpreter at the disciplinary hearings (*see* Dkt. 59-1 at ¶ 23; Dkt. 93-1 at ¶ 23),[5] Plaintiff has failed to raise a triable issue of fact as to whether he was deprived of a protected liberty interest. Indeed, Plaintiff concedes that he was not confined to the SHU for any of the disciplinary violations he was found guilty of committing, save just one. (*See* Dkt. 59-1 at ¶ 20; Dkt. 93-1 at ¶ 20); *see generally Young v. Hoffman*, 970 F.2d 1154, 1156 (2d Cir. 1992) (finding that the plaintiff had "suffered no interference with a liberty interest and has no valid claim for relief" for procedural due process where he "was never penalized on the charges of committing unhygienic acts"); *Strasser v. New York*, No. 9:10-CV-141 (FJS/DEP), 2012 WL 253391, at \*3 (N.D.N.Y. Jan. 26, 2012) (dismissing a procedural due process claim where the plaintiff failed to allege whether he served any disciplinary confinement before his violation was administratively reversed).

5    The Court notes that, under New York law, "[a]n interpreter is only required when the inmate speaks no English." *Zhang v. Murphy*, 1 A.D.3d 784, 785 (3d Dep't 2003); *see* 7 N.Y.C.R.R. § 253.2 ("A non-English speaking inmate who cannot read

Case 9:22-cv-00181-GTS-MJK   Document 96   Filed 07/24/24   Page 91 of 201

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

2019 WL 1230778

and understand English must be given a translated notice of the charges and statements of evidence relied upon and reasons for actions taken, and provided with a translator who shall be present at the hearing."); *Maldonado v. Racette,* 175 A.D.2d 963, 963 (3d Dep't 1991) ("[T]he regulations only require the presence of an interpreter when the inmate does not speak any English."); *see also Rodriguez v. Murphy,* 19 A.D.3d 913, 913 (3d Dep't 2005) (rejecting the "petitioner's contention that he should have been provided with the assistance of a Spanish interpreter" where "the record reveals that [the] petitioner 'was sufficiently fluent in English to understand and knowledgably participate in the disciplinary hearing' " (quoting *Santiago v. Goord,* 253 A.D.2d 970, 970 (3d Dep't 1998) ) ).

**\*7** Plaintiff did serve time in the SHU during December of 2013 for an incident occurring in May 27, 2010, but it was for a period of just two months. (*See* Dkt. 59-1 at ¶ 22; Dkt. 93-1 at ¶ 22). The Second Circuit has stated that "restrictive confinements of less than 101 days do not generally raise a liberty interest warranting due process protection, and thus require proof of conditions more onerous than usual." *Davis v. Barrett,* 576 F.3d 129, 133 (2d Cir. 2009). Generally, the plaintiff must demonstrate that the conditions of confinement under such relatively brief periods "were more severe than the normal SHU conditions ... or a more fully developed record show[s] that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer,* 364 F.3d at 65.

In response to Defendants' properly supported summary judgment motion with respect to this incident (*see* Dkt. 59-6), Plaintiff has failed to set forth proof suggesting that his confinement in the SHU, beginning in December 2013 and lasting for just two months, was any more severe than normal, *Gaines v. City of New York,* No. 14 Civ. 6403 (ER), 2016 WL 951580, at \*3 (S.D.N.Y. Mar. 9, 2016) (granting the defendants' motion to dismiss where the plaintiff failed to allege "any facts regarding the conditions of his confinement to suggest that it imposed 'atypical and significant hardship' "); *Vogelfang v. Copra,* 889 F. Supp. 2d 489, 511 (S.D.N.Y. 2012) (stating that "[a]bsent additional particularized allegations regarding the harshness of the confinement—which plaintiff does not adduce—[sixty days of keeplock confinement], under the case law, is insufficient to rise to the level of a due process violation"); *Sales v. Barizone,* No. 03 Civ. 6691RJH, 2004 WL 2781752, at \*7 (S.D.N.Y. Dec. 2, 2004) ("Sales' other due process claim

arising out of two months' confinement in the SHU, however, cannot survive the *Sandin* test absent further allegations."); *Williams v. Goord,* 111 F. Supp. 2d 280, 289 (S.D.N.Y. 2000) (finding that 75 days of solitary confinement under normal conditions did not implicate a due process liberty interest). As a result, Plaintiff has failed to establish that he was deprived of a protected liberty interest. Therefore, the Court grants summary judgment dismissing Plaintiff's due process claims. [6]

[6]    To the extent Plaintiff seeks to raise an independent due process claim concerning the denial of his federal Freedom of Information Act ("FOIA") or New York State Freedom of Information Law ("FOIL") requests (Dkt. 46 at ¶¶ 389, 405-06), the Court construes Plaintiff's allegations as arising solely under FOIL because FOIA "applies only to federal agencies." *Chisholm v. United of Omaha Life Ins. Co.,* 514 F. Supp. 2d 318, 321 (D. Conn. 2007) ("Although [the plaintiff] does not say so, this Court construes her constitutional claims as having been brought under 42 U.S.C. § 1983, and her FOIA claims as arising under the Connecticut Freedom and Information Act, since the federal Freedom of Information Act, applies only to federal agencies." (citations omitted) (citing *Grand Cent. P'ship, Inc. v. Cuomo,* 166 F.3d 473, 484 (2d Cir. 1999) ) ). Furthermore, it is well-settled that the denial of a FOIL request "does not implicate Fifth or Fourteenth Amendment due process rights, where [the] plaintiff did not pursue state law remedies." *Murray v. Coleman,* 737 F. Supp. 2d 121, 126 (W.D.N.Y. 2010), *on reconsideration* (Dec. 14, 2010); *see Reed v. Medford Fire Dep't, Inc.,* 806 F. Supp. 2d 594, 607 (E.D.N.Y. 2011) ("[I]t is well-settled in New York that section 1983 is not a proper vehicle for bringing a FOIL claim." (quotation omitted) ); *see also Old St. George's LLC v. Bianco,* 389 F. App'x 33, 35 (2d Cir. 2010) ("[W]ith respect to appellants' claims relating to the alleged interference by officials of the Town of Yorktown with appellants' ability to access the Town's public records, we agree with the district court that the complaint alleges, at best, only a violation of New York's Freedom of Information Law, and not a federal constitutional claim."). Accordingly, insofar as Plaintiff alleges

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 92 of 201
Abreu v. Farley, Not Reported in Fed. Supp. (2019)
2019 WL 1230778

a § 1983 cause of action arising out of his FOIL disputes, such a claim is untenable and is dismissed.

## IV. Plaintiff's Eighth Amendment Claims

### A. General Principles

**\*8** "The Eighth Amendment, which applies to the states under the Due Process Clause of the Fourteenth Amendment," guarantees freedom from cruel and unusual punishment." *Jones v. Westchester Cty. Dep't of Corr. Med. Dep't*, 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008). "A prison deprivation violates the Eighth Amendment only when there is an 'unnecessary and wanton infliction of pain.' " *Barclay v. New York*, 477 F. Supp. 2d 546, 553 (N.D.N.Y. 2007) (quoting *Wilson v. Setter*, 501 U.S. 294, 297 (1991) ). "In order to prove that a prison condition amounted to cruel and unusual punishment, a plaintiff must satisfy both an objective and a subjective standard." *Stokes v. Goord*, No. 9:03-CV-1402 (LEK/DRH), 2007 WL 995624, at \*4 (N.D.N.Y. Mar. 30, 2007) (citing *Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996) ). "First, the prisoner must allege that the defendant acted with a subjectively 'sufficiently culpable state of mind.' Second, he must allege that the conduct was objectively 'harmful enough' or 'sufficiently serious' to reach constitutional dimensions." *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015) (citations omitted).

### 1. Subjective Element

"The subjective component of the claim requires a showing that the defendant 'had the necessary level of culpability, shown by actions characterized by "wantonness" ' " in light of the particular circumstances surrounding the challenged conduct." *Sims v. Artuz*, 230 F.3d 14, 21 (2d Cir. 2000) (quoting *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999) ); *see Swift v. Tweddell*, 582 F. Supp. 2d 437, 444 (W.D.N.Y. 2008) ("To establish deliberate indifference, then, plaintiff must prove that the defendants had a culpable state of mind and intended wantonly to inflict pain."). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law. This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citation omitted).

### 2. Objective Element

The objective requirement "does not mandate comfortable prisons," *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981); "[o]nly 'deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation,' " *Salahuddin*, 467 F.3d at 279 (quoting *Wilson*, 501 U.S. at 298). "States must not deprive prisoners of their 'basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety.' " *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (quoting *Helling v. McKinney*, 509 U.S. 25, 32 (1993) ). In other words, the objective component requires that a prisoner "prove that the conditions of his confinement violate contemporary standards of decency." *Id.*

### B. Allegations of Contaminated Food

"[T]he Eighth Amendment prohibition against cruel and unusual punishment does require that prisoners be served 'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.' " *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (quoting *Ramos v. Lamm*, 639 F.2d 559, 571 (10th Cir. 1980) ). "In food tampering claims a plaintiff must allege that he suffered an actual injury, 'the mere allegation of food tampering alone [ ] is insufficient to establish a claim under the Eighth Amendment.' " *Calvin v. Schmitt*, No. 15 CV-6584 (NSR), 2017 WL 4280683, at \*5 (S.D.N.Y. July 7, 2017) (alteration in original) (quoting *Harris v. Ashlaw*, No. 9:07-CV-0358(LEK/DEP), 2007 WL 4324106, at \*5 (N.D.N.Y. Dec. 5, 2007) ).

Here, Plaintiff's alleged food contamination is too speculative to survive summary judgment. Plaintiff alleges that the food loaves [7] he received "were wet[,]" as if C.O. Countryman had spit in his food. (Dkt. 93-5 at ¶ 41; *see also id.* at ¶ 107 (alleging that C.O. Countryman "was spitting on my loa[ves]") ). He also alleges that some of the food items he received had been opened and mixed around or were broken into pieces. (*See id.* at ¶ 107). "[A] plaintiff's allegation that 'Defendants spit in his food and 'violat[ed] [his] bread by making holes in it,' without more, has been found insufficient to state an Eighth Amendment violation." *Bee v. Krupp*, No. 08 Civ.10141 (SHS)(KNF), 2009 WL 2981910, at \*3 (S.D.N.Y. Sept. 15, 2009) (quoting *Chavis v. Kienert*, No. 9:03-CV-0039(FJSRFT), 2005 WL 2452150, at \*21 (N.D.N.Y. Sept. 30, 2005) ). Plaintiff's allegations

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 93 of 201
Abreu v. Farley, Not Reported in Fed. Supp. (2019)
2019 WL 1230778

that C.O. Countryman either spit on his loaves or otherwise tampered with his food are conclusory and unsubstantiated. Without more, such bare-bone allegations are insufficient to sustain an Eighth Amendment conditions-of-confinement cause of action. *See Sital v. Burgio*, 592 F. Supp. 2d 355, 359 (W.D.N.Y. 2009) ("the allegations in the Amended Complaint that Defendant Karamonos 'spit' in [p]laintiff's food and poked his finger in [p]laintiff's food are conclusory and unsubstantiated.... Plaintiff provides no factual support for the contention and, therefore, the claim is subject to dismissal" (quoting *Zimmerman v. Seyfert*, No. 9:03-CV-1389(TJM), 2007 WL 2080517, at *29 (N.D.N.Y. July 19, 2007) ) ); *Bee*, 2009 WL 2981910, at *3 (concluding that the plaintiff's allegations that " 'visible globs of spit' were present in his food" did not give rise to an Eighth Amendment violation).

7    A "food loaf" generally "contains a variety of ingredients, including carrots and potatoes." *Alexander v. Whitney*, No. 9:04-CV-1298 (LEK/GJD), 2008 WL 904897, at *6 n.8 (N.D.N.Y. Mar. 31, 2008).

**\*9** Plaintiff also makes the general assertion that his food was "regularly and frequently contaminated and or spoiled." (Dkt. 93-5 at ¶ 190). He further alleges that he became nauseous and was forced to vomit after eating the food loaves. (*Id.*). Plaintiff also allegedly experienced stomach pains and anal bleeding, which were "*possibly* due to bacterias [sic] and parasites due to the spoiled foods" and the "dirty hands" of the correctional officers and their practice of "spitting" into his food. (*Id.* (emphasis added) ). Plaintiff's allegations are self-serving and completely unsupported. *See Martinez v. Lape*, No. 9:09-CV-0665 (TJM/RFT), 2011 WL 4527943, at *9 (N.D.N.Y. Mar. 28, 2011) ("Other than the unsupported broad assertion that he contracted H. pylori from the food or water at Coxsackie, Plaintiff fails to allege how the expired food and juice posed an immediate risk to his health, inflicted pain and suffering, or otherwise amounted to an extreme deprivation."), *report and recommendation adopted*, 2011 WL 4528980 (N.D.N.Y. Sept. 28, 2011). Conclusory claims of spoiled food are insufficient to survive a dispositive motion. *See Black v. Fischer*, No. 9:08-CV-0232, 2010 WL 2985081, at *8 (N.D.N.Y. July 1, 2010) (stating that the "plaintiff's food complaints consist entirely of broad and conclusory allegations which, while at first blush troublesome, are devoid of the specifics necessary to prove such a claim"); *Dorsey v. Fisher*, No. 9:09-CV-1011 (GLS)(DEP), 2010 WL 2008966, at *7 (N.D.N.Y. May 19, 2010) (dismissing an Eighth Amendment claim based on

contaminated food where the plaintiff alleged, in "conclusory fashion," a conspiracy to "poison[ ] his food with infected DNA").

Furthermore, the injuries that allegedly resulted from Plaintiff's ingestion of the food loaves are not borne out by the medical evidence. *See Stokes*, 2007 WL 995624, at *4 ("[A]lthough Stokes makes general allegations regarding the health effects he suffered because of the alleged contaminated and inadequate food, there is nothing in his medical records to indicate that he suffered any adverse health effects from the food served to him by defendants."). While a Court must view the evidence in the light most favorable to the non-movant on a motion for summary judgment, "[v]ague assertions supported only by self-serving statements," even if found "in the nonmoving party's affidavit[,] are insufficient to defeat a properly supported summary judgment motion." *Moe v. United States*, 668 F. Supp. 2d 497, 502 (W.D.N.Y. 2009); *see also Brown v. Eagen*, No. 9:08-CV-0009 (TJM/DRH), 2009 WL 815724, at *10 (N.D.N.Y. Mar. 26, 2009) (rejecting the plaintiff's "allegations that his food was contaminated" by blood, feces, semen, and chemicals as so "conclusory and fantastic as to rise to the level of factually frivolous"). Indeed, outside his general allegations that the correctional officers had "dirty hands" and were "spitting" in his food, Plaintiff provides no credible basis to support the assertion that he was actually exposed to harmful "bacteria[ ]" or "parasites." *See generally Stokes*, 2007 WL 995624, at *4 ("[A]lthough Stokes contends that defendants delivered him the food, he fails to allege that he saw any of them actually contaminate or tamper with his food.").

Therefore, Plaintiff's Eighth Amendment claim for cruel and unusual punishment, based upon the alleged contamination of his food, is dismissed because he has failed to raise an issue of material fact sufficient to satisfy the objective element of this cause of action.

### C. Deliberate Medical Indifference

For purposes of opposing Defendants' motion, Plaintiff "focuses on his most serious untreated medical conditions." (Dkt. 93 at 30). These conditions include the injuries he allegedly sustained during an "assault that occurred on March 30, 2010, the chronic back and neck pain that was at issue in the March 30, 2010 assault, for which he requires at least pain medication and a back brace, and the acute incident of a potential heart attack he suffered on April 2, 2010." (*Id.*).

Case 9:22-cv-00181-GTS-MJK   Document 96   Filed 07/24/24   Page 94 of 201

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

2019 WL 1230778

"The Eighth Amendment [also] forbids 'deliberate indifference to serious medical needs of prisoners....' " *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) ). This category of Eighth Amendment violation also requires the satisfaction of objective and subjective elements. In the context of a deliberate indifference claim, the objective component requires that "the alleged deprivation of adequate medical care ... be 'sufficiently serious,' " *Salahuddin*, 467 F.3d at 279 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) ), while the subjective component requires that "the charged officials ... be subjectively reckless in their denial of medical care," *Spavone*, 719 F.3d at 138.

**\*10** The "sufficiently serious" element is analyzed more broadly where the alleged claim amounts to "a failure to provide any treatment for an inmate's medical condition" than "where the inadequacy is in the medical treatment given." *Salahuddin*, 467 F.3d at 280. In the former scenario, the focus is on whether "the inmate's *medical condition* is sufficiently serious," whereas the latter situation emphasizes the treatment itself. *Id.* (emphasis added); *see Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) ("When the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.").

"It appears that no courts have specifically addressed neck pain in the context of a deliberate indifference claim." *Medina v. Barrett*, No. 14-CV-6377-FPG, 2018 WL 1383232, at \*6 (W.D.N.Y. Mar. 19, 2018). However, "courts have held that '[s]evere back pain, especially if lasting an extended period of time, can amount to a "serious medical need" under the Eighth Amendment.' " *Guarneri v. Hazzard*, No. 9:06-CV-0985, 2008 WL 552872, at \*6 (N.D.N.Y. Feb. 27, 2008) (quoting *Nelson v. Rodas*, No. 01-CV-7887 (RCC/AJP), 2002 WL 31075804, at \* 14 (S.D.N.Y. Sept. 17, 2002) ); *see Mosley v. Woodty*, No. 9:11-CV-1490, 2013 WL 5347272, at \*4 (N.D.N.Y. Sept. 23, 2013) ("Courts have found chronic, debilitating back pain to be a serious injury for Eighth Amendment purposes.").

Plaintiff appears to quarrel with the medical treatment he received at Five Points and challenges the propriety of the Five Points medical staffs' decision to interrupt treatment previously prescribed by other correctional facilities. Specifically, Plaintiff disputes Dr. Weinstock's decision to remove his back brace on March 30, 2010, even though Plaintiff informed Dr. Weinstock that it had been prescribed by physicians at another correctional facility, who had also recommended physical therapy and pain medication to treat his chronic back pain. (Dkt. 93 at 30; *see* Dkt. 46 at ¶¶ 101, 103-04). However, Plaintiff's contentions merely challenge Dr. Weinstock's medical judgment, and Plaintiff submits no medical evidence demonstrating that a back brace should have been continued as a form of treatment. *See Evan v. Manos*, 336 F. Supp. 2d 255, 263 (W.D.N.Y. 2004) (stating that the plaintiff's opinion that the defendant "should have prescribed a back brace is also inadequate to give rise to any issue of fact about whether his constitutional rights were violated," and noting that "[t]here is no medical evidence that a back brace was medically called for or that it would have relieved plaintiff's alleged pain"). "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998). "Disagreement over treatment relates to an issue of medical judgment and at worst, amounts to medical malpractice, not a constitutional violation." *Tavares v. N.Y.C. Belleview Hosp.*, No. 13 CV 3148 (PKC)(MHD), 2015 WL 7736544, at \*5 (S.D.N.Y. Nov. 30, 2015) (citing *Estelle*, 429 U.S. at 106).

Indeed, Dr. Weinstock indicates that his decision to remove the back brace and to discontinue some of Plaintiff's pain medications was based upon his medical examination of Plaintiff and objective medical evidence, such as x-rays. (Dkt. 59-9 at ¶¶ 24-28); *see Lewis v. Alves*, No. 01-CV-0640A(SR), 2004 WL 941532, at \*6 (W.D.N.Y. Mar. 22, 2004) (stating that the defendant's decision to deny drug treatment while the plaintiff completed "an alcohol and drug treatment program was based upon objective medical criteria and the exercise of [the defendant's] medical judgment," and thus, could not support a medical indifference claim); *see also Munlyn v. Pietrie*, No. 13-CV-6170FPG, 2014 WL 3695488, at \*6 (W.D.N.Y. July 24, 2014) (stating that the plaintiff's allegations only reflect his "disagreement with [the medical staff's] evaluation and assessment of his medical circumstances" where he claims that they "did not believe he had any pain, or disputed the severity of the pain," and then they "refused [the p]laintiff's requests to see the doctor," removed his neck brace and walking cane, disapproved physical therapy, and told him "to stop lying"). Furthermore, Dr. Weinstock affirms that Plaintiff was often seen multiple times a week by the Five Points medical staff (Dkt. 59-9 at ¶ 7), an averment that is borne out by the medical records submitted by Defendants (*see* Dkt. 59-10).

Case 9:22-cv-00181-GTS-MJK Document 96 Filed 07/24/24 Page 95 of 201

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

2019 WL 1230778

**\*11** Plaintiff also argues that Defendants consistently ignored his chronic back and neck pains. (Dkt. 93 at 31 & n.8). However, "a delay in medical treatment does not necessarily give rise to an Eighth Amendment violation." *Pagan v. Corr. Med Servs.*, No. 11 Civ. 1357 (ER), 2013 WL 5425587, at \* 12 (S.D.N.Y. Sept. 27, 2013). Where delays in medical treatment have implicated Eighth Amendment concerns, "they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness." *Ferguson v. Cai*, No. 11 Civ. 6181 (PAE), 2012 WL 2865474, at \*4 (S.D.N.Y. July 12, 2012).

As such, Plaintiff's allegations must be viewed in context; it appears that Plaintiff frequently sought and received some form of medical attention, and it is undisputed that he was examined by medical personnel "well over 100 times" while housed at Five Points. (Dkt. 59-1 at ¶ 1; Dkt. 93-1 at ¶ 1). Simply because Plaintiff was not examined each and every day he complained of some form of chronic pain does not demonstrate that Defendants were deliberately indifferent to a serious medical need. At least under the circumstances presented here, where the medical records reveal that Plaintiff was examined and/or prescribed medications multiple times a month and sometimes several times a week, Plaintiff's assertion that Defendants ignored his complaints of pain fails to establish a viable constitutional cause of action. (*See* Dkt. 59-10). Indeed, many of Plaintiff's medical evaluations were only separated by a matter of days. *See Youngblood v. Glasser*, No. 9:10-CV-1430 (NAM/DEP), 2012 WL 4051846, at \*8 (N.D.N.Y. Aug. 22, 2012) ("Plaintiff maintains that his constitutional rights were violated as a result of a five-day delay in arranging for a physician to examine his hemorrhoids. Proof of such complaints and the modest delay at issue is not sufficient to establish an Eighth Amendment claim."), *report and recommendation adopted*, 2012 WL 4051890 (N.D.N.Y. Sept. 13, 2012); *Williams v. Raimo*, No. 9:10-CV-245 (MAD/GHL), 2011 WL 6026111, at \*5 (N.D.N.Y. Dec. 2, 2011) (noting that any delay in treating "a prisoner's injuries from the weekend to the next business day does not constitute deliberate indifference where the prisoner 'submitted no medical evidence showing any negative effect of the delay' " (quoting *Croft v. Hampton*, 286 F. App'x 955, 959 (8th Cir. 2008) ) ); *Alster v. Goord*, 745 F. Supp. 2d 317, 335 (S.D.N.Y. 2010) (dismissing the plaintiff's medical indifference cause of action where he claimed that the defendants "waited two days after he complained of abdominal pain to take him to the hospital"); *Evan*, 336 F. Supp. 2d at 261 (finding that a "nine-day delay between

being placed on the callout list and plaintiff's initial visit" was not actionable where the plaintiff "has not identified anything that [the defendant] could or should have done had he examined plaintiff sooner, nor has he shown that he was harmed by any delay in treatment"); *see also Colon v. Plescia*, No. CIVA9:07-CV-0727(DNH/DE), 2009 WL 2882944, at \*7 (N.D.N.Y. July 27, 2009) ("Where a plaintiff's claim is based on a delay in medical treatment, the plaintiff must show that substantial harm resulted from the delay itself."), *report and recommendation adopted*, 2009 WL 2914160 (N.D.N.Y. Sept. 4, 2009). [8]

[8]  Insofar as Plaintiff asserts a medical indifference claim based upon the many allegedly unwarranted denials of his sick-call slips (*see, e.g.*, Dkt. 46 at ¶¶ 190, 193, 196, 200-01, 203-04, 206, 216-17, 223, 226, 245, 252, 265, 267, 285), it too is unsupported by the evidence, *see Kee v. Hasty*, No. 01 Civ.2123 (KMW)(DF), 2004 WL 807071, at \*29 (S.D.N.Y. Apr. 14, 2004) (rejecting the plaintiff's "overly conclusory" allegations that the defendants failed to treat him where he failed "to specify the dates on which [he] was denied proper treatment, the nature of his needs on those dates, and the nature of the treatment that was purportedly denied"); *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 309 (S.D.N.Y. 2001) ("[A] generalized claim that an inmate was denied access to medical treatment will not suffice."); *Vento v. Lord*, No. 96 Civ. 6169 (SS), 1997 WL 431140, at \*4 (S.D.N.Y. July 31, 1997) (dismissing the deliberate medical indifference claim where the plaintiff complained that "the medical staff will not see me fit ... for medical attention," but failed to provide sufficient allegations regarding the denial of his sick call requests or the nature of those requests). Indeed, "[t]he issue in this case is not whether [the plaintiff] was seen every time that he requested sick call, but whether the defendants were deliberately indifferent to his serious medical needs concerning his back pain." *Butler v. Weissman*, No. CIV.9:00-CV-1240 (LEK/GLS), 2002 WL 31309347, at \*5 (N.D.N.Y. June 20, 2002). In light of the extensive medical record, which demonstrates that Plaintiff was frequently seen in the infirmary multiple times a month, and sometimes several times a week, any claim of medical indifference based upon the wrongful denial of Plaintiff's sick-call slips is

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 96 of 201

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

2019 WL 1230778

unsustainable. *See Davidson v. Desai*, 817 F. Supp. 2d 166, 190-91 (W.D.N.Y. 2011) (concluding that the plaintiff failed to point to "a request seeking sick call for a serious medical need sufficient to support a jury verdict on the claim" where the plaintiff's medical record establishes that he "was seen in sick call multiple time[s] each month"); *see generally Arnow v. Aeroflot Russian Airlines*, 980 F. Supp. 2d 477, 482 (S.D.N.Y. 2013) ("[S]elf-serving, conclusory affidavits, standing alone, are insufficient to create a triable issue of fact and to defeat a motion for summary judgment." (citing *BellSouth Telecomms., Inc. v. W.R. Grace & Co.-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996) ) ).

**\*12**  Notably, despite Plaintiff's claim of medical indifference, it is undisputed that he failed to cooperate with medical staff or refused to take his prescribed medications on several occasions. (Dkt. 59-1 at ¶ 8; Dkt. 93-1 at ¶ 8); *see generally Buffaloe v. Fein*, No. 12 Civ. 9469 (GBD) (AJP), 2014 WL 1224446, at *2 (S.D.N.Y. Mar. 20, 2014) (noting that the plaintiff's "medical records indicate that he often refused treatment" and that a "plaintiff's refusal of medical treatment 'has been found to effectively rebut[ ] ... claims of deliberate indifference to serious medical needs' " (alteration in original) (quoting *Rivera v. Goord*, 253 F. Supp. 2d 735, 756 (S.D.N.Y. 2003) ) ). Whether or not Plaintiff ultimately agreed with the medical staff's evaluations and the medication and treatments prescribed during his numerous examinations, Plaintiff's "personal dissatisfaction" with the treatment received does not give rise to a constitutional violation. *See Wright v. Conway*, 584 F. Supp. 2d 604, 607 (W.D.N.Y. 2008) ("Wright's complaints demonstrate no more than his personal dissatisfaction with the level of care that he received, and these claims must therefore be dismissed.").

Plaintiff also references a "potential heart attack" that he allegedly suffered on or about April 2, 2010. (*See* Dkt. 93 at 32-33). Plaintiff alleges that Dr. Weinstock and nurse Annette Holm ("Nurse Holm") ignored his complaints of chest pain, which he could feel spreading over his left shoulder. (*See* Dkt. 46 at ¶¶ 124-26). Plaintiff further alleges that he had difficulty breathing and speaking at that time as well. (*Id.* at ¶ 125). The medical staff allegedly ignored these symptoms even though they suggested that Plaintiff was suffering from a "potential heart attack." (*Id.* at ¶ 126).

Plaintiff fails to provide any evidence—medical or otherwise—to explain the difference between a "potential" heart attack and an actual heart attack, or to associate his

alleged symptoms with any other cardiovascular health-related issues. Furthermore, a review of the medical records reveals that Plaintiff was examined several times on April 2, 2010, and in the following days. (*See* Dkt 59-10 at 131-33). For example, on April 2, 2010, Plaintiff complained of chest pain and discomfort in his left shoulder, but the medical staff noted that he was "talking easily," without any shortness of breath, and that his blood pressure had been taken. (*Id.* at 133). Dr. Weinstock was notified of the assessment, and the medical staff ordered Plaintiff to be evaluated again in an hour. (*Id.*). After one hour had passed, Plaintiff was observed "talking easily" without shortness of breath. (*Id.*). Plaintiff was instructed to request an escort back to the infirmary if he experienced an increase in pain, shortness of breath, or dizziness, but was otherwise told to return for a follow-up in the morning. (*Id.*).

The next morning, Plaintiff complained of a cough, chronic pain in his right arm, neck, back, both wrists, legs, face, and head, but apparently did not indicate whether he felt pain in his chest or shoulder. (*Id.*). Plaintiff was then provided with some ritussin and ibuprofen. (*Id.*). Later that morning, Plaintiff returned to the infirmary, where he again complained of pain in his back, wrist, head, face, and right arm, but displayed no signs of redness or swelling. (*Id.* at 132). Plaintiff did not appear to exhibit any shortness of breath, and he was "talking easily." (*Id.*). Plaintiff also indicated that he "doesn't feel too much compression to [his] chest." (*Id.*). On April 7, 2010, Plaintiff again complained of some "difficulty breathing," but was examined and prescribed treatment. (*Id.* at 131). The medical notes dated April 10, 2010, reveal that Plaintiff was "talking easily" without any shortness of breath, and no subjective complaints of chest or shoulder pain were recorded. (*Id.*).

In sum, the above-referenced medical progress notes wholly undermine Plaintiff's contention that he suffered a sufficiently serious cardiovascular event that was ignored by the Five Points medical staff. Even if Plaintiff suffered a "potential heart attack," the medical records demonstrate that he was provided with consistent care and treatment at the time his symptoms arose and in the days that followed—Plaintiff points to no medical evidence demonstrating that the medical staff were "subjectively reckless" in their examination of Plaintiff's condition. *Spavone*, 719 F.3d at 138.

**\*13**  Plaintiff has strategically chosen to focus his opposition papers on a few of the most allegedly egregious instances of deliberate indifference to a serious medical need asserted

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 97 of 201

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

2019 WL 1230778

by Plaintiff in this action. Although the Court has reviewed the balance of Plaintiff's alleged medical indifference claims against the medical records submitted by Defendants, "in deciding a motion for summary judgment, a District Court is not required to 'scour the record on its own in a search for evidence' where the non-moving party fails to adequately present it." *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 44 F. Supp. 3d 409, 426 (S.D.N.Y. 2014) (quoting *CILP Assocs. LP v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 125 (2d Cir. 2013) ). Here, Defendants have established that Plaintiff was medically examined on "numerous occasions" while incarcerated at Five Points, and sometimes multiple times a week. (Dkt. 59-4 at ¶¶ 4-6; *see* Dkt. 59-7 at ¶ 9; Dkt. 59-9 at ¶ 4, 7, 18). Despite Plaintiff's frequent complaints of medical ailments, these complaints were not substantiated by objective medical examination. (*See* Dkt. 59-4 at ¶ 9; Dkt. 59-7 at ¶¶ 10-12; Dkt. 59-9 at ¶¶ 9, 24-28, 34, 68-69). Furthermore, Plaintiff was often prescribed medications to relieve him of the subjective pain or discomfort he complained of, and he would usually receive medications at least once a day while housed in the SHU. (*See* Dkt. 59-4 at ¶¶ 6-7, 20; Dkt. 59-7 at ¶ 8; Dkt. 59-9 at ¶¶ 5, 18, 23-24, 28, 30). These averments are borne out by the medical records submitted by Defendants. (*See* Dkt. 59-10). In response, Plaintiff has submitted no medical evidence to substantiate his claims of deliberate indifference —instead, he relies on only his conclusory claims. In light of the robust medical records documenting Plaintiff's treatment, Plaintiff's self-serving averments are insufficient to raise a triable issue of fact as to whether he suffered constitutionally inadequate medical care during his confinement at Five Points. *See Scott v. Koenigsmann*, No. 9:12-CV-1551, 2016 WL 1057051, at *12 (N.D.N.Y. Mar. 14, 2016) (finding the record did not establish that the defendant "acted with deliberate indifference or deliberately ignored [the p]laintiff's complaints of pain" where the plaintiff "received a plethora of prescription medication for chronic low back pain and was routinely treated at Sick Call, by nurse practitioners and consulted with medical providers").

Accordingly, summary judgment is granted in favor of Defendants dismissing Plaintiff's Eighth Amendment claim for deliberate medical indifference.[9]

[9]    To the extent Plaintiff raises a related claim for the deprivation of constitutionally protected medical confidentiality (Dkt. 46 at ¶¶ 221, 258-59, 292), the Court notes that "[c]ourts within this Circuit have accorded constitutional privacy protection to

a handful of medical conditions only, including HIV, transsexualism and sickle cell anemia," *Myers v. Dolac*, No. 09-CV-6642P, 2013 WL 5175588, at *7 (W.D.N.Y. Sept. 12, 2013). Constitutional protection will only extend to a medical condition that "is both serious in nature and the type that is 'excruciatingly private and intimate in nature' such as those 'likely to provoke ... an intense desire to preserve one's medical confidentiality.' " *Id.* (quoting *Matson v. Bd. of Educ. of City Sch. Dist. of N.Y.*, 631 F.3d 57, 64 (2d Cir. 2011) ). As such, this constitutional right is limited in scope and exists only under "narrow parameters." *Matson*, 631 F.3d at 65 (quoting *Powell v. Schriver*, 175 F.3d 107, 112 (2d Cir. 1999) ). In determining whether constitutional protection extends to a particular medical condition, "courts must determine whether the disease is 'contagious ... or attributed in any way to socially repugnant conduct and whether it could be said that society as a whole views [the disease] as directly associated with any disease which might conceivably be characterized as loathsome.' " *Myers*, 2013 WL 5175588, at *7 (quoting *Matson*, 631 F.3d at 66).

The instant matter "is not a case in which plaintiff has an unusual medical problem which, if disclosed unnecessarily to other inmates, would likely expose plaintiff to discrimination, intolerance, or potential violence." *Rodriguez v. Ames*, 287 F. Supp. 2d 213, 220 (W.D.N.Y. 2003) (rejecting the plaintiff's claim where he had been "diagnosed with proctitis, a nontoxic inflammation of the mucose tissue of the rectum, and internal hemorrhoids"); *see Webb v. Goldstein*, 117 F. Supp. 2d 289, 298 (E.D.N.Y. 2000) (finding no right to privacy attendant to medical records containing information about the plaintiff's treatment for genital conditions); *see also Myers*, 2013 WL 5175588, at *7 ("[C]ourts have declined to recognize constitutional protection for many other medical conditions, including fibromyalgia, arthritis and sleep apnea."); *Ebert v. Hargreaves*, No. 4:11CV3139, 2012 WL 642470, at *3 (D. Neb. Feb. 28, 2012) (assuming that prisoners enjoy a limited right to privacy in medical information, the plaintiff failed to establish a violation of that right where he alleged that the defendant spoke about the plaintiff's "back pain in front of other inmates"); *see generally Kendall v. Kittles*, No. CO CIV. 628 (GEL),

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 98 of 201

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

2019 WL 1230778

2004 WL 1752818, at *6 (S.D.N.Y. Aug. 4, 2004) ("Hemorrhoids, albeit uncomfortable, are a minor health issue, far removed from the category of medical conditions that have been deemed 'sufficiently serious' by other courts."). Accordingly, Plaintiff has failed to raise a triable issue of fact as to whether he was deprived of his limited right to privacy in medical information.

### D. Eighth Amendment Excessive Use of Force

**\*14** In order for an Eighth Amendment excessive force claim to survive a motion for summary judgment, the evidence, viewed in the light most favorable to the non-moving party, must go "beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives," and instead "support a reliable inference of wantonness in the infliction of pain...." *Whitley v. Alters*, 475 U.S. 312, 322 (1986). " '[S]ome degree of injury is ordinarily required to state a claim' of excessive use of force in violation of the Eighth Amendment." *Taylor v. N.Y. Dep't of Corr.*, No. 10 CIV. 3819 (JPO), 2012 WL 2469856, at *4 (S.D.N.Y. June 27, 2012) (quoting *United States v. Walsh*, 194 F.3d 37, 50 (2d Cir. 1999) ). Accordingly, "a *de minimis* use of force will rarely suffice to state a constitutional claim." *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993). Indeed, "[t]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992) ).

However, "an inmate 'need not prove "significant injury" to make out an excessive force claim.' " *Banks v. County of Westchester*, 168 F. Supp. 3d 682, 688 (S.D.N.Y. 2016) (quoting *Griffin v. Crippen*, 193 F.3d 89, 92 (2d Cir. 1999) ). "[T]he core judicial inquiry is that set out in *Whitley*: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7.

Factors to consider in determining whether prison officials unnecessarily and wantonly inflicted pain include: (1) the extent of the injury suffered; (2) the need for the application of force; (3) the relationship between the need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response. *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (citing *Hudson*, 503 U.S. at 7). [10]

10    Although Plaintiff submits responsive papers opposing summary judgment on almost every one of his alleged assaults (*see* Dkt. 93 at 36-45), Defendants indicate that they have only moved to dismiss the allegations pertaining to the March 30, 2010, and September 27, 2011, incidents (*see* Dkt. 105-2 at 8; *see also* Dkt. 59-2 at 79 ("[T]he Supplement should be dismissed in its entirety with the exception of the alleged incident of January 17, 2012.") ). Despite Defendants' clarification, the Court will also address the alleged use of force events pertaining to nurse Kimberly Cheasman ("Nurse Cheasman") because Defendants' motion papers allude to at least one of these events and request that all claims alleged against her be dismissed. (*See* Dkt. 59-2 at 63-65). Accordingly, the Court does not address the assaults allegedly taking place on May 10, 2010, February 21, 2011, March 21, 2011, December 5, 2011, and January 17, 2012, and thus Plaintiff's § 1983 claims for excessive use of force and his common law claims arising from these incidents may proceed.

### 1. Alleged Use of Excessive Force on March 30, 2010

Plaintiff alleges that on March 30, 2010, C.O. Countryman and correctional officer Jacob Smith used excessive force to remove Plaintiff's back brace and to restrain Plaintiff after he protested the manner in which the correctional officers attempted to remove the brace. (Dkt. 46 at ¶¶ 104-06). Both correctional officers allegedly "dragged Plaintiff out of the sick-call room, and violently slammed Plaintiff to the floor face down." (*Id.* at ¶ 107). C.O. Countryman then "tightened the handcuffs on Plaintiff's wrists, twisting both hands and wrists maliciously," and then "twisted Plaintiff's legs, causing extreme pain and suffering to Plaintiff's body, legs and back." (*Id.* at ¶¶ 108-09). C.O. Countryman then "shoved and pushed Plaintiff into a wall," and then he, correctional officer Richard Cioffa, and other unidentified correctional officers "took Plaintiff's back brace violently from his body...." (*Id.* at ¶ 110).

**\*15** A review of the medical evidence reveals that the medical staff did not observe any injuries subsequent to the alleged assault. Although Plaintiff complained of pain in his arm, face, and wrist, no visible injuries, edema, or redness were observed ten minutes after the use of force occurred. (*See* Dkt. 59-10 at 134-35). Plaintiff made similar complaints

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 99 of 201

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

2019 WL 1230778

the following day, but no swelling or any deformity was noted; nonetheless, the medical staff prescribed Motrin to relieve any discomfort, (*Id.* at 134).

However, the Court does not require corroborating medical evidence demonstrating the presence of an injury to conclude that an excessive force claim survives summary judgment. *See Ninortey v. Shova*, No. 05 CIV 542 (SHS), 2008 WL 4067107, at *12 (S.D.N.Y. Sept. 2, 2008) (noting that courts in the Southern District of New York "have not required that injuries caused by the alleged use of excessive force be corroborated by medical records"); *Beckles v. Bennett*, No. 05 CIV. 2000 (JSR), 2008 WL 821827, at *16 (S.D.N.Y. Mar. 26, 2008) (denying summary judgment even though "the nurse noted no sign of physical injury after the incident," where "the medical records provided by [the p]laintiff show that he complained repeatedly and consistently about pain to the back and kidney, beginning immediately after the incident and continuing for months"). "Where 'a prisoner's allegations and evidentiary proffers could reasonably, if credited, allow a rational factfinder to find that corrections officers used force maliciously and sadistically,' summary judgment is improper 'even where the plaintiff's evidence of injury [is] slight and the proof of excessive force [is] weak.' " *Clarke v. Anderson*, No. 10-CV-319S, 2012 WL 3292879, at *5 (W.D.N.Y. Aug. 10, 2012) (quoting *Wright v. Goord*, 554 F.3d 255, 269 (2d Cir. 2009) ). "[T]he absence of visible injuries does not mean ... that [the p]laintiff was not harmed," and thus, "the records, standing alone, are not sufficient to permit the Court to conclude as a matter of law that [the p]laintiff was not subjected to the excessive use of force or that he suffered only *de minimis* injuries." *Ninortey*, 2008 WL 4067107, at *12; *see also United States v. Walsh*, 194 F.3d 37, 50 (2d Cir. 1999) (finding that the prisoner's pain resulting from the force used demonstrates a sufficient injury); *Campbell v. City of New York*, No. 06 CV 5743 (HB), 2010 WL 2720589, at *8 (S.D.N.Y. June 30, 2010) ("That there is at best limited medical evidence in the record to corroborate [the plaintiff's] story is insufficient to dismiss his excessive force claim as a matter of law.").

Furthermore, a "plaintiff's injuries are but one factor to consider in the excessive force analysis." *Cole v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 9:14-CV-0539 (BKS/ DEP), 2016 WL 5394752, at *12 (N.D.N.Y. Aug. 25, 2016), *report and recommendation adopted*, 2016 WL 5374125 (N.D.N.Y. Sept. 26, 2016); *see also Dellamore v. Stenros*, 886 F. Supp. 349, 352 (S.D.N.Y. 1995) (rejecting the argument that the excessive force claim should be dismissed because

the plaintiff's "medical records do not show any injuries from the use of an alleged chokehold," and explaining that "if a chokehold was used, the fact that it did not cause any physical injuries goes to the amount of damages, if any, to which [the plaintiff] may be entitled, rather than the legal sufficiency of his allegation"). Indeed, Defendants do not appear to dispute the fact that some force was used to restrain Plaintiff on March 30, 2010, nor do they argue that the amount of force used was appropriate to maintain order and discipline. Instead, Defendants simply contend that any injury sustained was *de minimis* in the absence of substantiating medical proof. (*See* Dkt. 59-2 at 50-51). That Plaintiff's primary source of proof may be his own testimony does not mean there are no material issues of fact as to the circumstances underlying the force used and whether such force was maliciously and sadistically applied. *See Griffin*, 193 F.3d at 91 (reversing the dismissal of an excessive force claim, even though the plaintiff's evidence was "extremely thin" and "the only evidence he intended to offer in support of his claims was his own testimony and that the only injuries he suffered were a bruised shin and swelling"); *see also Jordan v. Fischer*, 773 F. Supp. 2d 255, 272 (N.D.N.Y. 2011) (denying a motion for summary judgment where the "plaintiff's excessive force claim will turn on issues of credibility").

**\*16** Therefore, Defendants' motion for summary judgment is denied insofar as it seeks dismissal of Plaintiff's Eighth Amendment excessive force claim arising out of the incident taking place on March 30, 2010.

### 2. Alleged Use of Excessive Force on November 21, 2010

Plaintiff alleges that on November 21, 2010, Nurse Cheasman was informed that Plaintiff had filed grievances and complaints against her. (Dkt. 46 at ¶ 212). After being so advised, Nurse Cheasman approached Plaintiff's cell, "opened the window panel of the solid door," and proceeded to "physically assault[ ] Plaintiff with a bucket, injuring Plaintiff's fingers and hands." (*Id.*).

Plaintiff's medical records indicate that he complained of hand pain for several medical visits subsequent to the alleged assault; however, no injuries were ever discerned and Plaintiff was always found to have full use of his hands. (*See* Dkt. 59-10 at 107-08, 110). On November 22, 2010, Plaintiff specifically informed medical staff that he had been assaulted by the "log nurse" with a "medical bucket." (*Id.* at 110). However, the progress notes also reveal

2019 WL 1230778

that Plaintiff "refused to unwrap hands and show this nurse any injuries." (*Id.*). Defendants argue that Plaintiff's assertion that Nurse Cheasman assaulted him is "far too vague to make out a claim to which any Defendant can respond." (Dkt. 59-2 at 64).

The fact that Plaintiff's medical records suggest that he suffered no visible injury to his fingers, and that he had no difficulty moving his fingers, does not wholly contradict Plaintiff's sworn allegations that he was assaulted by Nurse Cheasman in a manner that was unrelated to the maintenance of prison discipline and order. Indeed, Plaintiff's medical records indicate that he continued to complain of hand pain for several subsequent medical visits, and that he specifically stated that a nurse had struck him with a bucket. Although Nurse Cheasman has affirmed that she never acted "wantonly or willfully against Plaintiff" and never sought to harm him (*see* Dkt. 59-4 at ¶¶ 24-25), Defendants' reliance upon Plaintiff's medical records fails to establish their entitlement to judgment as a matter of law, *see Abascal v. Fleckenstein*, No. 06-CV-349S, 2012 WL 638977, at *6 (W.D.N.Y. Feb. 27, 2012) (denying summary judgment where the plaintiff alleged that the correctional officer committed a brief, yet unprovoked assault, "unrelated to any effort to maintain or restore discipline," despite having only resulted in a minor injury); *see also Cole*, 2016 WL 5394752, at * 11 (acknowledging that "a court must ask whether the alleged wrongdoing is objectively harmful enough to establish a constitutional violation," but recognizing that "when prison officials use force to cause harm maliciously and sadistically, contemporary standards of decency always are violated ... whether or not significant injury is evident" (quoting *Wright*, 554 F.3d at 268-69) ); *see generally Breen v. Garrison*, 169 F.3d 152, 153 (2d Cir. 1999) ("Where the parties' versions of facts differed markedly, '[t]he issue of excessive force was ... for the jury, whose unique task it was to determine the amount of excessive force used, the seriousness of the injuries, and the objective reasonableness of the officer's conduct.' ").

**\*17** Therefore, Defendants' motion for summary judgment is denied insofar as it seeks dismissal of Plaintiff's Eighth Amendment excessive force claim arising out of the incident taking place on November 21, 2010.

### 3. Alleged Use of Excessive Force on December 18, 2010

Plaintiff alleges that on December 18, 2010, Nurse Cheasman assaulted him by "slamming the hatch of Plaintiff's cell door on Plaintiff's left arm when Plaintiff was attempting to retrieve a cup that contained [his] medications." (Dkt. 46 at ¶ 247). However, a review of Plaintiff's medical records over the days that followed this alleged incident reveals that he did not complain of any pain in his left arm and was only treated for a sore throat. (Dkt. 59-10 at 100). The Court recognizes that there is authority supporting the proposition that "where undisputed medical records '*directly and irrefutably* contradict a plaintiff's descriptions of his injuries' attributed to an alleged use of excessive force, 'no reasonable jury could credit plaintiff's account of the happening.' " *Henry v. Brown*, No. 14-CV-2828 (LDH)(LB), 2016 WL 3079798, at *2 (E.D.N.Y. May 27, 2016) (quoting *Davis v. Klein*, No. 11-CV-4868 ENV, 2013 WL 5780475, at * 1 (E.D.N.Y. Oct. 25, 2013) ); *see also Felder v. Diebel*, No. 10-CV-343 JTC, 2012 WL 6690239, at *5 (W.D.N.Y. Dec. 21, 2012) (finding that the plaintiff's "medical records ... indicate no signs of injuries consistent with his allegations and no medical treatment," and concluding that "the amount of force used in this case was *de minimis*").

Nonetheless, the instant matter presents the unique scenario where a medical staff member is charged with the use of excessive force. Under these circumstances, the person alleged to have committed the unconstitutional act is potentially also responsible for recording and maintaining the very progress notes relied upon by Defendants in arguing that any amount of force used must have been *de minimis*. The Court cannot decipher the identity of the medical personnel who recorded the progress notes relevant to the December 18, 2010, incident simply by reading the signature transcribed therein. Put another way, Defendants have failed to provide a persuasive reason to dissociate Nurse Cheasman, a member of the medical staff, from the rest of the medical personnel charged with recording and maintaining the medical progress notes at issue.[11] As a result, Defendants have not carried their burden of demonstrating the absence of a triable issue of fact regarding the excessive force claims asserted against Nurse Cheasman.

11      This observation differs from general claims that medical personnel falsified medical records to minimize any injuries or illnesses. Such speculation is insufficient to defeat a motion for summary judgment. *See, e.g., Slater v. Lacapriccia*, No. 13-CV-1079S, 2018 WL 437931, at *6 n.8 (W.D.N.Y. Jan. 16, 2018) ("Slater contends that [the d]efendants and other medical providers falsified his medical records by not accurately

Case 9:22-cv-00181-GTS-MJK Document 96 Filed 07/24/24 Page 101 of 201

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

2019 WL 1230778

recording his complaints and minimizing his conditions. But Slater has presented no evidence to support this allegation, which is essentially a denial of [the d]efendants' evidence." (citation omitted) ). Here, because Nurse Cheasman is alleged to have herself committed an act of excessive force against Plaintiff—and because the Court is required to view Plaintiff's sworn allegations in the light most favorable to him—the Court is not prepared to give dispositive weight to the very medical progress notes that Nurse Cheasman is arguably tasked with maintaining. In other words, Defendants cannot simply point to the absence of any medical evidence where those same medical records are kept and maintained by the person charged with the use of unconstitutional force. This is, by itself, insufficient to carry Defendants' burden on a motion for summary judgment.

**\*18** Therefore, Defendants' motion for summary judgment is denied insofar as it seeks dismissal of Plaintiff's Eighth Amendment excessive force claim arising out of the incident taking place on December 18, 2010.

### 4. Alleged Use of Excessive Force on September 27, 2011

Plaintiff alleges that on September 27, 2011, C.O. Countryman violently assaulted him in the presence of Nurse Holm, Dr. Weinstock, and correctional sergeant Remy Babineaux ("Sgt. Babineaux"). (Dkt. 93-5 at ¶ 34). Plaintiff has submitted use of force reports that were completed after the alleged incident took place. (*See, e.g.,* Dkt. 93-6 at 7). Furthermore, the medical records indicate that force was used to restrain Plaintiff, and that he sustained minor injuries. (Dkt. 59-10 at 44). Clearly some degree of force was used on this occasion, and thus, questions of fact exist as to "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson,* 503 U.S. at 7; *see Henry v. City of New York,* No. 02 Civ. 4824, at *6, 2003 WL 22077469 (S.D.N.Y. Sept. 8, 2003) ("[W]here there is a factual dispute about the circumstances surrounding ... the degree of force used, the Second Circuit requires a jury determination of the reasonableness of that force."). Therefore, Defendants' motion for summary judgment is denied to the extent it seeks to dismiss any excessive force claim arising from the events taking place on September 27, 2011.

### E. Other Eighth Amendment Claims

To the extent Plaintiff's allegations also raise several other claims falling within the broader category of "cruel and unusual punishment," those claims are dismissed—with one exception, related to lighting as discussed below. For example, Plaintiff alleges that he was only provided with one clean bed sheet instead of two clean bed sheets for two weeks. (Dkt. 46 at ¶¶ 339-40). However, "such a temporary and minimal deprivation is *de minimis* at best, and as such does not rise to constitutional proportions." *Ahlers v. Nowicki,* No. 9:12-CV-0539 (DNH/RFT), 2014 WL 1056935, at *5 (N.D.N.Y. Mar. 18, 2014) (where the plaintiff claimed "he was forced to sleep on dirty sheets for approximately four nights"). In addition, Plaintiff alleges that he was not afforded adequate access to certain reading materials and the general library cart while he was housed in the SHU (Dkt. 46 at ¶ 202), but this assertion fails to state an Eighth Amendment claim, *see Lunney v. Brureton,* No. 04 Civ. 2438 LAK GWG, 2005 WL 121720, at *9 (S.D.N.Y. Jan. 21, 2005) (rejecting the plaintiff's claim that "the general library court was not 'properly stocked' as it was 'void of magazines, newspapers and periodicals' ... because magazines, newspapers and periodicals are not considered one of life's 'basic necessities' within the meaning of the Eighth Amendment" (collecting cases) ), *report and recommendation adopted,* 2005 WL 433285 (S.D.N.Y. Feb. 23, 2005).

Although Plaintiff sets forth general and conclusory allegations that he was deprived of recreational privileges (Dkt. 46 at ¶¶ 443, 459), he only once specifically alleges that correctional officer Eric Farley ("C.O. Farley") actually "denied [him] his daily access to the recreation yard for three days" (*id.* at ¶ 297). "Because exercise is one of the basic human needs protected by the Eighth Amendment, a plaintiff may prevail on an Eighth Amendment claim for deprivation of exercise by alleging that defendants were deliberately indifferent to a sufficiently serious deprivation of exercise." *Dillon v. City of New York,* No. 12 Civ. 6746 (LAP), 2013 WL 3776252, at *3 (S.D.N.Y. July 18, 2013). "However, not every deprivation of exercise amounts to a constitutional violation. Rather, a plaintiff must show that he was denied all meaningful exercise for a substantial period of time." *Williams v. Goord,* 142 F. Supp. 2d 416, 425 (S.D.N.Y. 2001). Assuming C.O. Farley denied Plaintiff recreational access for three days, such a minor deprivation of these privileges does not state a viable Eighth Amendment cause of action. *See Davidson v. Coughlin,* 968 F. Supp. 121, 131 (S.D.N.Y. 1997) (finding that the denial of "all outdoor exercise" for "fourteen days in a row" does not "implicate

Eighth Amendment concerns"); *Chappie v. Coughlin*, 92 CIV. 8629 (TPG), 1996 WL 507323, at *2 (S.D.N.Y. Sept. 5, 1996) (finding that the deprivation of recreational privileges for three days does not violate the Eighth Amendment); *see also Calderon v. Wheeler*, No. 9:06-CV-0963 (GTS/DEP), 2009 WL 2252241, at *14 (N.D.N.Y. July 28, 2009) ("Deprivations of exercise for limited periods have been found in several instances not to support a constitutional claim under the Eighth Amendment."); *Ford v. Phillips*, No. 05 CIV. 6646 (NRB), 2007 WL 946703, at *9 (S.D.N.Y. Mar. 27, 2007) ("[A]s a matter of law, minor and temporary deprivations of property, showers and recreation do not violate the Eighth Amendment."); *Hattley v. Goord*, No. 02 Civ. 2339(WHP) (RLE), 2003 WL 1700435, at *8 (S.D.N.Y. Mar. 27, 2003) (noting that one hour of recreation per day and 23 hours of confinement "are the normal conditions of an SHU").

**\*19** Plaintiff also makes various allegations regarding the lighting conditions at Five Points. In particular, Plaintiff alleges that he was subject to 24-hour illumination of his prison cell on several occasions. (*See, e.g.*, Dkt. 46 at ¶¶ 208, 273, 281). "Requiring inmates to live in constant illumination can[,] ... under certain circumstances, rise to the level of an Eighth Amendment violation." *Jones v. Rock*, No. 9:12-CV-0447 (NAM/TWD), 2013 WL 4804500, at *10 (N.D.N.Y. Sept. 6, 2013); *see Holmes v. Fischer*, No. 09-CV-00829S(F), 2016 WL 552962, at *17 (W.D.N.Y. Feb. 10, 2016) (same). "Indeed, the Second Circuit has recognized that sleep deprivation due to constant illumination can be [a] sufficiently serious condition[ ] that jeopardizes a prisoner's health." *Collins v. Fischer*, No. 15-CV-103 (KMK), 2018 WL 1626528, at *6 (S.D.N.Y. Mar. 30, 2018) (citing *Walker v. Schult*, 717 F.3d 119, 126 (2d Cir. 2013) ("[S]leep is critical to human existence, and conditions that prevent sleep have been held to violate the Eighth Amendment.") ). "Nevertheless, 'to succeed on a claim of illegal illumination, [a] plaintiff must produce evidence that the constant illumination had harmful effects on his health beyond mere discomfort.' " *Holmes*, 2016 WL 552962, at *17 (quoting *Vasquez v. Frank*, No. 05-C-528-C, 2007 WL 3254702, at *5 (W.D. Wis. Nov. 2, 2007), *aff'd*, 290 F. App'x 927 (7th Cir. 2008) ).

Plaintiff alleges that the constant illumination of his prison cell caused him to suffer eye problems, headaches, sleeplessness, and depression. (*See, e.g.*, Dkt. 46 at ¶¶ 181, 191, 208, 256, 281). In particular, he alleges three specific occasions where his prison cell was illuminated for extended durations. Plaintiff asserts that C.O. Farley ordered the "light to remain on in [his] cell" for an unspecified period of time

on October 1, 2010, and that correctional lieutenant Charles Coventry ("Lieutenant Coventry") kept his cell light on "for approximately 24 hours" on November 11, 2010. (*See id.* at ¶¶ 191, 208). Notably, Plaintiff further alleges that on January 14, 2011, C.O. Farley "altered his cell light so that it remained on 24 hours a day" (*id.* at ¶ 273), causing Plaintiff to be "unable to sleep for close to two weeks because his cell light was on day and night" (*id.* at ¶ 274).

"The decisions evaluating Eighth Amendment claims based on continuous lighting in the prison setting are very 'fact-driven,' generally turning on the degree of illumination, the duration of the inmate's exposure, the extent of harm it causes, and the penological justification for the lighting." *Quick v. Graham*, No. 9:12-CV-1717 (DNH/ATB), 2016 WL 873853, at *5 (N.D.N.Y. Jan. 8, 2016) (quoting *Booker v. Maly*, No. 9:12-CV-246 (NAM/ATB), 2014 WL 1289579, at * 18-19 (N.D.N.Y. Mar. 31, 2014), *aff'd*, 590 F. App'x 82 (2d Cir. 2015) ), *report and recommendation adopted*, 2016 WL 879310 (N.D.N.Y. Mar. 7, 2016), *vacated* (Mar. 7, 2016), *and report and recommendation adopted*, 2016 WL 1261107 (N.D.N.Y. Mar. 30, 2016). Defendants have not submitted any evidence disputing the fact that Plaintiff was subjected to periods of 24-hour prison cell illumination. Instead, Defendants argue that Plaintiff has failed to set forth any injury caused by these lighting conditions that rises to the level of an Eighth Amendment violation. (*See* Dkt. 59-2 at 33-34). In several cases where summary judgment was deemed appropriate, the court relied upon the low wattage of the light bulbs illuminating the inmate's prison cell. *See, e.g.*, *Booker*, 2014 WL 1289579, at *18 & n.27 (noting that a "3-watt LED bulb is much less bright than the 9 or 13-watt illumination that was found acceptable" in other cases); *McGee v. Gold*, No. 1:04-CV-335, 2010 WL 5300805, at *5 (D. Vt. Aug. 3, 2010) ("The record indicates that Vermont prisons are using compact fluorescent lighting between 5 and 8 watts, fluorescent bulbs between 7 and 8 watts, and 10-watt incandescent bulbs. These intensities are in a range that courts have generally found permissible under the Constitution." (collecting cases) ) (footnote omitted), *report and recommendation adopted sub nom. McGee v. Pallito*, No. 1:04-CV-00335, 2010 WL 5389996 (D. Vt. Dec. 20, 2010), *vacated on other grounds and remanded sub nom. Kimber v. Tallon*, 556 F. App'x 27 (2d Cir. 2014) (finding class counsel's representation deficient). By contrast, Defendants have not provided any indication of the intensity of the cell lights installed at Five Points.

2019 WL 1230778

**\*20**  The Court recognizes that Plaintiff's medical records disclose very little to suggest that his cell lights caused any alleged ailments. Nevertheless, Plaintiff appears to have complained of blurry or impaired vision on several occasions (*see, e.g.*, Dkt. 59-10 at 2-3, 48, 59, 108, 112), and he associated these symptoms with his cell lights at least twice, indicating that the "lights hurt[ ] his eyes," and that the "lights ... annoy me" (*id.* at 50, 99). In fact, Plaintiff lodged the former complaint on January 16, 2011, just two days after C.O. Farley allegedly "altered his cell light so that it remained on 24 hours a day." (Dkt. 46 at ¶ 273; Dkt. 59-10 at 50). Although other causes could have resulted in or at least contributed to Plaintiff's alleged sleeplessness and eye problems, Defendants have failed to submit evidence supporting such a conclusion on their motion. *Cf. McGee,* 2010 WL 5300805, at \*7 ("The affidavit of Dr. Burroughs-Biron establishes that there are a number of potential causes for the symptoms being alleged."). Furthermore, in the absence of evidence demonstrating the intensity of the lighting or the need for such illumination to sustain a secure prison environment, the fact that Plaintiff's medical records do not conclusively establish that his injuries were caused by the prison cell lights is not determinative. *Cf. Huertas v. Sec'y Penn. Dep't of Corr.*, 533 F. App'x 64, 68 & n.7 (3d Cir. 2013) (noting that the plaintiff failed to provide "competent medical evidence" demonstrating that his injuries were caused "because of the lighting" conditions, but relying on the defendants' explanation "that the constant illumination is required for security purposes" and the lack of evidence that "the lights were kept on for any impermissible purpose" in affirming summary judgment); *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 368 (N.D.N.Y. 2010) (distinguishing case law where the defendants "failed to cite any legitimate penological justification for their conduct" and relying on record submissions regarding safety and security concerns to grant summary judgment on the plaintiff's "retaliatory lighting" claim).

Therefore, because Plaintiff alleges that he suffered periods of 24-hour illumination of his prison cell, which resulted in headaches, eye problems, depression, and the inability "to sleep for close to two weeks" (Dkt. 46 at ¶ 274; *see id.* at ¶¶ 181, 191, 208, 256, 273, 281), in the absence of admissible evidence refuting these sworn statements, Defendants have failed to establish their entitlement to judgment as a matter of law, *see Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996) (denying summary judgment, despite the defendants' supporting evidence to the contrary, where the plaintiff "alleged that large florescent lights directly in front of and

behind his cell shone into his cell 24 hours a day, so that his cell was 'constantly illuminated, and [he] had no way of telling night or day,' and that this condition caused him 'grave sleeping problems' and other mental and psychological problems"), *opinion amended on denial of reh'g*, 135 F.3d 1318 (9th Cir. 1998); *cf. Murray v. Edwards Cty. Sheriffs Dep't*, 248 F. App'x 993, 998 (10th Cir. 2007) (distinguishing *Keenan* because the plaintiff's "own testimony indicated that the lights *only sometimes* disturbed his sleep and that he suffered headaches as a result of his loss of sleep *only every now and then*") (emphases added). Accordingly, Plaintiff's Eighth Amendment conditions-of-confinement claim for the unlawful illumination of his prison cell may proceed against C.O. Farley and Lieutenant Coventry.

Plaintiff further asserts that various correctional officials allegedly entered his prison cell and unlawfully searched his materials on several occasions. (Dkt. 46 at ¶¶ 130, 183-84, 218, 273, 436). However, Plaintiff does not appear to allege that any of these searches occurred with greater frequency than twice in a single month. *See Lashley v. Wakefield*, 367 F. Supp. 2d 461, 471 (W.D.N.Y. 2005) ("The number of searches during the five or six month time period is not excessive, in light of the policy at Five Points that cells are searched once or twice a month."); *Little v. Mun. Corp.*, 51 F. Supp. 3d 473, 498 (S.D.N.Y. 2014) ("[T]he three searches specifically alleged, as well as the general allegation that Plaintiffs were subject to 'intense discriminatory search[e]s, ['] are insufficient to satisfy the objective element of an Eighth Amendment claim."). Plaintiff's conclusory assertions that the searches took place "without cause" and "to harass" Plaintiff are insufficient to raise a triable issue of fact, and thus, Defendants are granted summary judgment on this claim as well. *Polk v. Olles*, No. 12-CV-01106S(F), 2015 WL 10381751, at \*8 (W.D.N.Y. Dec. 29, 2015) ("Plaintiff offers only conclusory assertions in support of his position that the cell search was other than a routine random search, which statements are insufficient to avoid summary judgment."), *report and recommendation adopted*, 2016 WL 777313 (W.D.N.Y. Feb. 29, 2016).

## V. Plaintiff's Common Law Causes of Action

**\*21**  Plaintiff has also asserted common law causes of action for assault, battery, intentional infliction of emotional distress, negligent infliction of emotional distress, and false imprisonment. (Dkt. 46 at 99-101). Defendants have not set forth specific arguments addressing these claims. While assault and battery claims are treated similarly to a Fourth Amendment excessive force claim, *see Kavazanjian v. Rice*,

No. 03-CV-1923 (FB) (SMG), 2008 WL 5340988, at *7 (E.D.N.Y. Dec. 22, 2008) ("[I]n effect, 'the test for whether a plaintiff can maintain [a state-law assault-and-battery] cause of action against law enforcement officials is ... the exact same test as the one used to analyze a Fourth Amendment excessive force claim.' " (quoting *Hogan v. Franco*, 896 F. Supp. 1313, 1315 n.2 (N.D.N.Y. 1995) ) ), an Eighth Amendment excessive force claim is not so analytically aligned with its common law counterparts, *see Davidson v. Brzezniak*, No. 95-CV-00204-RJA, 2011 WL 3236209, at *13 (W.D.N.Y. July 28, 2011) ("Although there is some overlap between the standards for assessing a prison official's liability for assault and battery under the common law and liability under the Eighth Amendment for use of excessive force, the standards are not identical."); *Dufort v. Burgos*, No. 04-CV-4940 (FB) (LB), 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (same). As Judge Friendly explained several decades ago:

> Certainly the constitutional protection [of the cruel and unusual punishment clause] is nowhere nearly so extensive as that afforded by the common law tort action for battery, which makes actionable any intentional and unpermitted contact with the plaintiff's person or anything attached to it and practically identified with it; still less is it as extensive as that afforded by the common law tort action for assault[.]

*Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973) (citation omitted), *rejected on other grounds by Graham v. Connor*, 490 U.S. 386 (1989); *see also Hernandez v. Lattimore*, 612 F.2d 61, 67 (2d Cir. 1979) ("Just as malpractice does not become a constitutional violation merely because the victim is a prisoner, so, too, not every assault and battery gives rise to a cause of action under the Eighth Amendment because the victim happens to be a prisoner." (citation omitted) ).

Since Defendants have set forth no specific arguments addressing any of these distinct causes of action, Defendants have failed to carry their burden of demonstrating their entitlement to judgment as a matter of law, and thus, Plaintiff's common law claims may proceed. *See, e.g., Guzman v. Sposato*, No. 13-CV-6829 (JMA) (AYS), 2018 WL 1597395, at *5 (E.D.N.Y. Mar. 31, 2018) (stating that while the defendants "have ... moved for summary judgment based

on qualified immunity," they have "not offered any specific argument as to why they are entitled to qualified immunity as to the excessive force claims," and concluding that the plaintiff's excessive force claims survive summary judgment); *Shao v. City Univ. of N.Y.*, No. 12-CV-1566 (RJS), 2014 WL 5038389, at *6 (S.D.N.Y. Sept. 30, 2014) (stating that while the defendants "purport to seek summary judgment with respect to all of [the p]laintiff's claims, [the d]efendants do not specifically address [the p]laintiff's hostile work environment claim in either their opening brief or reply brief," and finding that the defendants have failed to demonstrate that they are entitled to judgment as a matter of law on that claim); *Frederick v. Sheahan*, No. 6:10-CV-6527 (MAT), 2014 WL 3748587, at *9 (W.D.N.Y. July 29, 2014) ("At this juncture, the Court declines to grant summary judgment in Sgt. Holton's favor as to this claim, since he did not specifically address or move to dismiss the failure to supervise claim."); *see also Sprott v. Franco*, No. 94 Civ. 3818 (PKL), 1997 WL 79813, at *1 n.1 (S.D.N.Y. Feb. 25, 1997) (noting that the defendants "do not specifically argue for summary judgment with respect to plaintiff's § 1981 claim in their notice of motion or in their supporting memorandum of law," and stating that "[t]he Court will not consider this issue without the benefit of briefing from the parties"); *see generally Adeghe v. Janssen Pharm., Inc.*, No. 16 CIV. 2235 (LGS), 2017 WL 4839063, at *2 (S.D.N.Y. Oct. 24, 2017) (noting that the defendant "made no particularized arguments" as to certain claims in its initial motion for summary judgment and finding that the defendant's "new arguments to support summary judgment on the claims it had neglected to specifically address in its initial briefing ... need not be considered" on its motion for reconsideration).

## VI. First Amendment Retaliation Claims

**\*22** Because of the "near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated, [courts in this Circuit] examine prisoners' claims of retaliation with skepticism and particular care." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995); *see Khudan v. Lee*, No. 12-CV-8147 (RJS), 2016 WL 4735364, at *6 (S.D.N.Y. Sept. 8, 2016) ("Courts generally review claims of 'retaliation by prisoners "with skepticism" because of the ease with which a retaliation claim may be fabricated.' " (quoting *Bolton v. City of New York*, No. 13-CV-5749 RJS, 2015 WL 1822008, at *2 (S.D.N.Y. Apr. 20, 2015) ) ), *app. dismissed*, No. 16-3534, 2016 WL 10100723 (2d Cir. Dec. 8, 2016). Accordingly, retaliation claims must "be 'supported by specific and detailed factual allegations,' not stated 'in wholly

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 105 of 201

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

2019 WL 1230778

conclusory terms.' " *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds by Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002) ).

To the extent Plaintiff alleges that certain defendants falsified his medical records or omitted certain information from them (*see, e.g.*, Dkt. 46 at ¶¶ 150, 156, 224, 233, 306-07, 313, 329), those allegations, standing alone, do not provide a basis to support a § 1983 cause of action, *see Micolo v. Fuller*, No. 6:15-CV-06374(MAT), 2016 WL 6404146, at *3 (W.D.N.Y. Oct. 28, 2016) (noting that "the only omission attributed to Jones is a failure to record all of [the p]laintiff's alleged injuries in the treatment note" and stating that "this alleged omission does not amount to a constitutional violation"); *Williams v. Bentivegna*, No. 14-CV-6105-CJS, 2015 WL 162994, at *7 (W.D.N.Y. Jan. 13, 2015) ("Williams' complaints that prescribed medication was not provided to him, or that the doctors wrote false information in his medical record, might amount to malpractice, but not a constitutional violation."); *see also Crenshaw v. Hartman*, 681 F. Supp. 2d 412, 415 (W.D.N.Y. 2010) ("The law is clear that 'the issuance of false misbehavior reports against an inmate by corrections officers is insufficient on its own to establish a denial of due process.' " (quoting *Sital v. Burgio*, 592 F. Supp. 2d 355, 357 (W.D.N.Y. 2009) ) ). Nonetheless, "[a] prisoner may be able to state a constitutional claim by alleging facts indicating that false charges were brought against him in retaliation for the prisoner's exercise of a constitutionally protected right, such as the filing of grievances." *Crenshaw*, 681 F. Supp. 2d at 415.

To prevail on a First Amendment retaliation claim, a prisoner must demonstrate that: "(1) he engaged in protected speech or activity; (2) the defendant took adverse action against him; and (3) there was a causal connection between the protected speech or activity and the adverse action." *Simmons v. Adamy*, 987 F. Supp. 2d 302, 306 (W.D.N.Y. 2013) (citing *Espinal v. Goord*, 558 F.3d 119, 227 (2d Cir. 2009) ).

Plaintiff alleges that several correctional officers filed false misbehavior reports against him in retaliation for his filing of grievances against them, and that certain medical personnel denied him appropriate care and medications in retaliation for the grievances he filed against them as well. (*See, e.g.*, Dkt. 46 at ¶¶ 215, 220, 272, 279, 328, 418, 420, 422, 424, 428, 430, 432, 434, 436, 438, 440, 442, 445, 450, 453, 456). "Because the filing of prison grievances is a protected activity, Plaintiff meets the first prong of the test." *Nelson v. McGrain*, No. 6:12-CV-6292 (MAT), 2015 WL 7571911,

at *1 (W.D.N.Y. Nov. 24, 2015) (citation omitted). "The Second Circuit has defined 'adverse action' in the prison context as 'retaliatory conduct "that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " " *Adams v. Rock*, No. 9:12-CV-1400 (GLS/ATB), 2015 WL 1312738, at *10 (N.D.N.Y. Mar. 24, 2015) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) ). "[C]ourts have found that 'denial of medical evaluation, treatment, and adequate pain medication' can suffice to establish adverse action under a First Amendment retaliation analysis." *Castro v. Heath*, No. 9:12-CV-01250 (MAD), 2013 WL 5354241, at *10 (N.D.N.Y. Sept. 23, 2013) (quoting *Burton v. Lynch*, 664 F. Supp. 2d 349, 366 (S.D.N.Y. 2009) ); *see Williams v. Fisher*, No. 02 CIV. 4558(LMM), 2003 WL 22170610, at *11 (S.D.N.Y. Sept. 18, 2003) (finding the second element satisfied where the plaintiff alleged that medical staff revoked a "necessary medical rehabilitative treatment" as a result of the filing of a grievance). In addition, "[i]t is well settled that filing ... a false misbehavior report is an adverse action." *James v. Mosko*, No. 13-CV-5-LJV-MJR, 2016 WL 8671478, at *6 (W.D.N.Y. July 22, 2016) (citation omitted), *report and recommendation adopted*, 2017 WL 397474 (W.D.N.Y. Jan. 30, 2017); *Reed v. Doe No. 1*, No. 9:11-CV-0250 (TJM/DEP), 2012 WL 4486086, at *5 (N.D.N.Y. July 26, 2012) ("The filing of a false misbehavior report can qualify as an adverse action for purposes of a First Amendment retaliation." (citing *Gill*, 389 F.3d at 384) ), *report and recommendation adopted*, 2012 WL 4486085 (N.D.N.Y. Sept. 27, 2012); *Mateo v. Fischer*, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010) ("Filing a false misbehavior report against Mateo ... would deter a similarly situated person of ordinary firmness from exercising his First Amendment rights."). Thus, Plaintiff has also sufficiently alleged an "adverse action," satisfying the second element of a First Amendment retaliation claim.

**\*23** However, Plaintiff has failed to raise a triable question of fact as to whether there is a causal connection between the filing of his grievances and the alleged adverse actions at issue.

> In determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, a number of factors may be considered, including: (1) the temporal proximity between the protected activity and the alleged

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 106 of 201

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

2019 WL 1230778

retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation.

*Bunting v. Conway*, No. 04-CV-0731A (HKS), 2010 WL 5332280, at *7 (W.D.N.Y. Nov. 1, 2010) (citing *Colon*, 58 F.3d at 872), *report and recommendation adopted*, 2010 WL 5313308 (W.D.N.Y. Dec. 20, 2010).

Given that many of the alleged adverse actions seem to have occurred within weeks or even days of Plaintiff's grievances, it appears that Plaintiff relies on the temporal proximity between the filing of his grievances and the alleged retaliatory acts to establish the necessary causal connection—although Plaintiff's opposition papers do not discuss this element in any great detail. (*See* Dkt. 93 at 51-54). However, while "the temporal proximity of the filing of the grievance" and an "adverse action" is "circumstantial evidence of retaliation, such evidence, without more, is insufficient to survive summary judgment." *Williams*, 111 F. Supp. 2d at 290; *see Ayers v. Stewart*, 101 F.3d 687, 1996 WL 346049 (Table), at *1 (2d Cir. 1996) (stating that the plaintiff's "reliance on circumstantial evidence of retaliation—namely, the proximity of the disciplinary action to his complaint where no misbehavior reports were previously filed against him—does not suffice to defeat summary judgment"); *see also Colon*, 58 F.3d at 873 ("If ... circumstantial evidence represented the sum total of Colon's proof, we might be inclined to affirm the grant of summary judgment based on the weakness of Colon's case."); *see generally Flaherty*, 713 F.2d at 13 (acknowledging the ease in which a plaintiff may manufacture a claim for retaliation, and stating that summary judgment is appropriate if the claim appears insubstantial). Furthermore, the sheer volume of grievances filed by Plaintiff diminishes the weight attributed to the temporal proximity of any of his retaliatory allegations. (*See* Dkt. 46 at ¶ 408 (alleging that Plaintiff filed about 155 grievances "from March 25, 2010 through June 5, 2011") ); *Andino v. Fischer*, 698 F. Supp. 2d 362, 385 (S.D.N.Y. 2010) ("While there is some proximity between the complaints and the alleged adverse actions, this results from the large number of complaints in a short period of time.").

In addition, Plaintiff accumulated a lengthy disciplinary record while incarcerated. It is undisputed that "[b]ecause Plaintiff had accumulated so much SHU time from incidents

occurring prior to 2010, he did not serve" an SHU penalty imposed for an incident occurring in May 27, 2010, until over three years later in December 2013. (*See* Dkt. 59-1 at ¶ 22; Dkt. 93-1 at ¶ 22). The fact that Plaintiff was ultimately found guilty of at least some of the charged conduct asserted in many if not all of the misbehavior reports filed against him (*see* Dkt. 93 at 53; Dkt. 93-5 at ¶ 61; *see also* Dkt. 59-1 at ¶ 19; Dkt. 93-1 at ¶ 19)—and that those findings were subsequently affirmed (*see* Dkt. 93 at 53; Dkt. 93-5 at ¶ 72)—"certainly suggests that there was a valid basis for the issuance of the report, and [P]laintiff's conclusory assertion that it was retaliatory in nature fails to state a plausible claim," *Crenshaw v. Hartman*, 681 F. Supp. 2d 412, 416 (W.D.N.Y. 2010); *see White v. Bergenstock*, No. 9:08-CV-717, 2009 WL 4544390, at *7 (N.D.N.Y. Nov. 25, 2009) (stating that since "the charges in the misbehavior report have never been overturned[,] ... there is no sufficient allegation that the misbehavior report was false in any material respect"); *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 478 (N.D.N.Y. 2009) (noting that the plaintiff "has alleged that he was ultimately convicted of the disciplinary charge leveled" against him and that "the conviction was affirmed on appeal, plausibly suggesting that what caused him to receive the referenced misbehavior report was his own misconduct"). Furthermore, a large number of Plaintiff's allegations pertaining to the retaliatory conduct purportedly advanced against him are alleged "upon information and belief." (*See, e.g.*, Dkt. 46 at ¶¶ 220, 241, 248, 272, 281, 328, 415, 418, 420, 422, 424, 428, 430, 432, 434, 438, 440, 442, 445, 450, 453, 456). "[C]onclusory allegations 'upon information and belief,' as [P]laintiff advances here, cannot defeat summary judgment." *Little v. Massari*, 526 F. Supp. 2d 371, 376-77 (E.D.N.Y. 2007); *see Estate of Gustafson ex rel. Reginella v. Target Corp.*, 819 F.3d 673, 677 n.4 (2d Cir. 2016) ("The verified answer is stated only '[u]pon information and belief,' rather than on the basis of personal knowledge, and therefore may not be considered in opposition to summary judgment." (alternation in original) (citation omitted) ); *Dellacava v. Painters Pension Fund of Westchester & Putnam Ctys.*, 851 F.2d 22, 26 (2d Cir. 1988) (stating that an explanation based " 'upon information and belief' ... could not have been considered in the summary judgment motion"); *cf. Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004) ("[A] verified pleading, to the extent that it makes allegations on the basis of the plaintiff's personal knowledge, *and not merely on information and belief* has the effect of an affidavit and may be relied on to oppose summary judgment." (emphasis added) ).

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 107 of 201

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

2019 WL 1230778

**\*24** The Court is cognizant of the Second Circuit's instruction to view claims of First Amendment retaliation in this context with care and skepticism given their potential for abuse. *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). Certainly, the number of grievances and sick-call requests filed by Plaintiff provide substantial fodder for the manufacture of numerous claims of retaliation. *See generally Davidson v. Bartholome*, 460 F. Supp. 2d 436, 444 (S.D.N.Y. 2006) (noting that the "possibility of abuse" of a retaliation claim is "ever present," but was "especially apparent in the instant case" where the plaintiff had "filed approximately 150 previous lawsuits"). Indeed, in light of Plaintiff's failure to raise a triable issue of fact pertaining to his claim for deliberate medical indifference, as previously discussed, Plaintiff cannot sustain a viable claim for the retaliatory denial of constitutionally adequate medical treatment. *See Bilal v. White*, 494 F. App'x 143, 147 (2d Cir. 2012) ("As for the delay in Bilal's receipt of prescription pain medication, we conclude, for substantially the same reasons that we reject Bilal's Eighth Amendment claim, that the record presented fails to bring Bilal's retaliation claim within 'the ambit of constitutional protection.' " (quoting *Dawes*, 239 F.3d at 493) ); *Vail v. Lashway*, No. 9:12-CV-1245 (GTS/RFT), 2014 WL 4626490, at \*19 (N.D.N.Y. Sept. 15, 2014) (dismissing a retaliation claim where "there is no evidence that [the p]laintiff was ever deprived of adequate medical care," and stating that the court's "conclusion in this regard is, on its own, likely sufficient to grant summary judgment against [the p]laintiff's medical retaliation claims"); *Cole v. Levitt*, No. 07-CV-00767(M), 2009 WL 4571828, at \*10 (W.D.N.Y. Dec. 4, 2009) ("Having concluded that Dr. Levitt was not deliberately indifferent to plaintiff's medical needs, I likewise conclude that there is no evidentiary basis to conclude that her conduct was retaliatory."); *see generally Adams*, 2015 WL 1312738, at \*10 (stating that "[e]ven where a complaint or affidavit contains specific assertions, the allegations may still be deemed conclusory if [they are] ... largely unsubstantiated by any other direct evidence" (quotation omitted) ).

Therefore, for the foregoing reasons, Plaintiff's First Amendment retaliation claim is dismissed. [12]

[12]    To the extent Plaintiff also alleges that certain correctional officers and medical personnel made hostile remarks or threats against him on various occasions (*see, e.g.*, Dkt. 46 at ¶¶ 145, 164, 212, 215, 225, 248, 286, 288, 348), these allegations

fail to give rise to a viable claim for retaliation, *see Roseboro v. Gillespie*, 791 F. Supp. 353, 373 (S.D.N.Y. 2011) (finding that the plaintiff's retaliation "claim fails because an inmate 'has no right to redress simply because [an officer] made a hostile or derogatory comment about him.' " (quoting *Davidson v. Bartholome*, 460 F. Supp. 2d 436, 446 (S.D.N.Y. 2006) (dismissing retaliation cause of action where the defendant "became hostile and began cursing" at the plaintiff and told the plaintiff "that he was going to issue him a 'false' misbehavior ticket") ) ); *see also Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986) ("The claim that a prison guard called Purcell names also did not allege any appreciable injury and was properly dismissed.").

## VII. **Plaintiff's Right to Access to the Courts**

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003). The right of access to the courts "requires state prisons 'to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.' " *Bellezza v. Holland*, No. 09 CIV. 8434, 2011 WL 2848141, at \*4 (S.D.N.Y. July 12, 2011) (quoting *Bounds v. Smith*, 430 U.S. 817, 825 (1977) ). "To state a claim for denial of access to the courts—in this case due to interference with legal mail—a plaintiff must allege that the defendant 'took or was responsible for actions that hindered [a plaintiff's] efforts to pursue a legal claim.' " *Davis*, 320 F.3d at 351 (quoting *Monsky v. Moraghan*, 127 F.3d 243, 247 (2d Cir. 1997) ). "[P]risoners who bring a claim for the violation of a derivative right of access to the courts must demonstrate 'actual injury' in order to have standing." *Collins v. Goord*, 581 F. Supp. 2d 563, 573 (S.D.N.Y. 2008). "In other words[,] 'the plaintiff must show that a non-frivolous legal claim had been frustrated or was being impeded due to the actions of prison officials.' " *Cancel v. Goord*, No. 00 CIV 2042 LMM, 2001 WL 303713, at \*4 (S.D.N.Y. Mar. 29, 2001) (quoting *Warburton v. Underwood*, 2 F. Supp. 2d 306, 312 (W.D.N.Y. 1998) ).

**\*25** Nowhere in Plaintiff's submissions does he provide factual proof that a non-frivolous legal claim was frustrated due to the alleged interference with his legal mail. Instead, Plaintiff only alleges, in conclusory form, that "[a]s a result of the failure of [certain of his] legal documents to reach the

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

2019 WL 1230778

court, Plaintiff's rights were violated in the associated court proceedings." (Dkt. 46 at ¶ 352). Plaintiff fails to elaborate upon this general allegation in any respect. Accordingly, because Plaintiff has failed to raise a triable issue of fact as to whether he suffered an "actual injury" from any alleged interference with his legal mail, Plaintiff's claim is dismissed. [13]

[13]    To the extent Plaintiff also alleges that he was denied access to the courts due to constitutionally inadequate access to law library resources (*see, e.g.,* Dkt. 46 at ¶¶ 211, 354, 363, 368, 404, 407), this too fails to raise a triable issue of fact because Plaintiff has failed to establish that he suffered an "actual injury" as a result of any of these purported deprivations, *see Benjamin v. Kerik,* 102 F. Supp. 2d 157, 162 (S.D.N.Y. 2000) (noting that the Supreme Court has "held that prisoners do not have a freestanding right to law libraries or legal assistance," and that inmates "must show actual injury" (citing *Lewis v. Casey,* 518 U.S. 343, 353 n.4 (1996) (rejecting "a freestanding right to libraries," and stating that the "[d]enial of access to the courts could not possibly cause the harm of inadequate libraries, but only the harm of lost, rejected, or impeded legal claims") ) ), *aff'd sub nom. Benjamin v. Fraser,* 264 F.3d 175 (2d Cir. 2001); *see also Smith v. Donaher,* No. 12-CV-6035-CJS, 2013 WL 2531750, at *9 (W.D.N.Y. June 10, 2013) ("Plaintiff was not denied access to the courts merely because of the amount of time that it took to make the copies."); *Muhammad v. Hodge,* No. 07-CV-0232(SR), 2010 WL 1186330, at *5 (W.D.N.Y. Mar. 24, 2010) ("Courts in the Second Circuit have repeatedly held that a prisoner does not have a constitutional right to free copies....").

## VIII. <u>Failure to Provide Kosher Meals in Violation of the First Amendment's Free Exercise Clause</u>

"The Free Exercise Clause of the First Amendment is an 'unflinching pledge to allow our citizenry to explore ... religious beliefs in accordance with the dictates of their conscience.' " *Jackson v. Mann,* 196 F.3d 316, 320 (2d Cir. 1999) (quoting *Patrick v. LeFevre,* 745 F.2d 153, 157 (2d Cir. 1984) ). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir. 2003); *see Jackson,* 196 F.3d

at 320 ("An inmate is therefore entitled to a reasonable accommodation of his religious beliefs."). "The reach of the free exercise clause extends to 'an inmate's diet and participation in religious meals.' " *Riehl v. Martin,* No. 9:13-CV-439 GLS/TWD, 2014 WL 1289601, at *8 (N.D.N.Y. Mar. 31, 2014) (quoting *Johnson v. Guiffere,* No. 9:04-CV-57, 2007 WL 3046703, at *4 (N.D.N.Y. Oct. 17, 2007) ); *see Bass v. Coughlin,* 976 F.2d 98, 99 (2d Cir. 1992) ("[P]rison officials must provide a prisoner a diet that is consistent with his religious scruples."). The right to participate in religious meals includes the right to a kosher diet. *See Thaxton v. Simmons,* No. 9:10-CV-1318 MAD/RFT, 2012 WL 360104, at *5 (N.D.N.Y. Jan. 5, 2012) ("Among those protected rights is the right to receive a kosher diet."), *report and recommendation adopted,* 2012 WL 360141 (N.D.N.Y. Feb. 2, 2012).

"Whether or not brought by prisoners, free exercise claims often test the boundaries of the judiciary's competence, as courts are 'singularly ill-equipped to sit in judgment on the verity of an adherent's religious beliefs.' " *Ford,* 352 F.3d at 588 (quoting *Patrick,* 745 F.2d at 157). "An individual claiming violation of free exercise rights need only demonstrate that the beliefs professed are 'sincerely held' and in the individual's 'own scheme of things, religious.' " *Fifth Ave. Presbyterian Church v. City of New York,* 293 F.3d 570, 574 (2d Cir. 2002) (quoting *Patrick,* 745 F.2d at 157). However, "scrutiny of the prisoner's sincerity is often essential in 'differentiating between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud.' " *Ford,* 352 F.3d at 588 (quoting *Patrick,* 745 F.2d at 157).

**\*26** Plaintiff has alleged that his "religious belief is Jewish" and that his "religion is jews too." (Dkt. 93-5 at ¶ 87; *see* Dkt. 46 at ¶ 182 (alleging that Plaintiff had informed correctional sergeant T. Barber ("Sgt. Barber") "that he was Jewish") ). Plaintiff claims that he was supposed to receive Kosher loaves, but instead he was being fed non-Kosher loaves because Defendants did not care about his religious beliefs. (*See* Dkt. 93-5 at ¶ 103). However, "[n]o where [sic] in the Complaint does Plaintiff allege the sincerity of his beliefs and what role the kosher diet plays therein." *Thaxton,* 2012 WL 360104, at *6; *see Meadows v. Lesh,* No. 10-CV-00223 M, 2010 WL 3730105, at *3 (W.D.N.Y. Sept. 17, 2010) (acknowledging that the sincerity of a religious belief is usually a factual issue, but stating that "the complaint must still assert sufficient allegations necessary to establish that plaintiff's claim is based upon a sincerely

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 109 of 201

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

2019 WL 1230778

held religious belief"). Indeed, "[m]ere membership in an established religion is not enough to show that a prisoner has sincerely held religious beliefs." *Thaxton*, 2012 WL 360104, at *6 (citing *Ford*, 352 F.3d at 588). Although Plaintiff alleges that he was not provided Kosher loaves, he fails to allege that his adherence to a Kosher diet is a "sincerely held" religious belief, nor does he explain why a Kosher diet is important to his religion. *See Woodward v. Ali*, No. 9:13-CV-1304 LEK/RFT, 2015 WL 5711899, at *8 (N.D.N.Y. Sept. 29, 2015) (noting that the plaintiff "has not explained why the removal of his name from the Ramadan feed-up list and denial of two meals substantially burdened his exercise of religious beliefs" and finding that "in the absence of any admissible facts with respect to [the p]laintiff's personally held beliefs or how [the d]efendants' conduct impacted those beliefs, we find that [the p]laintiff has failed to meet his burden of showing that his professed religious beliefs are sincerely held and were infringed"); *Turner v. Oakland Police Officers*, No. C 09-03652 SI, 2010 WL 816797, at *4 (N.D. Cal. Mar. 9, 2010) (dismissing the plaintiff's free exercise claim where, "[a]bsent some description of plaintiff's religion, his religious practices, and the role and importance of blessing oil in the religion, it is impossible to determine whether plaintiff's beliefs are sincerely held and whether blessing oil is rooted in that religious belief"); *Evans v. Albany Cty. Corr. Facility*, No. 9:05-CV-1400 GTS/DEP, 2009 WL 1401645, at *8 (N.D.N.Y. May 14, 2009) (granting summary judgment on a free exercise claim where the plaintiff failed to "allege[ ] or establish[ ] how receiving non-vegetarian meals infringed on his sincerely held religious beliefs" (citing *Benjamin v. Coughlin*, 905 F.2d 571, 580 (2d Cir. 1990) ) ); *see also Odom v. Dixion*, No. 04-CV-889F, 2008 WL 466255, at *6 (W.D.N.Y. Feb. 15, 2008) (describing a plaintiff's burden of demonstrating his religious beliefs are sincerely held as "a threshold requirement for any religious freedom claim under either the First Amendment or the [Religious Land Use and Institutionalized Persons Act]").

Recognizing that "the issue of sincerity can rarely be determined on summary judgment," *Snyder v. Murray City Corp.*, 124 F.3d 1349, 1353 (10th Cir. 1997), *opinion vacated in part on reh'g en banc on other grounds*, 159 F.3d 1227 (10th Cir. 1998), and that "courts are not permitted to inquire into the centrality of a professed belief to the adherent's religion or to question its validity in determining whether a religious practice exists," *Fifth Ave. Presbyterian Church*, 293 F.3d at 574, the Court nevertheless concludes that Plaintiff has failed to raise a triable issue of fact as to whether his beliefs are sincerely held, *see generally Ochoa v. Cornell*,

No. 9:05-CV-1068 GLSRFT, 2007 WL 3049889, at *7 (N.D.N.Y. Oct. 18, 2007) ("Ochoa fails to allege the nature and content of his beliefs, how he came to hold them, and what difference they have made in his life. Ochoa does not describe his participation in other religious activities such as Sabbath observances, dietary strictures, religious meetings, holy feast days, or other significant religious activities to which he purportedly adheres to so that we may comfortably determine that he has pled enough facts to establish that his beliefs are both religious and sincerely held."). Accordingly, Plaintiff's First Amendment Free Exercise Clause claims are dismissed. *See Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988) ("Because Farid has neither alleged nor submitted any proof that he sincerely holds to any religious belief that mandates the use of Tarot cards, we conclude that summary judgment was appropriate on the free exercise claim.").

## IX. Plaintiff's Equal Protection Clause and Section 1985 Causes of Actions

### A. Equal Protection Claim

"The Equal Protection Clause of the Fourteenth Amendment 'is essentially a direction that all persons similarly situated should be treated alike.' " *Barnes v. Ross*, 926 F. Supp. 2d 499, 506 (S.D.N.Y. 2013) (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985) ). "In order to prove a violation of the Equal Protection Clause, a plaintiff must demonstrate evidence of 'purposeful discrimination ... directed at an identifiable or suspect class.' " *Harnage v. Caldonero*, No. 3:16CV1876(AWT), 2017 WL 2190057, at *3 (D. Conn. May 18, 2017) (quoting *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) ).

Plaintiff has failed to allege membership in a protected class and has submitted no evidence demonstrating that he was treated disparately from similarly situated individuals. Indeed, it is well-established that "[p]risoners are not a part of a suspect class." *Tavares v. Amato*, 954 F. Supp. 2d 79, 99 (N.D.N.Y. 2013) (citing *Scott v. Dennison*, 739 F. Supp. 2d 342, 362 (W.D.N.Y. 2010) ); *see Lee v. Governor of State of N.Y.*, 87 F.3d 55, 60 (2d Cir. 1996) ("[P]risoners either in the aggregate or specified by offense are not a suspect class...."); *see also Harvey v. Harder*, No. 9:09-CV-154 TJM/ATB, 2012 WL 4093792, at *7 n.12 (N.D.N.Y. July 31, 2012) (noting that the assertion of an equal protection claim would be meritless because the plaintiff "has not alleged that any other inmates, similarly situated to plaintiff, were treated differently regarding classification"), *report and recommendation adopted*, 2012 WL 4093760 (N.D.N.Y.

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

2019 WL 1230778

Sept. 17, 2012). Plaintiff's allegations of discrimination are based "upon information and belief" and acts of verbal harassment or are otherwise too conclusory to demonstrate a triable issue of fact. (*See, e.g.*, Dkt. 46 at ¶¶ 1, 103, 172, 197, 415); *Giano*, 54 F.3d at 1057 (concluding that the plaintiff's "equal protection claim fails" where he "presents no evidence" of discrimination "against a particular class of inmates"); *see generally DeJesus v. Tierney*, No. 9:04-CV-298, 2006 WL 839541, at * 11 (N.D.N.Y. Mar. 28, 2006) (stating that it is "well settled that verbal harassment itself does not rise to the level of a constitutional violation," and that "[v]erbal abuse, vulgarity, and even threats are insufficient to rise to the level of constitutional violations").

**\*27** "When a plaintiff alleges an equal protection violation (without also alleging discrimination based upon membership in a protected class), the plaintiff must plausibly allege that he or she has been intentionally treated differently from others similarly situated and no rational basis exists for that different treatment." *Progressive Credit Union v. City of New York*, 889 F.3d 40, 49 (2d Cir. 2018). This category of equal protection violation is commonly known as a "class of one" claim. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, (2000). "[C]lass-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006). In other words, the Plaintiff must be "*prima facie* identical" to the person or persons who have received different treatment. *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005) (quotation omitted), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008).

Overall, "to succeed on a class-of-one claim, a plaintiff must establish that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake."

*Progressive Credit Union*, 889 F.3d at 49 (quoting *Ruston v. Town Bd. for Skaneateles*, 610 F.3d 55, 59-60 (2d Cir. 2010) ).

It is unclear whether Plaintiff has asserted a "class of one" equal protection claim, but to the extent that he has attempted to do so, Plaintiff "has not alleged sufficient facts to show the requisite degree of similarity to" any other inmate. *Harnage*, 2017 WL 2190057, at *3; *see Riley v.*

*Roycroft*, No. 16 CV 2227 (VB), 2017 WL 782917, at *8 (S.D.N.Y. Feb. 28, 2017) (granting motion to dismiss where the plaintiff alleges that he was not given certain medication that "was provided to other inmates with the same medical condition," because he "fails to allege facts that demonstrate a substantial similarity between himself and the other inmates with whom he compares himself"); *Rankel v. Town of Somers*, 999 F. Supp. 2d 527, 545 (S.D.N.Y. 2014) (dismissing the plaintiff's "class of one" equal protection claim because he "has provided no facts from which it may be plausibly inferred that ... any other citizens were similarly situated" and "provides no information about their properties, situations or conduct that would support the conclusory statement that they were similarly (let alone extremely similarly) situated"). In fact, Plaintiff's SAC "does not identify any comparators or similarly situated entities at all," and thus, to the extent Plaintiff raises a "class of one" equal protection claim, it "is deficient as a matter of law." *MacPherson v. Town of Southampton*, 738 F. Supp. 2d 353, 371 (E.D.N.Y. 2010).

**B. Plaintiff's § 1985 Claim**

Similarly, Plaintiff's allegations that Defendants unlawfully conspired to violate his constitutional rights in contravention of 42 U.S.C. § 1985(3) also fail to raise a triable issue of fact because "Plaintiff nowhere alleges that he was a victim of a conspiracy due to his membership in some protected class." *Malsh v. Austin*, 901 F. Supp. 757, 764 (S.D.N.Y. 1995). "42 U.S.C. § 1985(3) prohibits conspiracies undertaken 'for the purpose of depriving, either directly or indirectly, any person or class of person of the equal protection of the laws, or of equal privileges or immunities under the laws.' " *Id.* (quoting *Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of N.Y., Inc.*, 968 F.2d 286, 290-91 (2d Cir. 1992) ). "Such a claim requires more than simply a showing that the defendants acted jointly to achieve some end, and that they used unlawful means to do so. Instead, plaintiff must show that defendants were motivated by animus toward plaintiff based on his membership in some protected class." *Robinson v. Allstate*, 706 F. Supp. 2d 320, 328 (W.D.N.Y. 2010) (citations omitted), *aff'd sub nom. Robinson v. Allstate Ins. Co.*, 508 F. App'x 7 (2d Cir. 2013).

**\*28** A conspiracy claim under Section 1985(3) requires a plaintiff to allege: "1) a conspiracy; 2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and 3) an act in furtherance of the conspiracy; 4) whereby a person is either

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 111 of 201

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

2019 WL 1230778

injured in his person or property or deprived of any right or privilege of a citizen of the United States."

*Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015) (quoting *Britt v. Garcia*, 457 F.3d 264, 269 n.4 (2d Cir. 2006) ).

Because Plaintiff has failed to demonstrate that any conspiracy to violate his constitutional rights arose due to his membership in a protected class, Plaintiff's § 1985(3) claim is without merit. In *Katz v. Klehammer*, 902 F.2d 204 (2d Cir. 1990), the Second Circuit found that the plaintiff's "complaint is completely devoid of any claim of class-based animus, whether economic, political, or otherwise," and found that the § 1985(3) claim "was properly dismissed as frivolous." *Id.* at 208 (noting also that the Supreme Court has "strictly construed" the requirement that plaintiffs demonstrate class-based animus). "The Supreme Court added a 'class-based animus' requirement to § 1985(3) to prevent it from being broadly, and erroneously, interpreted as providing a federal remedy for 'all tortious, conspiratorial interferences with the rights of others.' " *Malsh*, 901 F. Supp. at 764 (quoting *Jews for Jesus, Inc.*, 968 F.2d at 291); *see Dolan*, 794 F.3d at 296 (stating that "the term class 'unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors' " and to hold otherwise would permit "innumerable tort plaintiffs" to raise § 1985 claims "by simply defining the aggrieved class as those seeking to engage in the activity the defendant has interfered with" (quoting *Town of W. Hartford v. Operation Rescue*, 991 F.2d 1039, 1046 (2d Cir. 1993) ) ). Although Plaintiff summarily alleges that the discrimination he suffered was "based on his mental illness, race and ethnicity" (Dkt. 46 at ¶ 1; *see id.* at ¶¶ 103 (alleging discrimination "on the basis of Plaintiff's race, ethnicity, and language"), 197 (alleging discrimination "based on Plaintiff's race"), 415 (alleging discrimination "on the basis of his ethnicity and religion") ), Plaintiff "fails to allege *any facts showing* he was treated differently due to his membership in a protected class," *Klein v. Zugabie*, No. 15 CIV 9093 (NSR), 2017 WL 374733, at *8 n.12 (S.D.N.Y. Jan. 24, 2017) (emphasis added); *see Hollman v. County of Suffolk*, No. 06-CV-3589 JFB ARL, 2011 WL 2446428, at *11 (E.D.N.Y. June 15, 2011) (granting summary judgment on the plaintiff's § 1985 claim where he "only offers conclusory allegations that the actions involved discriminatory animus," and finding "no evidence of racial or other class-based animus on the record"); *see also Grant v. City of Syracuse*, No. 5:15-CV-445 (LEK/TWD), 2017 WL 5564605, at *9 (N.D.N.Y. Nov. 17, 2017) ("Alonzo's argument in support of his conspiracy claim consists of conclusory statements

that the Arresting Officers' alleged misconduct can only be explained by implicit racial bias. While it is undisputed that Alonzo is African-American, conclusory statements linking officers' actions to race are insufficient to survive summary judgment." (citation omitted) ). Therefore, Plaintiff's § 1985 cause of action is also dismissed. [14]

[14]    While the Second Circuit does not appear to have directly addressed the issue, a number of courts have ruled that "[t]he 'class of one' theory is insufficient to form the basis for a § 1985 action." *Chance v. Reed*, 538 F. Supp. 2d 500, 509 (D. Conn. 2008) (citing *Am. Nat'l Bank & Tr. Co. of Chicago v. Town of Cicero*, No. 01 C 1396, 2001 WL 1631871, at * 12 (N.D. Ill. Dec. 14, 2001) ) ("While the 'class of one' may qualify under a section 1983 equal protection claim, plaintiffs fail to cite, and this Court fails to find, any case stating that such a class qualifies for protection under section 1985."); *see Royal Oak Entm't, LLC v. City of Royal Oak, MI.*, 205 F. App'x 389, 399 (6th Cir. 2006) ("Plaintiffs argue that just as they may comprise a 'class of one' for purposes of their equal protection claim, they are a 'class of one' for purposes of their § 1985(3) claim. Not surprisingly, Plaintiffs provide no authority whatsoever for this claim, and we reject it."); *C & H Co. v. Richardson*, 78 F. App'x 894, 902 (4th Cir. 2003) (affirming summary judgment on § 1985(3) claims where the plaintiff "does not allege that the complained-of discrimination resulted from its membership in any qualifying class"); *McCleester v. Dep't of Labor & Indus.*, No. CIV.A. 3:06-120, 2007 WL 2071616, at * 15 (W.D. Pa. July 16, 2007) ("The emerging consensus among federal authority therefore falls against the 'class of one' theory in the § 1985(3) context."). Although the Court is inclined to agree with the overwhelming consensus of authority that a § 1985(3) conspiracy cannot be sustained by allegations merely sufficient to support a "class of one" equal protection claim, the Court need not decide that issue on the facts presented. Because Plaintiff has failed to allege a "class of one" equal protection claim, he has likewise failed to allege a § 1985(3) based upon a "class of one" theory— assuming such a claim even exists.

## X. Plaintiff's Official Capacity Claims

**\*29** Defendants argue that "Plaintiff sues certain defendants in their official and individual capacities" (Dkt. 59-2 at 69), although Defendants do not cite to any allegation suggesting that Plaintiff seeks recourse against any defendant in his or her official capacity. However, to the extent Plaintiff seeks such relief, the Eleventh Amendment bars Plaintiff's official-capacity causes of action. *See Gray-Davis v. New York*, No. 5:14-CV-1490 GTS/TWD, 2015 WL 2120518, at *7 (N.D.N.Y. May 5, 2015) ("The Eleventh Amendment has been found to bar official capacity claims for money damages against [DOCCS] officials and parole officers."); *Tompkins v. Beane*, No. 9:10-CV-1200 LEK/RFT, 2012 WL 3079537, at *6 (N.D.N.Y. July 30, 2012) ("Plaintiff's claims against corrections officers in their official capacities are ... barred by the Eleventh Amendment."); *Tolliver v. N.Y. State Corr. Officers*, No. 99CIV.9555(JGK), 2000 WL 1154311, at *2 (S.D.N.Y. Aug. 14, 2000) (dismissing official capacity claims where "[a]ll of the defendants in this case are state officials because they are employees of [DOCCS]").

## XI. **The Failure to Demonstrate the "Personal Involvement" of Several Named Defendants**

Plaintiff has also failed to allege the personal involvement of several of the named defendants in any of the purported constitutional violations set forth in his SAC and supplemental papers. "Because Section 1983 imposes liability only upon those who actually cause a deprivation of rights, 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Blyden*, 186 F.3d at 264 (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ).

Correctional officer Matthew Null ("C.O. Null") is only alleged to have instructed Plaintiff to stand back from his prison cell door so that "C.O. Null could observe whether Plaintiff was wearing pants." (Dkt. 46 at ¶ 324). This allegation fails to implicate C.O. Null in an unconstitutional act or any other wrongful conduct. As such, any claim asserted against C.O. Null is dismissed.

Correctional officers Jason Lortus ("C.O. Lortus") and M. Ranger ("C.O. Ranger") are alleged to have denied Plaintiff medical attention after Nurse Cheasman allegedly hit Plaintiff's hands with a bucket. (*Id.* at ¶ 213). Plaintiff alleges that the incident was not recorded in a logbook, which "violat[ed] the doctor's directives, policies, and regulations." (*Id.*). As discussed above, Plaintiff received adequate care and treatment, and the medical records indicate that he was examined on November 22, 2010, but refused to show his hands to the medical staff. (*See* Dkt. 59-10 at 110). Plaintiff's allegations against C.O. Lortus and C.O. Ranger also fail to establish their involvement in any constitutional violation. *See also White v. Rock*, No. 9:13-CV-392 (GTS/CFH), 2016 WL 11478222, at * 12 (N.D.N.Y. Feb. 23, 2016) ("The claim that a defendant failed to file an injury report is insufficient to satisfy the subjective prong of the deliberate indifference test."), *report and recommendation adopted*, 2016 WL 1248904 (N.D.N.Y. Mar. 29, 2016); *Harris v. Howard*, No. 907-CV-1065 TJM/GJD, 2009 WL 537550, at *12 (N.D.N.Y. Mar. 3, 2009) ("Failure to complete reports is simply not an Eighth Amendment claim under any view of the facts."); *Mitchell v. Keane*, 974 F. Supp. 332, 342 (S.D.N.Y. 1997) ("Williams' failure to fill out an injury report does not state an Eighth Amendment claim. An injury report is not medically necessary for a minimally civilized life."), *aff'd*, 175 F.3d 1008 (2d Cir. 1999). Accordingly, C.O. Lortus and C.O. Ranger are also dismissed from this action.

Similarly, Plaintiff has named the Assistant Commissioner of DOCCS Mental Health Services, Diane Vanburen, as a defendant, but has not set forth any allegations that plausibly suggest her personal involvement in any constitutional violation. (Dkt. 46 at ¶ 86). The same can be said for defendant Eileen R. Diniston, the Regional Health Services Administrator (*id.* at ¶ 72), as well as Acting Deputy Superintendent Thomas Tanea (Dkt. 93-5 at 3). No allegations of wrongdoing are asserted against these defendants as well. As a result, they too are terminated from this action.

**\*30** Likewise, Plaintiff names the Commissioner of the New York State Office of Mental Health, Michael Hogan, the Director of Mental Health Services for DOCCS, Doris Romero, and the Assistant Commissioner of the New York State Office of Mental Health, Howard Holanchock, as defendants in this action, but fails to make any specific allegations of wrongdoing against them either. Instead, he collectively refers to these individuals as the "MHU Defendants" (Dkt. 46 at ¶ 87), and generally claims "[f]or the abuses and complaints chronicled herein, the MHU Defendants are jointly and severally liable due to their participation in the wrongs against Plaintiff and/or their wrongful refusal to address the issues when brought to their attention through complaints and grievances" (*id.* at ¶ 349). However, because none of these three defendants is alleged to have committed any wrongful act, individually or in the collective, the SAC fails to set forth sufficient facts that plausibly suggest their personal involvement in the harms

otherwise set forth therein. Therefore, these three defendants are also dismissed from this action.

Relatedly, insofar as Plaintiff seeks relief for Defendants' failure to take action on his grievances or to process his administrative appeals (*see, e.g.*, Dkt. 46 at ¶¶ 248, 264, 271, 313, 320, 408-09, 413), these allegations fail to state a constitutional claim under § 1983. "Generally, the receipt of a letter is insufficient to establish personal involvement under § 1983. Instead, courts typically require something more before finding personal involvement." *Ward v. Rabideau*, 732 F. Supp. 2d 162, 169 (W.D.N.Y. 2010) (citations omitted); *see Candelaria v. Higley*, No. 04-CV-277A, 2008 WL 478408, at *2 (W.D.N.Y. Feb. 19, 2008) ("Numerous courts have held that merely writing a letter of complaint does not provide personal involvement necessary to maintain a § 1983 claim."); *Johnson v. Wright*, 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002) ("Personal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint."); *Gayle v. Lucas*, No. 97 CIV 0883 (MGC), 1998 WL 148416, at *4 (S.D.N.Y. Mar. 30, 1998) ("Generally, the allegation that a supervisory official ignored a prisoner's letter protesting unconstitutional conduct is not itself sufficient to allege the personal involvement of the official so as to create liability under § 1983."). As such, Plaintiff's allegations that Defendants ignored or failed to act upon his grievances or letters do not state a viable § 1983 claim. *See Walker v. Pataro*, No. 99CIV.4607(GBD)(AJP), 2002 WL 664040, at *12 (S.D.N.Y. Apr. 23, 2002) ("[I]f mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose *respondeat superior* liability."). [15]

[15]    Similarly, to the extent Plaintiff alleges that certain supervisory defendants failed to overturn or otherwise rectify the actions of Five Points medical staff (*see, e.g.*, Dkt. 46 at ¶¶ 140-41, 264), this claim fails to establish a viable § 1983 cause of action as well. Initially, insofar as Plaintiff's claim would impose *respondeat superior* liability upon officials in supervisory positions for the actions of their subordinates, Plaintiff's claim is rejected because, as previously discussed, a § 1983 claim must be premised upon the "personal involvement" of the defendant and cannot be based simply upon theories of

vicarious liability. *See Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) ("[S]upervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on *respondeat superior*."); *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002) ("A supervisor may not be held liable under section 1983 merely because his subordinate committed a constitutional tort."). In addition, supervisory officials without any medical training are permitted to rely upon the medical decisions of experienced and credentialed medical personnel. *See Hardy v. Diaz*, No. 908-CV-1352GLSATB, 2010 WL 1633379, at *7 (N.D.N.Y. Mar. 30, 2010) ("The Superintendent cannot be liable under Section 1983 for failure to supervise the prison medical staff, because he lacks the medical training and authority to do so."), *report and recommendation adopted*, 2010 WL 1633390 (N.D.N.Y. Apr. 21, 2010); *see also Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003) (affirming summary judgment where a supervisory official, who "had no medical training," gave "automatic and complete deference" to certain medical decisions made by the medical staff); *Cuoco v. Moritsugu*, 222 F.3d 99, 111 (2d Cir. 2000) (finding it not unreasonable for a "non-medical prison official" to refrain from "dictat[ing] the specific medical treatment to be given to particular prisoners—for whatever reason"). Such reliance does not demonstrate "personal involvement" in a constitutional violation. *See Morales v. Fischer*, 46 F. Supp. 3d 239, 255 (W.D.N.Y. 2014) (dismissing claims against "the Superintendent" of the correctional facility where he had "no medical training, and [was] entitled to rely on the medical decisions of the doctors ... in making his decision affirming the denial of [the p]laintiff's grievances"). Accordingly, insofar as Plaintiff alleges that Deputy Superintendents of Administration Jeffrey Minnerly and Matthew Thomas failed to resolve issues related to Plaintiff's medical treatment, Plaintiff's allegations fail to state a claim pursuant to § 1983.

**\*31** Furthermore, "[g]rievance procedures are the internal procedures and requirements of DOCCS, and as such, prison inmates neither have a constitutionally protected right to a grievance procedure, nor, as a general rule, is there a federal right to have them properly administered." *Gomez v. Sepiol*, No. 11-CV-1017SR, 2014 WL 1575872, at *15 (W.D.N.Y.

2019 WL 1230778

Apr. 11, 2014) (citations omitted); *see Shell v. Brzezniak,* 365 F. Supp. 2d 362, 370 (W.D.N.Y. 2005) ("If prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim."). "Therefore, the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983." *Cancel v. Goord,* No. 00 CIV 2042 LMM, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001). In addition, because "[t]here is no constitutional right to an inmate appeals process," *Dolberry v. Levine,* 567 F. Supp. 2d 413, 416 (W.D.N.Y. 2008) (quoting *Washington v. Early,* No. 103CV05263LJOSMSPC, 2008 WL 795603, at *15 (E.D. Cal. Mar. 24, 2008), *report and recommendation adopted,* 2008 WL 2261399 (E.D. Cal. June 2, 2008) ), any failure to process Plaintiff's administrative appeals does not support a § 1983 cause of action.

## XII. Plaintiff's Claim for the Failure to Intervene

Lastly, "because '[t]here can be no failure to intervene ... where there was no constitutional violation,' " *Hardy v. Daly,* No. 17-2906, 2018 WL 4631831, at *1 (2d Cir. Sept. 26, 2018) (quoting *Tavares v. City of New York,* No. 08 Civ. 3782, 2011 WL 5877550, at *7 (S.D.N.Y. Oct. 17, 2011) ), Plaintiff's cause of action for the failure to intervene is dismissed, except insofar as Plaintiff has sufficiently stated such a claim associated with the use of excessive force claims that have been permitted to proceed.

## XIII. The Matter is Stayed Pending the Resolution of Defendants' Motion to Revoke Plaintiff's IFP Status

Because some of Plaintiff's claims survive Defendants' motion for partial summary judgment, and Defendants' motion to revoke Plaintiff's IFP status is held in abeyance pending the Second Circuit's decision in *Shepherd,* the Court *sua sponte* considers whether to stay the balance of this action until Defendants' revocation motion can be resolved.

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.,* 299 U.S. 248, 254 (1936); *see Javier H. v. Garcia-Botello,* 218 F.R.D. 72, 74 (W.D.N.Y. 2003) ("[A] 'federal district court has the inherent power, in the exercise of its discretion, to stay an action.' " (quoting *Twenty First Century Corp. v. LaBianca,* 801 F. Supp. 1007, 1010 (E.D.N.Y. 1992) ) ). "Accordingly, the decision to issue a stay is 'firmly within a district court's discretion.' " *Tradewinds Airlines, Inc. v. Soros,* No. 08 CIV.

5901JFK, 2009 WL 435298, at *3 (S.D.N.Y. Feb. 23, 2009) (quoting *Am. Shipping Line, Inc. v. Massan Shipping Indus.,* 885 F. Supp. 499, 502 (S.D.N.Y. 1995) ); *see Louis Vuitton Malletier S.A. v. LY USA, Inc.,* 676 F.3d 83, 97 (2d Cir. 2012) ("[A] court *may* decide in its discretion to stay civil proceedings when the interests of justice seem to require such action." (quoting *Kashi v. Gratsos,* 790 F.2d 1050, 1057 (2d Cir. 1986) ) ). A court may determine that a stay is appropriate and "in the interest of judicial economy, ... pending the outcome of proceedings which bear upon the case, even if such proceedings are not necessarily controlling of the action that is to be stayed." *LaSala v. Needham & Co.,* 399 F. Supp. 2d 421, 427 (S.D.N.Y. 2005).

In determining whether to stay a lawsuit, courts weigh the following factors:

> (1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the defendants; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the public interest.

*\*32 Luv N'Care, Ltd. v. Regent Baby Prod. Corp.,* No. 10 CIV. 9492, 2014 WL 572524, at *2 (S.D.N.Y. Feb. 13, 2014) (quoting *Kappel v. Comfort,* 914 F. Supp. 1056, 1058 (S.D.N.Y. 1996) ).

Under the facts presented here, a stay would not unduly prejudice Plaintiff. In fact, considering the robust medical documentation submitted by Defendants on this motion, and the law as it currently stands in this Circuit, Plaintiff faces an uphill battle to persuade the Court that he may maintain his IFP status. To be sure, the Second Circuit may solidify the approach presently used by courts in this Circuit to evaluate such motions. However, it may also divert from this approach, or, at the very least, elucidate nuances thereof in a manner favorable to Plaintiff. In other words, it is in Plaintiff's interest to await the Second Circuit's opinion in *Shepherd* because, as it currently stands, Plaintiff's IFP status would likely be revoked. Defendants would also benefit from the issuance of a stay. Indeed, it would be in their interests to avoid wasting limited resources in discovery disputes against a plaintiff who

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 115 of 201

Abreu v. Farley, Not Reported in Fed. Supp. (2019)

2019 WL 1230778

may not be entitled to IFP status. A stay is in the interests of judicial economy as well. A premature resolution of Plaintiff's IFP status may result in duplicative proceedings before this Court should the Second Circuit decide to depart from the approach taken by the other circuit courts that have opined on the issue. Lastly, while there is no evidence that any non-parties are specifically interested in the outcome of this matter, it is in the public interest to prevent the limited time and resources of the judiciary, the Office of the New York State Attorney General, and *pro bono* counsel from being unnecessarily diverted to a matter that could possibly be impacted should the Court revoke Plaintiff's IFP status.

Accordingly, the Court finds that it is in the interests of justice to require this action be stayed pending the resolution of Defendants' motion to revoke Plaintiff's IFP status.

## **CONCLUSION**

For the foregoing reasons, Defendants' motion for partial summary judgment (Dkt. 59) is granted in part and denied in part, and Defendants' motion to revoke Plaintiff's IFP status

(Dkt. 59) is held in abeyance pending the Second Circuit's decision in *Shepherd v. Annucci*, No. 17-2261 (2d Cir. July 21, 2017). To the extent Plaintiff asserts § 1983 excessive use of force and related failure to intervene claims as well as common law causes of action against Barry Countryman, Jacob Smith, Richard Cioffa, Correctional Officer VanHorn, Kimberly Cheasman, Annette Holm, Remy Babineaux, Richard Goodliff, Correctional Sergeant T. Barber, Nurse T. Carroll, and Correctional Sergeant D. Gleason, those claims survive Defendants' motion for partial summary judgment. In addition, Plaintiff's Eighth Amendment conditions-of-confinement claims asserted against Charles Coventry and Eric Farley for unlawful prison cell illumination will also proceed to discovery. The Clerk of Court is directed to terminate all other defendants from this action and is also directed to stay this matter until further order of the Court.

**\*33** SO ORDERED.

## **All Citations**

Not Reported in Fed. Supp., 2019 WL 1230778

---

    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2024 Thomson Reuters. No claim to original U.S. Government Works.    31

Haynes v. City of New York, Not Reported in Fed. Supp. (2020)

2020 WL 4926178

2020 WL 4926178
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Lloyd HAYNES, Plaintiff,

v.

The CITY OF NEW YORK, New York City Department
of Correction, New York City Health and Hospitals
Corporation, New York City Department of Correction
Commissioner Cynthia Brann, Manhattan Detention
Complex Warden Raleem Moses, Manhattan
Detention Complex Captain Winwick, Manhattan
Detention Complex Captain Lee, Manhattan
Detention Complex Captain Avin, et al., Defendants.

19 Civ. 1925 (NRB)
|
Signed 08/20/2020

**Attorneys and Law Firms**

Daniel Scott Hallak, Sysosset, NY, Charles H. Horn, The
Russell Friedman Law Group, LLP, Lake Success, NY, for
Plaintiff.

Alejandra Rosa Gil, Ana Maria Vizzo, Daniel Gerard May,
Heidell, Pittoni, Murphy & Bach, LLP, White Plains, NY,
Darshan Ishvar Patel, Gabrielle Apfel, Heidell, Pittoni,
Murphy & Bach, LLP, New York, NY, Mandy Nguyen, The
Legal Aid Society, Brooklyn, NY, for Defendants City of
New York, New York City Department of Correction, New
York City Health And Hospitals Corporation, New York City
Department of Correction Commissioner Cynthia Brann.

Gabrielle Apfel, Heidell, Pittoni, Murphy & Bach, LLP, New
York, NY, for Defendant Department of Correction Officers
John/Jane Does # 1-25.

## MEMORANDUM AND ORDER

NAOMI REICE BUCHWALD, UNITED STATES
DISTRICT JUDGE

*1 Plaintiff Lloyd Haynes ("plaintiff") brought this action
pursuant to 42 U.S.C. § 1983 against the City of New York
(the "City"), the New York City Department of Correction
("DOC"),[1] the New York City Health and Hospitals
Corporation ("HHC"), DOC Commissioner Cynthia Brann

("Commissioner Brann"), Manhattan Detention Complex
("MDC") Warden Raleem Moses, Bellevue Hospital Prison
Ward ("BPW") Deputy Warden John Doe, North Infirmary
Command ("NIC") Warden John Doe,[2] MDC Captain
Winwick, MDC Captain Lee, MDC Captain Avin, DOC
Officers John/Jane Does #1-25,[3] and no fewer than 213
individually named healthcare workers (the "Defendant
Healthcare Workers"),[4] (collectively, "defendants"), in
connection with defendants' purported failures to adequately
and timely treat plaintiff's Hirschsprung's disease.[5]

1    "It is well established that New York City agencies,
     such as the [DOC], are not suable entities."
     Cuadrado v. New York City Dep't of Corr., No.
     08 Civ. 3026 (PAC), 2009 WL 1033268, at
     *2 (S.D.N.Y. Apr. 16, 2009). Indeed, the New
     York City Charter provides that "[a]ll actions and
     proceedings for the recovery of penalties for the
     violation of any law shall be brought in the name of
     the city of New York and not in that of any agency,
     except where otherwise provided by law." N.Y.C.
     Charter Ch. 16 § 396. Plaintiff's claims against
     DOC are accordingly dismissed.

2    Commissioner Brann, MDC Warden Moses, BPW
     Warden Doe and NIC Warden Doe are referred
     to collectively in the first amended complaint (the
     "FAC" or the "amended complaint") and herein as
     the "Senior Officials." FAC ¶ 36.

3    DOC Officers John/Jane Does #1-25 are described
     in the amended complaint as "DOC officers
     including, but not limited to, assistant deputy
     wardens, captains, and correction officers ... who
     participated in and/or had knowledge of and failed
     to protect Plaintiff from and/or intervene in the
     denial of timely and adequate medical care[.]" FAC
     ¶ 39.

4    The 213 Defendant Healthcare Workers, which
     appear to include every medical provider listed
     in plaintiff's 1000+ page medical record, are
     described in the FAC as "the site directors,
     physicians, nurses, physician assistants, clinicians,
     therapists, and other medical staff employed by the
     City and/or HHC who were assigned to MDC, NIC,
     and BPW on the subject dates and were responsible

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 117 of 201

Haynes v. City of New York, Not Reported in Fed. Supp. (2020)

2020 WL 4926178

for the provision of appropriate medical care to patients at MDC, NIC, and BPW[.]" FAC ¶ 34.

5      "Hirschsprung's disease is a condition that affects the large intestine (colon) and causes problems with passing stool." See "Hirschsprung's disease," Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/hirschsprungs-disease/multimedia/hirschsprungs-disease/img-20006784.

Before the Court is defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, defendants' motion is granted. Plaintiff's state law claims are dismissed without prejudice to their potential refiling in state court.

## I. Background [6]

6      The following facts are drawn from the FAC and are assumed true for purposes of resolving the instant motion. See Stadnick v. Vivint Solar, Inc., 861 F.3d 31, 35 (2d Cir. 2017).

**\*2** Plaintiff was arrested and taken to the MDC on January 31, 2018. FAC ¶ 46. On February 1, 2018, plaintiff was evaluated by "MDC's Defendant Healthcare Workers" as part of an initial medical examination. [7] FAC ¶ 47. MDC's Defendant Healthcare Workers purportedly were advised of plaintiff's Hirschsprung's disease, which, according to plaintiff, "requires an ileostomy bag and constant maintaining, cleaning and monitoring of same." FAC ¶ 47. Specifically, plaintiff claims to have told MDC's Defendant Healthcare Workers that it was "medically necessary to change his ileostomy bag twice per day to prevent fecal matter from overflowing." FAC ¶ 49. Following plaintiff's initial medical examination, however, MDC's Defendant Healthcare Workers, "including but not limited to Defendants MARIANNA USTIAK, RN and/or LANDIS BARNES, MD," purportedly failed to change plaintiff's ileostomy bag until approximately February 6, 2018. FAC ¶ 50. Plaintiff alleges that by February 6, 2018, his ileostomy bag "had leaked fecal matter around the stomach area," causing plaintiff to develop a painful skin condition around the ileostomy site. FAC ¶ 50. According to plaintiff, the failure of MDC's Defendant Healthcare Workers to change his ileostomy bag for five days was in direct contravention of "the medical standard," [8] which plaintiff claims is to change an ileostomy bag twice per day. FAC ¶ 65.

7      The FAC does not expressly define "MDC's Defendant Healthcare Workers." Elsewhere in the FAC, however, 23 of the 200+ Defendant Healthcare Workers are alleged to have treated plaintiff during the time period at issue. See FAC ¶ 69 (listing by name each of the Defendant Healthcare Workers alleged to have treated plaintiff while he was at MDC between February 1, 2018 and June 5, 2018).

8      The Court notes that allegations regarding prevailing medical standards generally are not considered at the motion to dismiss stage. See, e.g., Knight v. Koenigsmann, No. 18 Civ. 7172 (KMK), 2019 WL 2615977, at *8 (S.D.N.Y. June 26, 2019) (argument that a catheter distribution policy complied with the "the current standard of care" was "inappropriate at the motion-to-dismiss stage"); cf. Vassallo v. City of New York, No. 15 Civ. 7125 (KPF), 2016 WL 6902478, at *2 n.2 (S.D.N.Y. Nov. 22, 2016) (detailed medical information, including "the appropriate blood sugar levels for a 'well-managed' diabetic" is "usually presented and considered at the summary judgment stage, not on the pleadings").

Plaintiff alleges that MDC ran out of ileostomy supplies on at least four occasions between February 6, 2018 and May 9, 2018, FAC ¶ 65, resulting in continued pain and worsening of his skin condition, FAC ¶ 58. Between February 6, 2018 and February 18, 2018, when MDC purportedly lacked a sufficient supply of ileostomy bags, plaintiff claims to have repeatedly asked MDC Captain Winwick if his mother could bring him the needed supplies. FAC ¶ 60. Plaintiff alleges that Captain Winwick, after assuring plaintiff that she would speak to the "Assistant Warden" about the issue, [9] repeatedly ignored plaintiff's requests. FAC ¶ 60. While the FAC alleges that plaintiff's concerns were never addressed by Captain Winwick and the Assistant Warden, plaintiff's mother allegedly was permitted to bring plaintiff one week's worth of ileostomy supplies on or about February 19, 2018. FAC ¶¶ 60, 61. At that point, however, plaintiff alleges that he "had already developed a severe skin condition as a result of the fecal matter overflow." FAC ¶ 61. While plaintiff allegedly was referred to BPW on February 21, 2018 for an ostomy evaluation and to have his skin condition examined, "Defendant Officers and Defendant Healthcare Workers" [10] repeatedly cancelled plaintiff's appointments "for no legitimate or lawful reason."

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 118 of 201

Haynes v. City of New York, Not Reported in Fed. Supp. (2020)
2020 WL 4926178

FAC ¶ 64. While "Defendants" purportedly began changing plaintiff's ileostomy bag approximately two times per week beginning on or about March 13, 2018, plaintiff alleges that twice per week was still too infrequent and that his requests to have his ileostomy bag changed twice per day continued to be ignored. FAC ¶¶ 61, 65.

9    The "Assistant Warden" is not named as a defendant in the case caption and it is unclear to whom the "Assistant Warden" is intended to refer.

10   As discussed in greater detail infra, plaintiff refers throughout the amended complaint to actions taken by "Defendants" and "Defendant Officers and Defendant Healthcare Workers," without identifying which of the many named defendants were actually involved in the conduct at issue.

*3  Plaintiff alleges that he was examined at MDC in early May 2018 by defendant Rhodina Williams, MD, who prescribed plaintiff an antifungal cream for plaintiff's skin condition and requested that an appointment be scheduled for plaintiff to see a specialist at BPW on May 15, 2018. FAC ¶ 66. However, "Defendant Officers and/or Defendant Healthcare Workers" purportedly failed to take plaintiff to that appointment and to several other appointments scheduled between February 2018 and June 5, 2018, causing his skin condition to continue to worsen. See FAC ¶¶ 66, 68, 69. While plaintiff was taken for an evaluation at BPW on June 5, 2018, plaintiff alleges that he was examined by interns and residents "with little to no experience regarding [plaintiff's] condition." FAC ¶ 71. Specifically, defendants Gloria Ihenacho, MD, Robert Reader, MD, "and/or" Patricio B. Lynn, MD, allegedly attempted to "push [plaintiff's] mucous fistula back into his stomach with his/her hands ... caus[ing] Plaintiff extreme pain and discomfort." FAC ¶ 71. Following that evaluation, plaintiff was discharged and prescribed a paste for his skin condition that purportedly caused "additional scabs and lesions." FAC ¶¶ 71, 74. While plaintiff alleges that he was supposed to have an immediate follow up appointment with a gastroenterologist, "Defendants" repeatedly failed to take him to that appointment. FAC ¶¶ 75, 76. Plaintiff alleges that his skin condition continued to deteriorate "as a result of not being examined by a skin specialist." FAC ¶¶ 73, 77. While plaintiff was evaluated by "non-specialist" Todd Cowdery, MD on or about September 6, 2018, Dr. Cowdery purportedly misdiagnosed plaintiff's skin condition and prescribed antibiotics that were ineffective. FAC ¶ 77. Although Dr. Cowdery allegedly arranged for plaintiff to see a gastroenterologist and a wound care specialist at BPW on

September 11, 2018, plaintiff alleges that that appointment, like the others before it, "was cancelled for no legitimate purpose." FAC ¶¶ 77-80.

On or about October 5, 2018, plaintiff was taken to BPW for an evaluation. FAC ¶ 81. Upon his arrival, however, BPW did not have any ileostomy bags to replace the one plaintiff was wearing, purportedly causing leakage of fecal matter that worsened the skin condition around the ileostomy site. FAC ¶ 81. While plaintiff was brought back to BPW on or about October 17, 2018 as a result of his worsening skin condition, "MDC's personnel failed to deliver Plaintiff to BPW on time for his appointment," causing him to miss an appointment with a dermatologist. FAC ¶ 83. At that point plaintiff's skin condition allegedly was so severe that he needed to be admitted to BPW. While at BPW, a dermatologist diagnosed his skin condition as a rash caused by the failure of "Defendants" to prevent the fecal matter from spreading around the ileostomy site. FAC ¶ 84. The dermatologist prescribed plaintiff a medicated cream to be applied hourly. FAC ¶ 85. Following his discharge from BPW on October 20, 2018, "Defendant Officers at MDC and Defendant Healthcare Workers at MDC" purportedly failed to give plaintiff the prescribed cream and failed to take plaintiff back to BPW for a scheduled follow up appointment. FAC ¶¶ 87, 88.

Plaintiff was transferred to North Infirmary Command ("NIC") on December 25, 2018. FAC ¶ 93. However, because "the officers at MDC and Defendant Healthcare Workers at MDC wholly failed to communicate Plaintiff's medically necessary needs to the NIC upon his transfer," FAC ¶ 94, NIC did not have any ileostomy bags upon his arrival, FAC ¶ 93. Plaintiff alleges that between his transfer to NIC until on or about February 12, 2019, he was "inadequately treated and/or assessed" by "Defendant Healthcare Workers at NIC." FAC ¶ 97. Specifically, plaintiff alleges that the inadequate treatment at NIC "caused [him] to have stool passing through his anus, requiring a disimpaction procedure, exposing him to risk of further infections and blood leaking from his rectum." FAC ¶ 96.

Plaintiff was readmitted to BPW on February 12, 2019 as a result of the "excruciating pain" caused by the NIC Defendants' failure to procure needed supplies and adequately treat his skin condition. FAC ¶ 98. A CAT scan performed at BPW revealed "a large fecal and mucus blockage in Plaintiff's intestines" for which plaintiff was given enemas daily for a four day period. FAC ¶ 199. Plaintiff alleges that from February 12, 2019 until his discharge from

Haynes v. City of New York, Not Reported in Fed. Supp. (2020)

2020 WL 4926178

BPW approximately five days later, he was "inadequately treated and/or assessed" by certain additional Defendant Healthcare Workers. FAC ¶ 102. Following his discharge from BPW plaintiff was transferred back to NIC, where he purports to have again been "inadequately treated and/or assessed." FAC ¶ 105. Plaintiff alleges that due to his condition having worsened, he was readmitted to BPW on or about March 14, 2019 through April 18, 2019, where the inadequate treatment purportedly persisted. FAC ¶ 105. [11]

> [11] Certain additional facts, which are not alleged in the FAC, are included in plaintiff's opposition to defendants' motion to dismiss. For example, plaintiff states in opposition that he received a colon disimpaction on March 19, 2019 and had a surgical disimpaction on April 5, 2019. Plaintiff also claims that he was discharged from BPW and transferred to the NIC on May 9, 2019, and that he was transferred to Midstate Correctional Facility on May 21, 2019. See ECF No. 63 at 7, 12, 16.

**\*4** Plaintiff alleges that, to date, his skin condition still has not been properly diagnosed and that he continues to suffer from discomfort and "excruciating" pain. See FAC ¶ 106.

## II. Procedural History

Plaintiff filed the original complaint in this case on February 28, 2019. ECF No. 1. In response, defendants filed a pre-motion letter asserting, inter alia, that the complaint relied on impermissible group pleading and failed to allege facts sufficient to establish the personal involvement of each defendant. See ECF No. 37 at 2. During a pre-motion conference, the Court directed plaintiff to obtain his medical records and to serve interrogatories on defendants so that plaintiff would be able to correct the deficiencies in an amended complaint.

Plaintiff's subsequently filed an amended complaint, which is the presently operative complaint in this case, named over 200 additional medical providers as defendants and asserts the following causes of action: (1) deliberate indifference to his medical needs pursuant to 42 U.S.C. § 1983 against all defendants; (2) deliberate indifference resulting from an official policy or custom under Monell against the City and HHC; (3) conspiracy pursuant to 42 U.S.C. § 1983 against the individual defendants; and (4) six state law causes of action for various forms of negligence, including medical malpractice. [12]

> [12] The state law causes of action include: (1) medical malpractice; (2) negligence; (3) negligent hiring, training supervision and retention; (4) neglect and failure to provide medical treatment; (5) neglect and failure to protect; and (6) prima facie tort. See FAC ¶¶ 168-220.

Defendants have moved to dismiss the amended complaint in its entirety on the grounds that plaintiff continues to rely on impermissible group pleading and that plaintiff has failed to show, in any event, that the purported inadequacies in plaintiff's medical treatment rise to the level of deliberate indifference. Defendants further argue that plaintiff has failed to demonstrate that he suffered a constitutional deprivation as a result of an official policy or custom, as is required to state a claim for liability under Monell, or that there was any meeting of the minds among the defendants of the kind necessary to adequately plead a claim for conspiracy. See ECF No. 57.

Because the Court agrees in substantial part with defendants' analysis, and for the additional reasons set forth below, defendants' motion is granted in its entirety.

## III. Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), the non-movant's pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the [pleaded] fact[s] ... allow[ ] the court to draw the reasonable inference that the [movant] is liable for the misconduct alleged." Id. While the Court accepts the truth of the pleaded facts, it is "not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Brown v. Daikin Am., Inc., 756 F.3d 219, 225 (2d Cir. 2014) (quoting Iqbal, 556 U.S. at 678).

### A. Materials Considered

**\*5** When ruling on a motion to dismiss pursuant to Rule 12(b)(6), "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable LLC, 622 F.3d 104, 111 (2d Cir. 2010). For a document to be incorporated by reference,

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 120 of 201

Haynes v. City of New York, Not Reported in Fed. Supp. (2020)

2020 WL 4926178

"the complaint must make 'a clear, definite and substantial reference to the documents.' " DeLuca v. AccessIT Grp., Inc., 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (quoting Helprin v. Harcourt, Inc., 277 F. Supp. 2d 327, 330-31 (S.D.N.Y. 2003)). "[W]here a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (quoting Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)). For example, when ruling on a motion to dismiss for failure to state a claim, a court may consider documents that were not attached as exhibits to the complaint where the plaintiff relied upon said documents in bringing suit. See Cortec Indus., Inc. v. Sum Holding LP, 949 F.2d 42, 48 (2d Cir. 1991); see also id. ("Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated.").

The Court finds here that plaintiff's medical records, which were filed as sealed exhibits to defendants' motion to dismiss, see ECF No. 60, may be considered in ruling on defendants' motion. As an initial matter, there is no dispute that plaintiff obtained his full medical record prior to filing the amended complaint. Indeed, plaintiff appears to have relied on his medical record in naming as additional defendants the 200+ Defendant Healthcare Workers listed therein. [13] The Court also informed the parties during a pre-motion conference that the medical records could be referenced in the parties' submissions. That plaintiff was in possession of his medical records prior to filing the amended complaint and was on notice of the possibility of their being considered eliminates any harm that otherwise might have resulted from their consideration. See Chambers, 282 F.3d at 153 ("[T]he harm to the plaintiff when a court considers material extraneous to a complaint is the lack of notice that the material may be considered"). [14]

---

[13] Plaintiff acknowledges in his opposition that "the only individuals who Plaintiff is aware of are those that made notations in his medical records." ECF No. 63 at 21.

[14] While plaintiff claims that the medical records "do not show the whole picture of Plaintiff's grievances," ECF No. 63 at 14, he does not dispute the medical records' authenticity or

accuracy. Cf. Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir 2006) ("[E]ven if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document."). To the contrary, plaintiff maintains that the medical records "collaborate [sic] [his] allegations on several aspects," and his opposition to defendants' motion to dismiss quotes extensively from the medical records in support of his claims. See ECF No. 63 at 15.

## IV. **Discussion**

The Court notes at the outset that the amended complaint relies heavily on precisely the sort of "group pleading" that the Second Circuit has held fails to comply with the requirements of Rule 8. See Atuahene v. City of Hartford, 10 F. App'x 33, 34 (2d Cir. 2001) ("Although Fed. R. Civ. P. 8 does not demand that a complaint be a model of clarity or exhaustively present the facts alleged, it requires, at a minimum, that a complaint give each defendant 'fair notice of what the plaintiff's claim is and the ground upon which it rests' ") (quoting Ferro v. Ry. Exp. Agency, Inc., 296 F.2d 847, 851 (2d Cir. 1961)). Indeed, plaintiff's fifty six page amended complaint -- hardly a "model of clarity" -- refers on numerous occasions to actions purportedly taken by various subsets of defendants (e.g., groups of individuals referred to collectively as "Defendant Healthcare Workers," "MDC Defendant Healthcare Workers," and "Defendant Officers"), failing in nearly all instances to identify any specific conduct by any particular defendant. Elsewhere, the FAC asserts claims against long lists of individual defendants that, while identified by name, remain wholly undifferentiated in terms of their conduct. [15]

---

[15] Where individual defendants are referenced by name, internal inconsistencies abound. Compare, e.g., FAC ¶ 69 (describing defendant Robert Reader, MD as one of the "MDC Defendant Healthcare Workers") with FAC ¶ 70 (describing Dr. Reader as part of a group of "interns and residents of BPW").

**\*6** For example, plaintiff alleges that between December 25, 2018 and February 12, 2019, he was "inadequately treated and/or assessed" by multiple Defendant Healthcare Workers at the NIC. See FAC ¶ 97 (listing thirty-four of the Defendant Healthcare Workers by name). While plaintiff alleges generally that the failure of those defendants "to

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 121 of 201

Haynes v. City of New York, Not Reported in Fed. Supp. (2020)
2020 WL 4926178

provide [him] with adequate medical care" exposed him to, inter alia, "risk of further infections," see FAC ¶ 96, plaintiff fails to allege how or when any of those defendants were involved in depriving him of adequate treatment. Plaintiff goes on to allege, in similarly vague terms, that he continued to be "inadequately treated and/or assessed" by various other "Defendant Healthcare Workers" throughout the remainder of the relevant period. See, e.g., FAC ¶ 102 (from February 12, 2019 to February 16, 2019, plaintiff was "inadequately treated and/or assessed" by forty Defendant Healthcare Workers listed by name); FAC ¶ 103 (from February 16, 2019 to March 13, 2019, plaintiff was "inadequately treated and/or assessed" by twenty-three Defendant Healthcare Workers listed by name); FAC ¶ 105 (from March 14, 2019 to April 18, 2019 plaintiff was "inadequately treated and/or assessed" by eighty-seven Defendant Healthcare Workers listed by name). In each of these instances and in numerous others not reproduced here, plaintiff fails to plead a single factual allegation differentiating among the defendants in terms of their involvement in plaintiff's medical treatment generally, much less in the constitutional violations alleged.

While plaintiff already was afforded an opportunity to amend in order to address the group pleading deficiencies of his initial complaint, it apparently warrants repeating that a complaint fails to meet the requirement of Rule 8(a) where, as here, the allegations "lump[ ] ... the defendants together in each claim and provid[e] no factual basis to distinguish their conduct." Atuahene, 10 F. App'x. at 34; see also Nesbeth v. New York City Mgmt. LLC, No. 17 Civ. 8650 (JGK), 2019 WL 110953, at *3 (S.D.N.Y. Jan. 4, 2019) ("It is well-established in this Circuit that ... 'Rule 8(a) is violated where a plaintiff, by engaging in group pleading, fails to give each defendant fair notice of the claims against it' ") (quoting Canon U.S.A., Inc. v. F & E Trading LLC, No. 215 Cv. 6015 (DRH), 2017 WL 4357339, at *7 (E.D.N.Y. Sept. 29, 2017)).

While the Court declines to find that dismissal under Rule 8 is warranted,[16] plaintiff's counsel's reliance on group pleading has placed an inexcusable burden on defendants and this Court. See Cannon v. NYS Comm'r of Soc. Servs., No. 19 Civ. 6493 (CM), 2019 WL 3743975, at *2 (S.D.N.Y. Aug. 7, 2019) (failure to comply with Rule 8 presents "far too [heavy a] burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [a plaintiff's] claims") (quoting Jackson v. Onondaga Cty., 549 F. Supp. 2d 204, 212 (N.D.N.Y. 2008)) (alteration in original); cf. McClean v. Cty. of Westchester, No. 17 Civ. 4492 (CS), 2018 WL 6329420, at

*6 (S.D.N.Y. Dec. 3, 2018) ("Were Plaintiff pro se and entitled to 'special solicitude,' the hours spent unraveling his claims and arguments would have been appropriate. But the Court should not have to make such efforts when the plaintiff is represented by counsel") (citation omitted). Plaintiff's counsel would be well advised to review the requirements of Rule 8 prior to making any additional filings in this Court.

16      "Dismissal under Rule 8 is 'usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised.' " Warner Bros. Entm't Inc. v. Ideal World Direct, 516 F. Supp. 2d 261, 269 (S.D.N.Y. 2007) (quoting Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988)).

With the foregoing deficiencies in mind -- and with the numerous difficulties arising therefrom never far from view -- the Court turns to plaintiff's first cause of action, asserted against all defendants, for deliberate indifference to plaintiff's serious medical needs pursuant to 42 U.S.C. § 1983.

### A. Deliberate Indifference to Serious Medical Need

As a preliminary matter, the amended complaint does not address explicitly whether plaintiff was a pretrial or post-trial detainee at the time of the events alleged. This is relevant because deliberate indifference claims brought by pretrial detainees are governed by the Fourteenth Amendment Due Process Clause rather than the Eighth Amendment Cruel and Unusual Punishments Clause,[17] and because the analysis differs depending upon the constitutional basis for the claim.

17      Deliberate indifference claims brought by pretrial detainees "are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment ... because [p]retrial detainees have not been convicted of a crime and thus may not be punished in any manner -- neither cruelly and unusually nor otherwise." Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017) (alteration in original) (internal quotation marks omitted).

 *7  "To state a claim for deliberate indifference to serious medical needs pursuant to 42 U.S.C. § 1983, a detainee must satisfy a two-pronged test: First, the 'alleged deprivation of adequate medical care must be sufficiently serious.' " Davis v. McCready, No. 14 Civ. 6405 (GHW), 2017 WL 4803918,

Haynes v. City of New York, Not Reported in Fed. Supp. (2020)

2020 WL 4926178

at *4 (S.D.N.Y. Oct. 23, 2017) (quoting Lloyd v. City of New York, 246 F. Supp. 3d 704, 717 (S.D.N.Y. 2017)). "Second, the defendant must act with a 'sufficiently culpable state of mind.' " McCready, 2017 WL 4803918, at *4 (quoting Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996)). While it used to be the case in this circuit that both prongs of the deliberate indifference test were analyzed under the same standard regardless of whether the claim was brought under the Eighth or Fourteenth Amendment, the Second Circuit held in Darnell v. Pineiro that the second prong of the analysis -- referred to as the *mens rea* prong -- differs depending on whether the inmate is a convicted prisoner or a pretrial detainee. 849 F.3d at 35. Specifically:

> Deliberate indifference under the Eighth Amendment ... means that a prison official 'appreciate[d] the risk to which a prisoner was subjected.' In contrast, after Darnell, a plaintiff suing under the Fourteenth Amendment is required to show only that the prison official acted with objective recklessness, or that the defendant 'knew, or should have known' that 'an excessive risk to health or safety' would result.

Grimmett v. Corizon Med. Assocs. of New York, No. 15 Civ. 7351 (JPO), 2017 WL 2274485, at *4 (S.D.N.Y. May 24, 2017) (quoting Darnell, 849 F.3d at 35) (citations omitted). [18] Stated differently, whereas the *mens rea* prong of the deliberate indifference analysis previously was assessed subjectively under both the Eighth and Fourteenth Amendments (i.e., an assessment of whether the defendant had actual knowledge that his conduct created an excessive risk of harm), the second prong, post-Darnell, may be assessed objectively (i.e., an assessment of whether the defendant *knew or should have known* of an excessive risk of harm) if the claim is brought by a pre-trial detainee. As courts in this district have acknowledged, the post-Darnell analysis applicable in cases involving pre-trial detainees will often prove challenging at the motion to dismiss stage. See, e.g., McCready, 283 F. Supp. 3d at 120 ("In determining whether [a pre-trial detainee] has pleaded sufficient facts to plausibly suggest that the *mens rea* prong is satisfied, following Darnell, the Court is faced with a difficult task. It is called upon to determine, without the benefit of medical expertise, whether an objectively reasonable person in [the defendant's] position would have known, or should have known, that [the defendant's] actions or omissions posed an excessive risk of harm to [the plaintiff].").

[18] While Darnell involved allegations of deliberate indifference to unconstitutional conditions of confinement and did not explicitly reference deliberate indifference to a detainee's serious medical needs, "[t]he reasoning of Darnell applies equally to claims of deliberate indifference to serious medical needs under the Fourteenth Amendment." Lloyd, 246 F. Supp. 3d at 718.

Here, notwithstanding the reliance by plaintiff's counsel on case law applying the standard applicable to convicted prisoners under the Eighth Amendment, see ECF No. 63 at 18-20, [19] the Court suspects -- and will assume for purposes of the pending motion -- that plaintiff was a pretrial detainee at the time of the events alleged. [20] See Knight v. City of New York, No. 19 Civ. 04022 (GHW), 2020 WL 2115411, at *5 (S.D.N.Y. May 1, 2020) ("Because it must draw all reasonable inferences in Plaintiff's favor, the Court will assume for purposes of this motion that Plaintiff was a pretrial detainee at the time Defendants allegedly violated his constitutional rights"); cf. Weyant v. Okst, 101 F.3d 845, 856 (2d Cir. 1996) ("[A]n unconvicted detainee's rights are at least as great as those of a convicted prisoner.").

[19] Plaintiff appears to have presumed that a claim for deliberate indifference to a serious medical condition is analyzed under the same standard regardless of whether the claim is brought under the Eighth or Fourteenth Amendment. See ECF No. 63 at 18 n.2 ("[t]he Eighth Amendment analysis applies to claims of pretrial detainees pursuant to the Fourteenth Amendment").

[20] Among other things, the amended complaint alleges that plaintiff was taken to MDC on the day of his arrest and that he was transferred to a state facility after the events in question. Cf. Ferguson v. Cai, No. 11 Civ. 6181 (PAE), 2012 WL 2865474, at *3 (S.D.N.Y. July 12, 2012) ("Although plaintiff's pleadings do not identify whether he was a pre-trial or post-trial detainee at the time of the incident -- and, therefore, whether the violation he claims is of the Fourteenth or Eighth Amendment -- the Court surmises that he was a pre-trial detainee because he was moved from Rikers Island to a New York State correctional facility sometime after the incident.").

**\*8** Having resolved the foregoing, the Court briefly reviews the two prongs of the deliberate indifference test (i.e., the "objective prong" and the "*mens rea* prong"), before

Haynes v. City of New York, Not Reported in Fed. Supp. (2020)

2020 WL 4926178

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 123 of 201

evaluating plaintiff's deliberate indifference claim as against the various categories of individual defendants.

### 1. Objective Prong [21]

[21] The analysis under the objective prong of the deliberate indifference test remains the same, post-Darnell, for pretrial detainees and convicted prisoners. See Darnell 849 F.3d at 30.

The first prong of the deliberate indifference test entails two inquiries: "whether the prisoner was actually deprived of adequate medical care," and, if so, "whether the inadequacy in medical care is sufficiently serious." Salahuddin v. Goord, 467 F.3d 263, 279-80 (2d Cir. 2006). Because a prison official is required only to provide "reasonable care," id. at 279, a detainee is deprived of adequate medical care only insofar as prison officials, including prison medical personnel, have failed " 'to take reasonable measures' in response to a medical condition," id. (quoting Farmer, 511 U.S. at 847). The second inquiry (i.e., whether the inadequacy is sufficiently serious), "requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." Id. at 280. If the conduct involves an alleged "failure to provide *any* treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." Id. (emphasis added). However, where the offending conduct is the "medical treatment given, the seriousness inquiry is narrower." Id. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.' " Id. (quoting Smith v. Carpenter, 316 F.3d 178, 185 (2d Cir. 2003)) (emphasis omitted).

Here, in an apparent effort to dismiss defendants' assessment that plaintiff's claim "is not for a failure to provide treatment but instead a claim for delay or inadequacy of treatment," ECF No. 63 at 23, plaintiff insists he "is not alleging that there were short-term delays and inadequacies of treatment surrounded by otherwise acceptable care, but rather that there were short-term provisions of inadequate care surrounded by otherwise non-existent and/or cursory care," ECF No. 63 at 23-24. However, this characterization of plaintiff's deliberate indifference claim -- perhaps because it was not originally tailored to the facts and circumstances of plaintiff's case [22] -- is belied by plaintiff's 1000+ page medical record documenting a course of treatment that, however suboptimal it may have been, cannot credibly be described as "non-existent and/or cursory." ECF No. 63 at 23-24. To be sure, during the time period in question plaintiff was treated by medical professionals on dozens of occasions for, inter alia, dressing changes, wound and colostomy care, and dermatology and gastrointestinal consults, and was prescribed numerous topical treatments and medications for his skin condition and pain. See ECF No. 58, Exs. B, C.

[22] Plaintiff's counsel appears to have copied this line verbatim (along with quite a few others throughout its brief) from a memorandum of law filed by another law firm in an unrelated case. See Plaintiff's Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Amended Complaint, Vassallo v. City of New York, No. 15 Civ. 7125 (KPF), 2016 WL 6902478 (S.D.N.Y. Nov. 22, 2016), ECF No. 56 at 21 ("Plaintiff is not alleging that there were short-term delays and inadequacies of treatment surrounded by otherwise acceptable care, but rather that there were short-term provisions of inadequate care surrounded by otherwise non-existent and/or cursory care."). Plaintiff's opposition contains numerous other examples of lines copied verbatim from that filing. To the extent verbatim use of another's briefing language is not in itself a *per se* violation of ABA Model Rule 8.4(c), see, e.g., NYC Bar Formal Opinion 2018-3: Ethical Implications of Plagiarism in Court Filings, the Court strongly cautions plaintiff's counsel against such practice. Here, not only has it resulted in arguments that are insufficiently specific and thus lacking in their persuasiveness, but it appears to have also resulted in the application of an outdated standard for deliberate indifference claims brought by pre-trial detainees. See supra at 20, n.19. Indeed, assuming the Court is correct that plaintiff is a pre-trial detainee, plaintiff's counsel's reliance on stock language applying the pre-Darnell deliberate indifference standard was incorrect in a manner potentially *detrimental* to his client.

**\*9** Accordingly, while the Court does not question the severity of plaintiff's Hirschsprung's disease, the Court has no trouble concluding that the appropriate focus when evaluating the objective prong of the deliberate analysis is "the particular

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 124 of 201

Haynes v. City of New York, Not Reported in Fed. Supp. (2020)

2020 WL 4926178

risk of harm faced by [plaintiff] due to the challenged deprivation of care, rather than the severity of the [his] underlying medical condition." Smith, 316 F.3d at 186.

### 2. Mens Rea Prong

"Under the second prong of the deliberate indifference analysis, a plaintiff must show that a defendant acted with a sufficiently culpable state of mind." Grimmett, 2017 WL 2274485, at *4. A pretrial "detainee asserting a Fourteenth Amendment claim for deliberate indifference to his medical needs can allege either that the defendants *knew* that failing to provide the complained of medical treatment would pose a substantial risk to his health or that the defendants *should have known* that failing to provide the omitted medical treatment would pose a substantial risk to the detainee's health." Charles v. Orange Cty., 925 F.3d 73, 87 (2d Cir. 2019) (emphasis in original).

Of course, "not every lapse in medical care is a constitutional wrong," Salahuddin, 467 F.3d at 279, and allegations of negligence generally are insufficient to state a constitutional claim. See, e.g., Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998) ("[N]egligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim"); Darnell, 849 F.3d at 36 (Deliberate indifference "requires proof of a *mens rea* greater than mere negligence"). Thus, "the fact that a plaintiff feels that more should have been done for his condition is not a sufficient basis for a deliberate indifference claim." Brown v. McElroy, 160 F. Supp. 2d 699, 706 (S.D.N.Y. 2001).

\* \* \*

While the gravamen of plaintiff's amended complaint is that numerous named and unnamed "defendants" failed to adequately and timely treat conditions associated with plaintiff's Hirschsprung's disease, plaintiff's claims -- which pertain not to a single incident involving a single defendant but rather to numerous incidents spanning an approximately sixteen month period during which plaintiff was housed at and transferred between multiple facilities -- cannot be singularly characterized or assessed. Thus, for the sake of analytical clarity, the Court separately analyzes plaintiff's deliberate indifference claim insofar as it is alleged against discrete categories of individual defendants (i.e., the Defendant Healthcare Workers, the Senior Officials, MDC Captains

Winwick, Avin and Lee, and the John/Jane Doe Officer defendants).[23]

> [23]  Plaintiff has sued all of the individual defendants in their individual and official capacities. FAC ¶ 127. However, the official capacity claims are duplicative of plaintiff's claims against the entity defendants. See Davis v. Stratton, 360 F. App'x 182, 183 (2d Cir. 2010) ("[I]n a suit against a public entity, naming officials of the public entity in their official capacities 'add[s] nothing to the suit' ") (quoting Gernetzke v. Kenosha Unified Sch. Dist. No. 1, 274 F.3d 464, 466 (7th Cir. 2001)); Phillips v. Cty. of Orange, 894 F. Supp. 2d 345, 385 at n.35 (S.D.N.Y. 2012) ("Within the Second Circuit, where a plaintiff names both the municipal entity and an official in his or her official capacity, district courts have consistently dismissed the official capacity claims as redundant.").

 **\*10**  By way of preview, the Court finds that where plaintiff has adequately pleaded the personal involvement of the individual defendants -- and in many instances he has not -- he has failed to adequately plead that those defendants "acted intentionally to impose [his] alleged condition, or recklessly failed to act with reasonable care to mitigate the risk" posed by his condition. Darnell, 849 F.3d at 35. Stated differently, plaintiff has failed to adequately allege that *any* of the individual defendants acted with the requisite deliberate indifference. The Court accordingly dismisses plaintiff's Section 1983 deliberate indifference claim as to all defendants pursuant to Rule 12(b)(6).

### 3. Deliberate Indifference Claim against Defendant Healthcare Workers

As noted previously, plaintiff's claims against the 200+ Defendant Healthcare Workers rely almost exclusively on impermissible group-wide allegations. Plaintiff's deliberate indifference claim as to the Defendant Healthcare Workers must be dismissed at the outset to the extent the amended complaint fails to put them on notice as to the basis for the claim against them. See Leneau v. Ponte, No. 1:16 Civ. 776 (GHW), 2018 WL 566456, at *15 (S.D.N.Y. Jan. 25, 2018), appeal dismissed (July 16, 2018) ("[C]omplaints that rely on 'group pleading' and 'fail to differentiate as to which defendant was involved in the alleged unlawful conduct are insufficient to state a claim' ") (quoting Adamou v. Cty. of

Haynes v. City of New York, Not Reported in Fed. Supp. (2020)

2020 WL 4926178

Spotsylvania, Virginia, No. 112 Civ. 07789 (ALC), 2016 WL 1064608, at *11 (S.D.N.Y. Mar. 14, 2016)).

In the several instances in which plaintiff makes specific allegations regarding individually named Defendant Healthcare Workers, the allegations -- though they may in certain instances state a claim for negligence -- fail to rise to the level of deliberate indifference. The allegations raised against specific Defendant Healthcare Workers are briefly addressed in turn.

### i. Marianna Ustiak, RN and Landis Barnes, MD

Plaintiff alleges that following his initial medical examination at MDC, MDC's Defendant Healthcare Workers, "including but not limited to Defendants MARIANNA USTIAK, RN and/or LANDIS BARNES, MD,"[24] purportedly failed to change plaintiff's ileostomy bag until approximately February 6, 2018. See FAC ¶ 50. Because of the failure to change plaintiff's ileostomy bag during that period, plaintiff alleges that by February 6, 2018, his ileostomy bag "had leaked fecal matter around the stomach area creating painful lesions and visible bumps on the skin around the ileostomy site." FAC ¶ 50. Plaintiff's skin condition allegedly worsened as a result of defendants' failure to ensure he had access to a sufficient amount of ileostomy supplies, as "[e]ach time Defendants failed to provide Plaintiff's ileostomy supplies, his ileostomy bag continued to leak more fecal matter over the very painful lesions[.]" FAC ¶ 57. Plaintiff alleges that a dermatologist eventually diagnosed his skin condition as a rash. See FAC ¶ 84.

[24]  Even here, plaintiff arguably has relied on impermissible group pleading. See Targum v. Citrin Cooperman & Co., LLP, No. 12 Civ. 6909 (SAS), 2013 WL 6087400, at *6 (S.D.N.Y. Nov. 19, 2013) (describing the use of "and/or" between the names of defendants as a form of group pleading that "fails to put [each defendant] on notice of the specific allegations against it").

While troubling, these allegations do not rise to the level of deliberate indifference.

With respect to the first prong of the deliberate indifference analysis, the Second Circuit has explained that when evaluating whether delayed or otherwise inadequate treatment is "sufficiently serious," "the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." Smith, 316 F.3d at 187. While "[t]here is no 'static test' to determine whether a deprivation is sufficiently serious," Darnell, 849 F.3d at 30, "[a] skin rash is generally insufficient to meet the objective requirement of a sufficiently grave and serious condition giving rise to a deliberate indifference claim," Purdie v. City of New York, No. 10 Civ. 5802 (PKC), 2011 WL 1044133, at *3 (S.D.N.Y. Mar. 15, 2011) (collecting examples). It is also true, however, that "[w]here temporary delays or interruptions in the provision of medical treatment have been found to satisfy the objective seriousness requirement in this Circuit, they have involved either a needlessly prolonged period of delay, *or a delay which caused extreme pain* or exacerbated a serious illness." Ferguson, 2012 WL 2865474, at *4 (emphasis added). Here, because plaintiff has alleged that his skin condition caused him to experience "excruciating" pain, FAC ¶¶ 2, 55, 84, the Court declines to conclude that the harm incurred due to defendants' failures to change his ileostomy bag was not "sufficiently serious" for purposes of satisfying the first prong of the deliberate indifference analysis.

**\*11**  However, plaintiff has still failed to state a claim for indifference against Defendant Healthcare Workers Marianna Ustiak "and/or" Landis Barnes (or any others not explicitly listed), because plaintiff has failed to allege facts suggesting that any of them "knew or should have known" that a failure to change his ileostomy with greater frequency could pose an "excessive risk" to plaintiff's health. See Charles, 925 F.3d at 87 ("[A] [pretrial] detainee asserting a Fourteenth Amendment claim for deliberate indifference to his medical needs can allege either that the defendants *knew* that failing to provide the complained of medical treatment would pose a substantial risk to his health or that the defendants *should have known* that failing to provide the omitted medical treatment would pose a substantial risk to the detainee's health."). Despite his repeated efforts to do so, plaintiff cannot simply rely on general allegations concerning what he told "MDC's Defendant Healthcare Workers" during his initial evaluation (i.e., regarding it being "medically necessary" to change plaintiff's ileostomy bag twice per day, see ECF No. 63 at 11), in order to impute the requisite awareness onto *all* of the 200+ Defendant Healthcare Workers. Absent facts demonstrating that specific healthcare workers possessed such awareness, plaintiff's allegations concerning their deliberate indifference is purely speculative and does not permit the requisite inference regarding what any particular defendant "knew

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 126 of 201

Haynes v. City of New York, Not Reported in Fed. Supp. (2020)

2020 WL 4926178

or should have known" regarding his medical treatment. Charles, 925 F.3d at 87.

Indeed, even if plaintiff had alleged such facts, it is far from clear that a 5-day delay in changing plaintiff's ileostomy bag would rise to the level of a constitutional violation. See Demata v. New York State Corr. Dep't of Health Servs., 198 F.3d 233 (2d Cir. 1999) ("Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, this Court has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment."). [25] The Court accordingly dismisses plaintiff's deliberate indifference claim against Marianna Ustiak, Landis Barnes, and any other Defendant Healthcare Worker insofar as it is premised on the alleged failures to change plaintiff's ileostomy bag with greater frequency.

[25]    See also Whitfield v. O'Connell, No. 09 Civ. 1925 (WHP), 2010 WL 1010060, at *7 (S.D.N.Y. Mar. 18, 2010), aff'd, 402 F. App'x 563 (2d Cir. 2010). ("Even if, as [plaintiff] alleges, basic medical procedure required [the defendants] to 'take appropriate additional steps' ... this is at most negligence, not deliberate indifference."); cf. Ayala v. Terhune, 195 F. App'x 87, 91 (3d Cir. 2006) ("Although the defendants may have failed to provide a new colostomy bag to [plaintiff] on occasion, at best, their failure amounts to negligence, not deliberate indifference.").

### ii. Todd Cowdery, MD

Plaintiff alleges that Dr. Todd Cowdery "[mis]diagnosed the bumps around Plaintiff's stomach as a condition known as Pyoderma-Gangrenosum" and that plaintiff was prescribed an antibiotic and increased pain medication as a result of Dr. Cowdery's misdiagnosis. FAC ¶ 77. Plaintiff does not, however, allege facts suggesting that the misdiagnosis was intentional or reckless, or that Dr. Cowdery somehow should have known that his misdiagnosis and associated treatment would cause plaintiff to suffer serious pain. To the extent plaintiff is alleging that Dr. Cowdery's misdiagnosis was negligent, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment," Estelle v. Gamble, 429 U.S. 97, 106 (1976), precisely because "allegations of negligent misdiagnosis ...

do not suggest that the defendant acted with a conscious disregard to inmate health or safety," Williams v. Williams, No. 13 Civ. 3154 (RA), 2015 WL 568842, at *7 (S.D.N.Y. Feb. 11, 2015). [26]

[26]    Plaintiff claims to have been "denied his right to be examined by a specialist," ECF No. 63 at 20, and repeatedly suggests that his misdiagnoses were a function of his being seen by "non-specialist doctors unable to correctly diagnose Plaintiff's condition. See, e.g., ECF No. 63 at 13. However, any claim premised upon a failure to have been seen by a specialist reflects, at most, disagreement over proper treatment and does not rise to the level of a constitutional violation. See Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001) ("[D]isagreements over medications, diagnostic techniques[,].... *or the need for specialists or the timing of their intervention*, are not adequate grounds for a Section 1983 claim") (emphasis added). See also Chance, 143 F.3d at 703 ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim"); cf. Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986) ("It must be remembered that the State is not constitutionally obligated, much as it may be desired by inmates, to construct a perfect plan for [medical] care that exceeds what the average reasonable person would expect or avail herself of in life outside the prison walls.").

**\*12** Plaintiff's claim for deliberate indifference against Dr. Cowdery is accordingly dismissed.

### iii. Gloria Ihenacho, MD, Robert Reader, MD, and Patricio B. Lynn, MD

With respect to plaintiff's allegation that defendants Gloria Ihenacho, MD, Robert Reader, MD, "and/or" Patricio B. Lynn, MD, attempted to "push [plaintiff's] mucous fistula back into his stomach with his/her hands ... caus[ing] Plaintiff extreme pain and discomfort," FAC ¶ 71, plaintiff offers no suggestion that these defendants "acted with a sufficiently culpable state of mind." Grimmett, 2017 WL 2274485, at *4. To the contrary, plaintiff suggests that the purported mistreatment was a function of the defendants having "little to no experience regarding Plaintiff's condition." FAC ¶ 71. If anything, lack of experience cuts against a finding that

2020 WL 4926178

any of these defendants "act[ed] or fail[ed] to act under circumstances in which [they] knew, or should have known, that a substantial risk of serious harm to the pretrial detainee would result." Feliciano v. Anderson, No. 15 Civ. 4106 (LTS), 2017 WL 1189747, at *13 (S.D.N.Y. Mar. 30, 2017).

Plaintiff accordingly has failed to state a deliberate indifference claim against these defendants.

#### iv. Additional Defendant Healthcare Workers

Finally, the Court notes that a number of the individually named Defendant Healthcare Workers, including, but not limited to, Grace Oh, MD, Michael Shen, MD, Andrew Capsopoulos and Anna Barrios, are not even included among the defendants alleged to have inadequately treated plaintiff. Rather, they are named only once in the amended complaint in a multi-page paragraph that lists each and every one of the 200+ Defendant Healthcare Workers. See FAC ¶ 37. Plaintiff's claims against these defendants, and all others against whom claims are alleged solely on a group-wide basis, see supra at 14-15, must be dismissed for failure to plead personal involvement. See King v. Falco, No. 16 Civ. 6315 (VB), 2018 WL 6510809, at *7 (S.D.N.Y. Dec. 11, 2018) (claims "must be dismissed for plaintiff's failure to plead [the defendant's] personal involvement" where plaintiff had "include[d] [the defendant's] name in the case caption but fail[ed] to make any substantive allegations against her in the body of the complaint").

* * *

For the foregoing reasons, plaintiff has failed to state a claim against any of the 200+ Defendant Healthcare Workers. Plaintiff's deliberate indifference claim against those defendants is accordingly dismissed.

#### 4. Deliberate Indifference Claim against "Senior Officials"

Plaintiff's claims against defendants Commissioner Brann, MDC Warden Moses, BPW Warden Joe Doe and NIC Warden John Doe (the "Senior Officials") are based solely on a theory of supervisory liability. See, e.g., FAC ¶ 36 ("Defendants Commissioner Brann, MDC Warden Moses, BPW Warden Doe and NIC Warden Doe ... were, at all times relevant hereto, senior officials who exercised policymaking, supervisory, and

disciplinary authority on behalf DOC"); ECF No. 63 at 32 ("DOC and its supervisory officials were the gateway to Plaintiff obtaining medical examinations and treatment, as without their approval and collaboration, Plaintiff could not be transported to and/or examined at any emergency care center, clinic, hospital, or specialist."). However, "[i]t is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983," Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) (quoting Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)), and that an individual accordingly cannot be liable for damages under § 1983 "merely because he held a high position of authority," Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). Rather, "a plaintiff must establish a given defendant's personal involvement in the claimed violation." Patterson v. Cty. of Oneida, N.Y., 375 F.3d 206, 229 (2d Cir. 2004). Specifically, a plaintiff must allege with respect to a supervisory official that:

> **\*13** (1) [he or she] participated directly in the alleged constitutional violation, (2) [he or she], after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) [he or she] created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) [he or she] was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) [he or she] exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Brandon v. Kinter, 938 F.3d 21, 36–37 (2d Cir. 2019) (quoting Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)). In practice, this means that "[t]he bare fact that [a defendant] occupies a high position in the New York prison hierarchy is insufficient to sustain [a plaintiff's] claim." Colon, 58 F.3d at 874.

Here, plaintiff has failed to proffer any facts demonstrating the Senior Officials' personal involvement. [27] For example, the FAC, while long on high level descriptions of Commissioner

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 128 of 201

Haynes v. City of New York, Not Reported in Fed. Supp. (2020)

2020 WL 4926178

Brann's job responsibilities, is wholly devoid of allegations supporting an inference that Commissioner Brann directly participated in, authorized, or was ever even made aware of the deprivations alleged. See, e.g., FAC ¶¶ 27, 28 (detailing Commissioner Brann's responsibilities as outlined in the New York City Charter); FAC ¶ 29 (alleging that, as DOC Commissioner, Commissioner Brann was responsible for "the drafting, promulgation and implementation of DOC policies, practices and directives; the training, supervision, promotion, demotion, discipline and conduct of all DOC personnel, ... the custody, control and care of all prisoners confined to the City's jails and hospital prison wards; and the enforcement of DOC rules and ensuring that DOC personnel obey the laws of the United States, the State of New York, and the City of New York"). Similarly, the FAC recites in general terms MDC Warden Moses's supervisory responsibilities, see FAC ¶ 30 (describing his responsibility for "the care, custody, and control of all inmates, as well as the supervision of all staff in MDC"), but does not contain a single, non-conclusory allegation regarding his involvement in or knowledge of the purported violations. BPW Warden Joe Doe and NIC Warden John Doe likewise appear to be named in the FAC solely because of their general responsibility for "the care, custody, and control of all inmates, as well as the supervision of all staff" at their respective facilities, see FAC ¶¶ 31, 35, but the complaint lacks allegations suggesting that either had direct involvement in, supervised, or were otherwise informed of the purported deprivations.

[27]    While the Second Circuit "ha[s] observed that Iqbal may have heightened the requirements for supervisory liability by requiring more direct personal involvement," that issue need not be addressed "where, as here, the allegations are also insufficient to state a claim under Colon." Lombardo v. Graham, 807 F. App'x 120, 124 n.1 (2d Cir. 2020).

While plaintiff proffers conclusory and formulaic allegations that the Senior Officials "created or allowed the continuance of [a] custom under which inmates were illegally and excessively deprived of access to adequate medical care," FAC ¶ 125, boilerplate allegations of that nature are insufficient to state a claim. See, e.g., McNair v. Ponte, No. 16 Civ. 1722 (LAP), 2019 WL 1428349, at *9 (S.D.N.Y. Mar. 29, 2019) ("[P]laintiff's claim that the Supervisory Defendants 'created' the alleged D.O.C. customs or policies under which unconstitutional practices occurred ... fails because 'it merely alleges a legal conclusion and thus fails as a matter of law' ") (quoting Lara-Grimaldi v. Cty. of Putnam, No. 17 Civ. 622

(KMK), 2018 WL 1626348, at *12 n.9 (S.D.N.Y. Mar. 29, 2018)); see also Koehl v. Bernstein, No. 10 Civ. 3808 (SHS) (GWG), 2011 WL 2436817, at *19 (S.D.N.Y. June 17, 2011), report and recommendation adopted, No. 10 Civ. 3808 (SHS), 2011 WL 4390007 (S.D.N.Y. Sept. 21, 2011) ("[C]onclusory allegations that a defendant was involved in the creation and enforcement of unconstitutional policies cannot sustain a claim of personal involvement.").

*14  In short, plaintiff's allegations concerning the "Senior Officer" defendants fail to provide a sufficient basis for subjecting them to liability under § 1983 and accordingly are dismissed.

### 5. Deliberate Indifference Claim against MDC Captains Winwick, Lee and Avin and John/Jane Does #1-25

Plaintiff has failed to allege that MDC Captain Winwick, MDC Captain Lee, or MDC Captain Avin actually deprived him of adequate medical care, much less that those defendants were deliberately indifferent to plaintiff's serious medical needs.[28]

[28]    While non-medical personnel may be found to have engaged in deliberate indifference, "a plaintiff must 'prove that [nonmedical] prison personnel intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problems known to the attendant prison personnel or that the inmate suffered a complete denial of medical treatment.' " Roundtree v. City of New York, No. 15 Civ. 8198, 2018 WL 1586473, at *6 (S.D.N.Y. Mar. 28, 2018) (quoting Hodge v. Coughlin, 1994 WL 519902, at *11 (S.D.N.Y. Sept. 22, 1994)).

The FAC alleges that Captain Winwick ignored plaintiff's "numerous pleas" for his mother to bring him ileostomy supplies. FAC ¶ 60. The FAC goes on to allege, however, that Captain Winwick assured Plaintiff that she would raise plaintiff's request with the "Assistant Warden," and that plaintiff's mother ultimately *was* permitted to bring plaintiff the requested supplies. FAC ¶ 62. These facts fail to raise an inference, as plaintiff argues in opposition, that "Captain Winwick was made aware of Plaintiff's medical condition and knew that he required medical assistance, but willfully chose to ignore Plaintiff's pleas and caused Plaintiff's condition deteriorate [*sic*] for two weeks and leaving him to deal with

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 129 of 201

Haynes v. City of New York, Not Reported in Fed. Supp. (2020)

2020 WL 4926178

excruciating pain as a result of the fecal matter pouring over the painful lesions he developed." ECF No. 63 at 30. To the contrary, plaintiff has failed to proffer any non-conclusory facts suggesting that Captain Winwick -- a corrections official undoubtedly untrained to identify medical need -- was actually aware that plaintiff had developed a painful skin condition for which additional ileostomy supplies were needed. Nor does the amended complaint plead facts suggesting that there was a ready supply of ileostomy bags that Captain Winwick or any of the other MDC Captains or Defendant Healthcare Workers consciously withheld. Absent such circumstances, the fact that plaintiff may have complained repeatedly to Captain Winwick of his need for additional supplies does not suffice to make out a claim for deliberate indifference. Cf. Roundtree, 2018 WL 1586473, at *10 ("While [plaintiff] may have complained repeatedly about his [medical condition], the Complaint fails to allege that Defendants expressly refused to treat him and that his requests for treatment were rejected for an invalid reason or to punish him."). [29]

[29]  Plaintiff maintains that he "requires further discovery including deposition testimony to ascertain the substance of the conversation between Captain Winwick and the Wardens of the MDC with regards to Plaintiff's condition." ECF No. 63 at 32. Discovery is not warranted, however, where, as here, it would amount to a "fishing expedition for evidence in search of a theory that has yet to be asserted." In re Alper Holdings USA, Inc., 398 B.R. 736, 754 (S.D.N.Y. 2008).

**\*15** Plaintiff separately alleges that "Captains Lee and Avin failed to take Plaintiff to his appointments at Bellevue Hospital, completely disregarding the orders from MDC's doctors." ECF No. 63 at 29-30; see also FAC ¶ 93 ("Plaintiff's transfer [to NIC] was affected because the MDC Defendants, including but not limited to MDC Captain Avin, were unable to transport Plaintiff to BPW for his doctor's appointments, despite a duty to do so."). For one, general allegations regarding the MDC Captains' collective or individual involvement in cancelling or delaying plaintiff's appointments or otherwise impeding his ability to obtain treatment, without any factual allegations supporting when or why the appointments were cancelled or delayed, are insufficient to state a claim. [30] Nor can such allegations plausibly be squared with a medical record documenting numerous medical appointments and treatments during the period in question.

[30]  The Court regards with some skepticism plaintiff's attempts to add greater specificity to his claims against the MDC Captains in his opposition. For example, whereas the FAC states only that plaintiff was *referred* to BPW on February 21, 2018, plaintiff's opposition to defendants' motion to dismiss appears to presume that plaintiff actually had an appointment at BPW on February 21, 2018 and that "MDC Personnel, including Defendant Captains Winwick, Lee, and/or Avin, failed to take Plaintiff to BPW at the appointment time and caused Plaintiff to miss his appointment." ECF No. 63 at 12.

While plaintiff maintains that his medical records show that plaintiff had made several "311 complaints" to Captains Winwick, Lee and Avin and thus that the Captains were on notice of his condition and his need for medical treatment, see ECF No. 63 at 31, the medical records do not even contain a reference to Captain Winwick, and the references to Captains Avin and Lee have nothing to do with the specific claims asserted against them. The reference to Captain Avin states only that Captain Avin had notified a medical provider of plaintiff's 311 complaint concerning his not having been transferred to *NIC* (not BPW), and in any event contains no suggestion that Captain Avin was aware of and disregarded risks associated with his underlying medical condition. See ECF No. 58, Ex. B at 231 ("Captain Avin came and notified me this [patient] had 311 complaint because, despite DOC being given sevl dispos [*sic*] never went to NIC."). Similarly with respect to Captain Lee, a progress note from October 24, 2018 states that "client filed a 311 complaint with DOC" and that "DOC Capt Lee was looking for some dates regarding BVH Clinic appointment as part of the 311 complaint investigation." See ECF No. 58, Ex. B at 269. The reference to Captain Lee indicates, if anything, that Captain Lee was involved in investigating and attempting to resolve plaintiff's complaints.

Plaintiff's claims against DOC Officers John/Jane Does #1-25 (referred to collectively as the "Defendant Officers"), which rely entirely on group pleading, fare no better. See, e.g., FAC ¶ 64 (alleging that "Defendant Officers and Defendant Healthcare Workers kept cancelling Plaintiff's hospital appointments for no legitimate or lawful reason"). Bare allegations that groups of defendants failed on multiple occasions to take plaintiff to appointments "for no legitimate or lawful reason," do not suffice.

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 130 of 201

Haynes v. City of New York, Not Reported in Fed. Supp. (2020)

2020 WL 4926178

In summary, plaintiff has not pled a sufficiently serious medical condition that was met with deliberate indifference by the MDC Captains or by the John/Jane Doe Defendants, and plaintiff's claims against those defendants accordingly are dismissed.

\* \* \*

While the wide-ranging and ill-defined nature of plaintiff's claims against various groups and subgroups of defendants, discussed supra, have made it difficult for the Court to address each and every one of plaintiff's allegations, the FAC broadly alleges claims arising from: (i) the failure of named and unnamed Defendant Healthcare Workers to change plaintiff's ileostomy bag with sufficient frequency; (ii) the failures of certain MDC personnel to take plaintiff to his medical appointments, resulting in delayed treatments; and (iii) the failure of certain defendants to ensure that plaintiff was examined in a timely manner by specialists, which purportedly resulted in, inter alia, plaintiff's skin condition being misdiagnosed.

**\*16** Certain of plaintiff's allegations may well support a claim for negligence. However, and particularly in light of the amount of documented medical care that plaintiff received in connection with his Hirschsprung's disease, the allegations plainly do not amount to a constitutional violation supporting a claim for deliberate indifference under § 1983. Cf. Vassallo, 2016 WL 6902478, at \*11 ("At bottom, the FAC alleges that this care was inadequate because it was characterized by delay, irregularity, misdiagnoses, and suboptimal treatment options, but these allegations do not rise to the level of a constitutional violation"); see also Chance, 143 F.3d at 703 ("[N]egligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim.").

Defendants' motion to dismiss plaintiff's § 1983 claim for deliberate indifference accordingly is granted.

### B. Monell

"To state a § 1983 claim against a municipality, the plaintiff must allege that an officially adopted policy or custom caused his injury." Ferguson v. Cai, No. 11 Civ. 6181 (PAE), 2012 WL 2865474, at \*5 (S.D.N.Y. July 12, 2012); see also Zahra v. Town of Southold, 48 F.3d 674, 685 (2d Cir. 1995) ("To hold a municipality liable [under Monell], 'a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right' ")

(quoting Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983)). Conclusory allegations regarding alleged customs or practices are insufficient.

Plaintiff attempts to assert a Monell claim against the City and HHC based upon defendants' purported policies of, inter alia: (i) "refusing to provide Plaintiff with adequate ileostomy supplies," FAC ¶ 136; and (ii) "refusing to allow individuals to be admitted to a hospital and/or receive ileostomy supplies pending hospital admission," FAC ¶ 137. However, the amended complaint alleges only that plaintiff did not receive ileostomy supplies on the several occasions in which the supplies were out of stock. The amended complaint is devoid of facts suggesting that defendants ever "refused" to provide plaintiff -- or any other inmate -- ileostomy supplies to the extent they were available. The existence of the purported policies accordingly is not supported by the facts alleged, and "[t]o state there is a policy does not make it so." Betts v. Shearman, No. 12 Civ. 3195 (JPO), 2013 WL 311124, at \*16 (S.D.N.Y. Jan. 24, 2013), aff'd, 751 F.3d 78 (2d Cir. 2014).

To the extent plaintiff has attempted to assert a Monell violation under a failure to train or supervise theory, see FAC ¶ 158, ECF No. 63 at 34-35, his allegations are boilerplate and strictly conclusory, and the "existence of a municipal policy or practice, such as a failure to train or supervise, cannot be grounded solely on the conclusory assertions of the plaintiff." Santos v. New York City, 847 F. Supp. 2d 573, 577 (S.D.N.Y. 2012).

In any event, having found no underlying constitutional violation, without which there can be no municipal liability under Section 1983, see City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986), the Court need not even address plaintiff's various arguments related to the City's and HHC's liability under Monell. See Segal v. City of New York, 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under Monell was entirely correct"); Ferguson, 2012 WL 2865474, at \*6 ("Because the Court has concluded that [the plaintiff's] constitutional rights have not been violated, his claim of municipal liability pursuant to Monell is, a fortiori, also meritless.").

**\*17** Plaintiff's Monell claim accordingly is dismissed.

### C. Conspiracy

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 131 of 201

Haynes v. City of New York, Not Reported in Fed. Supp. (2020)

2020 WL 4926178

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999). "It is well settled that claims of conspiracy 'containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss.' " Gallop v. Cheney, 642 F.3d 364, 369 (2d Cir. 2011) (quoting Leon v. Murphy, 988 F.2d 303, 311 (2d Cir. 1993)).

Plaintiff's attempt to state a conspiracy claim fails to multiple reasons. First, even assuming plaintiff had alleged a constitutional violation, plaintiff's conspiracy allegations are strictly conclusory. See, e.g., FAC ¶ 161 (alleging that the individual defendants "willfully conspired with one another to deprive Plaintiff of his constitutional rights"); FAC ¶ 163 (alleging that the individual defendants "had knowledge that a conspiracy was in progress, had the power to prevent or aid in preventing the conspiracy from continuing, and neglected or refused to do so"). Where, as here, a plaintiff "has not provided any 'details of time and place' and has 'fail[ed] to specify in detail the factual basis necessary to enable [defendants] intelligently to prepare their defense,' ... his § 1983 conspiracy claim must be dismissed." Ciambriello v. Cty. of Nassau, 292 F.3d 307, 325 (2d Cir. 2002) (first quoting Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir. 1993); then quoting Ostrer v. Aronwald, 567 F.2d 551, 553 (2d Cir. 1977)).

Plaintiff also failed to oppose dismissal of his conspiracy claim in his opposition to defendants' motion to dismiss, permitting the Court to deem that claim abandoned. See Wilkow v. Ameriprise Fin. Servs., Inc., 753 F. App'x 44, 47 n.1 (2d Cir. 2018) (affirming dismissal of claims "on the ground that they were 'abandoned' by [the plaintiff] when she failed to oppose them in her opposition to [the defendant's] motion to dismiss"); Lipton v. Cty. of Orange, NY, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004) ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed.").

For each of these reasons, plaintiff's conspiracy claim is dismissed.

### D. State Law Claims

The Second Circuit has "generally held that where all federal claims have been dismissed at a relatively early stage, the district court should decline to exercise supplemental jurisdiction over pendent state-law claims." Astra Media Grp., LLC v. Clear Channel Taxi Media, LLC, 414 F. App'x 334, 337 (2d Cir. 2011); see also Marcus v. AT&T Corp., 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well.").

Having dismissed all of plaintiff's federal law claims, the Court declines to exercise supplemental jurisdiction over plaintiff's pendent state law claims.

### E. Leave to Amend

**\*18** "Although Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend 'shall be freely given when justice so requires,' it is within the sound discretion of the district court to grant or deny leave to amend." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007). "Where it appears that granting leave to amend is unlikely to be productive ... it is not an abuse of discretion to deny leave to amend." Ruffolo v. Oppenheimer & Co., 987 F.2d 129, 131 (2d Cir. 1993) (per curiam). "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." Lucente v. Int'l Bus. Machines Corp., 310 F.3d 243, 258 (2d Cir. 2002).

Plaintiff previously was afforded an opportunity to amend his initial complaint. Even with the benefit of his full set of medical records, plaintiff has failed to allege facts sufficient to support an inference that any of the numerous healthcare workers or officers acted with the requisite deliberate indifference. While plaintiff suggests in his opposition that he will be able to cure any deficiencies with information obtained through discovery, see ECF No. 63 at 21, "it is axiomatic that a plaintiff must state a claim *before* he is entitled to discovery." Bristol-Myers Squibb Co. v. Matrix Labs. Ltd., No. 12 Civ. 5846 (PAE), 2015 WL 4430614, at \*8 (S.D.N.Y. July 20, 2015) (emphasis in original). [31] Having received over one thousand pages of medical records at the Court's direction, plaintiff has if anything had more "discovery" than is available in most cases and yet has still been unable to plead a sustainable cause of action that rises to the level of a constitutional violation.

---

[31]   Moreover, "[d]iscovery is 'not intended to be a fishing expedition, but rather is meant to allow

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 132 of 201

Haynes v. City of New York, Not Reported in Fed. Supp. (2020)

2020 WL 4926178

the parties to flesh out allegations for which they initially have at least a modicum of objective support.' " Lituma v. United States, No. 04 Civ. 8955 (NRB), 2005 WL 1705088, at *2 (S.D.N.Y. July 18, 2005) (quoting Cleveland-Goins v. City of New York, No. 99 Civ. 1109 (AGS), 1999 WL 673343, at *2 (S.D.N.Y. Aug. 30, 1999)); see also KBL Corp., 646 F. Supp. 2d at 346 ("[A]llowing the plaintiff to conduct discovery in order to piece together a claim would undermine the purpose of Federal Rule of Civil Procedure 12(b)(6), which is to 'streamline[ ] litigation by dispensing with needless discovery and factfinding" where the plaintiff has failed to state a claim under the law' ") (quoting Neitzke v. Williams, 490 U.S. 319, 319 (1989)).

Because the Court finds that any effort to replead would be futile, plaintiff's request for leave to amend is denied.

See Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000) (repleading would be futile where plaintiff's complaint did not "suggest[ ] that the plaintiff ha[d] a claim that she ha[d] inadequately or inartfully pleaded").

## V. Conclusion

For the foregoing reasons, defendants' motion to dismiss is granted in its entirety. Plaintiff's state law claims are dismissed without prejudice. The Clerk of Court is respectfully directed to terminate the motion pending at ECF No. 55, and to close the case.

**SO ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 4926178

---

**End of Document**  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.  17

2009 WL 1437589

KeyCite Yellow Flag - Negative Treatment

Distinguished by Benitez v. Parmer, N.D.N.Y., July 8, 2013

2009 WL 1437589
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Steven MOTTA, Plaintiff,
v.
Dr. Lester WRIGHT, Deputy Commissioner of
Health Services, NYS Docs; Dr. Syed Haider
Shah, Marcy Correctional Facility, Defendants.

No. 9:06–CV–1047.
|
May 20, 2009.

West KeySummary

1    **Prisons** 🔑 Particular Conditions and
Treatments

**Prisons** 🔑 Psychological Conditions and
Treatment

**Sentencing and Punishment** 🔑 Medical
Care and Treatment

**Sentencing and
Punishment** 🔑 Psychological and Psychiatric
Treatment

In his § 1983 action, prisoner failed to state
Eighth Amendment claim against prison doctor
who was allegedly deliberately indifferent to
prisoner's serious medical needs because the
doctor delayed prisoner's hepatitis treatment
from October of 2002 until June of 2006.
There was no evidence that the delay was
substantially serious. Moreover, the doctor's
explanation for the delay in providing prisoner
with the hepatitis treatment was based upon
the lack of a psychiatric clearance between
October 2002 and October 2005. The hepatitis
protocol clearly required a psychiatric clearance
for individuals who have a history of major
depression or other major psychiatric illness.
U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**Attorneys and Law Firms**

Steven Motta, Dannemora, NY, pro se.

Andrew M. Cuomo, Attorney General of the State of
New York, Office of the Attorney General, Charles J.
Quackenbush, Esq., Assistant Attorney General, of Counsel,
Albany, NY, for Defendants Haider Shah and Wright.

***ORDER***

NORMAN A. MORDUE, Chief Judge.

**\*1** The above matter comes to me following a Report–
Recommendation by Magistrate Judge Gustave J. DiBianco,
duly filed on the 29th day of April 2009. Following ten
days from the service thereof, the Clerk has sent me the file,
including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including
the Magistrate Judge's Report–Recommendation, and no
objections submitted thereto, it is

ORDERED that:

1. The Report–Recommendation is hereby adopted in its
entirety.

2. The defendants' motion for summary judgment (Dkt. No.
29) is granted, and the complaint is dismissed in its entirety.

3. The Clerk of the Court shall serve a copy of this Order upon
all parties and the Magistrate Judge assigned to this case.

**IT IS SO ORDERED.**

**REPORT–RECOMMENDATION**

GUSTAVE J. DiBIANCO, United States Magistrate Judge.

This matter has been referred to the undersigned for Report
and Recommendation by the Honorable Norman A. Mordue,
Chief United States District Judge pursuant to 28 U.S.C. §
636(b) and Local Rules N.D.N.Y. 72.3(c).

2009 WL 1437589

In this civil rights complaint, plaintiff alleges that defendants denied him constitutionally adequate medical care from October 10, 2002 until June 1, 2006, while plaintiff was an inmate in the custody of the Department of Correctional Services (DOCS) at Marcy Correctional Facility (Marcy). Complaint (Dkt. No. 1). In the jurisdictional section of the complaint, in addition to 42 U.S.C. § 1983, plaintiff cites the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.;* the Rehabilitation Act (RA), 29 U.S.C. § 794; and 42 U.S.C. §§ 1985, 1988. Compl. ¶ 8. In the body of the complaint plaintiff also quotes the text of the ADA, RA, and sections 1985 and 1988.[1] Compl. ¶¶ 67, 68–69. Plaintiff's Causes of Action, however, do not mention these statutes. The complaint contains seven causes of action and all of them state that they are violations of the "Eighth and Fourteenth Amendments." Compl. ¶¶ 73–88. The complaint seeks declaratory and substantial monetary relief.[2] Compl. at 28.

[1]    The jurisdictional section also mentions unspecified state law claims. Compl. ¶ 8.

[2]    The complaint also requests "costs and disbursements," including "reasonable attorneys fees" and asks for permission to "be placed before District Court Judge David N. Hurd, who presides over the recently certified class action suit in *Hinton v. Wright,"* ...." Plaintiff is referring to *Hilton v. Wright,* 235 F.R.D. 40 (N.D.N.Y.2006). The court would point out that a *pro se* litigant is not entitled to attorneys fees under 42 U.S.C. § 1988. *See SEC v. Price Waterhouse,* 41 F.3d 805, 808 (2d Cir.1994). This would be true even it the *pro se* plaintiff were an attorney. *See Kay v. Ehrler,* 499 U.S. 432, 111 S.Ct. 1435, 113 L.Ed.2d 486 (1991). Thus, plaintiff would not be entitled to attorneys fees even if he were successful in the action. The court will discuss plaintiff's request regarding the class action later in this report.

Presently before this court is defendants' motion for summary judgment, pursuant to FED. R. CIV. P. 56. (Dkt. No. 29). Plaintiff has responded in opposition to the motion. (Dkt. No. 33). Although the docket sheet indicates that defendants have filed a "Reply," the document filed is simply "dated copies of signature pages from the Declarations of Dr. Haider Shah and Dr. Wright" that were originally filed in support of defendants' motion for summary judgment.[3] (Dkt. No. 34).

For the following reasons, this court agrees with defendants and will recommend dismissing plaintiff's complaint.

[3]    Plaintiff's first argument in opposition to the defendants' motion was that the defendants' Declarations were unsigned and undated and, thus, not admissible in support of the motion. Plaintiff's Memorandum of Law at 2. (Dkt. No. 33). Defendants corrected their error by submitting copies of the appropriate signed and dated pages, together with a certificate of service on plaintiff, but this correction is docked as a "Reply." (Dkt. No. 34).

## DISCUSSION

### 1. *Summary Judgment*

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**\*2** In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of " 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-movant bears the burden of proof at trial, the moving party may show that he is entitled to summary judgment by either (1) pointing to evidence that negates the non-movant's claims or (2) identifying those portions of the non-movant's evidence that demonstrate the absence of a genuine issue of material fact. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006) (citing *Celotex Corp.,* 477 U.S. at 23). The

2009 WL 1437589

second method requires identifying evidentiary insufficiency, not merely denying the opponent's pleadings. *Id.*

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.* A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Additionally, while a court " 'is not required to consider what the parties fail to point out," " the court may in its discretion opt to conduct "an assiduous view of the record" even where a party fails to respond to the moving party's statement of material facts. *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted). Plaintiff in this case has responded to defendants' motion, however, the court will still carefully review the entire record in making its determination.

## 2. *Facts and Contentions*

In his complaint, plaintiff states that he has been in the custody of DOCS since 1982, and has Hepatitis–C (HCV). [4] Plaintiff's medical records show that he was diagnosed with HCV in December of 1995. Haider Shah Decl. ¶ 9 & Ex. A [5] at 503. The first several paragraphs of plaintiff's complaint are entitled "INTRODUCTION" and discuss plaintiff's allegations generally. Compl. ¶¶ 1–7. The complaint then contains a section entitled "ALLEGATIONS," containing a more specific statement of facts and chronology of plaintiff's claims. Compl. ¶¶ 25–63.

[4]     Plaintiff disputes when he contracted the illness. Plaintiff states that he contracted the virus *after* he was incarcerated, and defendants state that plaintiff became infected sometime *prior* to his incarceration in 1982. This dispute is not relevant to the court's analysis since it is undisputed that he was not diagnosed with HCV until December of 1995.

[5]     Defendant Haider Shah has submitted a declaration in support of defendants' motion for summary judgment. Exhibit A are plaintiff's medical records including his Ambulatory Health Record (AHR) and other relevant medical records. An inmate's

AHR contains entries referring to medical visits on particular days, however, multiple visits are recorded on each day, with up to three visits from three dates recorded on one page. Exhibit A has been paginated, and the page numbers appear at the bottom. Thus, the court will cite to the page number of Exhibit A with further citation to the date of a particular entry of the AHR if necessary.

Plaintiff alleges that after he arrived at Marcy on October 10, 2002, defendant Dr. Haider Shah failed to monitor plaintiff's elevated liver function tests (LFT's) for nineteen months, in violation of the HCV "protocol" [6] and failed to refer plaintiff to a liver specialist. Compl. ¶ 1. Plaintiff claims that defendant Haider Shah refused to give plaintiff HCV treatment "on a number of occasions" for improper reasons, including that plaintiff was too close to being paroled; needed psychiatric clearance; or "needed outside clearance." Compl. ¶ 2. Plaintiff states that defendant Haider Shah failed to order the prescribed liver biopsy on October 20, 2005 and failed to seek psychiatric clearance for plaintiff until October 20, 2005. *Id.* Plaintiff claims that once defendant Haider Shah obtained the psychiatric clearance in October of 2005, he delayed giving plaintiff the HCV treatment for another nine months. *Id.*

[6]     Plaintiff is referring to the DOCS Division of Health Services "protocol" entitled "Hepatitis C Primary Care Practice Guidelines ." (DOCS Guidelines). Defendants have submitted various revisions of the DOCS Guidelines, dated January 17, 2000; July 20, 2004; and October 13, 2005. Wright Decl. Ex. A–1–A–3

**\*3** Plaintiff states that he filed two grievances regarding his medical care. Compl. ¶¶ 3–4. Plaintiff claims that defendant Haider Shah did not order a genotype blood test until February 14, 2006, after plaintiff's second grievance was filed, and "after nineteen straight months of no blood tests at all." Compl. ¶ 4. Plaintiff states that only after he filed his second grievance, did defendant Haider Shah begin to check plaintiff's liver function. On June 1, 2006, plaintiff claims that he vomited in front of a nurse, and that on the same day, plaintiff was examined by defendant Haider Shah, who had plaintiff sign a "Contract for Specialty Care" appointment, and requested medication for plaintiff from defendant Wright. Compl. ¶ 6. Plaintiff states that if it had not been for the vomiting incident, defendant Haider Shah never would have ordered the medication that eventually was started on June 9, 2006. Compl. ¶ 7.

In the complaint, plaintiff has listed a number of medical terms that are associated with HCV. Compl. ¶¶ 12–24. Plaintiff has filed a substantial number of documents in support of his complaint, including numerous medical records and other references concerning HCV. Compl. App. A–C. Plaintiff begins the "Allegations" portion of the complaint by outlining the facts surrounding the diagnosis and care of his condition since October 10, 1990, when a laboratory report of blood tests taken at Elmira Correctional Facility, showed that plaintiff tested positive for Hepatitis A [7] (HAV) and B(HBV). Compl. ¶ 26 & App. B at 3–5.

[7]    Plaintiff states that the tests were positive for both A and B, but the pages he cites only show that the tests were positive for Hepatitis B. Compl. App. B at 3–5.

Plaintiff was diagnosed with HCV on December 12, 1995, while he was in Clinton Correctional Facility. Compl. ¶ 28. Plaintiff states that the tests showed an "out of control chronic Hepatitis C virus," and that although plaintiff complained of liver pain, dizziness, and nausea, he was not scheduled to see a "liver specialist." *Id.* The complaint discusses 1995 through 2002, stating that at various times, plaintiff complained about symptoms that he was experiencing. Compl. ¶¶ 29–34.

Plaintiff states that in June of 1999, he was incarcerated at Riverview Correctional Facility and experienced dizzy spells. Compl. ¶ 33. Plaintiff states that on June 15, 1999, Dr. R. Hentschel noted that plaintiff was positive for HCV and recommended a follow-up with a private physician, "Rx medication for hepatitis C, [and] lab monitoring." [8] Compl. ¶ 33 (citing App. B at 40–45). Plaintiff states that when he was at Franklin Correctional Facility in April of 2002, he requested medication for HCV and signed consent forms. Compl. ¶ 34. Plaintiff's Ambulatory Health Record (AHR) indicates that he was interested in HCV treatment, and he signed consent forms in April of 2002. Pl.App. at 65 (AHR entries of 4/8 and 4/11/02).

[8]    The court must point out that in the pages of the medical records cited by plaintiff there is no reference to "medication." Pl.App. B at 41. It is unclear what Dr. Hentschel wrote. The notation appears to be "Needs f/u private physician Rx of Hepatitis C. Lab monitoring." Pl.App. at 41.

Plaintiff was transferred to Marcy in October of 2002, and plaintiff states that on October 17, 2002, he requested HCV treatment again, and that defendant Haider Shah told plaintiff that he would review the policy and record to see if plaintiff met the criteria for medication. Compl. ¶ 35 (citing App. B at 71 AHR entry of 10/17/02). Plaintiff then states that on October 23, 2002, he requested HCV treatment and a "Nurse" told plaintiff that he needed psychiatric clearance. [9] *Id.* Plaintiff states that after the October 17, 2002 "examination," defendant Haider Shah failed to administer a course of treatment; send plaintiff to a private physician; and monitor his liver function every six months as ordered by Dr. Hentschel in 1999. Compl. ¶ 37.

[9]    Plaintiff is again mistaken regarding his citation to the record. Pages 70 and 71 of plaintiff's appendix are copies of the same page. The ***October 17, 2002*** entry is written by Nurse K. Dooley. App. B at 70, 71. Nurse Dooley states that plaintiff is requesting treatment for HCV, and Nurse Dooley stated that she would consult P. Perrotta about reviewing the record to determine whether plaintiff met the criteria. The entry dated October 23, 2002 contains the notation of a variety of requests made by plaintiff, including vaccine for Hepatitis A and B; a lead-level test because of a gunshot wound; a memory test; and HCV treatment. Pl.App. B at 70, 71. The entry ends with the notation "Psych Clearance for Possible Hep C Rx." *Id.* Defendant Haider Shah states in his declaration that ***he*** met with plaintiff on October 23, 2002. Haider Shah Decl. ¶ 11.

**\*4**  Plaintiff states that he was examined by defendant Haider Shah on August 7, 2003 and told that he was not ready for medication because he was "too close to going home." Compl. ¶ 39. Plaintiff then cites various laboratory test results, showing that he had a high HCV viral load in 2003. Compl. ¶¶ 40–41. Plaintiff states that consistent with the high viral count, he went to sick call on August 13, 2003, January 7, 2004, and March 31, 2004. Compl. ¶ 42. Plaintiff claims that although he had serious symptoms, no medical action was taken. *Id.* Plaintiff then cites additional dates on which he was tested. Compl. ¶¶ 43–47.

Plaintiff states that on January 9, 2004, he had a liver function test, and the notation on the report stated that plaintiff "needs to be seen." Compl. ¶ 43. On October 20, 2004, defendant Haider Shah sent plaintiff for a CAT Scan of his abdomen to

2009 WL 1437589

rule out a bile duct obstruction. Compl. ¶ 45. The CAT Scan was performed on November 5, 2004. *Id.* (citing App. B at 83). Plaintiff states that on October 13, 2005, defendant Lester Wright sent a memorandum, rescinding the DOCS policy that would prevent an inmate from having HCV treatment if he had not participated in the Alcohol and Substance Abuse Treatment (ASAT)/Residential and Substance Abuse Treatment (RSAT) programs. Compl. ¶ 48. At the same time, defendant Wright rescinded that policy prohibiting approval for HCV treatment if the inmate were going to be released prior to the completion of the treatment. *Id.* (citing Pl.App. A–HCV Guidelines dated 2/10/06).

Plaintiff states that on October 20, 2005, he asked again for the HCV treatment and discovered that he had not received psychiatric clearance. Compl. ¶ 49. Plaintiff states that the sick call nurse cited to the AHR dated 10/20/04, 6/25/04, 10/23/02 after she noted that there was no psychiatric clearance in the medical records. Compl. ¶ 49. Plaintiff claims that the main reason that he did not obtain his treatment was that he did not have psychiatric clearance, but maintains that no request had ever been made for the clearance. *Id.*

Plaintiff states that he the request was finally made on October 20, 2005, and he obtained the psychiatric clearance on the same day, using the same form upon which the request was written. Compl. ¶ 50 & App. B at 90. Plaintiff claims that on January 4, 2006, he complained to defendant Haider Shah about some of the symptoms plaintiff had been having. Compl. ¶ 52. Plaintiff alleges that during the examination, defendant Haider Shah was going through the medical records and "deliberately lied" about not receiving a reply from the Mental Health Department, when in fact the clearance had been sent on October 20, 2005. *Id.*

Plaintiff states that he wrote a grievance on January 14, 2006 that was consolidated with a prior grievance dated November 15, 2002. Compl. ¶ 53. Plaintiff states that he had an Inmate Grievance Resolution Committee (IGRC) hearing, but that the IGRC could not override a medical decision. *Id.* Plaintiff states that the Superintendent denied his grievance on January 30, 2006, in part because the medical department was waiting for the psychiatric clearance, and that when that clearance was obtained, the medical department would pursue the next step. Compl. ¶ 54. Plaintiff appealed the grievance, stating that he had already received the clearance, but that in any event, he had met the criteria "for years." Compl. ¶ 55.

**\*5** In the meantime, on February 15, 2006, defendant Haider Shah made a request for plaintiff to have a liver biopsy which was completed on March 27, 2006. Compl. ¶¶ 57–58. Plaintiff claims that on June 1, 2006, he reported for sick call and vomited in front of the nurse. Compl. ¶ 59. Plaintiff states that the nurse wrote in the AHR that plaintiff was seeking HCV treatment. *Id.* Plaintiff states that he was examined by defendant Haider Shah on the same day and that plaintiff signed the "Contract for a Specialty Care Appointment." Compl. ¶ 60. Plaintiff states that his HCV treatment began on June 9, 2006, however, if it had not been for the incident in which plaintiff vomited in front of the nurse, "Defendant Haider Shah would never have ordered the medication...." Compl. ¶ 61.

Finally, plaintiff states that on July 5, 2006, defendant Haider Shah informed plaintiff that the high "iron readings" on his liver function tests were the "number one **'killer,'** for him." Compl. ¶ 62 (emphasis in original). Plaintiff stated that his iron levels had always been high and asked defendant Haider Shah whether there was any medication that could bring plaintiff's iron levels down. *Id.* Plaintiff states that defendant Haider Shah told plaintiff that such medication existed, but that he did not believe that plaintiff needed it at the time. *Id.*

Essentially, plaintiff claims that the delay in his treatment caused him serious physical and emotional injury since plaintiff now has fibrosis of the liver that cannot be cured "except by way of liver transplant...." Compl. ¶ 63. Plaintiff alleges that defendant Wright may be held liable for failure to train and supervise his medical employees in the care of inmates such as plaintiff, who have been identified by their treating physicians as being in need of treatment for HCV. Compl. ¶ 70. Plaintiff also seeks to hold defendant Wright liable for establishing an unconstitutional policy and custom of refusing to administer treatment because inmates are too close to going home or because plaintiff did not complete a substance abuse program. Compl. ¶ 71.

The complaint contains seven causes of action, each referring **only** to the Eighth and Fourteenth Amendments and not to any statutory basis for relief. [10]

10  In any event, the court would point out that while the defendants must be sued in their individual capacities for purposes of section 1983, defendants may **not** be sued in their "individual" capacities for violations of the ADA or the RA. *Garcia v. S.U.N.Y. Health Science Center of Brooklyn,* 280 F.3d 98,

2009 WL 1437589

107 (2d Cir.2001). Thus, any suit for statutory relief would be against the defendants in their "official" capacities. Without discussing whether the Eleventh Amendment in this case would bar damage relief against the State (defendants in their "official" capacities), the court would merely note that plaintiff does not state a claim under the ADA or the RA. *See e.g.* Carrion v. Wilkinson, 309 F.Supp.2d 1007 (D.Ohio 2004).

> In *Carrion,* the court specifically stated that the ADA and RA "afford disabled persons legal rights regarding access to programs and activities enjoyed by all, but do not provide them with a general federal cause of action for challenging the medical treatment of their underlying disabilities." *Id.* (quoting Galvin v. Cook, CV–00–29, 2000 U.S. Dist. LEXIS 15181, *19–20, 2000 WL 1520231 at *6 (D.Ore. Oct. 3, 2000)). Plaintiff in this case is only challenging the medical treatment of his underlying medical condition, thus, he could not proceed under either the ADA or the RA, even if this court were to interpret his complaint to raise those claims. The court will analyze this case under the Eighth and Fourteenth Amendment claims that plaintiff includes in his "Causes of Action." Compl. ¶¶ 73–88.

(1) Defendant Haider Shah violated plaintiff's Eighth and Fourteenth Amendment rights when he delayed plaintiff's HCV treatment from October 17, 2002 until June 1, 2006.

> (2) Defendant Haider Shah was deliberately indifferent to plaintiff's serious medical needs when he delayed plaintiff's HCV treatments until June 1, 2006, even after he received the psychiatric clearance on October 20, 2005.

> (3) Defendant Haider Shah was deliberately indifferent to plaintiff's serious medical needs when he departed from the "new" HCV Primary Care Guidelines from October 20, 2005 until June 1, 2006.

> (4) Defendant Haider Shah was deliberately indifferent to plaintiff's serious medical needs when he failed to administer liver function tests every eight to twelve weeks.

> **\*6** (5) Defendant Haider Shah was deliberately indifferent to plaintiff's serious medical needs when he ignored "numerous 'red flags' " regarding plaintiff's condition that indicated that plaintiff was in need of immediate treatment.

> (6) Defendant Wright is responsible for the delay between October 23, 2002 and October 13, 2005, when he changed the HCV policy.

> (7) Defendants Wright and Haider Shah were deliberately indifferent to plaintiff's serious medical needs when defendant Haider Shah refused to administer HCV treatment on August 7, 2003 because plaintiff was "too close to going home."

Compl. ¶¶ 73–88.

Both defendants have submitted declarations in support of their motion for summary judgment. (Dkt.Nos.29–15, 29–16). Defendants have also submitted the declaration of John B. Rogers, M.D., whose primary area of practice is Gastroenterology. Rogers Decl. (Dkt. No. 29–21). Dr. Rogers has examined a copy of plaintiff's medical records, dating back to 1995. Rogers Decl. ¶¶ 4, 7 & Ex. B.

Defendant Haider Shah states that he is a clinical care physician with the Medical Department at Marcy, and he has been providing medical services to plaintiff since his arrival at Marcy in 2002 and during the time period relevant to this case. Haider Shah Decl. ¶¶ 2, 4. Defendant Haider Shah has also submitted copies of plaintiff's medical records as Exhibit A. [11] In his declaration, defendant Haider Shah gives a short description of HCV in general, stating that, while it is a serious infection, is progression is variable and generally slow. Haider Shah Decl. ¶ 10. Defendant Haider Shah states that HCV may go undetected for a number of years without physical signs or symptoms. *Id.* ¶ 7.

[11]    The medical records have been "traditionally filed" and are not part of the electronic docket. The court notes the medical records submitted by plaintiff are also contained in the defendants' exhibits, except for those records from prior to 1995 that plaintiff has submitted in his appendices. Defendants medical records are more extensive than those submitted by plaintiff.

Dr. Rogers states that HCV has the potential of producing cirrhosis of the liver and/or liver cancer. Rogers Decl. ¶

10. HCV is the leading cause of liver cancer in the United States, and thus, it is important to treat the disease "when possible." *Id.* Dr. Rogers states that advances in treatment during the past *six* years have been "particularly helpful," but notwithstanding these advancements, it is not yet possible to cure all individuals who are infected with HCV. *Id.*

The current drug treatment for HCV is a combination of two drugs, pegylated interferon and ribavarin. Rogers Decl. ¶ 11. Dr. Rogers states that treatment is often difficult for the patient because these drugs have many serious side effects, some of which can be considered life-threatening. *Id.* Thus, before starting this treatment, patients must be carefully evaluated to determine if they will have a good chance of tolerating the treatment itself. *Id.* Dr. Rogers states that it is also important to check patients for "coinfections" with Hepatitis B(HBV) or human immune deficiency virus (HIV) because the treatment "is very likely to fail" if the patient has either one of those viruses in addition to HCV. *Id.*

Because of all the above variables regarding whether the existing drug treatment is appropriate, and because of the great number of inmates infected with HCV, DOCS has developed a "protocol" to make certain that all of the necessary information is considered regarding each patient with HCV before starting the drug treatment. Rogers Decl. ¶ 11; Wright Decl. ¶¶ 4–7. Defendant Wright states that DOCS develops and regularly updates "Clinical Practice Guidelines" for various diseases in an effort to maintain the consistency of care and stay current with scientific advances. Wright Decl. ¶ 5. The "Hepatitis C Primary Care Practice Guideline" (the Guidelines) used by DOCS was initially approved on March 31, 1999 and revised December 17, 1999, December 13, 2000, July 20, 2004, and October 13, 2005. Wright Decl. ¶ 6. Copies of these Guidelines are included as Exhibits A–1 to A–3, attached to defendant Wright's declaration.

 **\*7** Defendant Wright states that the Guidelines were developed by a task force of physicians and other health professionals, including DOCS practitioners, and experts from medical colleges and hospitals. Wright Decl. ¶ 5. The Guidelines are based upon many sources of information and research regarding HCV, including publications of the National Institutes of Health (NIH); the United States Centers for Disease Control; the New York State Department of Heath Bureau of Communicable Disease Control; the New England Journal of Medicine; and the Federal Bureau of Prisons Treatment Guidelines for Viral Hepatitis. Wright Decl. ¶¶ 7–8.

Dr. Rogers states that it is now possible to achieve a "cure" in almost fifty percent of the HCV cases after 24 to 48 weeks of treatment, "depending upon the genotype of the virus." Rogers Decl. ¶ 12. Dr. Rogers states that it is "well worth the risks and costs of therapy to prevent the development of cirrhosis of the liver and/or liver cancer which often develops in patients with untreated HCV." Rogers Decl. ¶ 12. If the patient's viral levels remain undetectable six months after completion of the drug therapy, it is considered a "sustained viral response" and the patient may be considered "cured," however, relapses have been reported. Rogers Decl. ¶ 13. The likelihood of a relapse depends upon "individualized" factors, including the virus genotype, the patient's ethnicity, gender, age, the duration of the disease, and alcohol use. *Id.*

The "current" treatment with pegylated interferon and ribavirin was approved by the United States Food and Drug Administration (FDA) in 2001. Wright Decl. ¶ 12. However, there are patients that do not achieve sustained suppression of the virus even after treatment, and they are referred to as "nonresponders." Wright Aff. ¶ 13. Defendant Wright states that at this time, there is no alternative treatment for these individuals. *Id.* There are also patients called "relapsers," who initially respond to the treatment, but experience a re-emergence of the virus. *Id.* In the case of a "relapser," it may be appropriate to explore re-treatment with variations on the duration of therapy and/or the dosage of the drugs. *Id.*

Defendant Haider Shah states that plaintiff was diagnosed with HCV in December of 1995, but was not transferred to Marcy until October of 2002. Haider Shah Decl. ¶¶ 8–9. In 1992, it had been determined that plaintiff had also been exposed to Hepatitis A and B, but had acquired immunity to those viruses. *Id.* ¶ 9. By the time that he was transferred to Marcy, plaintiff's HCV had already progressed to the "chronic" stage. *Id.* Defendant Haider Shah had no responsibility for plaintiff's care until he was transferred to Marcy in 2002.

Defendant Haider Shah states that he met with plaintiff on October 23, 2002. [12] The medical records confirm that October 23, 2002 was the first time that defendant Haider Shah met with plaintiff at Marcy. Haider Shah Decl. Ex. A at 331. On October 17, 2002, plaintiff met with **Nurse Dooley,** and he told the nurse that he wanted a lead level test because he had metal fragments in his abdomen; [13] wanted a treatment plan for his HCV; wanted "injections" for his HAV and HBV; and had some concerns about his memory. *Id.*

2009 WL 1437589

12    Although as stated above, plaintiff states that the October 17, 2002 AHR entry was based on an examination by defendant Haider Shah, it is clear that the October 17th entry was written by Nurse Dooley, and that defendant Haider Shah's entry is dated October 23rd. Haider Shah Decl. Ex. A at 331.

13    These fragments were apparently the residue of a gunshot wound. Haider Shah Decl. Ex. A at 331.

**\*8** Nurse Dooley advised plaintiff of the "policy" regarding reviewing the record and determining whether plaintiff met the criteria for treatment. *Id.* Nurse Dooley also stated that there would be a follow up with Nurse Perrotta to "review for need." *Id.* Nurse Dooley also questioned the need for "injections" because the medical records indicated "immunity" for HAV and HBV. *Id.* Finally, Nurse Dooley wrote in the AHR entry that plaintiff had an "md" appointment on October 23, 2002. *Id.*

Dr. Haider Shah states that when he met with plaintiff on October 23, they discussed various medical issues. Haider Shah Decl. ¶ 11 & Ex. A at 331. Defendant Haider Shah told plaintiff that the vaccinations for HAV and HBV were not necessary 14 and the lead level testing was not necessary. *Id.* Defendant Haider Shah also noted that plaintiff was requesting treatment for HCV, and states in his declaration that he "made a notation on [plaintiff's] AHR requesting a psychiatric consultation ... this was the first of a series of such requests." Haider Shah Decl. ¶ 12 & Ex. A at 311.

14    The reason that vaccinations were not necessary was that although plaintiff had been exposed to both HAV and HBV, the tests showed that his body had already developed an immunity to both. *See* Pl.App. C at 29 ("medical conditions").

Defendant Haider Shah states that some of the risks involved in the HCV treatment include suppression of the bone marrow; damage to the thyroid gland; damage to the heart and kidneys; and depression that can lead to suicide. Haider Shah Decl. ¶ 16. Dr. Haider Shah states that due to the risks, the slow rate of the disease's progression, and the moderate success of the current treatment, "very often it is most reasonable to refrain from drug therapy entirely and await the next innovation in treatment." Haider Shah Decl. ¶ 17.

Defendant Haider Shah states that when an inmate/patient has a history of depression or other serious mental disorder, he must be examined by a psychiatrist and issued a clearance to proceed with the drug therapy for HCV. *Id.* ¶ 21. The drugs may sometimes trigger depression even in those who have no prior psychiatric history, but those who do have such a history are "particularly susceptible." *Id.* Thus, before a DOCS treating physician will submit an HCV treatment request to Albany, 15 a psychiatric clearance must be obtained for the inmate. *Id.* A psychiatric clearance is obtained by the DOCS physician submitting a referral/consultation request to the Office of Mental Health (OMH), which oversees the provision of mental hygiene services to DOCS inmates. Haider Shah Decl. ¶ 22. Defendant Haider Shah states that OMH processes and fulfills the request "in due course." *Id* .

15    Before an inmate may be treated for HCV, the treating physician must submit a request for treatment to defendant Wright, the Chief Medical Officer of DOCS. Haider Shah Decl. ¶ 20.

Defendant Haider Shah states that prior to 2002 and during the following years, plaintiff had a "significant history" of clinical depression, was seen by a psychiatrist, and was prescribed medication on a number of occasions. Haider Shah Decl. ¶ 23. Defendant Haider Shah states that "we submitted multiple requests for psychiatric evaluations between October of 2002 and October of 2005, when the clearance was finally obtained. *Id.* ¶ 24 (citing Ex. A at 331 (10/23/02 request); 261 (10/29/04 request); 245–47 (8/5/05 request); and 239 (10/20/05 request)); Pl.App. B at 89–92. Defendant Haider Shah speculates that "it may well be" that the psychiatrists did not clear plaintiff for treatment earlier because between 2002 and 2005, plaintiff was reporting symptoms of depression and was receiving medication off and on for the condition. *Id.* ¶ 25 (citing Ex. A at 293–94 (4/8/04 consult/treatment for depression)).

**\*9** On October 30, 2002, plaintiff had laboratory tests related to his HCV diagnosis. Haider Shah Decl. Ex. A at 325–27. Between 2002 and 2005, testing was done in August of 2003; in January of 2004; February of 2004; in April of 2004; in June of 2004; in July of 2004; in August of 2004; and in May of 2005. Haider Shah Decl, Ex. A at 312–15; 16 Pl.App. B at 77; Haider Shah Decl. Ex. A at 305–309; 290; 284–85; 278; 273–74; and 250. Plaintiff had laboratory testing in February of 2006 17 and twice in March of 2006. Haider Shah Decl. Ex. A at 220–23; 207–208. After plaintiff started his treatments in June of 2006, he was receiving regular laboratory testing to

2009 WL 1437589

monitor his blood levels. Ex. A at 226 (chart of lab testing). *See also* Pl.App. B at 109 (AHR of June 22, 2006–HCV tracking note regarding the frequency of lab testing).

16     Plaintiff's August 13, 2003 AHR entry has a "Lab" notation, and the following AHR entry for what appears to be February 2004 states "Last Labs 8/03." Pl.Ex. B at 75.

17     The record indicates that on February 11 and 15, 2006. plaintiff did not show up for his laboratory testing, and the tests had to be rescheduled. Haider Shah Decl. Ex. A at 227.

It appears from the medical records that as of January 4, 2006, defendant Haider Shah did not know that the psychiatric clearance had been obtained. Haider Shah Decl. Ex. A at 235 (AHR dated January 4, 2006). However, by February 15, 2006, defendant Haider Shah had requested a referral to a gastroenterologist to approve the HCV treatment and for a liver biopsy, noting that the psychiatric clearance had been obtained. Haider Shah Decl. Ex. A at 190 (Referral dated February 15, 2006). On March 20, 2006, plaintiff's history and physical were done in anticipation of his liver biopsy. Haider Shah Decl. Ex. A at 210. Plaintiff had the biopsy on March 27, 2006. *Id.* Ex. A at 195 (surgical pathology report of biopsy) [18]. The biopsy report indicated that plaintiff's diagnosis was "chronic hepatitis with stage 3 fibrosis." Haider Shah Decl. ¶ 33 & Ex. A at 195. Defendant Haider Shah states that they then obtained additional blood chemistry tests, including a thyroid hormone analysis. *Id.* & Ex. A at 186. On June 1, 2006, defendant Haider Shah requested a repeat CT Scan based on the plaintiff's complaints of nausea and pain in the area of the lesion. Haider Shah Decl. Ex. A at 180. Defendant Haider Shah states that after considering all the available information, including the biopsy result, he determined that it was appropriate to proceed with the drug therapy requested by plaintiff. Haider Shah Decl. ¶ 33. Final approval was requested from DOCS, and plaintiff obtained his first of a twenty four week dose of HCV medication on June 6, 2006. *Id.*

18     Page 197 of Ex. A is a copy of the biopsy report.

After plaintiff began his drug treatment, the medical records show constant monitoring. In July of 2006, plaintiff complained of abdominal pain, and another CT Scan was performed on July 21, 2006. Haider Shah Decl. Ex. A at 160. On August 3, 2006, plaintiff was noted to be continuing his treatment without complaints. *Id.* at 157. However, on August

6, 2006, plaintiff was "agitated" and wanted to be referred to the mental health department. *Id.* at 155–56. Plaintiff was crying and wringing his hands, but denied thoughts of self-harm or harm to others. *Id.*

**\*10**  There are approximately eight entries in plaintiff's medical records in August 2006 alone. *Id.* at 142–53. Plaintiff had laboratory tests and was examined for complaints of headaches. *Id* . The monitoring continued through September and October. *Id.* at 122–42. In November of 2006, plaintiff had an abnormal thyroid and platelet count. *Id.* at 112–16. Plaintiff completed his HCV treatment on December 11, 2006 after 24 weeks. *Id.* at 105. Defendant Haider Shah states that upon completion of the treatment, plaintiff's virus had dropped to undetectable levels. Haider Shah Decl. ¶ 34. However, the virus has re-emerged. *Id.* Both defendant Haider Shah and Dr. Rogers state that the timing of the treatment was not related to the re-emergence of the virus, and that it was unlikely that drug therapy in 2002 would have been any more successful. Haider Shah Decl. ¶ 34; Rogers Decl. ¶ 14. Defendant Haider Shah states that the viral response to the drug therapy depended upon the effect of the drugs upon plaintiff's particular virus and not upon the timing of the drugs. *Id.* ¶ 34.

Plaintiff filed this action on August 29, 2006, during the time that he was receiving his drug treatment. (Dkt. No. 1). Defendants have submitted a great deal of medical records relating to plaintiff's medical care, even after he filed this complaint. A CT Scan performed on January 3, 2007 showed that the lesion in plaintiff's liver had increased in size from 8 by 13 millimeters to 13 by 15 millimeters. Haider Shah Decl. Ex. A at 91. His monitoring continued, however, most of the AHR entries for January and part of February of 2007 are unrelated to plaintiff's HCV. *Id* . at 84–88. Plaintiff was transferred to Elmira Correctional Facility (Elmira) on February 15, 2007. *Id.* at 79–84.

Although plaintiff received laboratory tests while at Elmira, most of the AHR entries are unrelated to plaintiff's HCV. *Id.* at 61–76. Plaintiff was transferred to Clinton Correctional Facility in June of 2007. *Id.* at 58–61. On March 4, 2008, while still at Clinton, plaintiff was examined by an endocrinologist for abnormal thyroid function. *Id.* at 20. The consultant stated that plaintiff's abnormal thyroid readings were likely due to the HCV, however, the consultant stated that plaintiff "[d]oes not need treatment as Interferon is known to be able to cause ... abnormalities in thyroid function...." *Id.*

The doctor suggested another test in six to eight months. *Id.* at 9, 20.

### 3. *Personal Involvement*

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus subject to individual liability.

**\*11** A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)).

In this case, it is clear that defendant Wright, who is the Chief Medical Officer of DOCS, was not involved in plaintiff's day-to-day medical care and was in no way involved in plaintiff's case. Wright Decl. ¶ 3. The only "involvement" by defendant Wright would have been when defendant Haider Shah made the request for the approval of plaintiff's treatment and ordered the medications. Haider Shah Decl. Ex. A at 179, 181. Plaintiff is claiming that the delay in treating him for HCV was the unconstitutional conduct. To the extent that defendant Wright had any actual involvement at all, it was *after* the allegedly unconstitutional delay had occurred.

Plaintiff claims that he can establish personal responsibility either because defendant Wright created an unconstitutional policy or because he failed to properly train physicians such as defendant Haider Shah in the proper care of inmates with HCV. Compl. ¶¶ 70, 71. Plaintiff attempts to hold defendant Wright liable for the allegedly unconstitutional policy of denying inmates HCV treatment if they are within fifteen months of parole, or the policy of denying inmates HCV

treatment if they have not participated in a drug treatment program.

The court would first point out that prior to 2005, the HCV Guidelines contained a provision stating that the inmate's "anticipated incarceration" had to be adequate to complete the evaluation and treatment. Wright Decl. Ex. A–2, June 20, 2004 Guidelines at p. 4 (Criteria for Treatment No. 13). The length of anticipated incarceration required was different for different genotypes of the virus: nine months for genotypes 2 and 3 and fifteen months for genotypes 1 and 4, from the time of referral, including the 24–48 week treatment course. *Id.* This section provided that inmates who would not be able to complete a course of treatment due to their time of incarceration would receive a baseline evaluation and be referred for medical follow-up and treatment upon release. *Id.* Additionally, inmates who had a substance abuse history were required to successfully complete or be enrolled in a substance abuse program. *Id.* (Criteria for Treatment No. 11).

In October 2005, the Guidelines were revised, and the above requirements were amended. Wright Decl. Ex. A–1 at p. 2. Instead of requiring the substance abuse program, the new Guidelines "strongly encouraged" inmates with a history of substance abuse to complete the program "since dealing with alcohol or substance use issues is an essential part of their Hepatitis C/liver treatment and protection program." *Id.* (Criteria for Treatment No. 11). Finally, if the inmate does not have an anticipated incarceration adequate to complete the evaluation and treatment, the new Guidelines provide that he could begin the treatment, and he would be followed *after release* through the "Continuity Program," as long as the inmate agreed to the conditions of the program. *Id.* (Criteria for Treatment No. 13).

**\*12** While defendant Wright might be responsible for helping to create these guidelines, plaintiff in this case was *never* denied treatment *because of* the failure to take the substance abuse program since he completed the program in 2000, long before he requested the treatment that became available in *2002. See* Haider Shah Decl. Ex. A at 350. Thus, even if defendant Wright were responsible for the "policy," plaintiff was never denied treatment based on this policy.

Plaintiff somehow claims that he also may have been denied the HCV treatment because of the pre–2005 policy limiting treatment based on an inmate's anticipated length of incarceration. There are some notations in the record, indicating that he was going to be paroled in the near future.

On August 7, 2003, a nurse noted on plaintiff's AHR that plaintiff "goes home in 30–60 days." *See* Haider Shah Decl. Ex. A at 321. On August 5, 2005, Nurse Perrotta wrote in the AHR that plaintiff "states [sic] is paroling soon-needs psych eval." *Id.* at 247. Based upon plaintiff's August 5, 2005 statement, on the same day, Nurse Perrotta completed a "Request and Report of Consultation Form," with a similar notation that plaintiff "states [sic] paroling soon-mandatory psy. eval. needed." *Id.* at 245.

Neither of these notations indicates that plaintiff was being denied HCV treatment because he was not going to be incarcerated long enough.[19] In any event, by October 13, 2005, DOCS had removed the anticipated length of incarceration requirement from the Guidelines. Although plaintiff states that on August 7, 2003, defendant Haider Shah told plaintiff that "he was too close to going home, '30–60 days', 'not ready for medication,' " plaintiff cites the AHR entry written by Nurse Dooley, ***not*** by defendant Haider Shah. *See* Haider Shah Decl. Ex. A at 321; Pl.Ex. B at 72. In any event, plaintiff was clearly ***not*** being released within 30–60 days of August 7, 2003, nor was "paroling soon" in 2005 when the note was written by Nurse Perrotta. Thus, plaintiff was not subjected to either "policy" that he claims was unconstitutional.

[19]    In fact, the court notes that the only time that plaintiff's length of incarceration was mentioned in conjunction with HCV treatment was in April of 2002, while plaintiff was still at Franklin, and a Hepatitis Consult Request was completed. Haider Shah Decl. Ex. A at 350. At that time, the older guidelines required at least 15 months, and the individual completing the form stated that plaintiff ***met the criteria.*** *Id.*

The court notes that in *Hilton v. Vasquez,* 235 F.R.D. 40 (N.D.N.Y.2006), District Judge David N. Hurd certified a class of inmates who had been denied HCV treatment based upon their failure to complete a DOCS-sponsored substance abuse program. *Id.* at 50–54. By memorandum, defendant Wright had voluntarily rescinded the requirement, however, the court was concerned that the plaintiff class would not be assured of the appropriate relief. *Id.* at 46–50. The parties entered into an interim settlement agreement in July of 2007, and on January 2, 2008, Judge Hurd approved the interim agreement as a final settlement agreement. *Hilton v. Vasquez,* 9:05–CV1038, 2008 U.S. Dist. LEXIS 461, 2008 WL 53670 (N.D.N.Y. Jan. 2, 2008). The settlement required DOCS to

reevaluate any prisoner who was denied treatment for HCV ***"because of"*** the ASAT program. *Id.* at *3.

**\*13** Plaintiff was not, and clearly is not a class member in *Hilton.* Plaintiff in this case has obtained his treatment, and thus, only has a claim for damages. Plaintiff was ***never*** denied treatment because he failed to participate in a substance abuse program. Nor does the record support that he was ever denied treatment because he was being paroled "soon."[20] Thus, plaintiff cannot show that he was denied treatment due to any "policy" that was created or condoned by defendant Wright.

[20]    The court notes that the amended complaint in *Hilton* also alleged that it was difficult to enroll in the programs due to the number of inmates who took the programs. (Dkt. No. 11 at ¶ 4) (*Hilton* ). The amended complaint further alleged that even if an inmate finally had the opportunity to enroll in the substance abuse program, he would be denied participation in the program if the inmate were going to be released on parole before finishing the program. *Id.* ¶ 5. There was no challenge, however, to the requirement that an inmate had to have enough time remaining on their sentence before they were allowed to get treatment. There were various ***other*** issues related to the requirement that inmates participate in the substance abuse programs, and one of the important allegations was that the DOCS policy did not allow for individualized assessments of an inmate's drug history or medical condition prior to imposing this requirement. *Id.* ¶ 3.

Plaintiff's HCV drug treatment was delayed because of the requirement that an individual with a prior psychiatric history must be cleared by a psychologist or a psychiatrist prior to beginning the treatment. Although this requirement is one of the criteria for treatment[21] and is, thus, part of the DOCS "policy," plaintiff is not challenging the "policy" or the requirement. Plaintiff is claiming that defendant Haider Shah "failed to seek the psychiatric clearance until October 20, 2005," and "failed to acknowledge" that plaintiff was cleared for treatment for six months after he was cleared, causing an unconstitutional delay in treatment. Compl. ¶ 2.

[21]    *See* Hepatitis C Primary Care Guidelines dated October 13, 2005, Criteria for Treatment No. 10. Wright Decl. Ex. A–1 at p. 6.

2009 WL 1437589

Plaintiff claims that defendant Wright may be held liable because he failed to train and supervise employees such as defendant Haider Shah in the care of inmates who are identified by their treating physicians as being in need of HCV treatment. Compl. ¶ 70. Defendant Wright is the Chief Medical Officer of DOCS and is not located at any particular correctional facility. Because the allegedly unconstitutional policies plaintiff has cited as created by defendant Wright were not applied to plaintiff, plaintiff would now have to show that defendant Wright was "grossly negligent" in supervising defendant Haider Shah. *Colon,* 58 F.3d at 873.

Plaintiff does not claim that defendant Wright had notice of the alleged improper delay in plaintiff's case. Thus, it is unclear how defendant Wright would be "grossly negligent" in supervising defendant Haider Shah, given that the adequacy of the general policy of requiring psychiatric clearances for HCV treatment is *not in dispute.* Thus, plaintiff has failed to show that defendant Wright was personally involved in plaintiff's alleged denial of constitutionally adequate medical care, and any claim for damages may be dismissed as against defendant Wright. The court may proceed to consider plaintiff's medical care claims as against defendant Haider Shah.

### 4. *Medical Care*

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing inter alia *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

#### A. Objective Element

**\*14** In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006) (citing *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Determining whether a deprivation is sufficiently serious also involves two inquiries. *Id.* The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who

act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Id.* (citing *Farmer,* 511 U.S. at 844–47).

The second part of the objective test asks whether the *inadequacy* in the medical care is "sufficiently serious." *Id.* at 280. The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Id.* (citing *Helling v. McKinney,* 509 U.S. 25, 32–33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)). If the "unreasonable care" consists of a failure to provide *any* treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003)). However, in cases such as this one, where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id.* If the plaintiff is receiving ongoing treatment, and the issue is an unreasonable delay or interruption of the treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Id.* (citing *Smith,* 316 F.3d at 185). Thus, the court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as the basis for an Eighth Amendment claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Id.* at 280.

#### B. Subjective Element

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Id.* (citing *Wilson v. Seiter,* 501 U.S. 294, 300, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Id.* (citing *Farmer,* 511 U.S. at 835–37). Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id.* Deliberate indifference is equivalent to subjective recklessness. *Id.* (citing *Farmer,* 511 U.S. at 839–40).

In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* (citing *Chance,* 143 F.3d at 702). The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. *Chance,* 143 F.3d at 702 (quoting *Farmer*

*v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). The defendant must be subjectively aware that his or her conduct creates the risk, however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer,* 511 U.S. at 844. Thus, the court stated in *Salahuddin,* that the defendant's believe that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin* 467 F.3d at 28.

**\*15** Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds,* 151 F.Supp.2d at 312 (citing *Estelle,* 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams,* 474 U.S. 327, 332, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (negligence not actionable under Section 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under Section 1983.

### C. Application

In this case, plaintiff essentially claims that defendant Haider Shah was deliberately indifferent to plaintiff's serious medical needs because the doctor delayed plaintiff's HCV treatment from October of 2002 until June of 2006 for a series of improper reasons. Plaintiff's other claims, alleging that defendant Haider Shah also failed to "monitor plaintiff's elevated liver functions tests (LFT's), for nineteen straight months, when the HCV protocol called for monitoring every 8–12 weeks; failed to refer plaintiff to a liver specialist; and failed to order a "prescribed" liver biopsy are related to the delay.

No one disputes that HCV is a "serious medical condition." However, since a review of the plaintiff's medical records in this action show that plaintiff received **substantial** medical care for his illness, this court must analyze the Eighth Amendment claim with reference to whether the "delay" was sufficiently serious. The Second Circuit opinion in *Salahuddin* is instructive in this regard. The plaintiff in *Salahuddin* also had HCV, and the defendant doctor cancelled plaintiff's liver biopsy, postponing the procedure for a period of five months. 467 F.3d at 281. The court stated that it could not determine as a matter of law that it was "reasonable" for a prison official to postpone the plaintiff's course of treatment for HCV "because of the possibility of parole without an individualized assessment of the inmate's actual chances of parole." *Id.* The court then assumed that the five-month delay was "objectively serious" because the defendants did not address the issue on appeal. [22]

---

[22]    The Second Circuit pointed out that the defendants incorrectly believed that the objective prong turned upon the severity of plaintiff's HCV, rather than the severity of the delay. *Salahuddin,* 467 F.3d at 281 n. 7. The court relied on the defendants' forfeiture of the argument.

---

**\*16** The delay in this case was approximately three and one half years, according to plaintiff. [23] The court first finds that plaintiff has not raised a material issue of fact regarding the objective factor in the Eighth Amendment analysis. There is no evidence that the delay was "substantially serious." It is clear that on October 23, 2002, defendant Haider Shah's entry in plaintiff's AHR "ordered" a psychiatric clearance. In *Salahuddin,* the defendants did not present any evidence regarding the "seriousness" of the harm caused by the five month delay. 467 F.3d at 281. Unlike defendants in *Salahuddin,* the defendants in this case have presented evidence that the delay was not "substantially serious." Both defendants and Dr. Rogers state in their declarations that because HCV progresses so slowly, the three year delay was "unremarkable." Wright Decl. ¶ 35; Haider Shah Decl. ¶ 34; Rogers Decl. ¶ 14. [24] Dr. Rogers states that "it is unlikely that drug therapy in 2002 or 2003 would have been any more successful than the course of therapy [plaintiff] received in 2006." Rogers Decl. ¶ 14. Thus, plaintiff has not raised a genuine issue regarding the objective prong of the test. In any event, assuming that the delay were substantially serious, the court will proceed to analyze the subjective prong of the test.

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 146 of 201
Motta v. Wright, Not Reported in F.Supp.2d (2009)
2009 WL 1437589

23     As stated above, plaintiff complains about the delay between October of 2002 and June 1, 2006, whereas defendants interpret the "delay" as beginning in October 2002, but ending on October 30, 2005, when plaintiff's psychiatric clearance was obtained.

24     Dr. Rogers actually states that "four years is not a particularly long period in the course of a Hepatitis C progression." Rogers Decl. ¶ 14.

Again, reference is made to the analysis in *Salahuddin.* Notwithstanding the question of fact regarding the reasonableness of the defendant's actions in *Salahuddin,* the court granted summary judgment for the defendant doctor based upon the subjective element of the analysis. *Id.* at 281–82. The court found that the doctor had written a letter expressing his belief that because "Hepatitis C leads to cirrhosis only over 20 to 30 years, Salahuddin 'is in no immediate danger' and that 'f[ro]m a medical standpoint [,] there is no urgency for [the cancelled liver biopsy].'" *Id.* at 282 (alteration in original). The court stated that while the assumption could have been "unsound" absent an investigation into the progression of the plaintiff's HCV, the doctor's letter was "direct evidence that he was not aware of a substantial risk that postponing the liver biopsy would cause serious harm." *Id.*

The court in *Salahuddin* stated that there was no circumstantial evidence to contradict the doctor's conclusion, distinguishing the court's own decision in *Johnson v. Wright,* 412 F.3d 398 (2d Cir.2005). *See Salahuddin,* 467 F.3d at 282. In *Johnson,* another HCV case, the Second Circuit denied summary judgment because there was evidence raising a genuine issue of material fact surrounding the defendant's decision to administer one drug over another, based upon other treating physicians' recommendations of the rejected medication. *Id.* The court stated that *Johnson* involved a case of "willful blindness," and the idea of "willful blindness" would have required that someone arouse the defendant's suspicion that postponing Salahuddin's biopsy would be seriously harmful. *Id.* (distinguishing *Johnson,* 412 F.3d at 404–05).

**\*17**  In this case, defendant Haider Shah's explanation for the delay in providing plaintiff with the HCV treatment is based upon the lack of a psychiatric "clearance" between October 2002 and October 2005. The HCV protocol clearly requires a psychiatric clearance for individuals who have a history of "major depression or other major psychiatric

illness." Wright Decl. Ex. A–1, Criteria for Treatment No. 10. The requirement itself is a medical judgment that is not in dispute in this case. In any event, there appears to be no question that one of the side effects of the HCV treatment is "depression with associated suicidal feelings," making the requirement of psychiatric clearance reasonable. *See* Rogers Decl. ¶ 18. Dr. Rogers states that some inmates who receive the HCV treatment "will need to be followed by psychiatry and treated with mood altering drugs." *Id.* ¶ 20.

Defendant Haider Shah states that "multiple requests" were submitted for psychiatric evaluations of plaintiff. Haider Shah Decl. ¶ 24. Plaintiff's October 23, 2002 AHR shows that defendant Haider Shah noted the need for a psychiatric clearance for "possible" HCV treatment. Haider Shah Decl. Ex. A at 331. In his declaration, defendant Haider Shah cites this notation in the AHR as one of the multiple "requests" that were "submitted" for "psychiatric evaluations" between October 2002 and October of 2005. Haider Shah Decl. ¶ 24. The other dates cited by defendant Haider Shah are October 29, 2004; August 5, 2005; and October 20, 2005, the date that clearance was finally obtained. *Id.* (citing Ex. A at 262; 245–47; 239).

A review of the above "requests" shows that the first is a "notation" in the AHR. The second request is a "Mental Health Referral" form, dated October 29, 2004. Haider Shah Decl. Ex. A at 261. The form states that plaintiff was requesting to resume the psychiatric medications that he had refused two months before because of increased "frustration, anxiety, and sleeplessness." *Id.* The AHR contains a nurse's entry, dated October 29, 2004 stating that plaintiff was requesting to resume his Paxil and Vistaril. *Id.* at 263.

The third request consists of an AHR entry and a "Request and Report of Consultation," dated August 5, 2005. Haider Shah Decl. Ex. A at 245, 247. This entry on the AHR is made by a nurse and follows the notation that plaintiff "states" he is paroling soon. *Id.* at 245. The top of the "Request and Report of Consultation" form is also completed by the nurse and states that plaintiff told the nurse that he was paroling soon, and the nurse wrote that plaintiff needed a mandatory psychiatric evaluation. *Id* . at 247. The bottom of the form is blank, indicating that the evaluation was never performed. [25] *Id.*

25     It is possible that the evaluation was never performed because plaintiff was ***not*** paroling soon. It appears from other portions of the plaintiff's

medical records that psychiatric evaluations may be required for parole purposes. *See* Haider Shah Decl. Ex. A at 383–84 (Mental Health Status Report for Division of Parole, dated August 20, 2001).

The final request is the October 20, 2005 "Request and Report of Consultation," and the AHR entry dated the same day, referencing the HCV treatment as the reason for the request. *Id.* at 239, 240. The bottom of the form was completed on the same day, stating that plaintiff was only treated briefly for "a few months for depression" after the death of a family member and stating that there was no contraindication for the treatment. *Id.* at 239. The AHR entry states that on October 30, 2005, plaintiff was "asking" about the HCV treatment, and defendant Haider Shah referred to all the requests for psychiatric consultation listed above and stated that there had been "no psych. clearance." *Id.* at 240.

**\*18** In the October 30, 2005 AHR entry, defendant Haider Shah refers to another prior request, dated June 25, 2004. *Id.* A review of the June 25, 2004 AHR entry shows that one of defendant Haider Shah's "orders" on that date was a "note to tracking nurse" to check for the "Hep C tx." *Id.* at 286. The entry also states "Ret if not written." *Id.* On October 30, 2005, defendant Haider Shah ordered "Psych. Clearance" and "GI Consult." *Id.* There is a notation by the nurse indicating that she "so noted" the ordered section of the entry. [26] *Id.* The October 29, 2004 and August 5, 2005 requests, however, do not reference HCV or HCV treatment as the reason for the referral.

[26]    This notation also appears on the October 23, 2002 entry. Haider Shah Decl. Ex. A at 331.

Interestingly, the record contains various versions of the October 30, 2005 request for psychiatric clearance. Plaintiff himself has submitted four such versions. Pl.App. B at 88–92. One of these versions is simply the referral form with only the top portion (the request) completed. *Id.* at 91. The second has the top portion and the bottom portion (the clearance) completed. *Id.* at 88, 90 (two copies). The third document contains a notation at the bottom, written by defendant Haider Shah, which appears to be dated June 1, 2006, but the notation is very difficult to read. *Id.* at 92. It appears to state "How did it get ... without ... us ... seeing." *Id.* Defendants' exhibit contains the same notation. Haider Shah Decl. Ex. A at 239.

Finally and most interestingly, ***plaintiff's appendix*** contains a version of the document with what appears to be a note copied onto the top left corner of the document, written by Dr. L.

Kalias, the doctor who signed the clearance at the bottom. Pl.App. B at 89. The note states "Sorry this took so long-Also FYI—Gave MH approval for Hep C tx today." *Id.* It is unclear why Dr. Kalias would be apologizing for taking "so long," when the form request and the clearance are dated the same day, unless, there had in fact been prior requests that had gone unanswered. This version does not appear in the defendants' exhibits.

It thus appears that although plaintiff seeks to blame defendant Haider Shah for the delay, it may not be completely attributable to this defendant. Defendant Haider Shah also states in his declaration that plaintiff may not have been cleared sooner because between 2002 and 2005, he was reporting symptoms of depression and was receiving medication for the condition. Haider Shah Decl. ¶ 25. The records ***do*** show that plaintiff had periods of psychiatric treatment. Plaintiff had signs of depression as early as January 1995, while he was incarcerated at Collins Correctional Facility. Haider Shah Decl. Ex. A at 534. However, in 1999, plaintiff was psychiatrically evaluated by Dr. David Goldman at Riverview Correctional Facility for the Parole Board, and there were "no current psychiatric problems." *Id.* at 420–23. Dr. Goldman had the same opinion in 2001 when he performed another psychiatric review for the Parole Board. [27] *Id.* at 383–85.

[27]    It is clear from these documents that each time an inmate is considered for parole, there is a mandatory psychiatric examination.

**\*19** On February 25, 2002, plaintiff was again examined by Dr. Goldman, who wrote a report, changing plaintiff's OMH level to Level III[28] and prescribing Zyprexa. *Id.* at 372. Dr. Goldman wrote a second report the next day, February 26, 2002, continuing plaintiff's OMH level as III. *Id.* at 368–69. Plaintiff was still taking the psychiatric medication when he was transferred to Franklin on March 15, 2002. *Id.* at 365, 368. The medications were discontinued by plaintiff's own request on March 30, 2002. *Id .* at 358–59. His OMH Level was changed to 6 on September 13, 2002. *Id.* at 335.

[28]    Mental Health Service Level 3 indicates that the inmate needs short term chemotherapy for disorders such as anxiety, moderate depression, or adjustment disorders. Haider Shah Ex. A at 444. (listing of levels). Level 6 is an inmate who does not need Mental Health Services. *Id.* The medical

providers use roman numerals and arabic numbers interchangeably to refer to these levels.

Although there was no discussion of plaintiff's mental status in the 2003 medical records, in plaintiff's April 8, 2004 AHR entry, there is a notation that plaintiff was complaining of being depressed, that a relative was dying, and that he wanted to resume his psychiatric medication. Haider Shah Decl. Ex. A at 294. An urgent mental health referral was made. *Id.* at 293. Plaintiff was prescribed his Paxil and Vistaril on April 12, 2004. *Id.* at 291. Although plaintiff stopped taking this medication in June of 2004, he resumed the medication in October of 2004. *Id.* at 261, 263, 283. The court notes that plaintiff did experience some psychiatric problems on August 6, 2006, during the course of his HCV treatment. *Id.* at 155–56.

Defendant Haider Shah also states that aside from plaintiff's psychiatric history, there were physical conditions to consider prior to beginning the HCV treatment. Haider Shah Decl. ¶ 27. The medical personnel were concerned about the risk to plaintiff's thyroid and the scarring of plaintiff's internal organs due to a gunshot wound. *Id.* Defendant Haider Shah points out that plaintiff did experience some thyroid problems as a result of the treatment. *See* Haider Shah Decl. ¶ 27 & Ex. A at 9, 17, 20, 23–24. Plaintiff was referred to a specialist for evaluation. Ex. A at 20.

Although plaintiff in this case complains about the "delay" between October of 2005 and June of 2006 when he began his treatment, there is no evidence of "delay." Dr. Rogers and defendant Wright state that even after the psychiatric clearance was obtained, further evaluation was required, and "significant medical steps" had to be taken before the administration of the treatment. Rogers Decl. ¶ 22; Wright Decl. ¶ 34. Beginning in January of 2004, plaintiff had laboratory tests more frequently. [29] After the psychiatric clearance was obtained in October 2005, plaintiff was referred to a gastroenterologist, and had a liver biopsy prior to beginning his treatment in June of 2006. Haider Shah Decl. Ex. A at 192–93 (biopsy report). Plaintiff's extensive medical care continued throughout his HCV treatment and afterward.

[29]     Plaintiff had laboratory testing for liver function done twice in January 2004; July; and October of 2004. Haider Shah Decl. Ex. A at 306, 308–09, 278–81, 268. On October 20, 2004, defendant Haider Shah made a request for a CT scan of plaintiff's abdomen to rule out a possible

obstruction of plaintiff's bile duct because plaintiff was complaining of vomiting and weight loss. *Id.* at 260, 269. The CT scan was performed on November 5, 2004. Plaintiff had laboratory tests again on May 25, 2005; February 14, 2006; March 7, 2006; March 16, 2006; and April 4, 2006. *Id.* at 250, 220–23, 217, 211–12, 186.

Defendant Haider Shah states that upon completion of the HCV therapy, plaintiff's viral levels had become almost undetectable, however, the virus reemerged. Haider Shah Decl. ¶ 34. Defendant Haider Shah states that this reemergence was not related to the delay in treatment, but rather due to the effectiveness of the drugs on plaintiff's particular virus. *Id.* Defendant Wright states that by the time that plaintiff had his liver biopsy on March 27, 2006, the fibrosis in his liver had progressed to Stage 3, a severe degeneration, falling short of cirrhosis. Wright Decl. ¶ 27.

**\*20** There is no evidence in this case that defendant Haider Shah was "deliberately indifferent" to plaintiff's condition. At worst the failure of defendant Haider Shah to follow up on the request for psychiatric clearance was inadvertence or negligence, [30] and it is unclear whether the delay was attributable to defendant Haider Shah since the notation on plaintiff's exhibit from Dr. Kalias contains an apology that the clearance "took so long." The delay appears to have been due to a possible misunderstanding regarding the request for psychiatric clearance.

[30]     The court in no way states this as a "finding."

According to Dr. Rogers, the delay was based on a "combination of legitimate factors." Rogers Decl. ¶ 30. These factors were based on medical reasons, and any delay between obtaining the psychiatric clearance in October of 2005 and the eventual commencement of the treatment in June of 2006 was due to plaintiff undergoing the required tests prior to the administration of the drugs, including plaintiff's biopsy in March of 2006. Rogers Decl. ¶ 31. As in *Salahuddin,* since all of the doctors in this case have indicated that it is their medical judgment that the disease progresses so slowly that even a four year delay would not affect the efficacy of plaintiff's treatment, [31] there is no evidence to show that defendant Haider Shah was deliberately indifferent to a serious risk to plaintiff.

[31]     As stated above, although plaintiff initially responded to the treatment, the virus has

reemerged. All the doctors state, however, that the re-emergence of the virus is not due to any delay in treatment, but rather due to the type of virus. The doctors state that because plaintiff is a "relapser," the virus would have re-emerged whether he had the treatment in 2002 or 2006. Haider Shah Decl. ¶ 34; Wright Decl. ¶ 27. *See also* Rogers Decl. ¶ 28 ("the likelihood of a different response to the same drugs is not high").

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 29) be **GRANTED,** and the complaint be **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 1437589

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Gazzola v. County of Nassau, Not Reported in Fed. Supp. (2022)

2022 WL 2274710

2022 WL 2274710
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Gloria GAZZOLA, Individually and as Administrator
of the Estate of Antonio Marinaccio, Jr., Plaintiff,

v.

COUNTY OF NASSAU; Nassau County Correctional
Center; Nassau County Sheriff's Department; Michael
J. Sposato, Individually and as Sheriff of Nassau
County; Armor Correctional Health Services, Inc.;
Armor Correctional Health Services of New York,
Inc.; Nassau County Corrections Officers, "John Does
1-10," in their Individual and Official Capacities;
Armor Correctional Health Service Employees
and Agents, "John and Jane Does 11-20," in their
Individual and Official Capacities, Defendants.

16-CV-0909(JS)(AYS)
|
Signed 06/23/2022

**Attorneys and Law Firms**

For Plaintiff: Harry Chris Demiris, Esq., 400 Post Avenue,
Suite L11, Westbury, New York 11590.

For Defendant County of Nassau: Andrew Reginald Scott,
Esq., Nassau County Attorney's Office, 1 West Street,
Mineola, New York 11501.

For Defendant Armor Health: Dale Nicholson McLaren, Esq.,
John J. Doody, Esq., Lewis Brisbois Bisgaard & Smith, LLP,
77 Water Street, 21st Floor, New York, New York 10005.

## MEMORANDUM & ORDER

SEYBERT, District Judge:

**\*1** On February 23, 2016, Gloria Gazzola ("Plaintiff"),
individually and as the administrator of the estate of
Antonio Marinaccio, Jr., commenced this action pursuant
to 42 U.S.C. § 1983 against the County of Nassau (the
"County") and Armor Correctional Health Services, Inc. [1]
("Armor," and together with the County, "Defendants"),
among other Defendants. Plaintiff brings Monell claims
against Defendants for deliberate indifference to Marinaccio's

medical needs in violation of his Eighth Amendment
constitutional rights, as well as New York State law claims.
Pending before the Court are Defendants' respective motions
for summary judgment. (County Mot., ECF No. 58; County
Support Memo, ECF No. 58-13; County Reply, ECF No. 69;
Armor Mot., ECF No. 61; Armor Support Memo, ECF No.
61-12; Armor Reply, ECF No. 70.) For the following reasons,
the County's motion is GRANTED in part and DENIED in
part; and Armor's motion is GRANTED in part and DENIED
in part.

[1]    Plaintiff also names Armor Correctional Health
       Services of New York, Inc. as a Defendant.

## BACKGROUND

Unless otherwise noted, the following facts are undisputed. [2]

[2]    The parties' respective Local Rule 56.1 Statements
       are equally unhelpful, Defendants for failing
       to address facts of obvious relevance to the
       legal issues raised herein, such as the New
       York State Commission of Corrections report
       on the Decedent's (and others') death while in
       custody at the NCCC; and Plaintiff for failing
       to support each statement of fact with admissible
       evidence, as the Local Rules require. Further,
       neither Defendant filed a response to Plaintiff's
       Local Rule 56.1 Counterstatement, as the Local
       Rules and this Court's Individual Rules require.
       Rather than strike the parties' respective Local
       Rule 56.1 Statements and Counterstatements, the
       Court has independently reviewed the summary
       judgment record, including the exhibits attached
       to the Declarations of Andrew R. Scott (Scott
       Decl., ECF No. 58-1), Dale McLaren (McLaren
       Decl., ECF No. 61-2), and Harry C. Demiris, Jr.
       (Demiris Decl., ECF Nos. 66; Second Demiris
       Decl., ECF No. 67-2), to identify the facts relevant
       to disposition of Defendants' respective motions.
       See Holtz v. Rockefeller & Co., 258 F.3d 62, 73
       (2d Cir. 2001) ("[W]hile a court "is not required
       to consider what the parties fail to point out" in
       their Local Rule 56.1 statements, it may in its
       discretion opt to "conduct an assiduous review
       of the record."). For that reason, the Court cites

Case 9:22-cv-00181-GTS-MJK   Document 96   Filed 07/24/24   Page 151 of 201

Gazzola v. County of Nassau, Not Reported in Fed. Supp. (2022)

2022 WL 2274710

sparingly to the parties' Local Rule 56.1 Statements and Counterstatements.

I. Facts

This case arises out of the death of Antonio Marinaccio, Jr. ("Decedent") while incarcerated at the Nassau County Correctional Center ("NCCC"). The NCCC is a correctional facility operated by the Nassau County Sheriff's Department, an agency of the County. Michael Sposato served as the Sheriff of Nassau County during the relevant period. Sheriff Sposato was therefore responsible for the daily operation of the NCCC.

A. Pre-Incarceration Medical Examination

**\*2** From September 19, 2012 up until his incarceration at the NCCC on April 24, 2015, Decedent received treatment from Patricia Dellatto, a nurse practitioner, for pain management after he sustained injuries in a car accident in October 2010. (Armor Local Rule 56.1 Statement ("Armor 56.1 Stmt."), ECF No. 61-1, ¶ 15; Nurse Dellatto Depo. Tr. at 23:8-11, Ex. H, attached to McLaren Decl.) Throughout the course of his treatment, Nurse Dellatto twice performed an electrocardiogram test, or "EKG," [3] on Decedent: once on January 28, 2013, and again on April 14, 2015. [4] (Armor 56.1 Stmt. ¶ 16.) After the first EKG, which showed changes with possible myocardial infarction and "right access deviation," or electrical activity of the heart shifting to the right," Nurse Dellatto referred Decedent to a cardiologist. (Nurse Dellatto Depo. Tr. at 56:20-57:6; id. 67.) Nurse Dellatto's medical chart from around this time indicates that Decedent was diagnosed with "coronary artery disease with shortness of breath and nonspecific EKG changes ... showing first degree block." (Id. at 69:11-14.)

[3]     "An electrocardiogram (ECG) [also known as an "EKG"] is one of the simplest and fastest tests used to evaluate the heart. Electrodes (small, plastic patches that stick to the skin) are placed at certain spots on the chest, arms, and legs. The electrodes are connected to an ECG machine by lead wires. The electrical activity of the heart is then measured, interpreted, and printed out. No electricity is sent into the body." Electrocardiogram, Johns Hopkins Medicine        https://www.hopkinsmedicine.org/ health/treatment-tests-and-therapies/electrocardiogram (last visited June 23, 2022).

[4]     There is some confusion whether Decedent received more than the two documented EKGs during his course of treatment with Nurse Dellatto. (See, e.g., Nurse Dellatto Depo. Tr. at 68, 72.)

Nurse Dellatto performed the second EKG on Decedent shortly before his incarceration at the NCCC. The EKG indicated "nonspecific abnormal electrocardiogram" with an "unconfirmed interpretation." (Id. at 100:1-12.) Based on the results of the second EKG, as well as her physical examination, Nurse Dellatto did not find any indication that Decedent was suffering from a cardiac problem. (Id. at 100-101.) Nurse Dellatto believes that she gave Decedent "a copy of the EKG to show to his lawyer, and the jail, and the court." (Id. at 50:6-8.)

B. Initial Examination at the NCCC

Decedent arrived at the NCCC on April 24, 2015. At 11:00 p.m. that evening, Armor nurse Katherine McCormack performed an "intake health screening and assessment" on Decedent. (Armor Medical Records at 15, Ex. C, attached to McLaren Decl.) [5] Nurse McCormack took a complete set of Decedent's vitals and his temperature. (Id.) According to Nurse McCormack's treatment notes, Decedent reported that for the two weeks leading up to his admission to NCCC he had been suffering from a cough with expectoration of green mucus. (Id. at 22.) Decedent added that he "went on a binge until jail" and admitted to using cocaine, crack, marijuana, and Percocet. [6] (Id. at 13, 16; see also Nurse McCormack Depo. Tr. at 25, Ex. 9, attached to Second Demiris Decl.) [7] Nurse McCormack observed Decedent was "anxious," "disheveled," and "aggressive." (Armor Medical Records at 15.)

[5]     Citations are to the exhibits' internal pagination where available; otherwise, citations are to the electronically generated pagination.

[6]     Nurse Dellatto had invariably prescribed Percocet for Decedent for pain management, and it is unclear from the record whether Decedent's Percocet use prior to his incarceration was physician-approved.

[7]     Plaintiff separately provided an uncorrupted copy of Nurse McCormack's deposition testimony at ECF No. 73.

Based on Decedent's anxious and disheveled state, as well as his "significant past medical history of polysubstance," or

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 152 of 201

Gazzola v. County of Nassau, Not Reported in Fed. Supp. (2022)

2022 WL 2274710

use of multiple forms of drugs and alcohol, and the fact that he had an EKG prior to his incarceration, Nurse McCormack asked the supervising doctor, Dr. Sanchez, to order an EKG and a chest X-ray. (Nurse McCormack Depo. Tr. at 25-26.) According to Nurse McCormack, after confirming that Decedent did not report any chest pain, Dr. Sanchez declined to order an EKG or chest X-ray. (Id. at 26-27.) Nurse McCormack further testified that, at her urging, Dr. Sanchez came into the intake room and spoke to Decedent. (Id. at 28-29.) Although she does not recall the specifics, including whether Dr. Sanchez examined Decedent, she recalls some discussion about Decedent's recent EKG. (Id. 28:24-29:14.) In the end, Dr. Sanchez ordered an albuterol nebulizer to treat Decedent's asthma but did not order the EKG or chest X-ray. (Id. at 30.) Nor did Dr. Sanchez write a progress note summarizing his visit with Decedent. Moreover, Nurse McCormack claims that the assessment note she created in connection with Decedent's intake examination, wherein she recorded that Dr. Sanchez declined to order an X-ray and EKG, went missing after Decedent's subsequent cardiac incident. (Id. at 39-40.)

**\*3** The following morning, another Armor nurse examined Decedent. She observed "wheezes present in lungs" and contacted an Armor physician's assistant to order albuterol nebulizer to treat Decedent's asthma.

### C. Emergency Medical Treatment

In the early morning hours of April 26, 2015, Decedent complained of chest pains to the NCCC correctional officer on duty in Decedent's cell block. (See Correction Officer Desk Log, Ex. 2, attached to Second Demiris Decl.) The correctional officer, likely Officer Meyer, later told the New York State Commission of Correction ("NYS COC") that Decedent told him "I feel like I am having a heart attack." (NYS COC Report on Decedent at 5, Ex. 7, attached to Second Demiris Decl.) Officer Meyer called Armor for an emergency sick call, and Armor Nurse Benny Cador responded.

In his deposition, Nurse Cador summarized his initial assessment:

> The patient was physically stable, no respiratory distress. He walked up from his bed, he walked to the bars. He was able to -- he was alert, oriented

> times four, he knew where he was. He was physically stable to walk to the bars.... I did a set of vitals, I checked his vitals. He didn't have a fever. He did complain that he ... felt warm ... and he felt achy. At first I thought it was like maybe the flu.

(Nurse Cador Depo Tr. at 62:16-63:4, Ex. I, attached to McLaren Decl.; see also Armor Medical Records at 3.) Nurse Cador does not recall whether Officer Meyer advised him that Decedent was complaining of chest pains. (Nurse Cador Depo. Tr. at 99:9-11.) The record on this question is unclear. (See, e.g., NCCC C.O. Stmts. at 5, Ex. 5, attached to Second Demiris Decl. (statement of Correctional Officer Sergeant Thomas Nicholas: "It is to be noted that Inmate Marinaccio was complaining of chest pains to correction staff ... approximately forty five [sic] minutes prior to him being found unresponsive in his cell."); id. at 37 (contemporaneous notes from unidentified correctional officer regarding encounter with Decedent: "I feel like I'm having a heart attack"); id. at 48 (contemporaneous notes from unidentified correctional officer regarding encounter with Decedent: "Don't recall stated to RN that Marinaccio was having chest pain"); id. at 57 (same: "Inmate c/o chest pains")). In any event, Nurse Cador promised to have a doctor follow up with Decedent in the morning. (Nurse Cador Depo. Tr. at 81:19-24.)

A short time after Nurse Cador's examination,[8] Officer Minter, another NCCC correctional officer, found Decedent unresponsive and lying faceup in his cell. (Armor 56.1 Stmt. ¶ 7; NCCC C.O. Stmts. at 18.) Officer Minter activated his body alarm and notified Armor that there was an emergency. (See generally NCCC C.O. Stmts.) Nurse Cador was summoned to provide emergency treatment; however, he forgot the automated external defibrillator, or "AED," and was forced to return to the nursing station to retrieve it. (Nurse Cador Depo. Tr. at 105:21-22.) In Nurse Cador's absence, the responding correctional officers performed CPR on Decedent. (Id. at 111:13-17.) Upon his return, Nurse Cador deployed the AED, and he and the responding correctional officers continued alternating between the AED and CPR "until the emergency services got there." (Id. at 111-17, 119:9-11.)

[8]    The length of the interval between Nurse Cador's initial examination and Decedent's cardiac incident

Case 9:22-cv-00181-GTS-MJK   Document 96   Filed 07/24/24   Page 153 of 201

Gazzola v. County of Nassau, Not Reported in Fed. Supp. (2022)

2022 WL 2274710

is unclear from the record. Nurse Cador's treatment notes indicate that his initial examination occurred at 3:25 a.m., and he was called back to Decedent's cell at 3:35 a.m. (Armor Medical Records at 3.) However, he testified at his deposition that the interval was "maybe forty-five minutes." (Nurse Cador Depo. Tr. at 63:13-14.)

**\*4** Emergency medical technicians subsequently arrived at the scene and took over all life-saving efforts. (Armor 56.1 Stmt. ¶ 10.) Decedent was transferred by EMT to Nassau University Medical Center and then again to North Shore University Hospital, where he died on May 2, 2015. (Armor 56.1 Stmt. ¶ 11.) The resulting autopsy performed on Decedent attributed his cause of death to anoxic encephalopathy following cardio-respiratory arrest, i.e., brain damage following a heart attack. (Armor 56. Stmt. ¶ 13.)

### D. The New York State Commission of Correction Reports

The NYS COC issued a final report on Decedent's death while in custody at the NCCC. (See NYS COC Report on Decedent, attached to Demiris Decl.) Based upon reports from its Medical Review Board, the NYS COC found that Decedent "received inadequate health care from Armor Inc. ... due to having an unrecognized acute myocardial infarction with probable electrocardiogram changes that could have been detected had he received a proper medical examination." (Id. at 2.) Had Armor recognized the "signs of [Decedent's] myocardial infarction," the Report continued, "his death may have been prevented." (Id.) The Report specifically found that the lack of a written examination note in the progress notes by Dr. Sanchez during his initial assessment of Decedent "represents inadequate documentation" in violation of the NY COC minimum standards and does not provide evidence that an examination occurred, and that Nurse Cador's decision to leave the scene of Decedent's cardiac incident to retrieve the AED constituted abandonment of a patient. (Id. at 3, 6.) The NYS COC made several recommendations to Armor, including that it conduct a detailed quality assurance review regarding the medical care provided to Decedent; and to the County, including that it conduct an inquiry into the fitness of Armor to serve as a correctional medical care provider at the NCCC. (Id. at 6-7.) The NYS COC addressed the Report to Sheriff Sposato. (Id. at 1.)

Plaintiff submits seven other NYS COC reports regarding inmate deaths at NCCC while under Armor's care during the 2012 through 2016 time period. (NYS COC Final Reports on Inmate Deaths, Ex. 8, attached to Second Demiris Decl.) In each report, all of which are addressed to Sheriff Sposato, the NYS COC makes certain findings as to the relevant incident and corresponding recommendations to Armor and the County. For example, in one report the NYS COC found that the decedent's death "was impacted by a failure of health care providers from Armor Inc. to adequately treat chronic illness, recognize and treat serious changes in [the decedent's] condition, provide adequate follow up on refusals of treatment and to provide a prompt transfer to a higher level of care when indicated." (Id. at 3.) The NYS COC found these failures amounted to "systemic deficiencies in the delivery of adequate medical care." (Id.) In another report, the NYS COC found that while the decedent died due to a pre-existing medical condition, "the failure of Armor Inc. health providers to adequately identify and treat [the decedent's] illnesses, to recognize the serious changes in his condition, to provide adequate follow up on refusals and renewals of medication, and a completely inadequate response to his sick call requests were contributory to his worsening health." (Id. at 15; see also id. at 30 (finding Armor's provision of "incompetent healthcare" contributed to inmate's death); id. at 42 (finding Armor's delivery of healthcare that was "incompetent and deficient" contributed to inmate's death); id. at 50 (similar); id. at 61 (finding inadequate evaluation and treatment by Armor).) The reports consistently recommended that the County conduct an inquiry into the fitness of Armor to provide correctional medical care at NCCC.

### E. The NCCC's Contract with Armor

**\*5** In 2011, after requesting and evaluating proposals from several healthcare providers, the County entered into an agreement with Armor whereby Armor would provide medical, mental health, dental, and ancillary services to inmates incarcerated at Nassau County Correctional Facilities. (County Local Rule 56.1 Statement ("County 56.1 Stmt."), ECF No. 58-14, ¶¶ 10-15.) [9] Under the contract, Armor agreed to provide services in accordance with the minimum standards of medical service as set forth in the Settlement Agreement between the Department of Justice and the County, which had resulted from a years' long investigation by the DOJ into conditions at the NCCC. (Pl. Local Rule 56.1 CounterStatement to County ("Pl. 56.1 Counterstmt. to County"), ECF No. 67-1, ¶ 48; Settlement Agreement, Ex. 1; Armor Contract, Ex. 5A; attached to Demiris Decl.)

2022 WL 2274710

9    The contract was extended through the relevant period in which Decedent was incarcerated at the NCCC.

As relevant here, the contract required Armor to develop and implement a written "quality improvement program" for medical and mental health care under the auspices of a Quality Improvement Committee, or QIC, which was responsible "for all quality improvement activities" consistent with the provisions of the DOJ Settlement (Settlement Agreement § 5(a), (b), (c).) The contract directed that the QIC be chaired by a physician and "include a multi-disciplinary review necessary to properly review the status of health care provided to inmates at NCCC." (Id.) The QIC would meet and report monthly to Sheriff Sposato and to the "Health Contract Administrator," a County employee designated to oversee administration of and monitor compliance with the contract. (Id.) However, since August 2013, the NCCC has been without a Health Contract Administrator due to the County's failure to designate one. (County Comptroller Audit at 9, Ex. 3, attached to Demiris Decl.) Nor did the QIC meet monthly with Sheriff Sposato, as the contract required. Indeed, Armor did not implement a quality improvement plan as required. (Pl. 56.1 Counterstmt. to County ¶ 158.)

Further, the contract obligated Armor to share costs with the County for off-site medical services. Specifically, once the cost of off-site medical services exceeded the $750,000 threshold per annum, Armor became responsible for 60% of the costs, with the County paying the remaining 40%. (Pl. 56.1 Counterstmt. to County ¶ 137.)

II. Procedure

Plaintiff initiated this action on February 23, 2016. Based on the foregoing allegations, Plaintiff asserted federal claims pursuant to Section 1983 for violations of Decedent's Eighth Amendment rights and Monell liability, as well as state law claims for failure to train; failure to supervise; failure to provide adequate medical care; mistakes in medical treatment; deliberate indifference; vicarious liability; negligence; wrongful death; failure to treat and/or diagnose; and intentional infliction of emotion distress.

By order dated October 13, 2016, Judge Spatt [10] dismissed Plaintiff's claims against Sheriff Sposato in his official and individual capacity for failure to adequately plead Sheriff Sposato's personal involvement in the alleged constitutional deprivations, but permitted Plaintiff's Monell claim against the County to proceed. (Order, ECF No. 20.) Magistrate Judge

Shields certified that the parties completed discovery after they filed their joint pre-trial order ("JPTO," ECF No. 57), and Defendants' respective motions for summary judgment followed.

10    The case was reassigned to the undersigned on June 30, 2020.

DISCUSSION

I. Legal Standard

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those which might affect the outcome of the suit under the governing law, and a dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Wagner v. Chiari & Ilecki, LLP, 973 F.3d 154, 164 (2d Cir. 2020) (quoting Coppola v. Bear Stearns & Co., 499 F.3d 144, 148 (2d Cir. 2007)) (internal quotation marks omitted). "The moving party bears the initial burden of showing that there is no genuine dispute as to a material fact." CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP, 735 F.3d 114, 123 (2d Cir. 2013) (cleaned up). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial," as Plaintiff does here, "the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Hetchkop v. Woodlawn at Grassmere, Inc., 116 F.3d 28, 33 (2d Cir. 1997). Moreover, "the court is not to make assessments of the credibility of witnesses" on a motion for summary judgment, as "[c]redibility assessments, choices between conflicting versions of events, and weighing of the evidence are matters for the jury." Id.

*6   On a motion for summary judgment the Court considers the "pleadings, deposition testimony, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits." Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011). In reviewing the record, "the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party

against whom summary judgment is sought." [Sheet Metal Workers' Nat'l Pension Fund v. Vadaris Tech. Inc.](), No. 13-CV-5286, 2015 WL 6449420, at *2 (E.D.N.Y. Oct. 23, 2015) (quoting [McLee v. Chrysler Corp.](), 109 F.3d 130, 134 (2d Cir. 1997)). When drawing inferences from evidence in the record in favor of the non-moving party, however, a court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." [Berk v. St. Vincent's Hosp. & Med. Ctr.](), 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (quoting [County of Suffolk v. Long Island Lighting Co.](), 907 F.2d 1295, 1318 (2d Cir. 1990)).

## II. Analysis

### A. Section 1983

[Section 1983]() provides a civil claim for damages against any person who, acting under color of state law, deprives another of any rights, privileges, or immunities secured by the Constitution or the laws of the United States. See [42 U.S.C. § 1983](); [Cornejo v. Bell](), 592 F.3d 121, 127 (2d Cir. 2010). "The purpose of [§ 1983]() is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." [Wyatt v. Cole](), 504 U.S. 158, 161 (1992). Further, it is well established that a municipality such as the County cannot be held liable under [Section 1983]() on a respondeat superior theory. See [Monell v. Dep't of Soc. Servs.](), 436 U.S. 658, 691 (1978); [Roe v. City of Waterbury](), 542 F.3d 31, 36 (2d Cir. 2008). "Rather, municipalities may be liable [under [Section 1983]()] only where 'execution of a government's policy or custom' causes constitutional violations." [Buari v. City of New York](), No. 18-CV-12299, 2021 WL 1198371, at *21 (S.D.N.Y. Mar. 30, 2021) (quoting [Monell](), 436 U.S. at 694).

There are no individually named defendants in this action, save Sheriff Sposato, who was dismissed as a party in an earlier order. Although several "John and Jane Doe" defendants were named, to date, Plaintiff has not moved to substitute named defendants for these unidentified individuals. As a result, Plaintiff's claims against these John and Jane Doe defendants are dismissed at this time. See [Asseng v. County of Nassau](), No. 14-CV-5275, 2021 WL 596620 at *11 (quoting [Delrosario v. City of New York](), No. 07-CV-2027, 2010 WL 882990, at *5 (S.D.N.Y. Mar. 4, 2010) ("Where discovery has closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe Defendants, it is appropriate to dismiss those Defendants without prejudice.")); [Gleeson v. County of Nassau](), No. 15-

CV-6487, 2019 WL 4754326, at *12 (E.D.N.Y. Sept. 30, 2019) (dismissing the plaintiffs' [Section 1983]() claims against John and Jane Doe defendants in identical circumstances).

With respect to her federal claims, then, Plaintiff may proceed against the County and Armor only on a theory of [Monell]() liability. "To prevail against a municipality in a [Section 1983]() action, a plaintiff must plead and prove three elements: (1) an official policy or custom that (2) caused the plaintiff to be subjected to (3) a denial of a constitutional right." [Kogut v. County of Nassau](), No. 06-CV-6695, 2009 WL 5033937 (E.D.N.Y. Dec. 11, 2009) (citing [Hartline v. Gallo](), 546 F.3d 95, 103 (2d Cir. 2008)). The Court first assesses whether there remain triable issues as to whether Defendants denied Plaintiff his right to adequate medical care while incarcerated as protected by the Eighth Amendment to the United States Constitution.

### 1. Deliberate Indifference to Medical Needs

#### i. Applicable Law

**\*7** The County [11] owes "a constitutional obligation to provide medical care to persons it is punishing by incarceration." [Charles v. Orange County](), 925 F.3d 73, 82 (2d Cir. 2019) (citing [Estelle v. Gamble](), 429 U.S. 97, 103 (1976)). "When the state is deliberately indifferent to the medical needs of a person it has taken into custody, it violates the Eighth Amendment's prohibition on cruel and unusual punishment." [Id.]() (citing [Estelle](), 429 U.S. at 104).

[11]    It is well established that third-party healthcare providers retained by the County to provide medical care at its prisons are state actors for purposes of [Section 1983](). [Ryan v. County of Nassau](), No. 12-CV-5343, 2016 WL 11500151, at *7 (E.D.N.Y. Mar. 31, 2016) (Seybert, J.) ("Since Armor was hired to fulfill the state's constitutional obligation to provide necessary medical care for its inmates, the Court finds that it was a state actor that can be sued pursuant to [Section 1983]()." (cleaned up)).

To establish that a prison official was deliberately indifferent to a prisoner's medical needs in violation of the Eighth Amendment, the plaintiff must show: (1) the alleged deprivation of adequate medical care was "sufficiently serious"; and (2) the prison official acted with "deliberate

Case 9:22-cv-00181-GTS-MJK   Document 96   Filed 07/24/24   Page 156 of 201

Gazzola v. County of Nassau, Not Reported in Fed. Supp. (2022)

2022 WL 2274710

indifference to inmate health." Salahuddin v. Goord, 467 F.3d 263, 279-80 (2d Cir. 2006) (quoting Farmer v. Brennan, 511 U.S. 825, 832 (1994)); see also Alvarez v. Wright, 797 F. App'x 576, 579 (2d Cir. 2019); Hill v. Curcione, 657 F.3d 116, 122 (2d Cir. 2011); Johnson v. Wright, 412 F.3d 398, 403 (2d Cir. 2005); Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003); Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998).

With respect to the first requirement, often referred to as the "objective test," the court must answer two inquiries. First, the court must determine "whether the prisoner was actually deprived of adequate medical care," because the prison official's duty under the Eighth Amendment "is only to provide reasonable care." Salahuddin, 467 F.3d at 279-280 (citing Farmer, 511 U.S. at 844-47). Second, "the objective test asks whether the inadequacy in medical care is sufficiently serious." Id. at 280. "Factors relevant to the seriousness of a medical condition include whether 'a reasonable doctor or patient would find [it] important and worthy of comment,' whether the condition 'significantly affects an individual's daily activities,' and whether it causes 'chronic and substantial pain.' " Id. (quoting Chance, 143 F.3d at 702). The "seriousness inquiry" differs where, rather than a failure to provide any medical treatment, the inmate claims that "the inadequacy is in the medical treatment given"; for example, where "the offending conduct is an unreasonable delay or interruption in [on-going] treatment." Id. (citing Smith, 316 F.3d at 185). In the case of delay or interruption in treatment, the focus is on "the severity of the temporary deprivation alleged by the prisoner" and the "particular risk of harm faced by the prisoner due to the challenged deprivation of care." Smith, 316 F.3d at 186 (citing Chance, 143 F.3d at 702-03); see also Demata v. N.Y.S. Corr. Dep't of Health Servs., 198 F.3d 233 (2d Cir. 1999) (holding the plaintiff could not sustain an Eighth Amendment claim for deliberate indifference to serious medical needs where he could not demonstrate his injuries degenerated as a result of the alleged deprivation of treatment); Bilal v. White, 494 F. App'x 143, 146 (2d Cir. 2012) (holding the plaintiff could not sustain an Eighth Amendment claim for deliberate indifference to serious medical needs where "there [was] no evidence that [the plaintiff's] conditions worsened over the hours of delay here").

**\*8** With respect to the second, "subjective" or "mens rea," requirement, at the summary judgment stage the court must determine whether a reasonable jury could conclude that the prison official knew of and disregarded "an excessive risk to inmate health or safety"; that is, the official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 827; see also Salahuddin, 467 F.3d at 280; Hill, 657 F.3d at 122; Hemmings v. Gorczyk, 134 F.3d 104, 108 (2d Cir. 1998). The subjective requirement demands the plaintiff show that the charged official was subjectively aware that his conduct created a substantial risk of harm to the inmate. Salahuddin, 467 F.3d at 280-81; Farmer, 511 U.S. at 837 (holding a subjective, rather than an objective, test for deliberate indifference "comports best with the text of the [Eighth] Amendment," since that Amendment "does not outlaw cruel and unusual 'conditions,' but rather cruel and unusual 'punishments' "). For that reason, "the risk of harm must be substantial and the official's actions more than merely negligent." Id. at 280 (citing Farmer, 511 U.S. at 835-37). "[N]ot every lapse in medical care is a constitutional wrong," id. at 279, and "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." Farmer, 511 U.S. at 838; see also Estelle, 429 U.S. at 106 (holding a prisoner must demonstrate more than "an inadvertent failure to provide adequate medical care").

Since it appears from their briefs that the parties fail to recognize it, the Court must point out that "[a] post-conviction-prisoner's deliberate indifference claim is analyzed under the Eighth Amendment while the same claim raised by a pretrial detainee is analyzed under the Due Process Clause of the Fourteenth Amendment." Horace v. Gibbs, 802 F. App'x 11, 13–14 (2d Cir. 2020) (citing Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017)). This distinction is relevant to the present dispute, because the Eighth and Fourteenth Amendments "embrace different definitions of the 'subjective' or 'mens rea prong.' " Id. at 14 (citing Darnell, 849 F.3d at 35). Whereas under the Eighth Amendment, the subjective requirement obligates the plaintiff to show that the defendant official acted or failed to act while actually aware of a substantial risk that serious inmate harm will result, under the Fourteenth Amendment, "an official does not act in a deliberately indifferent manner toward an arrestee unless the official 'acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety.' " Id. (quoting Darnell, 849 F.3d at 35) (emphasis omitted); see also Charles, 925 F.3d at 86–87 (holding that

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 157 of 201

Gazzola v. County of Nassau, Not Reported in Fed. Supp. (2022)

2022 WL 2274710

while this "formulation of the deliberate indifference standard was developed in cases involving unconstitutional conditions of confinement," the "same principles" apply to claims of unconstitutionally inadequate medical treatment).

ii. <u>Application</u>

The Court finds there are triable issues of fact as to Plaintiff's claim that Defendants were deliberately indifferent to Decedent's medical needs. Defendants cannot establish as a matter of law that Decedent's undetected heart condition was not "sufficiently serious" to establish the "objective test." As to the "subjective" or "<u>mens rea</u>" inquiry, genuine disputes of material fact in the summary judgment record preclude a finding as a matter of law that Armor's medical providers, namely, Dr. Sanchez and Nurse Cador, were unaware of facts from which the inference could be drawn that Decedent faced a substantial risk of serious harm upon arrival at the NCCC. To resolve these disputes of fact, the jury will have to make credibility judgments, which the Court cannot do at this stage. <u>Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 122 (2d Cir. 2004)</u> (at summary judgment stage, the court must "eschew credibility assessments").

Here, the objective test is straightforward. Whether viewed as a failure to provide Decedent any medical treatment -- in the sense that Armor did not treat Decedent's heart condition -- or as an inadequate course of treatment, a rational jury could conclude from the evidence submitted that the deprivation of adequate medical care was sufficiently serious. There is no dispute that Decedent's undiagnosed heart condition was sufficiently serious. <u>See Adams v. Franklin, 111 F. Supp. 2d 1255, 1270 (M.D. Ala. 2000)</u> (finding medical condition sufficiently serious where delay in treating plaintiff with heart condition who was suffering chest pains and shortness of breath resulted in plaintiff spending "two days in intensive care" and could have resulted in death). Further, reasonable jurors could conclude that Armor's alleged delay in treating Decedent's heart condition presented a serious risk of harm to Decedent and resulted in the deterioration of his health and ultimate demise. <u>See Smith, 316 F.3d at 186-87</u>; <u>Demata, 198 F.3d 233</u>; <u>Bilal, 494 F. App'x at 146.</u>

**\*9** Turning to the subjective test, the Court begins its analysis by clarifying that under the Eighth Amendment, which applies here because Decedent was a convicted prisoner serving out his sentence, the second prong of the test is <u>not objective</u>, as Plaintiff argues and Armor appears to

concede, but rather <u>subjective</u>.[12] So, Plaintiff's contentions that "the lesser standard of what a reasonable person would do under the circumstances" applies, and that Plaintiff "only must show that the treatment of the decedent was objectively unreasonable" are plainly wrong. (Opp'n to Armor at 11.)[13]

[12]    Equally puzzling is Plaintiff's reliance on several Eleventh Circuit decisions, not as persuasive authority, but rather to establish the standard for her Eighth Amendment claims. (Opp'n to Armor at 5-6.)

[13]    To support her interpretation, Plaintiff selectively quotes a footnote in <u>Darnell</u>, which reads: " 'Nothing about our interpretation of the proper standard for deliberate indifference[ ] ... should be construed as affecting the standards for establishing liability based on a claim that challenged conditions are punitive." (<u>Id.</u> at 12 (quoting <u>Darnell, 849 F.3d at 34, n.12</u>).) However, in full, the footnote states:

A pretrial detainee can establish a due process claim for inhumane conditions of confinement either by proving an official's deliberate indifference to those conditions, or by proving that that those conditions are punitive. <u>Kingsley</u> and its precedents are clear that the two theories of liability are distinct. Nothing about our interpretation of the proper standard for deliberate indifference <u>for due process purposes</u> should be construed as affecting the standards for establishing liability based on a claim that challenged conditions are punitive.

<u>Darnell, 849 F.3d at 34, n.12</u> (emphasis added; citation omitted). Plaintiff blatantly omits the "due process purposes" clause of the footnote (emphasized above), as well as the footnote's opening sentence, both of which make abundantly clear that the <u>Darnell</u> Court was referring to deliberate indifference claims arising under the Fourteenth Amendment, not the Eighth Amendment, which it confirmed can proceed "either by proving an official's deliberate indifference to [inhumane] conditions, or by proving that those conditions are punitive." <u>Id.</u> Moreover, to the extent the footnote's message is ambiguous (it is not), since <u>Darnell</u> the Second Circuit has reiterated that the Eighth and Fourteenth Amendments "embrace different definitions of the

Gazzola v. County of Nassau, Not Reported in Fed. Supp. (2022)

2022 WL 2274710

'subjective' or 'mens rea prong.' " E.g., Horace v. Gibbs, 802 F. App'x 13–14.

Under the correct standard, which asks whether a reasonable jury could conclude that the Armor medical providers knew of and disregarded "an excessive risk to inmate health or safety," the Court focuses on the two primary instances in which Armor provided medical treatment to Decedent during his brief stay at the NCCC. The first instance is Nurse McCormack's initial assessment of Decedent upon intake, as well as Dr. Sanchez's subsequent examination. The second instance is Nurse Cador's assessment of Decedent shortly before his cardiac incident.

First, regarding the initial assessment by Nurse McCormack and Dr. Sanchez, at this juncture there are too many disputes of material fact relating to Dr. Sanchez's knowledge of the substantial risks of harm Decedent faced upon admission to the NCCC. To start, after Nurse McCormack assessed Decedent, she recommended Dr. Sanchez order an EKG and a chest X-ray in light of Decedent's admitted recent drug binge; anxious, disheveled, and aggressive state; and the fact that he had a recent EKG prior to his incarceration. When Dr. Sanchez demurred, Nurse McCormack pressed him to at least examine Decedent in person. Nurse McCormack testified that during that examination, Dr. Sanchez and Decedent discussed the latter's recent EKG. Based on Dr. Sanchez's awareness of the foregoing facts, reasonable jurors could conclude that Dr. Sanchez knew of and disregarded an excessive risk to Decedent's health by ignoring the potential red flags, and the recommendations and protestations of Nurse McCormack, that Decedent was suffering from a serious and deadly heart condition. While the extent of Dr. Sanchez's awareness of Decedent's recent EKG is disputable, there is sufficient evidence in the record from which jurors could infer that Dr. Sanchez was aware of the EKG, a fact bearing on his awareness of the risk Decedent faced upon admission to the NCCC.

**\*10** In any event, Armor cannot escape liability because Dr. Sanchez failed to "verify underlying facts" that might have confirmed Nurse McCormack's suspicion that Decedent's serious medical problem bore further investigation. See Ruffin v. Deperio, 97 F. Supp. 2d 346, 354 (W.D.N.Y. 2000) ("A defendant may not escape liability if the evidence shows that he 'merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.' " (quoting Farmer, 511 U.S. at 843 n.8)); see also Hudak v. Miller, 28 F. Supp. 2d 827, 831 (S.D.N.Y. 1998) (finding that

the subjective element required a showing that the treating physician "knew that [the inmate] had some serious medical problem which bore further investigation"); Staten v. Semple, No. 18-CV-1251, 2021 WL 1060025, at \*18 (D. Conn. Mar. 19, 2021). Nurse McCormack's claim that portions of her examination notes recommending a chest X-ray went "missing" after Decedent's cardiac incident gives the Court further pause, as such a claim, if accepted by the jury, could demonstrate Armor's awareness that its course of treatment was reckless for purposes of Plaintiff's Eighth Amendment claim. [14]

[14]  However, unlike Nurse Cador's decision to defer treatment on Decedent until the morning, there is no evidence in the record that Dr. Sanchez's decision not to order an EKG or chest X-ray was motivated by Armor's profit. See infra for further discussion regarding Armor's profit motive.

With respect to Nurse Cador's examination shortly before Decedent's cardiac incident, there is a dispute of material fact as to whether Nurse Cador was aware of Decedent's complaints of chest pains, recorded in the Correctional Officer Desk Log, as well as Decedent's statement to Officer Meyer that he "felt like he was having a heart attack." [15] In the event a jury declined to credit Nurse Cador's assertion that he was not advised that Decedent was experiencing chest pains, it could reasonably conclude that Nurse Cador was both aware of facts indicating Decedent faced a substantial risk of cardiac injury, and that in deferring further treatment until the morning, acted on those facts, thus creating a substantial risk of harm to Decedent. [16]

[15]  Armor halfheartedly argues that Decedent's statement "seems to be in direct contravention of CPLR § 4519, also known as the Dead Man's Statute." (Armor Reply at 6.) But where, as here, Plaintiff invokes the Court's federal question jurisdiction, the Federal Rules of Evidence apply. And because the Federal Rules of Evidence abolished many common-law rules, like state Dead Man's statutes, they do not apply in this case. Rosenfeld v. Basquiat, 78 F.3d 84, 88 (2d Cir. 1996).

[16]  The County briefly argues the statements by unidentified correctional officers contained in the County's records are inadmissible hearsay. (County Reply at 4-5.) The County is correct that

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 159 of 201

Gazzola v. County of Nassau, Not Reported in Fed. Supp. (2022)

2022 WL 2274710

certain documents relied on by Plaintiff contain hearsay and even double hearsay. "A district court has broad discretion in choosing whether to admit evidence on summary judgment." HLT Existing Franchise Holding LLC v. Worcester Hosp. Grp., LLC, 609 F. App'x 669, 671 (2d Cir. 2015). Because statements like those contained in the Correctional Officer Desk Log and other correctional officer's reports on the incident may be admissible under different exceptions to the hearsay rule that the County fails to address, the Court considers these statements for purposes of the present motions. See Fed. R. Evid. 803(6) (business records hearsay exception); Fed. R. Evid. 803(8) (public record hearsay exception); Fed. R. Evid. 803(5) (past recollection recorded hearsay exception). Moreover, it appears from the parties' JPTO that Plaintiff intends to call as witnesses the correctional officers who likely made these statements in their reports and to the NYS COC. See Hill v. Laird, No. 06-CV-0126, 2016 WL 3248332, at *7 (E.D.N.Y. June 13, 2016) ("[T]he Court may consider hearsay on a motion for summary judgment where there is a showing that admissible evidence will corroborate the hearsay at trial.") (citing Isaacs v. Mid Am. Body & Equipment Co., 720 F. Supp. 255, 256 (E.D.N.Y. 1989)).

*11 Moreover, evidence in the record supports the theory that Armor was disinclined to send inmates to hospitals for medical treatment based on cost considerations. If proved at trial, i.e., if Plaintiff proves Nurse Cador deferred treating Decedent until the following morning to save costs on off-site medical care, the jury could find the subjective prong of Plaintiff's deliberate indifference claim satisfied based on Armor's profit motives. See Chance, 143 F.3d at 703 ("In certain instances, a physician may be deliberately indifferent if he or she consciously chooses 'an easier and less efficacious' treatment plan.") (quoting Williams v. Vincent, 508 F.2d 541, 544 (2d Cir. 1974)); Colon v. County of Nassau, No. 12-CV-4466, 2014 WL 4904692, at *7 (E.D.N.Y. Sept. 26, 2014) (Seybert, J.) ("[I]f Dr. Manetti subsequently denied Rodriguez medication based solely on Armor's budget, and not on actual medical need, Rodriguez could also establish the subjective prong of a deliberate indifference claim."); Jones v. Westchester County Dep't of Corr. Med. Dep't, 557 F. Supp. 2d 408, 415 (S.D.N.Y. 2008).

As a result, the Court finds there are triable issues of material fact regarding Plaintiff's Eighth Amendment claim for deliberate indifference to medical needs.

### 2. *Monell*'s Policy Requirement

Next, the Court turns to Monell's requirement that Plaintiff demonstrate the County and Armor violated Decedent's Eighth Amendment rights pursuant to a policy or custom. For substantially the same reasons as Judge Donnelly's well-reasoned decision in Gleeson v. County of Nassau, No. 15-CV-6487, 2019 WL 4754326 (E.D.N.Y. Sept. 30, 2019), which neither party cites, the Court finds Plaintiff can proceed on her Monell claims against the County and Armor.

### i. Applicable Law

The plaintiff can satisfy the municipal "policy or custom" requirement by alleging:

> (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom through which constructive notice is imposed upon policymakers; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised 'deliberate indifference' to the rights of the plaintiff.

Ying Li v. City of New York, 246 F. Supp. 3d 578, 636 (E.D.N.Y. 2017) (citing Second Circuit decisions); see also Vives v. City of New York, 524 F.3d 346, 353 (2d Cir. 2008) (official policy); Hu v. City of New York, 927 F.3d 81, 105 (2d Cir. 2019) (action by official with policymaking authority); Lucente v. County of Suffolk, 980 F.3d 284, 297-308 (2d Cir. 2020) (persistent and widespread custom and practice); Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 127 (2d Cir. 2004) (failure to train or supervise); Reynolds v. Giuliani, 506 F.3d 183, 191-93 (2d Cir. 2007) (failure to supervise); Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995)

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 160 of 201

Gazzola v. County of Nassau, Not Reported in Fed. Supp. (2022)

2022 WL 2274710

(failure to supervise); Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983) (failure to discipline).

"In order to establish Monell liability based upon a 'persistent and widespread' practice by a subordinate municipal employee (or employees) other than a policymaker, the employee's unconstitutional conduct must be 'so manifest as to imply the constructive acquiescence of senior policy-making officials.' " Lucente, 980 F.3d at 297-98 (quoting Sorlucco v. N.Y.C. Police Dep't, 971 F.2d 864, 870-71 (2d Cir. 1992)). "In other words, there must be 'sufficient instances of tolerant awareness by supervisors of abusive conduct to support an inference that they had a policy, custom or usage of acquiescence in such abuse.' " Id. at 298 (quoting Jones v. Town of East Haven, 691 F.3d 72, 82 (2d Cir. 2012)).

A failure to supervise "may constitute an official policy or custom if the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact." Wray v. City of New York, 490 F.3d 189, 195-96 (2d Cir. 2007) (quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989)). To prevail on this theory, the plaintiff must demonstrate that "the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions." Amnesty Am., 361 F.3d at 126 (citation omitted). "Thus, where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice,' that acquiescence 'may be properly thought of as a city policy or custom that is actionable under § 1983.' " Id. (quoting City of Canton, 489 U.S. at 388).

### ii. Application to Armor

 *12  Plaintiff argues that Armor had a widespread and well-settled custom of providing inadequate medical care to prison inmates. (Opp'n to Armor at 24 ("[D]efendants are liable for Mr. Marinaccio's death because the defendants had policies or customs of delivering inadequate healthcare to NCCC inmates.").) [17] To support her theory, Plaintiff points to the NYS COC reports and the Nassau County Comptroller Audit Report on Armor. (Id. at 20.)

[17]    Plaintiff also appears to allege that Armor's formal policy of requiring approval from its corporate office in Florida before referring patients to the

hospital caused Decedent's death here. However, unlike in Gleeson, there is no evidence that Armor clinicians intended to refer Decedent to see an off-site specialist but failed to do so timely due to Armor's policy. 2019 WL 4754326, at *14-15. As a result, it cannot be said that this policy caused the constitutional tort alleged here.

Courts in this district "have defined 'widespread' to mean that the unconstitutional acts in question are 'common or prevalent throughout the [entity]' and 'well-settled' to mean that the unconstitutional acts "have achieved permanent, or close to permanent, status." Gleeson, 2019 WL 4754326, at *15 (quoting Fowler v. City of New York, No. 13-CV-2372, 2019 WL 1368994, at *14 (E.D.N.Y. Mar. 26, 2019)). While there is "no 'magic number' of instances of unconstitutional conduct that will suffice to permit the inference of a broader municipal policy or custom," Fowler, 2019 WL 1368994, at *14, where the plaintiff relies on government reports, like the NYS COC and Comptroller Audit here, the Court must ensure "those reports are sufficiently connected to the specific facts of the case," Isaac v. City of New York, No. 16-CV-4729, 2018 WL 5020173, at *17 (E.D.N.Y. Aug. 6, 2018) (quoting Gomez v. City of New York, No. 16-CV-1274, 2017 WL 1034690, at *11 (E.D.N.Y. Mar. 16, 2017)), report and recommendation adopted, 2018 WL 4583481 (E.D.N.Y. Sept. 24, 2018).

The NYS COC reports and Comptroller Audit detail similar instances of Armor's failure to deliver adequate medical care to inmates at the NCCC during the same period in which Decedent's incident occurred. The NYS COC referred to these deficiencies as systemic. Accordingly, the Court finds Plaintiff has raised a genuine issue of material fact as to whether Armor has a widespread and well-settled custom of providing inadequate medical care to prison inmates. Gleeson, 2019 WL 4754326, at *15.

### iii. Application to the County

Plaintiff may proceed against the County on a failure-to-supervise theory of Monell liability. [18] Specifically, a reasonable jury could find that the NYS COC reports alerted the County, through its policymaker Sheriff Sposato, to a potentially serious problem of unconstitutional conduct, such that the need for greater supervision was obvious. Indeed, these reports consistently recommended that the County conduct an inquiry into the fitness of Armor to provide

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 161 of 201

Gazzola v. County of Nassau, Not Reported in Fed. Supp. (2022)

2022 WL 2274710

correctional medical care at the NCCC. But "[r]ather than address the obvious need for closer supervision," there is support in the record for the proposition that the County "scaled back its oversight." Gleeson, 2019 WL 4754326, at *17. For example, the County left vacant the Health Contractor Administrator position, a position designated to oversee administration of and monitor compliance with the contract between Armor and the County. Further, the QIC responsible for quality improvement activities consistent with the provisions of the DOJ Settlement did not meet monthly with Sheriff Sposato, as the contract required. As the Comptroller Audit found, the County "failed to provide adequate oversight to ensure that Armor was in compliance with its contract with the County." (County Comptroller Audit at ii.) For these reasons, Plaintiff has raised a genuine issue of material fact as to whether these failures to supervise Armor amount to deliberate indifference to the rights of inmates at the NCCC.

18    Following Gleeson, the Court declines to adopt Plaintiff's position, accepted by the Eleventh Circuit in Ancata v. Prison Health Services Inc., 769 F.2d 700 (11th Cir. 1985) but not adopted by this Circuit, that respondeat superior, absent a municipal policy, is a viable theory of liability in cases involving the failure to provide adequate medical care. Gleeson, 2019 WL 4754326, at *16. Further, the Court rejects Plaintiff's official policy theory, premised on the County's decision to approve and renew its contract with Armor, on the grounds that the County's decision to approve and renew the contract with Armor is too far removed from the incident giving rise to this action. Id. at *16, n.24.

* * *

**\*13** Accordingly, Defendants' respective motions for summary judgment as to Plaintiff's Monell claims are DENIED, and Plaintiff is permitted to proceed with Monell claim pursuant to the theories approved herein.

### 3. Damages

Armor raises two damages-related arguments. First, Armor argues that Plaintiff cannot recover reasonable attorney's fees under 42 U.S.C. § 1988, because Plaintiff cannot prevail on her Section 1983 claims. However, because Plaintiff's

Section 1983 claims can proceed to trial, Armor's contention is premature.

Second, Armor argues that it is immune from Plaintiff's claim for punitive damages. It is well established that punitive damages may be imposed under Section 1983 against an individual defendant who acts with "reckless or callous disregard for the plaintiff's rights." Smith v. Wade, 461 U.S. 30, 51 (1983). However, punitive damages may not be imposed on municipalities. Newport v. Fact Checkers, Inc., 453 U.S. 247, 263 (1981). The Supreme Court's conclusion in Fact Checkers that Section 1983 did not authorize punitive damages awards from municipalities rested on two considerations. First, historically, courts in the United States "that had considered the issue prior to 1871," the year Section 1983 was enacted, "were virtually unanimous in denying such damages against a municipal corporation." Id. at 260. "Given that municipal immunity from punitive damages was well established at common law by 1871," the Court found the absence of "evidence that Congress intended to disturb this common-law immunity" telling. Id. at 263-66. Nor did "consideration of public policy dictate a contrary result." Id. at 266. Rather, the Court reasoned that the "award of punitive damages against a municipality 'punishes' only the taxpayers," and would therefore have little deterrent effect on misbehavior by government officials. Id. at 267-70.

Essentially, Armor argues that, as a "state actor" for Section 1983 purposes, it steps into the County's shoes and should be entitled to the same protections against punitive damages that are afforded the County. (Armor Reply at 10.) However, as several courts have found, the rationale behind the Supreme Court's conclusion that Section 1983 does not authorize punitive damages awards from municipalities is less persuasive when applied to private entities. See Segler v. Clark County, 142 F. Supp. 2d 1264, 1268 (D. Nev. 2001) (finding a private corporation that contracted to provide medical care to inmates in Nevada prisons could be subject to imposition of punitive damages); Campbell v. Pennsylvania Sch. Boards Ass'n, No. 18-CV-0892, 2018 WL 3092292, at *6 (E.D. Pa. June 20, 2018) (same as to voluntary school board association); Phelan ex rel. Phelan v. Torres, No. 04-CV-3538, 2005 WL 4655382, at *16 (E.D.N.Y. Sept. 20, 2005) (same as to non-profit contractor for the State of New York); Barbara Kritchevsky, Civil Rights Liability of Private Entities, 26 Cardozo L. Rev. 35, 68-69 (2004).

Historically, private corporations have been subject to punitive damages. Kritchevsky, supra, at 77 n.293 (collecting

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 162 of 201

Gazzola v. County of Nassau, Not Reported in Fed. Supp. (2022)

2022 WL 2274710

cases and treatises for proposition that corporations were not immune from liability for punitive damages in 1871). Further, an award of punitive damages against Armor "would not punish taxpayers in the way such a decision would affect a municipality. Instead, punitive damages would be assessed against [Armor,] which would bear the burden of payment as a private corporation" and may be deterred as a result. Segler, 142 F. Supp. 2d at 1269. [19]

[19]   Although Armor does not make the argument, the Court recognizes that local governmental entities may opt to indemnify government officials for punitive damages, thus potentially undermining the taxpayer rationale at the municipal level. See Martin A. Schwartz, Should Juries Be Informed That Municipality Will Indemnify Officer's [Section] 1983 Liability for Constitutional Wrongdoing?, 86 Iowa L. Rev. 1209, 1249 n.49 (2001) (including Nassau County in list of states and municipalities that permit indemnification for punitive damages, albeit only for police officers). However, the Supreme Court acknowledged this fact in Fact Checkers and did not believe it undermined its decision. 453 U.S. at 269 n.30.

**\*14** The Court will not cloak Armor in the protection against punitive damages afforded to municipalities just because it has been deemed a state actor for Section 1983 purposes. Accordingly, Armor's motion for summary judgment as to Plaintiff's claims for punitive damages is DENIED.

## B. New York State Law Claims

### 1. Wrongful Death

Next, the Court addresses Plaintiff's New York State law claim for wrongful death. "To prevail on a claim for wrongful death under New York law, a plaintiff must establish the following elements: '(1) the death of a human being, (2) the wrongful act, neglect or default of the defendant by which the decedent's death was caused, (3) the survival of distributees who suffered pecuniary loss by reason of the death of decedent, and (4) the appointment of a personal representative of the decedent.' " Ryan v. County of Nassau, No. 12-CV-5343, 2016 WL 11500151, at *8 (E.D.N.Y. Mar. 31, 2016) (Seybert, J.) (quoting Chong v. N.Y.C. Tran. Auth., 441 N.Y.S.2d 24, 25 (N.Y. App. Div. 2d Dep't 1981)). Armor contends that Plaintiff has failed to submit any evidence

to support her claim for pecuniary loss, while the County appears to argue that it cannot be held liable for Armor's allegedly negligent conduct in treating Decedent. [20]

[20]   To the extent the County argues that Plaintiff's wrongful death claim fails because she never amended the Complaint to name the John and Jane Doe individuals who allegedly provided Decedent with inadequate medical treatment, such argument misses the mark, because Plaintiff is proceeding under a respondeat superior theory of liability.

First, the Court disagrees with the County that it cannot be held liable for wrongful death here. Plaintiff may hold the County liable for wrongful death under the doctrine of respondeat superior, provided the County's employees committed the allegedly tortious acts while acting within the scope of their employment. Perez v. City of New York, 912 N.Y.S.2d 691, 692 (N.Y. App. Div. 2nd Dep't 2010); see also Triolo v. Nassau County, 24 F.4th 98, 111 (2d Cir. 2022); 62 N.Y. Jur. 2d Government Tort Liability § 43.

In the present action, there is no competent evidence that County employees, i.e., the responding correctional officers, committed a tortious act while responding to the medical emergency that led to Decedent's death. However, the Court must determine whether the County can be vicariously liable for the negligent acts of its independent contractor, Armor. While "[t]he general rule is that a party who retains an independent contractor, as distinguished from a mere employee or servant, is not liable for the independent contractor's negligent acts," Kleeman v. Rheingold, 614 N.E.2d 712, 715 (N.Y. 1993) (citations omitted), there are several exceptions to this general rule.

One exception of particular relevance in this instance is the exception for nondelegable duties. Id. "[A] municipality that delegates a duty for which the municipality is legally responsible, such as the maintenance of its roads, to an independent contractor remains vicariously liable for the contractor's negligence." Rangolan v. County of Nassau, 749 N.E.2d 178, 182 (N.Y. 2001). Here, it is undisputed that the County was mandated by New York State and County law to provide for the care and safety of the inmates held at the NCCC, and that Sheriff Sposato was responsible for the daily operation of the NCCC under applicable law. N.Y. Correct. Law § 500-c ("[T]he sheriff of each county shall have custody of the county jail of such county."). Thus, in these circumstances, the County cannot escape vicarious liability

Case 9:22-cv-00181-GTS-MJK   Document 96   Filed 07/24/24   Page 163 of 201

Gazzola v. County of Nassau, Not Reported in Fed. Supp. (2022)

2022 WL 2274710

for the allegedly tortious acts of Armor that Plaintiff claims led to Decedent's wrongful death. [21]

[21]    The Court finds the County's motion for summary judgment as to Plaintiff's claims for "mistakes in medical care," "failure to treat/diagnose," and "negligence" fails for the same reasons.

**\*15** Next, the Court addresses Armor's contention that Plaintiff has not established her claim for pecuniary loss beyond funeral and burial expenses. "[T]o defeat a motion for summary judgment in a wrongful death case, the plaintiff must offer proof of pecuniary loss," such as loss of support, voluntary assistance, or inheritance. Singleton v. City of Newburgh, 1 F. Supp. 2d 306, 317 (S.D.N.Y. 1998) (citing Gonzalez v. New York City Housing Auth., 572 N.E.2d 598 (N.Y. 1991)). Here, Plaintiff's Local Rule 56.1 Counterstatement is silent on whether Decedent's distributees suffered pecuniary loss by reason of his death. Instead, to supports her claim of pecuniary loss, Plaintiff points to the deposition testimony of Decedent's sister and administrator, Gloria Gazzola. (Gazzola Depo. Tr., attached to Demiris Decl.) But Gazzola's testimony undermines her claim for pecuniary loss. Gazzola testified that her brother lived with his mother for "[m]ost of his life," did not have any children or dependents, and had not worked for more than five years. (Id. at 6-11.) [22] Thus, in this case, Plaintiff has not "presented evidence that she -- or any other person -- suffered pecuniary loss as a result of [Decedent's] death" beyond funeral and burial expenses. Singleton, 1 F. Supp. at 317. As a result, Plaintiff's damages for wrongful death, if any, will be limited to funeral and burial expenses proven at trial.

[22]    Out of an abundance of caution, the Court has also reviewed the Complaint and the parties' JPTO for proof of pecuniary loss but finds none.

Accordingly, the County's motion for summary judgment as to Plaintiff's wrongful death and related negligence claims is DENIED, and Armor's motion for summary judgment as to Plaintiff's wrongful death claim is GRANTED to the extent Plaintiff is limited to recovering for funeral and burial expenses on this claim.

## 2. Intentional Infliction of Emotional Distress

Next, Defendants ask the Court for summary judgment on Plaintiff's intentional infliction of emotional distress claim.

Intentional infliction of emotional distress has four elements: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." Greenaway v. County of Nassau, 97 F. Supp. 3d 225, 239-40 (E.D.N.Y. 2015) (quoting Howell v. N.Y. Post Co., Inc., 81 N.Y.2d 115 (N.Y. 1993)). To constitute "extreme and outrageous conduct," it must "go beyond all possible bounds of decency" and be "atrocious, and utterly intolerable in a civilized community." Greenaway, 97 F. Supp. 3d at 239-40 (citations omitted). The tort "may be invoked only as a last resort, to provide relief in those circumstances where traditional theories of recovery do not." Salmon v. Blesser, 802 F.3d 249, 256 (2d Cir. 2015) (internal citation and quotation marks omitted).

Here, the record does not sustain an intentional infliction of emotion distress claim. First, "[i]t is well settled that public policy bars claims sounding in intentional infliction of emotional distress against a government entity" like the County. J.H. v. Bratton, 248 F. Supp. 3d 401, 416 n.10 (E.D.N.Y. 2017). Further, "no reasonable juror would find that the evidence on this record establishes conduct 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency.' " Gleeson, 2019 WL 4754326, at \*18 (quoting Chanko v. Am. Broad. Cos. Inc., 27 N.Y.3d 46, 56 (N.Y. 2016) (granting summary judgment on intentional infliction of emotional distress claims in analogous circumstances)).

Accordingly, Defendants' respective motions for summary judgment as to Plaintiff's claims for intentional infliction of emotional distress are GRANTED.

## 3. Remaining Claims and Defendants

Plaintiff asserts several additional claims under New York State law and against untenable Defendants such as the NCCC and the Nassau County Sheriff's Department.

To begin, it is well established that Plaintiff cannot maintain claims against the Nassau County Sheriff's Department, because it is an administrative arm of the County that cannot be sued separately. Anderson v. Incorporated Village of Hempstead, No. 15-CV-1485, 2022 WL 267875, at \*5, n.4 (E.D.N.Y. Jan. 28, 2022); Dudek v. Nassau County Sheriff's Dep't, 991 F. Supp. 2d 402, 410 (E.D.N.Y. 2013). For the

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 164 of 201

Gazzola v. County of Nassau, Not Reported in Fed. Supp. (2022)

2022 WL 2274710

same reason, Plaintiff cannot maintain her claims against the NCCC. Adesola v. County of Nassau Sheriff's Dep't, No. 12-CV-1026, 2012 WL 928316, at *3 (E.D.N.Y. Mar. 13, 2012). Accordingly, Plaintiff's claims against the Nassau County Sheriff's Department and the NCCC are DISMISSED.

**\*16** Second, with respect to Plaintiff's failure-to-train claim, "a cause of action sounding in negligence is legally sustainable against a city when the injured party demonstrates that he was injured due to the negligent training and supervision of a law enforcement officer." Noonan v. City of New York, No. 14-CV-4084, 2015 WL 3948836, at *8 (S.D.N.Y. June 26, 2015) (quoting Barr v. Albany County, 406 N.E.2d 481, 485 (N.Y. 1980)). However, Plaintiff has not adduced any evidence regarding Armor or the County's allegedly negligent training program, and her claims cannot proceed on "conclusory allegations of a deficiency in training." Id. (citing Rodriguez v. City of New York, 649 F. Supp. 2d 301, 307-08 (S.D.N.Y. 2009) (finding that conclusory allegations insufficient to sustain a Section 1983 failure to train claim also "doom the plaintiff's [parallel] state law claim for failure to train")). As a result, Plaintiff's failure-to-train claims grounded in New York State law are DISMISSED.

\* \* \*

To the extent not expressly addressed, the Court has considered the parties' remaining arguments and finds them to be without merit.

## CONCLUSION

Accordingly, for the stated reasons, **IT IS ORDERED** that:

1) The Court GRANTS in part and DENIES in part Armor's (ECF No. 61) and the County's (ECF No. 58) respective motions for summary judgment, with the motions:

   a. GRANTED with respect to Plaintiff's New York State law claims for intentional infliction of emotional distress and failure to train; and

   b. GRANTED with respect to Plaintiff's wrongful death claim to the extent that, if proven, Plaintiff may only recover on this claim for funeral and burial expenses.

   c. DENIED with respect to Plaintiff's Eighth Amendment claims under Monell (under the theories approved herein) and her remaining New York State law claims;

2) The Court DENIES Armor's motion for summary judgment as to Plaintiff's claim for punitive damages;

3) All claims against the Nassau County Correctional Center, Nassau County Sheriff's Department, and the John and Jane Doe Defendants are DISMISSED, and the Clerk of the Court shall TERMINATE these entities as parties to this action;

4) The Clerk of the Court shall TERMINATE the motion pending at ECF No. 73;

5) **On or before July 1, 2022, the parties shall file a letter advising whether they wish to be referred to the Court's Trial Ready Rapid Mediation Program**; and

6) The parties shall use the following caption in all future filings:

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

-----------------------------------X

GLORIA GAZZOLA, Individually and as Administrator of the Estate of ANTONIO MARINACCIO, JR., Plaintiff,

-against-

COUNTY OF NASSAU; ARMOR CORRECTIONAL HEALTH SERVICES, INC.; and ARMOR CORRECTIONAL HEALTH SERVICES OF NEW YORK, INC. Defendants.

-----------------------------------X

MEMORANDUM & ORDER

16-CV-0909(JS)(AYS)

**All Citations**

Not Reported in Fed. Supp., 2022 WL 2274710

---

WESTLAW    © 2024 Thomson Reuters. No claim to original U.S. Government Works.                    15

KeyCite Yellow Flag - Negative Treatment

Distinguished by Castillo v. Hogan, D.Conn., March 31, 2018

2005 WL 893571

Only the Westlaw citation is currently available.

United States District Court,

E.D. New York.

Shawn KEMP, also known as "Albert Massie," Plaintiff,

v.

Dr. Lester WRIGHT, Dr. Alexis Lang, Dr. Halko, Dr. Maw, Dr. John Perilli, T.G. Eagen, Charles Greiner, and Dennis Breslin, Defendants.

No. 01 CV 562(JG).

|

April 19, 2005.

**Attorneys and Law Firms**

Shawn Kemp, a/k/a/ Albert Massie, NYSID # 5016685-H, B & C # 441-04-14793, Rikers Island Correctional Facility, East Elmhurst, New York, Plaintiff pro se.

Eliot Spitzer, Attorney General, State of New York, New York, New York, By: Steven N. Schulman, Assistant Attorney General, for Defendants.

*MEMORANDUM AND ORDER*

GLEESON, J.

**\*1** Plaintiff Shawn Kemp, also known as "Albert Massie," [1] brought this action pursuant to 42 U.S.C. § 1983 alleging that defendants, who are physicians and officials in the New York State Department of Correctional Services ("DOCS"), failed to provide him with adequate medical treatment in violation of his Eight Amendment right to be free from cruel and unusual punishment. The defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

[1]
    Plaintiff's true name is Albert Massie. He adopted the name Shawn Kemp in homage to the great NBA player of that name.

In their motion, defendants argue that (1) Kemp's conditions, plantar fasciitis and a sinus condition, were not sufficiently

serious to implicate the Constitution; (2) defendants were not deliberately indifferent in treating Kemp's conditions; (3) the non-medical defendants and Dr. Lester Wright were not personally involved; and (4) defendants have qualified immunity because it was objectively reasonable for them to believe that their conduct conformed with the law. I heard oral argument by telephone on March 25, 2005. For the following reasons, the defendants' motion is granted.

FACTS [2]

[2]
    The following facts are drawn from the defendants' Rule 56.1 Statement and the affidavits thereto, which include a deposition of the plaintiff. Plaintiff has not submitted a Rule 56.1 Statement.

Kemp was originally sent to Downstate Correctional Facility for intake on April 19, 1999. When examined by a physician's assistant, he had a firm, hard, non-tender mass of one-half to three-quarter inches on the arch of each foot. (Schulman Decl., Ex. B at K1.) He was given a thirty-day sneaker pass [3] and recommended for referral to a podiatrist. (*Id.* at K2-K3.) Once approved by the Facility Health Services Director at Downstate, the referral was forwarded to Physician Health Services ("PHS"), a private entity that provided specialist services for inmates. PHS conducted a utilization review on all referral recommendations, and denials by PHS were reviewed by the corresponding DOCS regional medical director. A denial by the DOCS regional medical director was appealable by the facility health services director who initially approved the referral.

[3]
    Inmates are required to wear boots issued to them by DOCS. A sneaker pass permits an inmate to wear sneakers.

On April 23, 1999, Kemp was transferred to Sing Sing Correctional Facility. His sneaker pass remained valid. However, his podiatry referral was denied. For approval, the medical necessity of his podiatry referral now had to be confirmed by the facility health services director at Sing Sing. From the end of April 1999 to the end of June 1999, Kemp was seen numerous times by medical staff at Sing Sing. Four visits were related to his feet. The nurses observed tissue growth at the bottom of each foot, out pouching of skin near his great toe, and fungus. (*Id.* at K3.) They provided foot pads, foot powder and antifungal cream. (*Id.*)

On June 15, 1999 and again on June 25, 1999, Kemp complained of "difficulty walking because of excess tissue growth on bottom of feet." (*Id.*) The nurses' notes reveal a request for a podiatry consult and indicate that a previous request from April 19, 1999 (*i.e.*, the one from Downstate) was pending. Kemp also requested a renewal of his sneaker pass. On June 30, 1999, his sneaker pass was renewed for three months.

**\*2** Thereafter, on July 13, 1999, physician's assistant Williams reported edema to Kemp's ankles and shins. (*Id.* at K5.) The condition was treated with leg elevation, compression hose, antifungal medication and a diuretic. The same day, a psychologist reported that Kemp had a history of major depression, which led the doctor to fear that Kemp would not be "motivated" to seek needed medical treatment for the swelling in his legs. (*Id.* at K6.) Kemp saw a nurse for the edema again on August 10, 1999. He missed scheduled appointments with Dr. Maw on August 11 and August 16, 1999 due to failure to receive notification. (Kemp.Dep.53-54.) Treatment for his edema continued in August and September of 1999, with Dr. Halko performing an examination and a number of tests, including a CAT scan and blood work. Kemp also continued to complain about the growths on the bottom of his feet.

On September 17, 1999, Kemp was taken to the emergency room at St. Agnes Hospital for "extreme swelling" resulting from edema at the direction of Dr. Maw. (Maw Aff. ¶ 5; Schulman Decl., Ex. C at 52.) Upon Kemp's return to Sing Sing that same day, he was admitted to the infirmary because of his widespread edema. He remained in the infirmary from September 17, 1999 to March 10, 2000. The progress notes for that period reveal multiple entries each day. (*See* Schulman Decl., Ex. C at 51-101.)

"Until the late stages of plaintiff's stay in the infirmary, [Dr. Halko] was concerned that [Kemp's] edema was a potentially life threatening condition." (Halko Aff. ¶ 8.) Dr. Halko referred Kemp to numerous specialists for his edema, and did not believe that the masses on Kemp's feet could be the cause of the edema. However, during his stay in the infirmary, Kemp was examined by a podiatrist, Dr. Shapiro, based on a consult request by Dr. Halko. (*Id.* at ¶¶ 11-12.) Dr. Shapiro wanted to rule out fibrosarcoma, which is malignant, but noted that that would require a biopsy. Because of Kemp's edema, the surgery required for a biopsy was not recommended. Instead, Dr. Shapiro recommended x-rays and consultation with an orthopedist.

Kemp's edema stabilized during the end of February and early March of 2000. On March 10, 2000, he was transferred out of the infirmary for a court trip. (Schulman Decl., Ex. C at 101.) When Kemp returned to Sing Sing on April 24, 2000, he was again having edema and problems with the masses on his feet. He received referrals for podiatry and orthopedics in late April and early May of 2000. Although he was seen by other physicians, there is no record of his being seen by either a podiatrist or an orthopedist. Dr. Maw requested another orthopedist consult in July of 2000.

On July 26, 2000, Kemp was transferred to Arthur Kill Correctional Facility. His edema continued. His sole claim at Arthur Kill is that Dr. Lang and Superintendent Breslin did not approve a referral for surgery on his sinuses. (Kemp Dep. 87.) Dr. Mitchell evaluated Kemp for a chronic sinus problem on August 11, 2000 and prescribed antibiotics and referred him for an ear, nose and throat procedure (surgery) that had been suggested by a specialist at St. Agnes Hospital. After consultation with PHS, Dr. Mitchell agreed that another referral and examination by an otolaryngologist would be beneficial before a decision was made regarding surgery.

**\*3** On October 18, 2000, Kemp was seen by the otolaryngologist, who recommended continued antibiotics, nasal spray and a CT scan of Kemp's sinuses. On December 4, 2000, a CT scan was performed and it showed polyps, opacification, and remodeling of some bony structures. (Schulman Aff., Ex. B at K32-33.) After returning to the infirmary with complaints about his sinuses in December 2000 and January 2001, Kemp was told on January 11, 2001 that he would be referred to otolaryngology once more. On April 16, 2001, at his follow-up appointment, the physician recommended that he continue the antibiotics, get another CT scan and noted that surgery may be indicated. Kemp continued visits to the otolaryngology clinic, with at least seven visits through February of 2002. Surgery was not recommended in any of those visits. His sinuses cleared up in roughly September of 2001, after receiving only medical (as opposed to surgical) treatment. (Kemp.Dep.88.)

On March 16, 2001, Dr. Armen Kasabjan successfully performed surgery on Kemp's feet to remove the masses.

DISCUSSION

A. *Standard for Summary Judgment*

2005 WL 893571

Under Rule 56 of the Federal Rules of Civil Procedure, a party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The substantive law governing the case identifies the facts that are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (citation omitted). Summary judgment is not warranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

In reviewing the evidence on a motion for summary judgment, I must "resolv[e] all factual ambiguities and credit[ ] all inferences, including those relating to credibility," in favor of the party opposing the motion. Petrosino v. Bell Altantic, 385 F .3d 210, 219 (2d Cir.2004) (citations omitted); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'' Matsushita, 475 U.S. at 586-87 (quoting Fed.R.Civ.P. 56(e)).

B. *Standard for Deliberate Indifference*

1. *Section 1983*

Section 1983 of Title 42 of the United States Code provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

**\*4** A plaintiff in a § 1983 action must therefore establish two elements. First, the plaintiff must show that he has been deprived of federally protected rights. See American Mfgs. Mutual Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999). Second, the plaintiff must show that a person acted under color of state law so as to deprive plaintiff of his rights. Id.; see also Pitchell v. Callan, 13 F.3d 545, 547 (2d Cir.1994).

The Eighth Amendment forbids "cruel and unusual punishments." U .S. Const. amend. VIII. The Amendment is violated when a prison official acts with "deliberate indifference" to a prisoner's "serious" medical needs. Hudson v. McMillian, 503 U.S. 1, 9 (1992) (citing Estelle v. Gamble, 429 U.S. 97, 103-04 (1976)). As the same time, "society does not expect that prisoners will have unqualified access to health care." Id.

2. *Objective Test: Serious Medical Condition and/or Need*
There is no bright-line test to measure the seriousness of a prisoner's medical need and/or condition, but the Second Circuit has set forth factors to "guide the analysis." Brock v. Wright, 315 F.3d 158, 162 (2d Cir.2003). Those include: (1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment; (2) whether the medical condition significantly affects daily activities; and (3) the existence of chronic and substantial pain. Id. (citing Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir.1998)). Courts must look to the "particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition ... in the abstract." Smith v. Carpenter, 316 F.3d 178, 186 (2d Cir.2003) (citing Chance, 143 F.3d at 702-03). In cases where the basis for a prisoner's claim is a delay or interruption in treatment, as opposed to the underlying medical condition alone, the inquiry should look to "the severity of the temporary deprivation alleged by the prisoner." Id. In considering a plaintiff's pain, courts do not "require an inmate to demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do we require a showing that his or her condition will degenerate into a life-threatening one." Brock, 315 F.3d at 163. However, the pain must be more than an annoyance. Id.

3. *Subjective Test: Deliberate Indifference*
The prisoner must show that a defendant " 'knows of and disregards an excessive risk to inmate health or safety,' ' which means "actual knowledge of a risk, [or] evidence that

2005 WL 893571

the risk was obvious or otherwise must have been known to a defendant." *Brock,* 315 F.3d at 164 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)). This is a "mental state more blameworthy than negligence"-"the equivalent of criminal recklessness." *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (quotation marks omitted). Thus, "a prisoner must demonstrate more than an inadvertent failure to provide adequate medical care by prison officials to successfully establish Eighth Amendment liability." *Smith,* 316 F.3d at 184 (quotation marks omitted). However, a plaintiff is not required to show that "the defendant acted for the very purpose of causing harm or with knowledge that harm will result ." *Hernandez,* 341 F.3d at 144 (quotation marks omitted). Instead, she must show "an act or failure to act by the prison doctor that evinces a conscious disregard of a substantial risk of serious harm." *Id.*

C. *Serious Medical Condition and/or Need: Plantar Fasciitis and Sinusitis*

 **\*5** Defendants argue that neither Kemp's plantar fasciitis nor his sinusitis rose to the level of a serious medical condition or need. I agree.

As noted above, the factors courts must consider in making this determination include a reasonable doctor or patient's assessment of the condition, the impact of the condition on the plaintiff's daily activities, and the existence of chronic and substantial pain. *Brock,* 315 F.3d at 162. Here, Dr. Kasabjan, the Chief of Plastic, Reconstructive and Hand Surgery at Staten Island University Hospital, eventually performed elective surgery as treatment for Kemp's plantar fasciitis on March 16, 2001. He found that Kemp had

> a not especially advanced case of plantar fasciitis ... [S]urgery was still elective at that point and, in my experience, many persons with plantar fasciitis in a similar stage have chosen not to have surgery.... [P]laintiff did not appear to be in acute distress and the bands appeared to be only "slightly tender" on examination.... I did not prescribe any pain medications or anti-inflammatories for plaintiff to take while he was waiting for the operation.

(Kasabjan Aff. ¶¶ 3-6.) This medical opinion is substantiated and reasonable; it contextualizes Kemp's condition and explains medical options. Kemp alleges that he was experiencing significant pain when he walked. While it is true that an inmate need not experience "pain that is at the limit of human ability to bear," here Kemp was not prescribed any medication for the pain in his feet. *Brock,* 315 F.3d at 163. Moreover, Dr. Kasabjan noted that surgery was not recommended for Kemp's condition until it reached a certain level of severity, because with premature surgery, the likelihood of recurrence is much higher. In other words, Kemp's condition was one where any patient would be forced to bear some amount of pain before the treatment he sought, namely surgery, was medically recommended. Accordingly, I conclude that no reasonable juror could find that Kemp's plantar fasciitis is sufficiently serious to implicate the Eighth Amendment.

In considering the same factors for Kemp's sinusitis, I again conclude that the condition was not sufficiently serious to implicate the Eighth Amendment. Dr. Alexis Lang, the DOCS's Regional Medical Director for the Fishkill Region, concluded that none of Kemp's sinus related conditions were "life threatening or seriously debilitating." (Lang Aff. ¶ 50.) While some of the physicians who examined Kemp found that surgery was indicated (*see, e.g.,* Def't 56.1 Stmt. ¶¶ 42-43, 59, 71), others recommended further tests and medication (*id.* at 73, 87-90). Although Kemp's sinuses were causing him pain, he does not indicate that the pain was severe. He states simply that his sinuses became painful during his time at Arthur Kill Correctional Facility. (Kemp Dep. 20.) His treatment included numerous medications for his condition, including over the counter medications for allergies as well as antibiotic treatment. The condition, which was being treated and which eventually improved with that treatment (*see* Schulman Decl. ¶¶ 20-23, 87-88), was not a serious medical condition.

 **\*6** Moreover, hindsight can be used in the objective assessment of whether Kemp had serious medical needs. In a case where an HIV positive prisoner did not receive his medication for brief periods during his incarceration, the Second Circuit held that among the factors to be considered in determining whether a medical condition or need is sufficiently serious to implicate the Eight Amendment, "[t]he absence of adverse medical effects or demonstrable physical injury is one such factor that may be used." *Smith,* 316 F.3d at 187 (citations omitted).

2005 WL 893571

Here, Kemp did eventually receive the treatment he sought for his plantar fasciitis and his sinuses improved with medical treatment, as opposed to the surgical treatment he sought. Kemp does not allege that he was adversely affected by the delay in the treatment for his feet. In fact, his condition may have recurred if surgery had been performed too early. Therefore, even if plantar fasciitis was a medical *condition* that was serious enough to implicate the Eighth Amendment, the delay in treatment here-where treatment was successfully provided-is not sufficiently serious. The same is true for sinusitis. Although I find that his sinusitis was not a sufficiently serious medical condition, even if it were, there were no "adverse medical effects or demonstrable physical injury" to support Kemp's contention that the medical need associated with his sinusitis was serious. *Id.* Instead, his condition improved with the medical care he received.

D. *Deliberate Indifference*

As stated above, Kemp does not make a sufficient showing that he had a serious medical condition or need during the relevant time period. However, even if his plantar fasciitis and/or sinusitis were serious enough to implicate the Eighth Amendment, his claims would not survive defendants' summary judgment motion because he has failed to adduce facts that would support a jury finding that any of the defendants acted with deliberate indifference.

1. *Medical Staff*

a. *Dr. Mikulas Halko, Physician at Sing Sing Correctional Facility*

Kemp's only plausible claim against Dr. Halko would arise from the fact that from the end of April of 1999 until July of 1999, Dr. Halko refused to see Kemp while the growths on the bottom of his feet were getting bigger. (Kemp Dep. 39-40.) Although it is not clear that Dr. Halko was aware of Kemp's desire to see him, even if he were, his actions or omissions do not rise to the level of deliberate indifference.

First, Kemp was seen during this period by the on-call nurse and given foot pads, antifungal cream and foot powder. Second, the nurses' notes indicate that a podiatrist referral was pending. Although this note was an error in that the referral needed to be renewed at Sing Sing, Dr. Halko's failure to follow-up sooner on the referral did not "evince[ ] a conscious disregard of a substantial risk of serious harm." *Hernandez,* 341 F.3d at 144 (quotation marks omitted). At most, this omission can be characterized as "an inadvertent failure to

provide adequate medical care," which is not actionable under the Eighth Amendment. *Smith,* 316 F.3d at 184.

b. *Dr. Kyeetint Maw, Physician at Sing Sing Correctional Facility*

**\*7** Dr. Maw did not regularly treat Kemp; he did so only when Dr. Halko was not available. There is no evidence supporting a claim that Dr. Maw was deliberately indifferent to Kemp's foot masses or to his edema. Although Kemp might believe that Dr. Maw's concern regarding the edema came at the cost of concern for Kemp's foot problem, this is by no means deliberate indifference. The exercise of medical judgment cannot be deliberate indifference, *Hernandez,* 341 F.3d at 146-47, and Kemp's disagreement with Dr. Maw's medical opinion is insufficient to support an Eighth Amendment claim.

2. *Supervisor Liability*

"Supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on respondeat superior ." *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (quotation marks omitted). In other words, a plaintiff must show personal involvement on the part of the supervisor in the alleged constitutional violations to maintain a cause of action; "linkage in the prison chain of command" is not sufficient to implicate a commissioner or prison superintendent. *Id.* at 435 (citing *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985)). In *Hernandez v. Keane,* the Second Circuit outlined the following ways in which the liability of a supervisor can be shown:

> (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.

341 F.3d at 146 (citing *Colon,* 58 F.3d at 873).

a *Dr. Alexis Lang, DOCS Regional Medical Director for the Fishkill Region*

Dr. Lang reviewed the treatment provided to plaintiff by various DOCS medical staff and outside specialists at Downstate, Sing Sing and Arthur Kill Correctional Facilities. (Lang Aff. ¶ 2.) Specifically, she affirmed a decision denying a referral to an orthopedist in May of 2000 based on the fact that Kemp was going to be away from the correctional facility for court proceedings. (*Id.* at ¶ 26.) The decision suggested resubmission of the request for a referral when Kemp returned from court. (*Id.*) Dr. Lang also affirmed a decision requiring a reevaluation by an otolaryngologist in September of 2000 after Dr. Mitchell, who treated Kemp at Arthur Kill, referred him for surgery to treat his sinusitis. (*Id.* at ¶ 38.) Finally, a physician who was covering for Dr. Lang affirmed a decision that denied a request for an MRI of Kemp's feet, and instead suggested surgery or excision of the lesions on his feet. (*Id.* at ¶ 42.)

None of these decisions reflects deliberate indifference. As discussed above, there was more than one course of treatment possible for both of Kemp's medical conditions and the exercise of medical judgment cannot constitute deliberate indifference. *Hernandez,* 341 F.3d at 146-47. The alternative treatment methods affirmed by Dr. Lang reflect medical judgments about the proper treatment of Kemp's conditions. *See Hudson,* 503 U.S. at 9.

**\*8** The orthopedic referral was denied because the treatment may have been interrupted by Kemp's absence during his court trip and could be delayed because it was not urgent. Dr. Lang's second decision requesting reevaluation for the sinus surgery was sound medical judgment, especially since the condition was one that is "typically treated with conservative measures or courses of antibiotics, decongestant and steroid sprays." (Lang Aff. ¶ 56.) In the end, the decision to continue medical treatment proved to be fruitful, as Kemp no longer suffers the extent of sinusitis that led him to seek medical care for the condition. (Kemp Dep. 88.) Finally, the decision to perform surgery as opposed to an MRI on his feet, is one that Kemp agrees with. That treatment too was ultimately successful. (Kasabjan Aff. ¶¶ 8-9.) There is no genuine issue of material fact regarding whether Dr. Lang was deliberately indifferent to Kemp's serious medical conditions or needs. Accordingly, defendants' motion for summary judgment is granted with respect to the claims against Dr. Lang.

b. *Dr. Lester Wright, Chief Medical Officer of DOCS*

Dr. Wright is the person to whom Dr. Lang directly reports. Kemp alleges that he wrote Dr. Wright a letter complaining that he was being denied treatment. (Kemp Dep. 32-34.) Thus, he seeks to show that Dr. Wright was liable as a supervisor because of his "failure to act on information indicating that unconstitutional acts were occurring." *Hernandez,* 341 F.3d at 145. Although a copy of the letter is not in the record, Kemp did receive a response to that letter, which stated, *inter alia,* that "the facility's medical staff were in the best position to evaluate [his] medical needs." (Kemp Dep. 33.) This response was justified. Moreover, as noted above, neither Kemp's medical conditions nor the treatment he was receiving from his treating physicians implicated the Eighth Amendment.

Even if Kemp had created a genuine issue of material fact with respect to the conduct of the physicians who treated him, Wright has qualified immunity. To establish a qualified immunity defense, "the defendants must show that it was objectively reasonable ... for them to believe that they had not acted with the requisite deliberate indifference." *McKenna v. Wright,* 386 F.3d 432, 437 (2d Cir.2004). The law allows supervisors "to rely upon the decisions of their predecessors or subordinates so long as those decisions do not appear to be obviously invalid, illegal or otherwise inadequate." *Poe v. Leonard,* 282 F.3d 123, 144 (2d Cir.2002) (citation omitted). Based on the above, and given Wright's position as a Chief Medical Officer who is generally not involved in decisions regarding treatment of individual inmates, it was objectively reasonable for him to believe that his reliance on the decisions of Kemp's treating physicians and Dr. Lang's review of those decisions was not deliberate indifference.

c. *Dr. John Perilli, Facility Health Services Director at Sing Sing Correctional Facility*

**\*9** Kemp's claim regarding Perilli was made under the mistaken belief that he was the health services director at Sing Sing when Kemp's podiatrist referral was denied. However, Perilli did not take the position until December 2, 1999, and the referral was denied in April or May of 1999. As he was not the health services director, he could not have been involved in the decision. Kemp admits as much. (Kemp Dep. 61-63.) Accordingly, defendants' motion for summary judgment is granted with respect to the claims against Perilli.

d. *Thomas G. Eagen, Director of DOCS Inmate Grievance Program*

Case 9:22-cv-00181-GTS-MJK   Document 96   Filed 07/24/24   Page 171 of 201
Kemp v. Wright, Not Reported in F.Supp.2d (2005)
2005 WL 893571

According to defendants, Eagen was not involved in Kemp's medical treatment in any way because he would not have reviewed Kemp's grievance. Moreover, even if a person with no medical training gives "automatic and complete deference" to a decision by a physician, this is not, by itself, sufficient evidence of deliberate indifference. *Brock,* 315 F.3d at 164. There must be some proof that the person was aware that the medical decision was not protective of the prisoner's well-being. An allegation that non-medical personnel should not have deferred to medical personnel "amounts to an allegation of negligence. But negligence is not deliberate indifference." *Id.* Accordingly, defendants' motion for summary judgment is granted with respect to the claims against Eagen.

e. *Charles Greiner, Superintendent of Sing Sing Correctional Facility and Dennis Breslin, Superintendent of Arthur Kill Correctional Facility*

Kemp alleges that Greiner and Breslin were deliberately indifferent because they rejected Kemp's grievance regarding his medical treatment at their respective facilities. Factually, this is incorrect; superintendents are not generally involved in the medical treatment of inmates, and there is no evidence that they were involved in this case. (Lang Aff. ¶ 5.) In order to succeed on a claim against the superintendents, Kemp must show some personal involvement. Mere linkage in the prison chain of command is not sufficient to implicate a commissioner or prison superintendent. *Richardson,* 347 F.3d at 435 (citing *Ayers,* 780 F.2d at 210). Kemp provides no evidence to support his claim.

Moreover, the superintendents are shielded by qualified immunity. They are not physicians and "[t]here is no evidence that [they] ... had the authority to intervene in [ ] admittedly medical decision[s] made" by the physicians responsible for the inmate. *Cuoco v. Moritsugu,* 222 F.3d 99, 111 (2d Cir.2000). It was "objectively reasonable ... for them to believe that they had not acted with the requisite deliberate indifference" because they reasonably relied on the medical staff to deal with Kemp's medical care. *McKenna,* 386 F.3d at 437. Accordingly, they are entitled to summary judgment on qualified immunity grounds because they are "non-doctors whose failure to intercede in the medical treatment of an inmate was, if wrongful, not objectively unreasonable." *Cuoco,* 222 F.3d at 111.

CONCLUSION

**\*10** For the foregoing reasons, defendants' motion for summary judgment is granted in its entirety. The Clerk of the Court is directed to close the case.

So Ordered.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 893571

---

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 172 of 201

Oh v. Saprano, Not Reported in Fed. Supp. (2020)
2020 WL 4339476

2020 WL 4339476
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Bamm Paul OH, Plaintiff,
v.
APRN SAPRANO, et al., Defendants.

No. 3:20-cv-237 (SRU)
|
Signed 07/27/2020

**Attorneys and Law Firms**

Kelly A. Fitzpatrick, Fitzpatrick Law, LLC, Southbury, CT;
Michael J. Dugan, Litchfield Cavo LLP, Simsbury, CT, for
Plaintiff.

Zenobia Gertrude Graham-Days, Office of the Attorney
General, Hartford, CT, for Defendants.

### INITIAL REVIEW ORDER

Stefan R. Underhill, United States District Judge

**\*1** On February 20, 2020, the plaintiff, Bamm Paul Oh, a
sentenced inmate who is currently confined at MacDougall-
Walker Correctional Institution ("MacDougall"), filed this
action against the Commissioner of the Department of
Correction (the "DOC") and several DOC staff members
employed at MacDougall, Corrigan-Radgowski Correctional
Center ("Corrigan"), and Cheshire Correctional Institution
("Cheshire"). *See* Compl., Doc. No. 1.

Specifically, pursuant to 42 U.S.C. § 1983, Oh sues sixteen
defendants: APRN Saprano, APRN Stork, Warden Kristene
Barone, Deputy Warden David Snyder, Nurse Administrator
O'Shea, Dr. John Doe, RN Supervisor Tawanna Furtick,[1]
and RNs Gwen Hite, Tutu and Rose at MacDougall;
Warden Kenneth Butricks, APRN Jean Caplin, and RN
Supervisor Jones at Cheshire; RNs Julie and Stephanie
Fraser[2] at Corrigan; and DOC Commissioner Rollin Cook[3]
(collectively, the "Defendants"). Compl, Doc. No. 1, at 1–
5. Oh alleges that he has received inadequate medical care
while in prison; he seeks money damages and a preliminary
injunction ordering the DOC to provide him with appropriate
treatment for his skin condition. *Id.* at 21; Mot. for Prelim.
Inj., Doc No. 9, at 2–3.

[1]    Oh refers to this RN as "Tuwana." *See* Compl.,
      Doc. No. 1, at 1.

[2]    Oh refers to this RN as "Stephine." *See* Compl.,
      Doc. No. 1, at 1.

[3]    As of July 1, 2020, Cook was no
      longer the Commissioner of the DOC. *See
      Connecticut prisons head Rollin Cook to resign
      July 1*, HARTFORD COURANT (June 12,
      2020), https://www.courant.com/breaking-news/
      hc-br-doc-rollin-cook-resign-20200612-
      su5wkkx645hg5fht7yeu4pvnli-story.html.

I **dismiss without prejudice** Oh's complaint because it fails
to state Eighth Amendment claims of deliberate indifference
to Oh's need for medical treatment. I note that Oh filed
this complaint *pro se*, but I have since appointed him *pro
bono* counsel. *See* Order, Doc. No. 33. Because I dismiss the
complaint without prejudice, Oh's appointed counsel may—if
Oh's claims can be cured—file an amended complaint within
thirty (30) days from the date of this Order.

### I. Standard of Review

Under 28 U.S.C. § 1915A, I must review prisoner civil
complaints and dismiss any portion of the complaint that
is frivolous or malicious, that fails to state a claim upon
which relief may be granted, or that seeks monetary relief
from a defendant who is immune from such relief. Although
detailed allegations are not required, the complaint must
include sufficient facts to afford the defendants fair notice
of the claims and the grounds upon which they are based
and to demonstrate a plausible right to relief. *Bell Atlantic
v. Twombly*, 550 U.S. 544, 555–56 (2007). Conclusory
allegations are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662,
678 (2009). The plaintiff must plead "enough facts to state
a claim to relief that is plausible on its face." *Twombly*, 550
U.S. at 570. Nevertheless, it is well-established that "[p]ro
se complaints 'must be construed liberally and interpreted
to raise the strongest arguments that they suggest.' " *Sykes
v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting
*Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d
Cir. 2006)); *see also Tracy v. Freshwater*, 623 F.3d 90, 101–
02 (2d Cir. 2010) (discussing special rules of solicitude for
*pro se* litigants).

### II. Factual Background

Oh v. Saprano, Not Reported in Fed. Supp. (2020)
Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 173 of 201
2020 WL 4339476

**\*2** In January 2019, Oh was housed at MacDougall, where he asked to be seen for a skin rash that covered 85 percent of his body. *See* Compl., Doc. No. 1, at 7. Although Oh wrote to sick call and filed grievances, Oh was not seen until April 11, 2019 by APRN Saprano. *Id.* Saprano provided Oh with some skin creams and told him to see a dermatologist at UConn Health Center ("UConn"). *Id.* Saprano also indicated that she would change Oh's pain medication to Neurontin because the current medication was hurting Oh's liver. *Id.*

On April 23, 2019, Oh was transferred to Corrigan, where he wrote to RN Julie, who was responsible for arranging medical trips. *Id.* On April 29, 2019, Oh went to UConn, where he had a biopsy; the doctor said Oh's condition looked like psoriasis.[4] *Id.* In May 2019, Oh became sick from the Neurontin, and he was prescribed Ibuprofen. *Id.* at 8. Oh told RN Stephanie Fraser that he could not take Ibuprofen for long periods due to damage to his liver. *Id.* Oh later saw RN Julie, who told him that, at UConn's instruction, Oh would begin a skin treatment with two topical creams for thirty days, and Oh would get a shot or a pill if the creams did not work. *Id.* RN Julie informed Oh that he needed to try the creams before taking the pills or getting the shot because the State of Connecticut would otherwise not cover the expensive pill or shot treatments. *Id.*

[4]    Oh also indicates that a doctor at UConn diagnosed Oh with psoriatic arthritis. *See* Compl., Doc. No. 1, at 17; Mot. for Prelim. Inj., Doc. No. 9, at 1.

Oh reports that he had difficulty with the cream treatment: Oh quickly ran out of the creams because he had to apply the cream to a large portion of his body and the "creams were small." *Id.* After thirty days, Oh wrote to the medical unit to explain that the cream treatment did not work and that his pain was getting worse. *Id.* at 9. Oh indicated that he wanted to see the medical provider to discuss other treatment options and his pain issues. *Id.* After more than ninety days and several requests, sick calls, and grievances, Oh asked RN Stephanie Fraser and RN Julie to permit him to see the medical provider. *Id.* They told Oh that he was not a priority; Oh was not seen by the medical provider while he was at Corrigan. *Id.*

On August 21, 2019, Oh was transferred back to MacDougall, where he was seen on August 26, 2019 by RN Tutu, who informed Oh that he would see APRN Stork. *Id.* Oh told RN Tutu that he had experienced back spasms, numbness in his hands, and burning, peeling skin. *Id.* at 9–10. RN Tutu responded that she would put him on the "emergency list" to

see the medical provider in September 2019. *Id.* at 10. After Oh's creams and Ibuprofen were discontinued, Oh saw RN Tutu again. *Id.* At that time, RN Tutu informed Oh that she had done all she could for him. *Id.* Oh continued to sign up for sick call. *Id.* When RN Gwen Hite saw Oh in September and October 2019, Oh told RN Hite that his skin was getting worse and he was in pain. *Id.*

Oh wrote to Nurse Supervisor Tawanna Furtick, APRN Stork, Nurse Administrator O'Shea, Warden Kristene Barone, Deputy Warden David Snyder, and Commissioner Rollin Cook; Oh explained that he needed to be seen by the medical provider for his skin and pain. *Id.* Oh talked to Warden Barone, Deputy Warden Snyder, and Commissioner Cook when they were on tours of the prison facility to request medical attention. *Id.* Warden Barone and Deputy Warden Snyder informed Oh that they "would talk to medical but the[y] did not control medical" and that the medical administration was "at war" with the custody administration. *Id.* at 10–11. Nurse Administrator O'Shea said she would try to look into it. *Id.*

**\*3** Oh wrote to RN Supervisor Tawanna Furtick and wrote grievances to RN Rose. Finally, on November 10, 2019, RN Rose called Oh to the medical unit. *Id.* APRN Stork saw Oh on November 13, 2019. *Id.* APRN Stork explained that Oh needed to go back to UConn and that, due to the expense of the pill and shot treatments, the State of Connecticut would not permit her to provide Oh those treatments. *Id.* at 11–12. APRN Stork informed Oh that she would put Oh on vitamins because his lab results showed a deficiency in Vitamin D. *Id.* at 12. APRN Stork also put Oh on Lyrica for pain and ordered an EKG, lab tests, and x-rays of Oh's chest, knees, and back. *Id.* On November 24, 2019, Dr. John Doe assessed Oh's skin condition and placed him on steroids and Benadryl. *Id.* Dr. Doe informed Oh he need not go to UConn for his rash. *Id.* APRN Stork raised Oh's Lyrica dosage and put Oh on Mobic (an anti-inflammatory drug) for Oh's muscles. *Id.*

On December 5, 2019, Oh was transferred to Cheshire. *Id.* Oh was informed that the MacDougall administration did not want to deal with him anymore. *Id.* At Cheshire, Oh wrote to RN Supervisor Jones, who indicated that Oh would see APRN Jean Caplin. *Id.* Oh also wrote to Commissioner Cook and Warden Butricks about his medical issues. *Id.* at 12–13. After he told Warden Butricks about his pain, Warden Butricks stated that he would look into it. *Id.*

Oh v. Saprano, Not Reported in Fed. Supp. (2020)

Case 9:22-cv-00181-GTS-MJK   Document 96   Filed 07/24/24   Page 174 of 201

2020 WL 4339476

On December 18, 2019, APRN Jean Caplin saw Oh. *Id.* at 13. She read Oh's x-ray and lab results and informed Oh that he has a deteriorating spine and prediabetes. *Id.* She also indicated that Oh's vitamins were unnecessary except for Vitamin D. *Id.* APRN Caplin told Oh that the pill and shot treatments for his skin condition were too expensive: The State of Connecticut would not pay $3,000 to $5,000 for that treatment. *Id.* APRN Caplin discontinued Oh's vitamins and increased his Mobic dosage. APRN Caplin informed Oh that he was a good candidate for the pill treatment and that Oh's skin disease could be a cause for most of his pain. *Id.*

APRN Caplin scheduled Oh for a trip to UConn, and she informed Oh that APRN Stork had not done so. *Id.* APRN Caplin also indicated that it would take between six and nine months to get a visit to UConn, and that she could not do anything further for Oh's skin or pain management until he was seen at UConn. *Id.* at 14. Oh asked both APRN Caplin and RN Supervisor Jones to do something for him, but they failed to provide Oh with any help for his condition. *Id.*

Oh has filed a petition for a writ of habeas corpus seeking relief in Connecticut Superior Court, but Oh remains in pain with burning, peeling skin. *Id.* at 14–16. The Defendants continue to delay and deny Oh treatment for his pain and skin condition. *Id.* at 16. UConn informed the DOC about Oh's psoriatic arthritis eleven months ago, but the Defendants have delayed Oh's treatment and stonewalled his requests. *Id.* at 17.

### III. Discussion

A. Eighth Amendment Deliberate Indifference to Medical Needs

"[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (cleaned up). The Supreme Court has explained that such indifference can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104–05 (cleaned up).

An official has exhibited deliberate indifference to an inmate's serious medical needs when that official knows that that inmate faces " 'a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.' " *Harrison v. Barkley*, 219 F.3d 132, 137–38 (2d Cir. 1998) (quoting *Farmer v. Brennan*, 511 U.S. 825,

837 (1994)). To state a claim for deliberate indifference, the plaintiff must satisfy both an objective and a subjective element. Objectively, the plaintiff must allege that his medical need was serious; subjectively, the plaintiff must allege that the defendants acted with a sufficiently culpable state of mind. *See Smith v. Carpenter*, 316 F.3d 178, 183–84 (2d Cir. 2003).

**\*4** Objectively, the alleged deprivation must be "sufficiently serious." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). The condition must be "one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (cleaned up). Subjectively, the defendants must have been reckless—that is, they must have been actually aware of a substantial risk that the plaintiff would suffer serious harm as a result of their conduct. *See Salahuddin v. Goord*, 467 F.3d 263, 280–81 (2d Cir. 2006). Thus, a defendant's mere negligence is not cognizable on an Eighth Amendment deliberate indifference claim. *See Carpenter*, 316 F.3d at 184 (citing *Estelle*, 492 U.S. at 105–06). Although "mere medical malpractice is not tantamount to deliberate indifference," such medical malpractice may constitute deliberate indifference when it "involves culpable recklessness, i.e., ... a conscious disregard of a substantial risk of serious harm." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) (quoting *Hathaway*, 99 F.3d at 553) (cleaned up). "[M]ere disagreement over [an inmate's] proper treatment does not create a constitutional claim," and "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Id.*

When an inmate brings an Eighth Amendment deliberate indifference claim based on "a temporary delay or interruption" of treatment, the court's objective, "serious medical need inquiry can take into account the severity of the temporary deprivation alleged." *Carpenter*, 316 F.3d at 186. The court should consider the "particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition." *Id.* "[I]n most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Id.* at 187. Deliberate indifference claims based on a delay in treatment are difficult to establish:

> Although a delay in providing
> necessary medical care may in

Oh v. Saprano, Not Reported in Fed. Supp. (2020)

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 175 of 201

2020 WL 4339476

some cases constitute deliberate indifference, [the Second Circuit] has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a life-threatening and fast-degenerating condition for three days; or delayed major surgery for over two years.... That [a plaintiff] feels something more should have been done to treat his injuries is not a sufficient basis for a deliberate indifference claim.

*Demata v. New York State Corr. Dep't of Health Servs.*, 1999 WL 753142, at *2 (2d Cir. Sept. 17, 1999) (unpublished) (cleaned up); *see also Goolsby v. Cicconi-Crozier*, 2014 WL 1279066, at *4 (W.D.N.Y. Mar. 27, 2014) (citing *Demata*); *Henry v. Doe*, 2020 WL 209091, at *5 (S.D.N.Y. Jan. 10, 2020) (citing *Demata*). To hold a particular defendant liable on such a theory, that defendant must have had the requisite state of mind to satisfy the subjective component of an inmate's Eighth Amendment claim: The delay must have been "the result of intentional or reckless conduct on the part of" that defendant. *Burke v. Pillai*, 2015 WL 1565413, at *7 (D. Conn. Apr. 8, 2015).

For purposes of this initial review, I conclude that Oh has a sufficiently serious condition to satisfy the objective component of the deliberate indifference analysis. Oh alleges that his psoriasis and psoriatic arthritis cause him significant pain because they produce burning, peeling skin and other harmful effects on his health and joints. Oh's allegations suggest that he has experienced a delay in treatment that has caused his condition to worsen. However, Oh's allegations do not indicate that any of the Defendants acted with a sufficiently culpable state of mind to be held liable for an Eighth Amendment violation.

1. Claims Against APRN Saprano, RN Rose, RN Hite, RN Tutu, RN Stephanie, and Dr. Doe.

**\*5** Oh has not stated an Eighth Amendment deliberate indifference claim against APRN Saprano, RN Rose, RN Hite, RN Tutu, RN Stephanie, and Dr. Doe. That is because Oh's allegations do not plausibly indicate that those six defendants were reckless in treating Oh. For instance, Oh's only allegations regarding APRN Saprano indicate that

APRN Saprano provided Oh with skin creams, informed Oh that he should see a dermatologist at UConn, and changed Oh's pain medication to Neurontin due to potential liver damage. *See* Compl., Doc. No. 1, at 7–8. Those claims simply do not plausibly allege that APRN Saprano recklessly and deliberately ignored Oh's medical needs. Instead, Oh's claims indicate that APRN Saprano responded to Oh's need for medical treatment. [5] The analysis is the same for RN Rose. Regarding RN Rose, Oh alleges only that Oh wrote grievances to her, after which RN Rose called Oh to the medical unit and arranged for Oh to see APRN Stork. *See id.* at 11. That is the sum total of Oh's allegations regarding RN Rose. Similarly, Oh's only allegations regarding RN Hite are that Oh saw RN Hite in September and October 2019 and told RN Hite that his skin was getting worse. *See id.* at 10. Oh does not allege any particular action that RN Hite took or did not take in response to that information. Viewed in the light most favorable to him, Oh alleges, at the most, that RN Rose and RN Hite acted negligently.

5    Oh also alleges that he filed grievances and sent letters to sick call for four months until he was finally seen by APRN Saprano. *See* Compl., Doc. No. 1, at 7. However, Oh has not specified the individuals to whom he sent the letters or the individuals who reviewed his requests for treatment. Thus, I cannot determine who, if anyone, acted with deliberate indifference to Oh's requests for medical treatment during the time preceding his meeting with APRN Saprano.

The same goes for Dr. Doe. Oh claims that on November 24, 2019, Dr. Doe assessed Oh's skin condition, placed Oh on steroids and Benadryl, and informed Oh that he need not go to UConn. *See id.* at 12. Dr. Doe thus attempted to treat Oh's psoriasis. That Oh might have preferred to go to UConn does not change the analysis because it is well settled that an inmate's unheeded preference for treatment does not create a constitutional claim. *See, e.g.*, *Weatherwax v. Barone*, 2020 WL 1677069, at *3 (D. Conn. Apr. 6, 2020) (citing, *inter alia, Munoz v. Eliezer*, 2018 WL 1626170, at *6 n.5 (S.D.N.Y. Mar. 30, 2018)).

Likewise, Oh's allegations regarding RN Stephanie do not plausibly suggest that RN Stephanie acted recklessly. Oh alleges that he told RN Stephanie that he could not take ibuprofen for long periods of time and that RN Stephanie once told Oh that he was not a medical priority and would not get "to see the p[ro]vider before others." *See* Compl., Doc. No.

Oh v. Saprano, Not Reported in Fed. Supp. (2020)

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 176 of 201

2020 WL 4339476

1, at 8–9. Regarding the first allegation, Oh simply recounts something he told RN Stephanie. There is no suggestion that RN Stephanie did not listen to him. Regardless, even construed most liberally, Oh's complaint regards his psoriasis, not any damage that he suffered from taking ibuprofen. Regarding Oh's second allegation, at the time Oh asked to see the medical provider at Corrigan, he had already been prescribed topical creams for his psoriasis. *See id.* Oh wanted to see the medical provider "to discuss the other treatment options plus pain issues I was having." *Id.* at 9. As already discussed, a prisoner's disagreement with a provider's chosen course of treatment alone does not raise a cognizable Eighth Amendment claim. *See Chance,* 143 F.3d at 703. Further, although Oh may have wished to see a medical provider immediately, he does not plausibly allege that RN Stephanie was actually aware of a substantial risk that Oh would suffer serious harm as a result of her actions or inactions. *See Salahuddin,* 467 F.3d at 280.

Finally, Oh's allegations against RN Tutu do not state a claim on which relief may be granted because, again, Oh has not plausibly alleged that RN Tutu acted with a sufficiently culpable state of mind. Oh alleges that RN Tutu saw him on August 26, 2019. Oh "explained [his] issues" to RN Tutu, who then referred Oh to APRN Stork. *See* Compl., Doc. No. 1, at 9. Oh further told RN Tutu that he had experienced back spasms, numbness in his hands, and burning, peeling skin. Thus, RN Tutu placed Oh on an "emergency list" to see the medical provider in September 2019. Oh then vaguely alleges that he told RN Tutu that his skin creams and ibuprofen were discontinued. *See id.* at 10. At that time, Oh alleges that RN Tutu informed Oh that "she did all she could do." *Id.*

**\*6** Oh does not plausibly allege that RN Tutu acted recklessly. Indeed, Oh admits that RN Tutu treated him by (1) referring him to APRN Stork and (2) putting him on an "emergency list" to be seen by a medical provider as soon as one week later. Even though Oh alleges that RN Tutu eventually informed him that she "did all she could do," RN Tutu had already referred Oh to another nurse and placed him on an "emergency list" for treatment. Even if RN Tutu should have followed up on Oh's requests to ensure that they proceeded apace, her failure to do so, at most, constituted negligence, which cannot support an Eighth Amendment deliberate indifference claim. *See Burke,* 2015 WL 1565413, at *5 (citing *Carpenter,* 316 F.3d at 184; *Estelle,* 429 U.S. at 106).

For the foregoing reasons, I dismiss Oh's Eighth Amendment claims against APRN Saprano, RN Rose, RN Hite, RN Tutu, RN Stephanie, and Dr. Doe.

2. Claims Against Supervisory Defendants

Oh sues seven supervisory defendants. Three of those supervisory defendants apparently supervise nurses specifically: Nurse Supervisor Tawanna Furtick, Nurse Administrator O'Shea, and RN Supervisor Jones. Four of those supervisory defendants are prison-wide supervisors: Warden Barone (MacDougall), Deputy Warden Snyder (MacDougall), Warden Buttricks (Cheshire), and Commissioner Cook. Oh's theory of liability is the same for all those defendants: Although Oh brought his condition to their attention, they failed to help Oh, and so they exhibited deliberate indifference to Oh's serious medical needs in violation of the Eighth Amendment. I dismiss all of Oh's claims against those seven supervisory defendants because (1) he has not alleged that some of them were personally involved in his alleged constitutional deprivation, and, even if he had, (2) he has not alleged that any supervisory defendant acted with a sufficiently culpable state of mind.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995) (cleaned up); *see also Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir. 2006). Personal involvement of a supervisory defendant can arise through (1) participating directly in the violation; (2) failing to remedy the wrong after learning of it; (3) creating a policy or custom under which the violation occurred; (4) being grossly negligent in supervising the bad actor; or (5) exhibiting deliberate indifference to the plaintiff's rights by failing to act on information indicating that unconstitutional acts were occurring. *Colon,* 58 F.3d at 873. [6]

> [6]     The Second Circuit has observed that *Iqbal* may have "heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations[.]" *Grullon v. City of New Haven,* 720 F.3d 133, 139 (2d Cir. 2013). However, without further guidance, I assume for purposes of ruling on this motion that the categories outlined in *Colon* remain valid.

In my view, at least Nurse Supervisor Furtick and Commissioner Cook were not personally involved in any constitutional deprivation. "A supervisory official's mere receipt of a letter complaining about unconstitutional conduct

2020 WL 4339476

is not enough to give rise to personal involvement on the part of the official." *Burke,* 2015 WL 1565413, at *6 (cleaned up); *see also Smart v. Goord,* 441 F. Supp. 2d 631, 643 (S.D.N.Y. 2006) (confirming that a supervisory defendant "cannot be held liable on the sole basis that he did not act in response to letters of protest"). In addition, "[t]o hold [high-ranking supervisory officials] liable on a mere complaint by an inmate, even a verbal one, would raise the same problems stemming from liability from letters" alone. *Hardy v. Illinois Dep't of Corr.,* 2017 WL 4224027, at *6 (S.D. Ill. Sept. 22, 2017). Oh's sole allegation against Nurse Supervisor Furtick is that Oh wrote to her regarding his allegedly unconstitutional medical treatment. *See* Compl., Doc. No. 1, at 10. Because Oh does not allege more, Oh has not alleged that Furtick was personally involved in any constitutional violation.

**\*7** With respect to Commissioner Cook, Oh alleges that he wrote letters to Commissioner Cook, and, when Commissioner Cook was on a tour of Oh's prison facility, Oh verbally requested medical attention. *See* Compl., Doc. No. 1, at 10, 13. Even though Oh's complaints to Commissioner Cook included both letters and a verbal complaint, Oh still does not plausibly allege Commissioner Cook's personal involvement. A single inmate's verbal complaint to the Commissioner of the DOC during a prison facility tour is highly similar to an inmate's sending the Commissioner a letter. The only difference is that on the prison tour, the Commissioner can actually see the inmate. Thus, an inmate's verbal complaint might give rise to supervisory personal liability if, for instance, the complaining inmate was clearly in very serious, visible danger at the time he made the complaint. *Cf. Hardy,* 2017 WL 4224027, at *6. But Oh does not make anything approaching such an allegation. Thus, Oh's single verbal complaint to Commissioner Cook during a prison facility tour was functionally equivalent to sending Commissioner Cook a letter. Further, I agree with other courts that have remarked that holding otherwise would "open up" a Commissioner "to deliberate indifference lawsuits based on inmates shouting complaints to the [Commissioner] during facility tours." *Id.* That would have a perverse effect on prison administration.

Oh's allegations against the five other supervisory defendants—Nurse Administrator O'Shea, RN Supervisor Jones, Warden Butricks, Deputy Warden Snyder, and Warden Barone—are highly similar to Oh's claims against Commissioner Cook. That is, Oh alleges that he wrote to all of them and talked to all of them (on prison tours or otherwise) regarding his condition, and each of those five defendants said they would look into it, but nothing happened. For that reason, I do not believe that Oh has plausibly alleged that any of those defendants was personally involved in any constitutional deprivation. However, even assuming that those five supervisory defendants *were* personally involved in Oh's alleged constitutional violation, I would still dismiss the claims against them because Oh does not plausibly allege that any acted with a sufficiently culpable state of mind.

With respect to Warden Butricks, Oh merely alleges that he wrote to Warden Butricks about his medical issues, and that, sometime thereafter, Warden Butricks stated that he would look into it. *See* Compl., Doc. No. 1, at 12–13. Without more, Oh's claims do not plausibly allege that Warden Butricks knew of "and disregard[ed] an excessive risk to" Oh's health or safety. *Hathaway,* 99 F.3d at 553. In other words, Oh has not plausibly alleged that Warden Butricks acted recklessly. Oh does not even allege, explicitly, that Warden Butricks failed to look into Oh's situation. At worst, Oh's allegations may raise an inference that Warden Butricks acted negligently by failing to follow up on Oh's request when he said that he would. But negligence is not enough to support an Eighth Amendment deliberate indifference claim. *See Burke,* 2015 WL 1565413, at *5.

Oh's allegations regarding Deputy Warden Snyder and Warden Barone are nearly identical. Oh alleges that he wrote to Snyder and Barone and explained that he needed to be seen by the medical provider for his skin and pain. *See* Compl., Doc. No. 1, at 10. Just as with Commissioner Cook, Oh alleges that he requested medical attention from Deputy Warden Snyder and Warden Barone while they were on a prison tour. *See id.* Oh's only additional allegation is that Warden Barone and Deputy Warden Snyder apparently responded to Oh's verbal complaints and said "they would talk to medical but the[y] did not control medical." *Id.* Deputy Warden Snyder also responded that the medical administration was "at war" with the custody administration. *Id.* at 11. Even assuming that Oh sufficiently alleges Snyder and Barone's personal involvement in the alleged constitutional violation in this case, Oh does not plausibly allege that Snyder or Barone acted with a sufficiently culpable state of mind. Notably, Oh does not allege that Barone and Snyder *did not* talk to medical. Even assuming that they did not, their failure to do so would be, at most, negligent. *Cf. Seymore v. Cherchever,* 2016 WL 3645197, at *8 (S.D.N.Y. June 29, 2016) (dismissing, at summary judgment, prisoner's Eighth Amendment claim against physician's assistant based

Oh v. Saprano, Not Reported in Fed. Supp. (2020)
Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 178 of 201
2020 WL 4339476

on alleged failure to "look into" medical issue prisoner raised with physician's assistant). In sum, Oh does not plausibly allege that Snyder or Barone were "actually aware of a substantial risk" that Oh would suffer serious harm as a result of their conduct. *Salahuddin*, 467 F.3d at 280–81.

**\*8** The same goes for Nurse Administrator O'Shea and RN Supervisor Jones. Regarding O'Shea, Oh alleges only that Oh wrote to O'Shea regarding his problems and, at some point, O'Shea "said she would try to look into it." Compl., Doc. No. 1, at 11. For the reasons already stated, even assuming that Oh plausibly alleges O'Shea's personal involvement, Oh does not plausibly allege that O'Shea acted recklessly. Again, Oh notably does not allege that O'Shea failed to "look into" Oh's complaint. Even assuming that she failed to do so, O'Shea's failure would be, at most, negligent. *See Goolsby*, 2014 WL 1279066, at \*2, \*5 (dismissing in part, on initial review, prisoner's Eighth Amendment deliberate indifference claim when prisoner alleged that a "[n]urse told plaintiff that she would look into the issue" and "fail[ed] to get back to him"). Finally, regarding RN Supervisor Jones, Oh claims that he wrote to RN Supervisor Jones, who arranged for Oh to see APRN Jean Caplin; Oh also at some point asked RN Supervisor Jones for help, but, in Oh's view, Jones did not provide Oh help. Oh's first allegation merely details that Jones helped Oh. Oh's second allegation is vague and, for all the reasons identified above, does not plausibly allege that Jones acted recklessly.

### 3. Claims Against APRN Stork, APRN Caplin, and RN Julie

Oh makes several allegations against these three nurses, including one common allegation. I will first address the common allegation and then address the individual allegations.

#### a. Denial of Oh's Requests for Pill or Shot Treatment

Oh alleges that each of APRN Stork, APRN Caplin, and RN Julie told Oh that they could not treat him by pills or shots, but only by cream, because the State of Connecticut would not cover the more expensive pill or shot treatment. *See* Compl., Doc. No. 1, at 8 (RN Julie telling Oh that he needed to try the creams before the pills or shots because the State of Connecticut would otherwise not cover the expensive pill or shot treatments); *id.* at 11–12 (APRN Stork explaining that, due to the expense of the pill and shot treatments, the

State of Connecticut would not permit her to provide Oh those treatments); *id.* at 13 (APRN Caplin informing Oh that the State of Connecticut would not pay for the pill and shot treatments). Oh summarizes: "[T]his is a hor[r]ible and del[i]b[e]r[a]te act to save the State money, and they do not care that they have hurt me." *Id.* at 15. Oh does not plausibly allege that APRN Stork, APRN Caplin, or RN Julie acted recklessly.

Generally, an inmate's disagreement with a medical provider about his medical treatment is not sufficient to state an Eighth Amendment violation. *See Chance*, 143 F.3d at 703; *Grays v. McGrain*, 333 F. Supp. 3d 225, 234 (W.D.N.Y. 2018) (citing cases). However, a medical provider may be deliberately indifferent by consciously providing an inmate with "an easier and less efficacious" treatment plan, particularly if the provider does so because of ulterior motives, such as improper monetary incentives. *Chance*, 143 F.3d at 703–04; *see also Braham v. Perelmuter*, 2017 WL 3222532, at \*16–17 (D. Conn. July 28, 2017). Put differently, a medical provider may be deliberately indifferent if the choice of treatment did not derive from sound medical judgment. *See Chance*, 143 F.3d at 703–04. "Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case." *Id.* at 703.

In *Braham*, for example, the district court denied the defendant-dentist's motion for summary judgment, in part, because a reasonable juror might have inferred that the defendant-dentist had chosen an unsound—but easier—treatment route by extracting several of the plaintiff's teeth rather than by trying to restore them, despite the possibility that extraction could result in the plaintiff's losing more teeth. *Braham*, 2017 WL 3222532, at \*17. Similarly, in *Chance*, the Second Circuit explained that the district court had erred in dismissing the plaintiff-prisoner's deliberate indifference claim based upon the defendant-dentists' decision to extract multiple of the plaintiff's teeth. *See Chase*, 143 F.3d at 700. That was because the plaintiff alleged that the defendant-dentists "would have been paid extra for the extractions." *See id.* Thus, if the plaintiff could prove that the defendant-dentists "recommended extraction not on the basis of their medical views, but because of monetary incentives," that "would show that the defendants had a culpable state of mind and that their choice of treatment was intentionally wrong and did not derive from sound medical judgment." *Id.* at 704.

**\*9** Although Oh's complaint reflects a difficult and frustrating effort to obtain effective medical treatment, his

Oh v. Saprano, Not Reported in Fed. Supp. (2020)

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 179 of 201

2020 WL 4339476

allegations do not suggest that APRN Stork, APRN Caplin, or RN Julie acted with conscious disregard of his medical needs. Unlike the dentist in *Braham*, Oh does not allege that any of those defendants chose an unsound—but easier—method of treatment. *See Braham*, 2017 WL 3222532, at *17. Oh also does not suggest that any of those defendants was motivated by ulterior considerations, such as improper monetary incentives, in providing Oh treatment. To be sure, Oh alleges that APRN Stork, APRN Caplin, and RN Julie told Oh that they were not authorized to provide Oh with treatment by pill or shot because the State of Connecticut had determined that such treatments were too expensive for state coverage. But those allegations do not suggest that any of those defendants was acting with an ulterior motive of financial gain. Unlike the defendants in *Chance*, APRN Stork, APRN Caplin, and RN Julie stood to gain (or lose) nothing personally from the type of treatment that Oh received. Thus, Oh's claims based on those defendants' failure to provide him with different treatments that Oh believes would have been more effective are dismissed without prejudice for failure to establish the subjective element of the Eighth Amendment analysis.

#### b. Individual Allegations

Just like Oh's allegations against other defendants in this action, I dismiss Oh's more specific allegations against APRN Stork, APRN Caplin, and RN Julie because none of those allegations plausibly alleges that APRN Stork, APRN Caplin, or RN Julie were "actually aware of a substantial risk" that Oh would suffer serious harm as a result of their conduct. *Salahuddin*, 467 F.3d at 280–81. In fact, almost all of Oh's allegations against APRN Stork, APRN Caplin, and RN Julie detail the ways in which those defendants helped Oh.

Oh alleges that APRN Stork put Oh on vitamins because his lab results showed a deficiency in Vitamin D. *See* Compl., Doc. No. 1, at 12. Oh alleges that some of the vitamins that APRN Stork told him to take were unnecessary. *See id.* Oh also alleges that APRN Stork put Oh on Lyrica for pain and ordered an EKG, lab tests, and x-rays of Oh's chest, knees, and back. *See id.* At a later date, APRN Stork raised Oh's Lyrica dosage and put Oh on Mobic (an anti-inflammatory drug) for Oh's muscles. *See id.* Oh also claims that APRN Stork did not arrange for him to return to UConn. *See id.* at 13. The above allegations demonstrate that APRN Stork attempted to help and treat Oh. Oh's belief that he did not need the vitamins that APRN Stork told him to take is a simple disagreement

about a course of treatment with a medical provider, which is not cognizable on an Eighth Amendment claim of deliberate indifference. Furthermore, Oh's allegation that APRN Stork failed to put him back on the list of patients to go to UConn does not plausibly allege that APRN Stork was anything more than negligent (particularly given her other efforts to treat Oh), which is not cognizable on an Eighth Amendment claim. See *Farmer*, 511 U.S. at 835.

Oh alleges that APRN Caplin saw Oh, read Oh's x-ray and lab results, and informed Oh that he had a deteriorating spine and prediabetes. *See* Compl., Doc. No. 1, at 13. Oh also alleges that APRN Caplin indicated that Oh's vitamins were unnecessary except for Vitamin D, so she discontinued Oh's vitamins and increased his Mobic dosage. *See id.* APRN Caplin informed Oh that he was a good candidate for the pill treatment and that Oh's skin disease could be a cause for most of his pain. *See id.* APRN Caplin scheduled Oh for a trip to UConn but indicated that it would take between six and nine months to actually visit and that she could not do anything further for Oh's skin or pain management until he was seen at UConn. *See id.* at 14. Oh asked both APRN Caplin and RN Supervisor Jones to do something for him, but they failed to provide Oh with any help for his condition. *See id.*

None of Oh's claims regarding APRN Caplin plausibly alleges that APRN Caplin was recklessly indifferent to Oh's medical needs. Again, most of Oh's claims detail APRN Caplin's efforts to help Oh. To the extent Oh complains that APRN Caplin could not speed up his visit to UConn, Oh does not plausibly allege that APRN Caplin was in any way responsible for that delay. To the extent Oh complains that he asked APRN Caplin to "do something" and that APRN Caplin did not, I have already explained why the same allegation against RN Supervisor Jones is vague and does not plausibly allege that APRN Caplin acted recklessly.

**\*10** Finally, Oh's only individual allegation against RN Julie is one that he also makes against RN Stephanie Fraser: that when Oh asked RN Stephanie Fraser and RN Julie to permit him to see the medical provider, they told Oh that he was not a priority. *See* Compl., Doc. No. 1, at 9. I have already explained why that allegation does not plausibly allege that RN Julie was actually aware of a substantial risk that Oh would suffer serious harm as a result of her actions or inactions. *See Salahuddin*, 467 F.3d at 280.

#### 4. Official Capacity Claims

Oh v. Saprano, Not Reported in Fed. Supp. (2020)

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 180 of 201

2020 WL 4339476

Because I have concluded that Oh's complaint fails to state plausible Eighth Amendment deliberate indifference claims against all of the Defendants, I also dismiss Oh's official capacity claims for a preliminary injunction against the Defendants. *See* Compl., Doc. No. 1, at 21 (requesting "treatment and medical to treat my is[s]ues"); *Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 406–07 (S.D.N.Y. 2010) (requests for injunctive relief are remedies and are dismissed with the underlying claim).

### ORDERS

For the foregoing reasons, I **dismiss without prejudice** Oh's complaint in its entirety because his Eighth Amendment claims are not plausible and thus "fail[ ] to state a claim upon which relief may be granted." 28 U.S.C. § 1915A(b)(1). Oh's appointed *pro bono* counsel may file an amended complaint within thirty (30) days of this ruling. If no amended complaint is filed within thirty (30) days of this ruling, the Clerk is instructed to close the case.

Because I have dismissed Oh's complaint in its entirety, I also **deny without prejudice** Oh's pending motions related to the claims contained in his complaint:

- Motion for Preliminary Injunction, **Doc. No. 9**;

- Motion for Oral Argument, **Doc. No. 13**;

- Motion to Collect Evidence, **Doc. No. 14**;

- Motion to Add Supporting Conduct, **Doc. No. 15**;

- Motion for Disclosure, **Doc. No. 16**;

- Motion to Subpoena Medical Records, **Doc. No. 20**;

- Letter Motion to Inform the Court, **Doc. No. 22**;

- Motion for Damages Analysis, **Doc. No. 25**;

- Motion to Add to Complaint, **Doc. No. 26**;

- Motion to Clarify and Respond, **Doc. No. 29**;

- Motion for Emergency Medical Treatment and Care, **Doc. No. 37**; and

- Motion for Settlement Conference, **Doc. No. 38**.

Oh's Motion to Appoint Counsel, **doc. no. 4**, is **denied as moot** because I have already appointed *pro bono* counsel in this matter. *See* Order, Doc. No. 33. Oh's motions to strike, **doc. nos. 24 and 27**, relate to the defendants' objection to Oh's motion for release; thus, Oh's motions to strike are **denied as moot** because I have already denied without prejudice Oh's motion for release from custody. *See* Order, Doc. No. 36. However, I **grant** Oh's Motion for Clarification, **doc. no. 35**, regarding the role of his appointed *pro bono* counsel. I advise Oh that Attorney Michael J. Dugan has been appointed to represent Oh in all matters of this case. Oh's counsel is instructed to file an amended complaint within thirty (30) days if Oh can allege any plausible Eighth Amendment claims. **All filings and communications with the court must be submitted by counsel, rather than by Oh**.

Finally, I **deny as moot** the Defendants' motion to stay, **doc. no. 23**, because I have now dismissed without prejudice Oh's complaint.

It is so ordered.

### All Citations

Not Reported in Fed. Supp., 2020 WL 4339476

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by Gutierrez Chacon v. P & S Select Foods, Inc., S.D.N.Y., November 19, 2019

2015 WL 1433353
United States District Court,
S.D. New York.

Jeffrey H. WALDEN, individually and on behalf
of all other persons similarly situated, Plaintiff,

v.

SANITATION SALVAGE CORP.,
Andrew Squitieri, John Squitieri, and Steve
Squitieri, jointly and severally, Defendants.
Kelvin Garcia, on behalf of himself and
all others similarly situated, Plaintiff,

v.

Sanitation Salvage Corporation and
Steven Squitieri, individually, Defendants.

Nos. 14 Civ. 112(ER), 14 Civ. 7759(ER).
|
Signed March 30, 2015.

***OPINION AND ORDER***

RAMOS, District Judge.

**\*1** This is a consolidated putative collective and class action under the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL"). Plaintiffs Jeffrey H. Walden and Kelvin Garcia allege that their former employers, Sanitation Salvage Corp. ("Sanitation Salvage"), Andrew Squitieri, John Squitieri, and Steven Squitieri (collectively, "Defendants") failed to pay them certain overtime wages in violation of the FLSA and the NYLL, and failed to comply with the NYLL's recordkeeping requirements. Pending before the Court is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Doc. 13. Defendants brought the instant motion prior to the commencement of discovery in this action. Plaintiff Walden has submitted a declaration pursuant to Rule 56(d), claiming that he is unable to present facts essential to his opposition of the instant motion without certain limited discovery.[1] Plaintiff Garcia does not request discovery in order to oppose the instant motion, but instead claims that Defendants have not demonstrated the absence of a genuine issue of material

fact. For the reasons set forth below, Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

1    Before 2010, Rule 56(d) was codified as Rule 56(f). *See* Fed.R.Civ.P. Advisory Comm. Notes (2010 Amendments).

**I. Procedural Background**

Plaintiff Walden commenced the instant action on January 8, 2014. Doc. 1. On March 7, 2014, Defendants filed their Answer. Doc. 8. A pre-motion conference was held on April 3, 2014, and the instant motion was filed on April 24, 2014. Doc. 13.

On January 28, 2014, Plaintiff Garcia filed an action against Sanitation Salvage and Steven Squitieri in the United States District Court for the Eastern District of New York. Doc. 1. The two defendants answered the Complaint on March 31, 2014. Doc. 9. On June 6, 2014, Hiram Arocho filed notice of his consent to join that action as an opt-in plaintiff. Doc. 12. Then, on September 23, 2014, upon stipulation of the parties, the case was ordered transferred to this Court.

On January 20, 2015, pursuant to Rule 42(a) and with consent of the parties, the two actions were consolidated. Doc. 30. Then, on March 10, 2015, Garcia filed his opposition to the instant motion.

**II. Factual Background**

Defendant Sanitation Salvage is a New York corporation engaged in interstate commerce. Declaration of Steven Squitieri ("Squitieri Decl."), ¶ 2; *see also* Walden Compl. ¶ 8. Sanitation Salvage is in the business of carrying and disposing of cardboard and garbage from residential and commercial establishments in the Bronx, Brooklyn, Queens, Manhattan, and Westchester County. *Id.* ¶ 29; Squitieri Decl. ¶ 2. Sanitation Salvage ships the waste it collects to locations throughout the United States and abroad. Walden Compl. ¶ 2. The individual defendants own, operate, and/or control the day-to-day operations of Sanitation Salvage and jointly employed Walden and Garcia. *Id.* ¶¶ 9, 11, 13.

Plaintiff Walden worked as a "helper" at Sanitation Salvage from June 17, 2011 to February 16, 2013. *Id.* ¶ 32; Squitieri Decl. ¶ 4. In this role, Walden's primary duties were to collect garbage and recyclable materials from the street and place them into Defendants' trucks. Walden Compl. ¶ 33. According

to Walden, he worked 16–hour shifts five days per week for a total of 80 hours per workweek. *Id.* ¶ 41. The parties agree that Walden was paid his regular rate of $14.50 per hour for 40 hours per week, and that he was paid one and a half times his hourly rate for ten hours of overtime per week. *Id.* ¶¶ 44–48; Squitieri Decl. ¶ 4. And while Walden maintains that he was not paid anything for the remaining 30 hours worked, Defendants claim that all helpers, including Walden, received at least one and a half times their hourly rate for each overtime hour worked in a given workweek. Walden Compl. ¶¶ 46–48; Squitieri Decl. ¶ 4.

  **\*2**  Plaintiff Garcia was employed at Sanitation Salvage from approximately January 28, 2008 to September 13, 2013 as a "garbage and recycling pick-up driver." Garcia Decl. ¶¶ 4–5. According to Garcia, he "just threw the garbage and recycling in the back of the truck" and did not exercise judgment or discretion relating to the pick-up or loading of the items on the street. *Id.* ¶ ¶ 8–9. Garcia contends that he worked five to six days per week in shifts of at least 11 hours, and was improperly paid a daily wage regardless of the number of hours he worked. *Id.* ¶¶ 6–7; Garcia Compl. ¶ 16.

## III. Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed.R.Civ.P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.,* 812 F.Supp.2d 454, 467 (S.D.N.Y.2011) (citing *SCR Joint Venture L.P. v. Warshawsky,* 559 F.3d 133, 137 (2d Cir.2009)). A fact is "material" if it might affect the outcome of the litigation under the governing law. *Id.* The party moving for summary judgment is responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.,* 706 F.Supp.2d 494, 504 (S.D.N.Y.2010) (internal quotation marks omitted) (quoting *Jaramillo v. Weyerhaeuser Co.,* 536 F.3d 140, 145 (2d Cir.2008)).

In deciding a motion for summary judgment, the Court must " 'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.' " *Brod v. Omya, Inc.,* 653 F.3d 156, 164 (2d Cir.2011) (quoting *Williams v.*

*R.H. Donnelley, Corp.,* 368 F.3d 123, 126 (2d Cir.2004)). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise. *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts." *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp .,* 475 U.S. 574, 586 (1986)). To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno,* 812 F.Supp.2d at 467–68 (citing *Anderson v. Liberty Lobby,* 477 U.S. 242, 256–57 (1986)).

If the party opposing a summary judgment motion shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may deny the motion or allow time to take discovery. Fed.R.Civ.P. 56(d). The affidavit or declaration must describe: (1) what facts are sought and how they are to be obtained, (2) how such facts are reasonably expected to raise a genuine issue of material fact, (3) what efforts the affiant has made to obtain them, and (4) why the affiant's efforts were unsuccessful. *Robinson v. Allstate Ins. Co .,* 508 F. App'x 7, 10 (2d Cir.2013). The grant of relief pursuant to Rule 56(d) is within the discretion of the district court. *Cont'l Cas. Co. v. Marshall Granger & Co., LLP,* 921 F.Supp.2d 111, 126–27 (S.D.N.Y.2013).

  **\*3**  "There is a critical distinction ... between cases where a litigant opposing a motion for summary judgment requests a stay of that motion to conduct *additional* discovery and cases where that same litigant opposes a motion for summary judgment on the ground that it is entitled to an opportunity to *commence* discovery with respect to [the non-movant's] claims." *Desclafani v. Pave–Mark Corp.,* No. 07 Civ. 4639(HBP), 2008 WL 3914881, at \*7 (S.D.N.Y. Aug. 22, 2008) (quoting *Crystalline H2O, Inc. v. Orminski,* 105 F.Supp.2d 3, 6–7 (N.D.N.Y.2000)) (emphasis in original). The Second Circuit has held that summary judgment should only be granted if *"after discovery,* the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 303–04 (2d Cir.2003) (quoting *Hellstrom v. U.S. Dep't of Veterans Affairs,* 201 F.3d 94, 97 (2d Cir.2000)) (internal quotation marks omitted) (alterations in original). Only in the "rarest of

2015 WL 1433353, 2015 Wage & Hour Cas.2d (BNA) 179,987

cases," therefore, may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery. *Id.*

### IV. Discussion

#### a. Legal Standard

The FLSA requires that employees engaged in interstate commerce be paid "at a rate not less than one and one-half times the [employee's] regular rate" of pay for work in excess of forty hours in any workweek. 29 U.S.C. § 207(a). However, Congress has exempted a broad range of employees from this rule. *See* 29 U.S.C. § 213. For example, the motor carrier exemption exempts from the FLSA's overtime provisions any employee with respect to whom the Secretary of Transportation (the "Secretary") has power to establish qualifications and maximum hours of service pursuant to 49 U.S.C. § 31502.

Section 31502 grants the Secretary the authority to prescribe qualifications and maximum hours of service of employees of a motor carrier. This grant of authority applies to transportation by motor carrier of property in interstate or foreign commerce on a public highway. 49 U.S.C. § 13501.

Whether the motor carrier exemption applies to an employee depends on the nature of both the employer's and the employee's activities. 29 C.F.R. § 782.2(a). First, the employer must be within the jurisdiction of the Secretary by virtue of operating as a "motor carrier," as defined by the statute. *Dauphin v. Chestnut Ridge Transp., Inc.,* 544 F.Supp.2d 266, 273 (S.D.N.Y.2008). Second, the individual employee must fall within an exempt classification, which the Supreme Court has held is a determination to be made by the courts. *Pyramid Motor Freight Corp. v. Ispass,* 330 U.S. 695, 707 (1947). In making this determination, the name given to the position is not controlling, rather it is the character of the activities involved in the employee's performance of his job that controls. *Id.* at 707–08. "According to the Department of Labor regulations, the employee must 'engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act.' " *Williams v. Tri–State Biodiesel, L.L.C.,* No. 13 Civ. 5041(GWG), 2015 WL 305362, at *5 (S.D.N.Y. Jan. 23, 2015) (quoting 29 C.F.R. § 782.2(a)). The four broad categories of workers whose duties are said to directly affect the safety of vehicle operation are: (1) drivers, (2) mechanics, (3) loaders, and

(4) helpers of the first three. *Id.* (internal citations omitted). However, "[i]f not all of an employee's activities affect the safety of operations of motor vehicles in interstate commerce, a court must consider 'the character of the activities rather than the proportion of either the employee's time or his activities.' " *Id.* (quoting *Morris v. McComb,* 332 U.S. 422, 431–32 (1947)); *see also Fox v. Commonwealth Worldwide Chauffeured Transp. of NY, LLC,* 865 F.Supp.2d 257, 266 (E.D.N.Y.2012) ("What matters is the degree to which a worker's activities affects safety, not the amount of time the worker spends on that activity." (citing *Levinson v. Spector Motor Serv.,* 330 U.S. 649, 674–75 (1947))).

**\*4** The Second Circuit has held that because the FLSA is a remedial act, its exemptions are to be narrowly construed, and that the employer bears the burden of proving that its employees fall within an exempted category of the Act. *Williams,* 2015 WL 305362, at *5 (quoting *Martin v. Malcolm Pirnie, Inc.,* 949 F.2d 611, 614 (2d Cir.1991)).

#### b. Defendants' Motion

Defendants argue that they are entitled to summary judgment on Plaintiffs' FLSA claim because there is no genuine issue of fact that they are exempt from the FLSA's overtime provisions. Defs. Mem. L. 13. Defendants contend that Sanitation Salvage is a motor carrier under the authority of the Department of Transportation for the purposes of the motor carrier exemption because it is subject to the jurisdiction of the Secretary and Plaintiffs' duties affected the safe operation of the trucks. [2] Defendants rely on the declaration of Steven Squitieri, as well as the affidavits of Sanitation Salvage helpers Christopher Bourke and Orrett Ewen (respectively, "Bourke Aff." and "Ewen Aff."), to argue that all helpers perform duties affecting the safety of operation.

[2]   The parties agree that Sanitation Salvage is subject to the Secretary's jurisdiction because it is a "motor carrier" as that term is defined by the statute.

According to Steven Squitieri, the helpers perform an initial safety inspection of the truck with the driver at the beginning of every shift, are required to familiarize themselves with hazards along the route and plan accordingly, and are given full discretion to screen for dangerous garbage and take action to ensure that the garbage is loaded safely. Squitieri Decl. ¶¶ 6–7. Helpers also act as "spotters," advising the drivers when the truck can be safely moved. *Id.* ¶ 7. Additionally, helpers are responsible for the safety of the other members of the crew by making sure their co-workers are wearing high-

2015 WL 1433353, 2015 Wage & Hour Cas.2d (BNA) 179,987

visibility clothing and reflective vests. *Id.* Sanitation Salvage also provides the helpers with safety training addressing many of the above responsibilities. *Id.* Finally, Defendants claim that all helpers, including Walden, were paid at least one and a half times the minimum wage rate of pay for each overtime hour worked. Defs.' 56.1 Stmt. ¶ 20.

The affidavits submitted by Bourke and Ewen are consistent with Defendant Squitieri's declaration. Both Bourke and Ewen attest that their job responsibilities include the safety-related duties discussed above, and that they were paid one and a half times the minimum wage rate for all hours over forty worked in a given week. Bourke Aff. ¶¶ 2–5; Ewen Aff. ¶¶ 2–5.

#### c. Walden's Counsel's Declaration

Douglas B. Lipsky, counsel for Walden, submitted a declaration asserting that Walden is unable to present facts essential to his opposition to the instant motion because there has been no discovery in the instant action. Lipsky Decl. ¶ 1. According to Walden, issues of fact exist as to whether he and the other helpers exercised discretion to "build a balanced load or to distribute the garbage in such a manner that the safety operation of the vehicle [is] not jeopardized," and the extent to which the helpers had discretion in loading the garbage onto the trucks, performing safety activities, and directing the activities of other helpers manning the trucks in order to ensure the safe operation of the trucks. *Id.* ¶¶ 6–9. In order to prove the existence of a genuine issue of material fact, Walden seeks information regarding, *inter alia,* the extent of the helpers' discretion in loading the trucks; the means by which Defendants communicate the purported discretionary authority to the helpers; and whether the helpers in fact adhere to a policy implemented by Sanitation Salvage in the performance of their duties. *Id.* Walden similarly seeks information regarding the discretion the helpers purportedly exercise in directing their co-workers' activities in order to ensure the safe operation of the trucks, as well as the helpers' discretion as to safety activities performed along the truck routes. *Id.* Walden seeks to obtain such information through depositions of Defendants and their affiants, as well as through paper discovery. *Id.* ¶¶ 6–12.

#### d. Walden's FLSA Claim

**\*5** Determining whether an employee is exempt from the FLSA overtime requirement is a "highly fact-intensive inquiry that is to be made on a case-by-case basis in light of the totality of the circumstances." *Indergit v. Rite Aid Corp.,*

Nos. 08 Civ. 9361(PGG), 08 Civ. 11364(PGG), 2010 WL 1327242, at \*5 (S.D.N.Y. Mar. 31, 2010) (internal quotation marks and citation omitted). Here, it is undisputed that the parties were engaged in interstate commerce. Accordingly, the inquiry hinges on whether Plaintiffs' duties directly affected the safe operation of the sanitation trucks.

Walden's counsel's declaration meets the requirements of Rule 56(d). The declaration sets forth the information that Walden requires in order to oppose the instant motion, as well as the discovery needed in order to obtain such information. And although the declaration does not specify the facts counsel anticipates learning through discovery, it is sufficient at this stage—based on the parties' disagreement as to material facts, including the impact Walden had on the trucks' safety of operation—to infer that such facts will be further developed through discovery. *Cf. Miller,* 321 F.3d at 303 ("While the affidavit did not specify with precision the information plaintiff believed he could learn from deposing the three affiants, plaintiff cannot be faulted for failing to advise the district court precisely what information he might learn during discovery given that the facts sought were exclusively within defendants' possession and that he had no previous opportunity to develop the record through discovery.").

Courts in the Second Circuit routinely deny or defer motions for summary judgment when the non-movant has not had an opportunity to conduct discovery and submits an affidavit or declaration that meets the requirements set forth in Rule 56(d). *See, e.g., id.* (finding that the district court's grant of summary judgment was premature where no discovery had taken place and the district court relied on affidavits submitted by defendants, which discussed facts the plaintiff had been unable to investigate); *Cont'l Cas. Co.,* 921 F.Supp.2d at 127 (deciding that defendants were entitled to conduct limited discovery where no discovery had taken place and defendants had submitted a declaration detailing the issues requiring discovery); *Wexelberg v. Project Brokers LLC,* No. 13 Civ. 7904(LAK)(MHD), 2014 WL 2624761, at \*9 (S.D.N.Y. Apr. 28, 2014) (observing that summary judgment would not be justified where discovery had not taken place and many pertinent facts were in defendants' unique possession).

Defendants claim that summary judgment is warranted here because "well-established case law" directs that helpers categorically fall under the FLSA's motor carrier exemption. Defs. Mem. L. 9. For this argument, Defendants rely on a district court case from outside of this district, *Graham v.*

*Town & Country Disposal of Western Missouri, Inc.,* 865 F.Supp.2d 952 (W.D.Mo.2011). In *Graham,* the court found that "garbage throwers" were exempt based on facts agreed to by the parties the plaintiffs were responsible for working with the drivers and riding on the trucks, operating the trash compactor, wearing clothing that was easily visible, and communicating with drivers through hand signals in order to ensure the safe backing up of the trucks. *Id.* at 960. The plaintiff in *Graham* also acknowledged that there were items he would not load onto the truck for safety purposes. *Id. Graham* is therefore easily distinguishable from this case, at least at this stage of the proceedings. Here, the parties have not agreed on a statement of facts, and Walden specifically denies that he had discretion in deciding what items to place into the trucks. Furthermore, while the court in *Graham* decided the motion after discovery, *see id.* at 961 n. 10 (referencing the deposition testimony of several plaintiffs), there has not been an opportunity for any discovery in this case.

 **\*6** Similarly, in *Veney v. John W. Clarke Inc.,* 28 F.Supp.3d 435, 442 (D.Md.2014), the court determined that the plaintiffs—laborers who threw trash into the defendants' sanitation trucks—exercised discretion in loading the truck and therefore affected its safety of operation. [3] Significantly, as in *Graham,* the parties in *Veney* had an opportunity for discovery before the defendants brought their motion for summary judgment. *See id.* at 438–40 (referencing six depositions and the individual defendant's interrogatory responses); *see also Vanartsdalen v. Deffenbaugh Indus., Inc.,* No. 09 Civ.2030(EFM), 2011 WL 1002027, at \*3 (D.Kan. Mar. 18, 2011) (granting defendant trash collection company's motion for summary judgment—after discovery—based on findings that the plaintiff exercised judgment and discretion when, at each stop, he determined if the trash could be loaded safely). Here, Plaintiffs have not had the opportunity to conduct depositions, submit interrogatories, or conduct any other discovery. And while the reasoning of *Graham* and *Veney* may ultimately prevail here, any reliance on these cases at this juncture would be premature. [4] Defendants' motion for summary judgment is therefore DENIED without prejudice with respect to Walden. [5]

---

[3]    The court denied the defendants' motion for summary judgment in *Veney* on the basis that they had failed to establish the motor carrier exemption's interstate commerce requirement. *Veney,* 28 F.Supp.3d at 442.

[4]

Defendants argue that because Walden has failed to submit a counterstatement to their statement of material facts pursuant to Local Rule 56.1, their statement should be deemed admitted by Walden. Defs. Reply Mem. L. 1. A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules. *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001) (internal citations omitted). Indeed, courts in this Circuit routinely excuse a party's failure to comply with Local Rule 56.1. *See, e.g., id.* (noting that it would "take [its] cue" from the district court, in whose discretion lay the initial determination not to apply Local Rule 56.1 to the plaintiff's failure to file a counterstatement to the defendant's Rule 56.1 statement); *Wilton Reassurance Life Co. of N.Y. v. Garbrecht,* No. 13 Civ. 5536(RJS)(HBP), 2014 WL 6850968, at \*8 (S.D.N.Y. Dec. 3, 2014) (adopting recommendation that the court overlook the non-moving defendants' failure to submit a Rule 56.1 statement and review the record independently based on the strong preference in the Second Circuit to resolve cases on the merits). Accordingly, the Court will exercise its discretion and excuse Walden's failure to submit a Rule 56.1 counterstatement in addition to the Rule 56(d) declaration.

Additionally, Defendants claim that Walden should have submitted an affidavit in compliance with Rule 56(e) of the Federal Rules of Civil Procedure in addition to counsel's Rule 56(d) declaration. Defs. Reply Mem. L. 1. However, Rule 56(e) states that even if a party fails to properly support an assertion of fact or address another party's assertion of fact, the Court may (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment; or (4) issue any other appropriate order. Accordingly, for the reasons stated above, the Court declines to grant the instant motion with respect to Walden based on an undeveloped record.

[5]

Because summary judgment on Walden's FLSA claim is premature, the Court need not address the issue of supplemental jurisdiction in connection with his NYLL claims.

Additionally, in connection with their argument that the Court should decline to exercise supplemental jurisdiction over Walden's NYLL claims, Defendants contend that Paragraph 20(c) should be stricken from Walden's complaint because he has failed to provide evidence in support of the allegation that Sanitation Salvage did not post a notice explaining employees' minimum wage and overtime pay rights. Defs. Reply Mem. L. 8. To prevail on a Rule 12(f) motion to strike, a party must demonstrate that (1) no evidence in support of the allegations would be admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the allegations to stand would result in prejudice to the movant. *In re Fannie Mae 2008 Sec. Litig.,* 891 F.Supp.2d 458, 471 (S.D.N.Y.2012), *aff'd,* 525 F. App'x 16 (2d Cir.2013). Matters should not be stricken from a pleading unless it "clearly can have 'no possible relation' to the matter in controversy." *TouchTunes Music Corp. v. Rowe Int'l Corp.,* No. 07 Civ. 11450, 2010 WL 3910756, at *4 (S.D.N.Y. Oct. 5, 2010) (quoting *Gleason v. Chain Serv. Rest.,* 300 F.Supp. 1241, 1257 (S.D.N.Y.1969), *aff'd,* 422 F.2d 343 (2d Cir.1970)). Defendants have not met this standard here. Moreover, given the Court's conclusion with respect to Walden's FLSA claim, it would be imprudent to grant a request to strike such allegations at this time based on Walden's purported failure to provide corresponding evidentiary support.

### e. Garcia's FLSA Claim

Unlike Walden, Garcia has not submitted an affidavit or declaration pursuant to Rule 56(d) in order to request discovery. However, in the declaration he swore to in opposition to the instant motion, Garcia asserts that he worked at Sanitation Salvage as a garbage and recycling pick-up driver. Still, he claims that Defendants have not demonstrated the absence of a genuine issue of material fact. Garcia Opp. Mem. L. 3. Garcia's position is untenable.

The case law regarding the motor carrier exemption's application to drivers is well-established. *See, e.g., Morris,* 332 U.S. at 430 ("The drivers are full-time drivers of motor vehicles well within the definition of that class of work by the Commission if the work is done in interstate commerce.");

*Bilyou v. Dutchess Beer Distribs., Inc.,* 300 F.3d 217, 222 (2d Cir.2002) (finding that the Secretary of Transportation had jurisdiction over defendant's drivers because they operated vehicles in interstate commerce); *Dauphin,* 544 F.Supp.2d at 274 (noting that "[t]he activities of drivers affect safety of operations of motor vehicles, and thus, drivers may come within the scope of the motor carrier exemption if their duties involve 'transportation on the public highways of passengers [or property] in interstate ... commerce' ") (internal citations omitted); *Alleyne v. Time Moving & Storage Inc.,* 264 F.R.D. 41, 45 (E.D.N.Y.2010) (noting that common examples of employees who fall under the motor carrier exemption include "employees who drive an employer's motor vehicles"). Because Garcia admits that he was a driver, his duties necessarily affected the safe operation of the vehicle, regardless of any other duties he may have had. Accordingly, Garcia's claim that he did not exercise judgment or discretion in picking up and loading trash onto Sanitation Salvage trucks—even if true—is beside the point. Garcia's FLSA claim is therefore DISMISSED without prejudice to replead with an appropriate plaintiff within thirty (30) days of the date of this Order. [6] *Cf. Shahrir v. Smith & Wollensky Rest. Grp., Inc.,* 659 F.3d 234 (2d Cir.2011) (stating in connection with an FLSA and NYLL collective and class action that "if, for some reason it is later determined by the court that the representative Plaintiffs are inadequate [under Rule 23(a)(4) ], the court could substitute another class plaintiff for the representative plaintiff in question or simply allow the remaining representative Plaintiffs to proceed with the class action."); *Faria v. Allstate Merch. Serv., LLC,* No. 09 Civ. 7444(JSR), 2010 WL 1541576, at *1 (S.D.N.Y. Apr. 13, 2010) (discussing counsel's motion for substitution of new lead plaintiff in FLSA putative collective action after original lead plaintiff was dismissed for his intentional failure to appear at a deposition).

[6]     If the FLSA claim is not replead accordingly, the Court will decline to exercise supplemental jurisdiction over the state law claims brought in Garcia's complaint and the case will be closed.

### f. Defendants' Request for Fees and Costs

 *7  Defendants request attorney's fees and costs on the ground that the instant action was commenced in bad faith. Courts in this Circuit have the power to award attorney's fees to a successful litigant when his opponent has commenced or conducted an action in bad faith, vexatiously, wantonly, or for oppressive reasons. *Landmark Ventures, Inc. v. InSightec, Ltd.,* ——F.Supp.3d ——, No. 14 Civ. 0233(JGK), 2014 WL

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 187 of 201
Walden v. Sanitation Salvage Corp., Not Reported in F.Supp.3d (2015)
2015 WL 1433353, 2015 Wage & Hour Cas.2d (BNA) 179,987

6683677, at *15 (S.D.N.Y. Nov. 26, 2014) (quoting *Dow Chem. Pac. Ltd. v. Rascator Mar. S.A.,* 782 F.2d 329, 344 (2d Cir.1986)). However, the Second Circuit has declined to uphold awards under the bad-faith exception absent clear evidence that the challenged actions are entirely without color and are taken for reasons of harassment or delay or for other improper purposes. *Id.* (quoting *Dow Chem. Pac. Ltd.,* 782 F.2d at 344). Based on the record before the Court, there is no basis to conclude that Garcia filed his complaint in bad faith. [7] Defendants' request for attorney's fees and costs is therefore DENIED at this time.

[7]    Because the instant motion was successful only as against Garcia, the Court has limited its consideration of Defendants' request for fees and costs to the filing of Garcia's complaint.

## V. Conclusion

For the reasons set forth above

- Defendants' motion for summary judgment is GRANTED with respect to Garcia's FLSA claim without prejudice to replead with an appropriate plaintiff within thirty (30) days of the date of this Order.

- Defendants' motion for summary judgment is DENIED without prejudice as against Walden.

- Defendants' request for attorney's fees and costs is DENIED at this time.

The Clerk of the Court is respectfully directed to terminate the motion. Doc. 13.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1433353, 2015 Wage & Hour Cas.2d (BNA) 179,987

---

End of Document    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Taft v. Fricke, Not Reported in Fed. Supp. (2019)

2019 WL 5197180

2019 WL 5197180
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Shawn TAFT, Plaintiff,

v.

Russell A. FRICKE; John/Jane Does, Defendants.

No. 9:17-CV-0346 (GTS/CFH)
|
Signed 07/26/2019

**Attorneys and Law Firms**

Shawn Taft, 21892-052, Allenwood Medium Federal Correctional Institution Inmate Mail/Parcels, P.O. Box 2000, White Deer, Pennsylvania 17887, Plaintiff, Pro Se.

OF COUNSEL: DAISY F. PAGLIA, ESQ., Thuillez, Ford Law Firm, 20 Corporate Woods Boulevard, 3rd Floor, Albany, New York 12211-1715, Attorneys for Defendant.

**REPORT-RECOMMENDATION AND ORDER** [1]

[1]     This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c).

CHRISTIAN F. HUMMEL, U.S. MAGISTRATE JUDGE

*1  Plaintiff pro se Shawn Taft ("plaintiff"), an inmate, who was at all relevant times in the custody of the Rensselaer County Jail ("RCJ"), brings this action pursuant to 42 U.S.C. § 1983 ("§ 1983"). Plaintiff alleges that defendant Russell Fricke, M.D. ("Dr. Fricke") violated his rights under the Fourteenth Amendment. See Dkt. No. 1. Plaintiff also alleges that unnamed defendants, John/Jane Does, violated his rights under the Fourteenth Amendment. [2] Presently pending before the Court is Dr. Fricke's Motion for Summary Judgment pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ. P.") 56. Dkt. No. 47. [3] For the following reasons, it is recommended that Dr. Fricke's motion be granted.

[2]     Plaintiff filed his complaint on March 27, 2017. Dkt. No. 1. In the more than two years that have passed since then, plaintiff has not identified the John Doe defendants and has not served process

upon them. This failure is not the result of lack of opportunity. The undersigned has extended the discovery deadline twice to accommodate plaintiff's requests. See Dec. 14, 2017 Order (Dkt. No. 18); Apr. 20, 2018 Order (Dkt. No. 28). The plaintiff has had more than two years, far more than the typical 120-day period, to identify and serve the John Doe defendants, and the Court is under no obligation to extend the deadline indefinitely. See Petway v. City of New York, No. 02-CV-2715 (NGG)(LB), 2005 WL 2137805, at *5 (E.D.N.Y. Sept. 2, 2005) (dismissing a claim under Fed. R. Civ. P. Rule 4(m) where the pro se plaintiff failed to serve John Doe defendants within roughly three years of filing complaint); Thomas v. Keane, No. 99 Civ. 4302, 2001 WL 410095, at *1, *5 (S.D.N.Y. April 23, 2001) (dismissing a claim under Fed. R. Civ. P. Rule 4(m) where the pro se plaintiff failed to serve John Doe defendants within roughly two years of filing complaint); Cammick v. City of New York, No. 96 Civ. 4374(RPP), 1998 WL 796452, at *1 (S.D.N.Y. Nov. 17, 1998) (dismissing a claim under Fed. R. Civ. P. Rule 4(m) where the plaintiff failed to serve John Doe defendants within two years and five months of filing complaint); Waldo v. Goord, No. 97-CV-1385 (LEK)(DRH), 1998 WL 713809, at *5 (N.D.N.Y. Oct. 1, 1998) (dismissing a claim under Fed. R. Civ. P. Rule 4(m) where the pro se plaintiff failed to serve John Doe defendants within a year of filing his complaint). The undersigned, therefore, recommends sua sponte dismissal without prejudice of the claims against the unidentified defendants for lack of timely service.

[3]     Plaintiff filed a document entitled "Motion for Summary Judgment" on April 12, 2019. Dkt. No. 62. Plaintiff's submission fails to meet the requirements of a Motion for Summary Judgment, despite plaintiff's labeling it as such. First, under N.D.N.Y Local Rule 7.1(a)(3), a Motion for Summary Judgment "shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue." N.D.N.Y. L.R. 7.1 (a)(3). Plaintiff does not file a Statement of Material Facts in support of his purported Motion for Summary Judgment. See Dkt. No. 62.

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 189 of 201

Taft v. Fricke, Not Reported in Fed. Supp. (2019)
2019 WL 5197180

His response to defendants' Statement of Material Facts, dkt. no. 61, does not suffice. Additionally, plaintiff's submission does not contain numbered paragraphs or citations to the record, as required by the Local Rules. Dkt. No. 62. Second, the dispositive motion filing deadline expired on January 25, 2019. Dkt. No. 46. Plaintiff filed his purported "Motion for Summary Judgment" over two months past that deadline. He did not request from the Court an extension of the dispositive motion deadline. In light of special solicitude, the undersigned will construe plaintiff's submission, dkt. no. 62, as a part of plaintiff's response in opposition to defendant's Motion for Summary Judgment; however, the undersigned will not consider this submission to be a Motion for Summary Judgment for the reasons set forth herein.

## I. BACKGROUND [4]

[4] Unless otherwise indicated, page citations refer to the pagination generated by this Court's electronic filing system, located at the header of each page, not to the pagination of the individual documents.

### A. Undisputed Facts

**\*2** On July 8, 2015, RCJ admitted plaintiff as a pretrial detainee. Dkt. No. 47-13 at ¶ 4 (citing Dkt. No. 47-10 at 2). RCJ contracts with Correctional Medical Care, now called CBH Medical, to provide medical care at RCJ. Dkt. No. 47-13 at ¶ 9. CBH Medical employs Dr. Fricke as a part-time physician at RCJ. Dkt. No. 47-11 at ¶ 7.

While incarcerated, plaintiff visited Dr. Fricke and nursing staff. See generally Dkt. No. 47-9 (documenting numerous visits with nursing staff and Dr. Fricke). After initial booking, plaintiff received a physical exam. Id. at 22. Plaintiff's eyesight exam results were 20/40, 20/40, 20/30. Id. Plaintiff had eyeglass when he was booked into RCJ. Id. at 2. On February 9, 2016, nonparty Nurse Practioner Claudia Graham saw plaintiff for a skin condition. Id. at 52. During this visit, Nurse Practioner Graham diagnosed plaintiff with elevated blood pressure and possible hypertension. Id. Following this visit, medical staff checked plaintiff's blood pressure daily. Id. On February 27, 2016, nonparty Dr. Irani prescribed plaintiff a daily dose of 12.5 mg. of hydrochlorothiazide ("HCTZ") for his elevated blood pressure. Dkt. No. 47-13 at ¶ 13. On March

1, 2, and 8, 2016, nursing staff saw plaintiff for cough and cold symptoms. Id. at ¶ 14. On March 13, 2016, nonparty Nurse Heather Holliday checked plaintiff's blood pressure. Dkt. No. 47-9 at 71. During this visit, plaintiff coughed up yellow sputum and requested antibiotics. Id. Dr. Fricke ordered a sputum culture, gram stain, complete blood count, and an erythrocyte sedimentation rate to test for infection. Id.

On March 16, 2016, Dr. Fricke saw plaintiff for his cough and cold symptoms. Dkt. No. 47-9 at 71. Plaintiff had elevated blood pressure. Id. at 71. Plaintiff told Dr. Fricke that he had a splenectomy in the past and requested antibiotics. Id. Dr. Fricke performed a physical examination and obtained a chest X-ray. Id. at 71, 77. Dr. Fricke examined plaintiff's lymph nodes and found that they were not enlarged. Id. at 71. Dr. Fricke determined that plaintiff was not in respiratory distress. Id. Dr. Fricke concluded that plaintiff was most likely recovering from a viral illness and prescribed three days of symptomatic treatment. Id. Aware of plaintiff's increased risk of bacterial infection from his splenectomy, Dr. Fricke agreed to prescribe antibiotics if plaintiff did not improve. Id.

On March 17, 2016, nonparty BioReference Laboratories faxed the sputum culture test resuls to RCJ. Dkt. No. 47-9 at 74. The results were normal. Dkt. No. 47-11 at ¶ 39. On March 20, 2016, RCJ staff notified Dr. Fricke that plaintiff was not feeling better. Dkt. No. 47-9 at 84. Dr. Fricke prescribed amoxicillin. Id. On March 23, 2016, Dr. Fricke renewed plaintiff's HCTZ prescription for his high blood pressure. Id. at 81. On April 16, 2016, plaintiff complained of shortness of breath, dizziness, and chest pain. Id. at 86. On April 23, 2016, nonparty Nurse Practioner Jennifer Augone ordered an echocardiogram ("EKG"). Id. at 90. On April 23, 2016, Nurse Practioner Augone informed plaintiff that his EKG showed possible ischemia, a restriction in the blood supply to cardiac tissue. Dkt. No. 47-11 at ¶ 55; Dkt. No. 47-9 at 92. Nurse Practioner Augone prescribed aspirin, a beta blocker, and a cardiology consult. Dkt. No. 47-9 at 92.

**\*3** On May 9, 2016, nonparty Dr. Ruslan Feygin, a cardiologist, saw plaintiff and ordered an EKG and nuclear stress test. Dkt. No. 47-9 at 113. On May 18, 2016, plaintiff met with nonparty Nurse Practioner Renee Leonard. Id. at 105. Plaintiff was refusing his daily beta blocker as he believed it was making him lightheaded. Id. Nurse Practioner Leonard discontinued plaintiff's beta blocker and increased his daily dose of HCTZ to 25 mg. Id. Nurse Practioner Leonard also ordered blood work to check plaintiff's potassium levels. Dkt. No. 47-11 at ¶ 58. The blood

Case 9:22-cv-00181-GTS-MJK   Document 96   Filed 07/24/24   Page 190 of 201

Taft v. Fricke, Not Reported in Fed. Supp. (2019)
2019 WL 5197180

work included a basic metabolic panel and a blood glucose test. Dkt. No. 47-13 at ¶ 36.

On May 26, 2016, plaintiff went to Samaritan Hospital for an EKG and nuclear stress test. Dkt. No. 47-9 at 124. Plaintiff's EKG suggested mild concentric left ventricular hypertrophy, a thickening of the heart's muscle wall. Dkt. No. 47-9 at 124; Dkt. No. 47-11 at ¶ 60. The results of the EKG, blood pressure response, and isotope distribution were otherwise normal. Dkt. No. 47-11 at ¶ 61. On or about May 27, 2016, plaintiff complained of deteriorating vision. Dkt. No. 47-9 at 129. RCJ staff put plaintiff on the list for the eye doctor. Id.

On June 1, 2016, Dr. Fricke saw plaintiff again. Dkt. No. 47-9 at 132. Plaintiff complained of blurry vision and trouble breathing. Id. Plaintiff believed his HCTZ medication caused his blurred vision. Id. Dr. Fricke assessed plaintiff's respirations with a peak flow meter. Id. Dr. Fricke also tested plaintiff's vision using a Rosenbaum Pocket Vision Card and referred plaintiff to an optometrist. Id. at 132-133. Dr. Fricke offered a substitute for HCTZ, which plaintiff refused. Id. at 132. Dr. Fricke lowered plaintiff's dose of HCTZ to its original level of 12.5 mg. a day and ordered continued blood pressure checks. Id.

On June 2, 2016, plaintiff met with nonparty Nurse Heather Holliday. Dkt. No. 47-9 at 138-40. Plaintiff complained of an inability to see, constipation, headaches, and an inability to drink water due to its metallic taste. Id. at 138. Nurse Holliday prescribed Motrin and Aspirin and advised plaintiff to ambulate and drink fluids. Id. at 140.

At approximately 9:00 A.M. on June 3, 2016, Nurse Holliday saw plaintiff in his cell. Dkt. No. 47-9 at 141. Plaintiff said he could not see and was dizzy. Id. Plaintiff also complained of dry mouth, weight loss, and an inability to eat. Id. Nurse Holliday tested plaintiff's blood glucose. Id. Plaintiff's blood glucose level was 528. Id. Dr. Fricke ordered 12 units of Humalog, a fast-acting insulin, and emergency transportation to the hospital. Id. at 147.

At approximately 10:00 A.M. on June 3, 2016, plaintiff was admitted into Samaritan Hospital. Dkt. No. 1-1 at 21. Plaintiff received insulin and intravenous fluids. Dkt. No. 47-9 at 157. Samaritan medical staff diagnosed plaintiff with diabetes. Id. On June 6, 2016, Samaritan doctors discovered a small bowel obstruction during an abdominal X-ray. Id. at 167. On June 9, 2016, nonparty Dr. Christina Sanders removed the obstruction and a portion of plaintiff's small bowel. Id. at

171, 173, 174. Dr. Sanders also lysed adhesions between the loops of plaintiff's small bowel and anterior abdominal wall. Id. at 174. On June 20, 2016, Samaritan Hospital discharged plaintiff. Id. at 192.

**B. Plaintiff's Recitation of Facts**

Plaintiff contends that he had medical issues throughout his detention at RCJ. Dkt. No. 1 at 11. Plaintiff argues that Dr. Fricke was aware of plaintiff's complications two months before his "organ failure." Id. at 9. During his March 16, 2016, appointment Dr. Fricke gave plaintiff a breathing exam. Dkt. No. 47-8 at 41. During the exam, Dr. Fricke told him, "he can get a 4-foot, 11 girl to blow into the apparatus harder than I could." Id. at 42. At that exam, and at other times, Dr. Fricke accused plaintiff of malingering. Dkt. No. 1 at 9. Plaintiff contends that Dr. Fricke should have known of plaintiff's diabetes from his symptoms or from the BioReference Laboratories report and taken action before plaintiff's "organs failed." Dkt. No. 1 at 8; Dkt. No. 61 at 4.

**\*4** Plaintiff argues that Dr. Fricke's failure to provide adequate care led to a delay in plaintiff's diabetes diagnosis and his hospitalization. Dkt. No. 1-1 at 32. Plaintiff contends that Dr. Fricke's acts or omissions led him to experience "organ failure," loss of vision, a small bowel obstruction that required surgery, and "probable morbidity." Dkt. No. 1-1 at 7, 32; Dkt. No. 61 at ¶ 71. Plaintiff contends that, before his incarceration, he did not have vision problems, high blood pressure, or diabetes. Dkt. No. 1 at 9. Plaintiff further contends that his bowel obstruction developed during his incarceration at RCJ. Dkt. No. 61 at ¶ 71.

**C. Defendants' Recitation of Facts**

In support of his motion, Dr. Fricke filed a Statement of Material Facts.[5] Dkt. No. 47-13. Dr. Fricke saw plaintiff two times before plaintiff's hospitalization on June 3, 2016. Dkt. No. 47-13 at ¶ 11. On May 18, 2016, Nurse Practioner Leonard ordered blood work. Id. at ¶ 34. She did not order blood work to test for diabetes. Id. at ¶ 35. The blood work was sent to BioReference Laboratories. Id. at ¶ 36. BioReference Laboratories did not call RCJ to report plaintiff's elevated blood glucose levels. Id. at ¶ 38. It was "standard procedure" for laboratories to call RCJ "to report critical values such as elevated blood glucose levels." Id. at ¶ 39. Further, BioReference Laboratories did not fax or mail the lab report

Taft v. Fricke, Not Reported in Fed. Supp. (2019)

Case 9:22-cv-00181-GTS-MJK   Document 96   Filed 07/24/24   Page 191 of 201

2019 WL 5197180

to RCJ although it was also "standard procedure" for outside laboratories to fax and mail lab reports to RCJ. Id. at ¶¶ 40, 41.

5   N.D.N.Y. Local Rule 7.1 (a)(3) states:
Summary Judgment Motions
Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.
The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

On June 1, 2016, Dr. Fricke saw plaintiff for the second time. Dkt. No. 47-13 at ¶ 47. Dr. Fricke was unaware of plaintiff's blood work results at this time. Id. at ¶ 49. Plaintiff did not cooperate with a peak-flow meter test. Id. at ¶ 58. Dr. Fricke also tested plaintiff's eyesight, which had improved since his initial eye test in 2015. Dkt. No. 47-11 at ¶ 74. During this visit, plaintiff did not complain about increased urination, intense thirst, the urge to drink increasing amounts of water, nausea, vomiting, abdominal pain, weight loss, or lethargy, which are symptoms of uncontrolled hyperglycemia or emerging diabetes. Dkt. No. 47-13 at ¶¶ 50-53. On June 5, 2016, Samaritan Hospital discovered a bowel obstruction which developed at Samaritan Hospital. Id. at ¶ 71.

## II. DISCUSSION [6]

6   All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

*5   Plaintiff alleges that Dr. Fricke was deliberately indifferent to his serious medical needs in violation of the Due Process Clause of the Fourteenth Amendment. See generally Dkt. No. 1. Dr. Fricke argues that plaintiff cannot demonstrate deliberate indifference because the record demonstrates that he was not subjectively reckless. See Dkt. No. 47-14.

### A. Legal Standards

#### 1. Summary Judgment standard

"A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of showing the basis for its motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party satisfies this burden by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' " that show an absence of a genuine issue of material fact. Id. There is a genuine issue of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skuble v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

A non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal quotation marks omitted). Instead, a non-moving party must support his or her assertions with evidence showing a genuine issue of material fact. See id. at 586, 106 S.Ct. 1348. Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.' " Smith v. Woods, 9:03-CV-480

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 192 of 201

Taft v. Fricke, Not Reported in Fed. Supp. (2019)

2019 WL 5197180

(DNH), 2006 WL 1133247, at *3 & n.11 (N.D.N.Y. Apr. 24, 2006) (quoting Jeffreys v. City of New York, 426 F.3d 549, 554-55 (2d Cir. 2005)) (additional citations omitted). "When no rational jury could find in favor of the non-moving party because the evidence to support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

In determining summary judgment, "[f]actual disputes that are irrelevant or unnecessary will not be counted." Liberty Lobby, 477 U.S. at 247, 106 S.Ct. 2505. The nonmovant "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Id. at 257, 106 S.Ct. 2505. "Mere conclusory statements or reliance on the pleadings, ... will not suffice, ...." Celotex, 477 U.S. at 324, 106 S.Ct. 2548. The court must look to the substantive law to identify which facts are material. Liberty Lobby, 477 U.S. at 248, 106 S.Ct. 2505.

When, as here, a party seeks judgment against a pro se litigant, a court must afford a non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). The Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law" ...

*6  Triestman, 470 F.3d at 477 (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

## 2. Deliberate Indifference standard

As plaintiff is a pretrial detainee his deliberate indifference claim falls under the Due Process Clause of the Fourteenth Amendment. Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2007) (quoting inter alia Iqbal v. Hasty, 490 F.3d 143, 168 (2d Cir. 2007) ("Pretrial detainees have not been convicted of a

crime and thus 'may not be punished in any manner-neither cruelly and unusually nor otherwise.' ")). Until recently, the Second Circuit instructed that " '[c]laims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment.' " V.W. ex rel. Williams v. Conway, 236 F. Supp. 3d 554, 582-83 (N.D.N.Y. 2017) (quoting Caiozzo v. Koreman, 581 F.3d 63, 72 (2d Cir. 2009)). However, in 2017 the Darnell Court extended the Supreme Court's decision in Kingsley v. Hendrickson, ⸺ U.S. ⸺, 135 S. Ct. 2466, 2470, 192 L.Ed.2d 416 (2015) to allegations related to unconstitutional conditions of confinement. [7] See Darnell, 849 F.3d at 35. The Darnell Court reasoned, "[u]nlike a violation of the Cruel and Unusual Punishments Clause [of the Eighth Amendment], an official can violate the Due Process Clause of the Fourteenth Amendment without meting out any punishment, which means that the Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." Id.

[7]     The Kingsley Court held that a pretrial detainee bringing an excessive force claim under the Fourteenth Amendment "must show only that the force purposely or knowingly used against him was objectively unreasonable." 135 S. Ct. at 2470.

Although Darnell involved a challenge to conditions of confinement, district courts within this Circuit have applied Kingsley to all pretrial detainees' deliberate indifference claims. See, e.g., Villafane v. Sposato, No. 16-CV-3674, 2017 WL 4179855, at *19 (E.D.N.Y. Aug. 22, 2017) ("District Courts in this circuit have applied Kingsley to claims for deliberate indifference to medical needs"); Lloyd v. City of New York, 246 F. Supp. 3d 704, 718 (S.D.N.Y. 2017) ("The reasoning of Darnell applies equally to claims of deliberate indifference to serious medical needs under the Fourteenth Amendment."); Feliciano v. C.O. Anderson, No. 15-CV-4106 (LTS)(JLC), 2017 WL 1189747, at *13 (S.D.N.Y. Mar. 30, 2017) ("Applying Darnell to claims of deliberate indifference to serious medical needs, the Court concludes that a defendant possesses the requisite mens rea when he acts or fails to act under circumstances in which he knew, or should have known, that a substantial risk of serious harm to the pretrial detainee would result.") (collecting cases).

Case 9:22-cv-00181-GTS-MJK   Document 96   Filed 07/24/24   Page 193 of 201

Taft v. Fricke, Not Reported in Fed. Supp. (2019)

2019 WL 5197180

To establish a claim for deliberate indifference under the Due Process Clause, a plaintiff must satisfy a two-prong test. Darnell, 849 F.3d at 29. First, the deprivation must have been "sufficiently serious." Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006) (citation and internal quotation marks omitted). Second, the defendant must have acted or failed to act with "a sufficiently culpable state of mind," which, "in prison conditions cases," is "deliberate indifference to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

### a. First Prong standard

**\*7** Under the Fourteenth Amendment, deliberate indifference is measured from an objective perspective.[8] Darnell, 849 F.3d at 35.[9] The objective prong is satisfied "when (a) the prisoner was actually 'deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.' " Bellotto v. Cty. of Orange, 248 F. App'x 232, 236 (2d Cir. 2007) (summary order) (quoting Salahuddin, 467 F.3d at 279-80).

[8]    Although the second prong of the deliberate indifference analysis differs from Eighth Amendment cases, the first prong remains the same. See Padilla v. Corr. Care Solutions, No. 9:17-CV-1150 (MAD/TWD), 2018 WL 550610, at \*3 (N.D.N.Y. Jan. 22, 2018).

[9]    In Darnell, the Second Circuit clarified that the second element of a deliberate indifference claim, though characterized as "subjective," is better understood as an element analyzing "*mens rea*" because it is "defined objectively." Darnell, 849 F.3d at 29, 35.

To determine whether an alleged deprivation of medical care is "sufficiently serious" -- the first prong of the deliberate indifference analysis -- a court is required to, (1) determine whether the medical care was inadequate, and, (2) if so, "to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." Salahuddin, 467 F.3d at 279-80 (citing Helling v. McKinney, 509 U.S. 25, 32-33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)). However, "[n]ot every lapse in medical care is a constitutional wrong." Salahuddin, 467 F.3d at 279.

In assessing the adequacy of care -- the first inquiry in assessing whether a deprivation of care was sufficiently serious -- "the prison official's duty is only to provide reasonable medical care." Salahuddin, 467 F.3d at 279-80 (citing Farmer, 511 U.S. at 845, 114 S.Ct. 1970). "Thus, prison officials who act reasonably [in response to an inmate-health risk] cannot be found liable ... and, conversely, failing to take reasonable measures in response to a medical condition can lead to liability." Id. at 279 (internal quotation marks and citations omitted; brackets in original.). The second inquiry in assessing whether a plaintiff's deprivation of care was sufficiently serious varies according to the plaintiff's allegations. See Smith v. Carpenter, 316 F.3d 178, 185 (2d Cir. 2003). "[I]f the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." Salahuddin, 467 F.3d at 280.[10] If, however, the plaintiff alleges that medical treatment was received but it was inadequate, the inquiry is narrower, and the court should focus on the specific inadequacy alone of the treatment, not the underlying medical condition alone. Id. (citing Smith, 316 F.3d at 186).

[10]    "There is no need to distinguish between a prisoner's underlying 'serious medical condition' and the circumstances of his 'serious medical need' when the prisoner alleges that prison officials have failed to provide general treatment for his medical condition." Smith, 316 F.3d at 185-86.

Finally, where a delay in medical treatment is alleged, "it is appropriate to focus on the challenged delay or interruption in treatment rather than the [detainee's] underlying medical condition alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious....' " Smith, 316 F.3d at 185 (quoting Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)); see also Salahuddin, 467 F.3d at 280. A delay in medical treatment must be interpreted in the "context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay." See id. at 186 (citing Chance, 143 F.3d at 702) ("[I]f prison officials deliberately ignore the fact that a prisoner has a five-inch gash on his cheek that is becoming infected, the failure to provide appropriate treatment might well violate the Eighth Amendment.").

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 194 of 201

Taft v. Fricke, Not Reported in Fed. Supp. (2019)

2019 WL 5197180

#### b. Second Prong standard

**\*8** For a plaintiff to satisfy the second prong, concerning *mens rea*, the defendant must have behaved in an objectively reckless manner, or "knew, or should have known, that the condition posed an excessive risk to health or safety." Darnell, 849 F.3d at 35. "Although *mens rea* is assessed from an objective perspective, as opposed to the more demanding subjective recklessness standard employed in the Eighth Amendment context, negligence is still insufficient to give rise to a valid claim under the Fourteenth Amendment." Smith v. Outlaw, No. 15-CV-9961 (RA), 2017 WL 4417699, at \*3 (S.D.N.Y. Sept. 30, 2017) (citing Darnell, 849 F.3d at 36); see also Kingsley, 135 S.Ct. at 2472 ("[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.").

### B. Analysis

Plaintiff claims that Dr. Fricke was deliberately indifferent to plaintiff's serious medical needs. Dkt. No. 1 at 4. He alleges that Dr. Fricke was "aware of plaintiff's complications two months before plaintiff's organs failed," but failed to diagnose and treat the underlying problem. Id. at 9. Plaintiff contends that, as a result of Dr. Fricke's failings, he now suffers irreversible injury. Id. Plaintiff has high blood pressure, diabetes, and wears eyeglasses. Id. Plaintiff takes Lisinopril, Atorvastatin, HCTZ, and Metformin for these conditions. Id. at 10. Plaintiff suggests that Dr. Fricke's deliberate indifference to his medical needs resulted in a delay in the diagnosis and treatment of plaintiff's diabetes and his subsequent hospitalization, bowel surgery, and decreased lifespan. Id. at 9. Additionally, plaintiff suggests that Dr. Fricke's deliberate indifference to his medical needs caused or contributed to the development of his high blood pressure and vision troubles. Id. Viewing the facts and drawing all reasonable inferences in plaintiff's favor, for the reasons that follow, the Court concludes that no reasonable factfinder could find that Dr. Fricke was deliberately indifferent to plaintiff's serious medical needs.

### 1. First Prong: Objective Component

Plaintiff alleges both inadequate medical care and a delay in treatment. See generally Dkt. No. 1. However, plaintiff fails to show how Dr. Fricke's care was inadequate under

the circumstances and what harm the alleged inadequacy caused him or will likely cause him. See infra at 17-26. Additionally, plaintiff fails to show how Dr. Fricke's alleged delay in treatment was unreasonable and how the alleged delay worsened plaintiff's medical conditions. Id.

### a. Adequacy of Care

As to the first inquiry of the objective component, adequacy of care, no reasonable juror could find that plaintiff was actually deprived of adequate medical care. Salahuddin, 467 F.3d at 279-80. Dr. Fricke and nonparty RCJ staff closely monitored plaintiff's medical conditions and complaints. See generally Dkt. No. 47-9. Plaintiff saw RCJ medical staff over fifty-six times between September 27, 2015, and his hospitalization on June 3, 2016. Id. at 29-144. Plaintiff received a nuclear stress test, an EKG, a physical, an eye exam, a sputum culture test, a complete blood count, a breath exam, a chest X-ray, blood pressure medication, rash medication, and over thirty-one blood pressure checks during this period. Id.

Plaintiff points to the BioReference Laboratories report ordered on May 18, 2016, as evidence of Dr. Fricke's deliberate indifference and inadequate care. Dkt. No. 52 at 8-9. Plaintiff claims that this report was available to Dr. Fricke on the BioReference Laboratories website on May 21, 2016, suggesting that Dr. Fricke had received the report at that time or had the ability to access the results. Id. at 4. However, based on Dr. Fricke's affidavit, BioReference Laboratories never sent this report to the jail or called to alert him of plaintiff's elevated blood glucose levels, which is their standard procedure. Dkt. No. 47-11 at ¶ 97. Further, other record evidence supports Dr. Fricke's assertions. On the May 21, 2016, lab report in the record, there is a handwritten note stating, "June 3-pulled from website" with Nurse Holliday's signature. Dkt. No. 47-9 at 121. This copy of the report does not have a "time received" fax stamp. Id. However, BioReference Laboratories did fax plaintiff's prior gram culture and sputum results. Id. at 74. The gram culture and sputum test results do have a "time received" fax stamp. Id. Although not dispositive, the absence of a time received fax stamp on plaintiff's May 21, 2016, report suggests that BioReference Laboratories did not fax the May 21, 2016, to the jail. Plaintiff has presented no evidence or non-conclusory argument to the contrary. See Dkt. Nos. 1, 22, 52, 61.

**\*9** Plaintiff also alleges that even if BioReference Laboratories failed to fax or mail the May 21, 2016,

**Taft v. Fricke, Not Reported in Fed. Supp. (2019)**
2019 WL 5197180

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 195 of 201

bloodwork report to RCJ, Dr. Fricke had access to the BioReference Laboratories website where the results were available, and, therefore, Dr. Fricke should have obtained the results sooner than June 3, 2016. Dkt. No. 52 at 4. Plaintiff appears to argue that if Dr. Fricke had obtained the blood results sooner, he would not have suffered negative medical consequences, or they would have been less severe. Id. at 4-5. Even if the lab had faxed or otherwise sent the report to RCJ, plaintiff has failed to demonstrate inadequacy of care because he does not demonstrate that Dr. Fricke was aware, or should have been aware, of plaintiff's elevated glucose levels.

As indicated above, when evaluating adequacy of care, the court examines if an individual providing care to a detainee acted unreasonably under the circumstances. Salahuddin, 467 F.3d at 279-80 (citing Farmer, 511 U.S. at 845, 114 S.Ct. 1970). Dr. Fricke was not unreasonable in failing to seek out plaintiff's blood results before June 3, 2016. First, plaintiff admits that he did not have a history of diabetes before his incarceration at RCJ. Dkt. No. 1 at 11. Second, before June 3, 2016, plaintiff did not present with telltale signs of diabetes at either of his visits with Dr. Fricke. Dkt. No. 47-9 at 71, 132. Dr. Fricke addressed and treated the medical symptoms with which plaintiff did present. Plaintiff complained of cold-like symptoms on March 16, 2016. Id. at 84. Dr. Fricke suspected that plaintiff had a "viral illness in convalescent phase" and tested for a bacterial infection. Dkt. No. 47-11 at ¶¶ 38, 39. When the tests were negative, Dr. Fricke prescribed three days of symptomatic treatment. Id. at ¶ 42. When plaintiff complained of chest pain on April 16, 2016, Dr. Fricke had plaintiff tested by a cardiologist on May 9, 2016. Dkt. No. 47-9 at 86, 113. When plaintiff complained of vision trouble on June 1, 2016, Dr. Fricke tested his vision and referred him to an optometrist. Id. at 129. During these visits, Dr. Fricke listened to plaintiff's complaints and treated them in accordance with his medical judgment. Dr. Fricke did not test for diabetes or seek out the May 21, 2016, bloodwork results because plaintiff's symptoms and history did not indicate that plaintiff was suffering from diabetes. Although not dispositive, nonparty medical professional Dr. Toll concluded that "[t]reatment recommendations by Dr. Fricke were appropriate at both visits."[11] Dkt. No. 47-12 at ¶ 28. Dr. Toll further opined that "Dr. Fricke evaluated all of [plaintiff's] presenting complaints, especially the visual and respiratory complaints, preformed appropriate physical examinations and reviewed all available testing data." Id. (emphasis in original).

[11]    Dr. Toll is a board-licensed doctor who practiced internal medicine from 1979 to 2016 in the capital region of New York State. Dkt. No. 47-12 at ¶ 1. Dr. Toll reviewed plaintiff's medical records, complaint, response to interrogatories, and deposition transcript, along with defendant's answer before submitting his medical opinion regarding Dr. Fricke's medical care of plaintiff. Id. at ¶ 4.

For the reasons stated, plaintiff fails to demonstrate how Dr. Fricke was unreasonable, as defined by the deliberate indifference standards, in not discovering the May 21, 2016, lab report at an earlier date. It is important to note that,

> Disagreement with prescribed treatment does not rise to the level of a constitutional claim. Sonds, 151 F. Supp. 2d at 311. Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. Id. (citations omitted). An inmate does not have the right to treatment of his choice. Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. Id. Thus, disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. Sonds, 151 F. Supp. 2d at 312 (citing Estelle v. Gamble, 429 U.S. at 107, 97 S.Ct. 285).

**\*10**  Allen v. Cooley, No.9:04CV91, 2006 WL 2376927, at \*3 (N.D.N.Y. Aug. 16, 2006).

There is ample evidence of plaintiff receiving medical care following each complaint he made to Dr. Fricke. "[P]rison officials may not be held liable ... if they responded

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 196 of 201

Taft v. Fricke, Not Reported in Fed. Supp. (2019)

2019 WL 5197180

reasonably to a known risk, even if the harm ultimately was not averted." Farmer, 511 U.S. at 826, 114 S.Ct. 1970. Insofar as plaintiff disagrees with Dr. Fricke's treatment of his symptoms or conditions or his method for checking on results from outside labs, because Dr. Fricke's conduct was reasonable under the circumstances, plaintiff fails to demonstrate a deprivation of adequate medical care. See Farmer, 511 U.S. at 847, 114 S.Ct. 1970; see also Salahuddin, 467 F.3d at 279. For reasons stated, plaintiff fails the first inquiry of the objective prong.

### b. Sufficiently Serious

Even if, *arguendo*, plaintiff had demonstrated a denial of adequate medical care, plaintiff has failed to show that the denial was "sufficiently serious." Salahuddin, 467 F.3d at 279-80. Insofar as plaintiff argues that the care he received was inadequate, plaintiff fails to show how "the offending conduct was inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." Id. at 280. To the extent plaintiff argues that a delay in diagnosis or treatment caused him injury, plaintiff fails to show how "the alleged delay in treatment worsened plaintiff's medical conditions." Carpenter, 316 F.3d at 185 (quoting Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)); see also Salahuddin, 467 F.3d at 280.

Plaintiff seems to allege that Dr. Fricke's inadequate medical care and subsequent delay in treatment led to his development of diabetes, high blood pressure, vision problems, a bowel obstruction necessitating surgery, and "probable morbidity." Dkt. No. 1 at 4. These allegations fail for the following reasons.

### i. Diabetes

The onset of diabetes can be "a sufficiently serious medical condition" to meet the threshold of a serious medical need. Beatty v. Davidson, 713 F. Supp. 2d 167, 174 (W.D.N.Y. 2010). "A serious medical need is generally characterized by 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' " Edmonds v. Central N.Y. Psychiatric Ctr., No. 10: Civ. 5810 (DAB)(KNF), 2011 WL 3809913, at *4 (S.D.N.Y. Aug. 25, 2011) (quoting Johnson v. Wright, 412 F.3d 398, 403 (2d Cir. 2005) (citation omitted)). However, when looking at deprivation of care, "[i]t's the particular risk of harm faced by the prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for [constitutional] purposes." Carpenter, 316 F.3d at 186. Further, when a plaintiff alleges a delay in treatment, the court considers the "context of the seriousness of the medical need ... whether the delay worsened the medical condition ... and the reason for delay." See Salahuddin, 467 F.3d at 186 (citing Chance, 143 F.3d at 702).

Plaintiff's claims rest on Dr. Fricke's failure to diagnose him with diabetes before his hospitalization on June 3, 2016. Dkt. No. 1 at 4, 8. As discussed, plaintiff did not present with the usual signs of diabetes at either visit with Dr. Fricke. Dkt. No. 47-9 at 71, 132. Plaintiff argues he satisfies the objective prong of the deliberate indifference analysis because doctors discovered his diabetes while he was incarcerated. See Dkt. No. 52 at 6. To support this position plaintiff cites to Edmonds. Id. In Edmonds, the Court does recognize the onset of diabetes as a sufficiently serious medical condition to meet the threshold of serious medical need; however, Edmonds is factually distinguishable. 2011 WL 3809913, at *5. In Edmonds, the plaintiff was tested for diabetes numerous times because it was a side effect of her prescribed medication. Id. Tests revealed that the plaintiff had diabetes, but doctors neglected to tell her of her diagnosis and did not treat her condition for five months. Id. Here, plaintiff was not specifically tested for diabetes because he did not display the usual diabetic symptoms and had no history of diabetes. Dkt. No. 47-9 at 71, 132. Once plaintiff exhibited these symptoms, he was tested and hospitalized. Id. at 141. There was a two-week period between BioReference Laboratories' uploading of the test results online and plaintiff's hospitalization. Id. at 121-141. However, plaintiff continued to see medical staff during this period and actively received treatment. Id. Although there is a two-week delay between the "availability" of plaintiff's lab work and his hospitalization, unlike in Edmonds, where the doctors were aware of the plaintiff's diagnosis, Dr. Fricke was unaware that plaintiff had diabetes during this two-week period. 2011 WL 3809913, at *5. Further, although plaintiff may have preferred Dr. Fricke to diagnose his diabetes sooner, Dr. Fricke still provided him with reasonable care insofar as he responded to all of plaintiff's complaints and referred him to other medical professionals. see Thomas v. Wright, No. 99-CV-2071, 2002 WL 31309190, at *8-9 (N.D.N.Y. Oct. 11, 2002) (holding that, "[a]lthough the[ defendants] may have failed to diagnose or even detect his cancer," the defendants did not act with "deliberate indifference" because

Case 9:22-cv-00181-GTS-MJK   Document 96   Filed 07/24/24   Page 197 of 201

Taft v. Fricke, Not Reported in Fed. Supp. (2019)
2019 WL 5197180

they "ordered medical tests, prescribed courses of treatments, and monitored his laboratory and radiological reports").

**\*11** When looking at a delay in treatment, the court focuses on the deprivation of care, rather than seriousness of medical need. Carpenter, 316 F.3d at 186. Plaintiff's delay in treatment was minimal and not a result of Dr. Fricke's inadequate care. To the extent that plaintiff argues that Dr. Fricke should have discovered plaintiff's diabetes earlier than June 3, 2016, even if BioReference Laboratories did not notify him of the results, as discussed, plaintiff did not present with signs of diabetes at either visit with Dr. Fricke. Dkt. No. 47-9 at 71, 132. Dr. Fricke did not discover plaintiff's diabetes before June 3, 2016, because of a lack of typical diabetic symptoms, which does not amount to a lack of adequate care.

In addition to the delay in treatment of his diabetes, plaintiff also seems to allege that Dr. Fricke's treatment, or lack of treatment, led to his development of diabetes. Dkt. No. 1 at 4. Plaintiff cites no evidence to support this claim, nor is there any support in his medical record; thus, plaintiff failed to show how any of Dr. Fricke's acts or omissions caused him to develop diabetes. See Dkt. Nos. 1, 22, 47-9, 52, 61; See also Celotex, 447 U.S. at 324, 100 S.Ct. 2214 (requiring "the nonmoving party to go beyond the pleadings" to defeat summary judgment). Accordingly, plaintiff has failed to show that Dr. Fricke provided inadequate care with respect to his diabetes or that such inadequacy was sufficiently serious.

#### ii. High Blood Pressure

Plaintiff seems to allege that Dr. Fricke's inadequate medical care led to his development of high blood pressure, arguing that he did not have high blood pressure before his incarceration at RCJ. Dkt. No. 1 at 9. Nurse Practioner Claudia Graham diagnosed plaintiff with high blood pressure on February 9, 2016. Dkt. No. 47-9 at 52. Plaintiff's diagnosis took place over one month before his first visit with Dr. Fricke on March 16, 2016. Id. at 71. After plaintiff's diagnosis, he was prescribed HCTZ for his high blood pressure. Dkt. No. 47-13 at ¶ 13. Plaintiff's high blood pressure was also monitored throughout his detention at RCJ. See generally Dkt. No. 47-9. Plaintiff's blood pressure was checked over thirty-four times between his diagnosis and hospitalization on June 3, 2016. Id. at 29-144. Although plaintiff contends that he "did not suffer from high blood pressure before his incarceration," plaintiff cites no evidence to support his claims that his blood pressure developed or worsened because

of Dr. Fricke's treatment or lack of treatment. See Dkt. Nos. 1, 22, 52, 61. Additionally, plaintiff's May 26, 2016, EKG showed "mild concentric left ventricular hypertrophy." Dkt. No. 47-9 at 124. According to Dr. Toll, hypertrophy of this nature "was likely caused by high blood pressure" and "not of recent origin." Dkt. No. 47-12 at ¶ 18. Dr. Fricke also submitted his medical opinion that plaintiff's left ventricular hypertrophy "is associated with chronic high blood pressure." Dkt. No. 47-11 at ¶ 60. Accordingly, plaintiff has failed to show how Dr. Fricke's conduct surrounding his high blood pressure was inadequate and caused, or will likely cause, plaintiff harm in the future. Salahuddin, 467 F.3d at 280.

#### iii. Vision

Plaintiff claims that he did not wear prescription eyeglasses before his incarceration and arguably suggests that Dr. Fricke's unspecified acts or omissions are responsible for his declining vision. Dkt. No. 1 at 4. However, the record shows that plaintiff had eyeglasses upon his admission to RCJ. Dkt. No. 47-9 at 22. The record further demonstrates that plaintiff's vision stayed roughly the same throughout his detention at RCJ, as evidenced by his two eye exams. Id. at 22, 132. Additionally, upon plaintiff's complaint of blurry vision, on May 27, 2016, Dr. Fricke referred plaintiff to an optometrist. Id. at 129. Therefore, plaintiff has failed to show how Dr. Fricke's conduct surrounding his vision was inadequate or caused him any harm. Salahuddin, 467 F. 3d at 280.

#### iv. Bowel Obstruction

**\*12** Plaintiff cites his June 9, 2016, laparotomy (Dkt. No. 47-9 at 187) and bowel surgery as further evidence of Dr. Fricke's inadequate care and resultant harm. Dkt. No. 52 at 6. However, RCJ staff and Samaritan doctors note that plaintiff had bowel sounds present before hospitalization (Dkt. No. 47-11 at ¶ 88) and upon entering Samaritan Hospital. Dkt. No. 47-9 at 157. It was not until June 5, 2016, that nonparty Dr. Sanders noticed increased distention in plaintiff's bowel. Id. at 165. On June 6, 2016, doctors discovered the bowel obstruction during an abdominal X-ray. Id. at 167. On June 9, 2016, plaintiff underwent surgery to remove the previously-discovered obstruction and lyse extensive adhesions around his bowels. Id. at 171-74. Upon discharge, Samaritan doctors noted that plaintiff's bowel blockage was resolved. Id. at 187. Although plaintiff claims that Dr. Fricke's acts or omissions led to plaintiff's bowel problems, even if plaintiff had been

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 198 of 201

Taft v. Fricke, Not Reported in Fed. Supp. (2019)

2019 WL 5197180

able to demonstrate that his bowel obstruction developed while he was incarcerated at RCJ, there is no medical evidence to support a claim that Dr. Fricke's acts or omissions were responsible for plaintiff's bowel issues. Id. at 171. Accordingly, plaintiff has failed to show how Dr. Fricke's conduct surrounding his bowel problems is inadequate or caused any resultant harm. Salahuddin, 467 F. 3d at 280.

### v. "Probable Morbidity" and "Organ Failure"

Plaintiff also alleges, in a wholly conclusory fashion, that his "organs failed" and now he has "probable morbidity" as a result of Dr. Fricke's care. Dkt. No. 1 at 4. Liberally construed, it appears that plaintiff is claiming that his medical condition worsened, leading to "organ failure" and risk of death, as a result of Dr. Fricke's alleged failure to identify and treat his diabetes. See id. It is unclear what plaintiff means by "organ failure"; however, Dr. Fricke submitted an uncontroverted medical opinion demonstrating that plaintiff's "acute renal failure" came from "loss of blood to plaintiff's kidneys" that is "entirely reversible when normal blood volume and glucose levels are restored." Dkt. No. 47-11 at ¶ 87. Plaintiff presents no evidence that the bowel obstruction occurred due to Dr. Fricke's acts or omissions. Upon discharge from the hospital, Samaritan doctors noted that plaintiff's renal failure was resolved. Dkt. No. 47-9 at 187. Although plaintiff uses the phrase "probable morbidity," at no point in the record does any medical professional conclude that plaintiff's life expectancy is lessened as a result of Dr. Fricke's alleged delay in diagnosing plaintiff's diabetes. See generally Dkt. No. 47-9. For the reasons stated, plaintiff has failed to show how Dr. Fricke's conduct was inadequate and what harm the inadequacy caused, or will likely cause, plaintiff in the future. Salahuddin, 467 F.3d at 280.

Based on the foregoing, the undersigned finds that there exists no material issue of fact as to whether plaintiff "was actually deprived of adequate medical care" as it relates to his diabetes, high blood pressure, vision, bowel obstruction and resultant surgery, and life expectancy. Plaintiff does not satisfy the requirements of the first prong in Darnell. See id. at 29 (establishing that deliberate indifference under the Fourteenth Amendment is the same as under the Eighth Amendment and therefore a pretrial detainee must satisfy two prongs to prove a claim of deliberate indifference, the objective prong and the subjective prong); Dobbins v. Ponte, No. 15-CV-3091 (JMF), 2017 WL 3309726, at *6 (S.D.N.Y. Aug. 2, 2017) (granting summary judgment to prison official where undisputed facts

showed that the pretrial detainee received adequate medical treatment); Gray v. Kang Lee, No. 9:13-cv-258 (GLS/DEP), 2015 WL 1724573, at *4 (N.D.N.Y. Apr. 15, 2015) (finding that the plaintiff was not deprived of adequate medical treatment where the record demonstrated that the inmate was frequently treated, prescribed pain medication, given an X-ray and an MRI, and referred to an orthopedic specialist).

### 2. Second Prong: Subjective Component

Even assuming, arguendo, that plaintiff demonstrated that he was actually deprived of adequate medical care, plaintiff cannot satisfy the second prong of the analysis, the mens rea prong. Darnell, 849 F.3d at 35. To satisfy the mens rea prong, a plaintiff must prove that the defendant "knew, or should have known, the condition posed an excessive health risk to health or safety." Id. In other words,

> **\*13** The pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety.

Id.

Plaintiff fails to demonstrate how Dr. Fricke "acted intentionally to impose the alleged condition or recklessly failed to act with reasonable care." Darnell, 849 F.3d at 35. Plaintiff claims that Dr. Fricke "knew of or should have known" of his diabetes because Dr. Fricke "received" the May 21, 2016, BioReference Laboratories report showing his elevated blood glucose levels. Dkt. No. 62 at 4. Plaintiff also claims that Dr. Fricke should have known of his diabetes because his "pain and symptoms grew more severe." Dkt. No. 1 at 4.

As discussed, although it was standard procedure for BioReference Laboratories to mail and fax lab results, the record suggests these results were not sent to RCJ. Dkt. No. 47-9 at 121; Dkt. No. 47-11 at ¶ 97; Dkt. No. 47-9 at 74.

Taft v. Fricke, Not Reported in Fed. Supp. (2019)

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 199 of 201

2019 WL 5197180

The nurses at RCJ "check the fax machine and review the reports for any results that are unusual or require immediate attention." Dkt. No. 47-11 at ¶ 14. Plaintiff's previous lab reports were faxed and received by nurse practioners. Dkt. No. 47-9 at 74-76. Additionally, Dr. Fricke stated, "it was standard procedure for outside laboratories to call the jail to report any critical values such as an elevated blood glucose" and "[n]o one at the jail had alerted me about the lab report." Dkt. No. 47-11 at ¶¶ 97, 98. Although plaintiff may disagree over the way nonparty RCJ staff and Dr. Fricke obtain lab reports and his report specifically, plaintiff's disagreement is not enough to show that Dr. Fricke "acted intentionally to impose the alleged condition or recklessly failed to act with reasonable care." Darnell, 849 F.3d at 35; Randle v. Alexander, 960 F. Supp. 2d 457, 481 (S.D.N.Y. 2013) ("disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim.").

Plaintiff's claim that Dr. Fricke should have known about his diabetes because of his symptoms fails for three reasons. First, plaintiff did not present with typical diabetic symptoms during either visit with Dr. Fricke (Dkt. No. 47-9 at 71, 132) or visits with nursing staff before June 3, 2016. See Dkt. No. 47-9 at 1-141. Plaintiff did complain about vision trouble, eye pain, nausea, constipation, trouble breathing, and extreme dizziness while at RCJ. Id. As a result of his complaints, plaintiff stopped taking his beta blockers, and Dr. Fricke referred him to a cardiologist. Id. at 113. Plaintiff also complained that when his HCTZ medication was doubled, his symptoms worsened. Id. at 132. However, plaintiff does not show that these symptoms and complaints were indicative of diabetes or that his high blood pressure should have led Dr. Fricke to discover or diagnose his diabetes. See Dkt. Nos. 1, 22, 52, 61. Additionally, Dr. Fricke notes that plaintiff did not present with key symptoms of diabetes, such as increased urination, or lesser symptoms, such as vomiting, weight loss, or lethargy, at his June 1, 2016, appointment. Dkt. No. 47-11 at ¶ 93. Second, plaintiff was confrontational during his June 1, 2016, appointment, which prevented Dr. Fricke from assessing fully plaintiff's condition or symptoms. Id. at ¶ 76. Third, plaintiff had no medical history of diabetes. Dkt. No. 47-9 at 8. Absent a diabetic history and diabetic symptoms, Dr. Fricke had no reason to test plaintiff for diabetes. See Dkt. No. 47-11 at ¶ 93; Dkt. No. 47-12 at ¶ 26. Even if, in hindsight, it can be argued that certain complaints plaintiff made should have led Dr. Fricke to realize

that plaintiff was diabetic, because plaintiff did not have a diabetic history or the usual diabetic symptoms, as Dr. Fricke continued to treat plaintiff and attempt to respond to his complaints, his failure to identify any symptoms as signs of diabetes does not demonstrate intentional or reckless failure to act with reasonable care. See, e.g., Sheils v. Flynn, 9:06-CV-407, 2009 WL 2868215, at *17 (N.D.N.Y. Sept. 2, 2009) ("While Defendants' failure to immediately diagnose the lesion on Plaintiff's shoulder as cancer was undoubtedly frustrating and frightening for Plaintiff, the record simply does not indicate any behavior on Defendants' part that elevates the situation from possible medical malpractice to the level of a constitutional violation. Plaintiff received frequent medical care, as his voluminous medical records demonstrate. Medical staff prescribed various medications in an attempt to relieve his symptoms.").

 **\*14**  Once Dr. Fricke was notified of plaintiff's elevated blood glucose level, he immediately had plaintiff transported to the hospital. Dkt. No. 47-9 at 133. Due to the lack of typical diabetic symptoms, known positive test results, and no medical history of diabetes, plaintiff cannot satisfy the *mens rea* prong as plaintiff cannot show that Dr. Fricke "acted intentionally to impose the alleged condition or recklessly failed to act with reasonable care." Darnell, 849 F.3d at 35.

Plaintiff's allegations could be construed as suggesting that Dr. Fricke had a duty to seek out the lab results, even if he had no reason to think they were abnormal. See Dkt. No. 62 at 4. However, even if Dr. Fricke "misdiagnosed" plaintiff and that misdiagnosis caused plaintiff unintended harm, or if Dr. Fricke were negligent in failing to seek out the results of plaintiff's blood work, his conduct is at most negligence, as he had no reason to suspect that plaintiff had diabetes before June 3, 2016.

> It has ... been held that a delay in medical treatment may constitute deliberate indifference, but that "such a classification is reserved for 'cases in which, for example officials deliberately delayed care as a form of punishment; ignored a life-threatening and fast degenerating condition for three days; or delayed major surgery for over two years.' "

Allen, 2006 WL 2376927, at *4 (quoting Magee v. Childs, No. CIV904CV1089 (GLS/RFT), 2006 WL 681223, at *12 (N.D.N.Y. Feb. 27, 2006), Freeman v. Strack, No. 99 Civ. 9878(AJP), 2000 WL 1459782, at *6 (S.D.N.Y. Sept. 29, 2000)).

Case 9:22-cv-00181-GTS-MJK   Document 96   Filed 07/24/24   Page 200 of 201

Taft v. Fricke, Not Reported in Fed. Supp. (2019)

2019 WL 5197180

"Thus, a physician who 'delay[s] ... treatment based on a bad diagnoses or erroneous calculus of risks and costs' does not exhibit the mental state necessary for deliberate indifference." Harrison, 219 F.3d at 129. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under Section 1983 if the treatment provided is "adequate."

Groves v. Davis, No. 9:11-CV-1317 (GTS/RFT), 2012 WL 651919, at *5 n.9 (N.D.N.Y. Feb. 28, 2012).

Here, plaintiff presents no argument or evidence to even suggest that Dr. Fricke intentionally failed to diagnose his diabetes as a form of punishment. Thus, the two-week delay in diagnosis is, at most, a "bad diagnosis or erroneous calculation of risks and costs," Harrison, 219 F.3d at 139, and plaintiff cannot demonstrate that Dr. Fricke had the requisite mental state. Groves, 2012 WL 651919, at 5 n.9. Further, negligence is not actionable under § 1983. See Grimmet v. Corizon Med. Assocs. of N.Y., No. 15-CV-7351 (JPO)(SN), 2017 WL 2274485, at *5 (S.D.N.Y. May 24, 2017) ("[N]egligence alone is insufficient to make out a deliberate indifference claim under the Fourteenth Amendment."); Burroughs v. Petrone, 138 F. Supp. 3d 182, 211 (N.D.N.Y. 2015) ("Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing the harm.") (internal quotation marks and citation omitted); Roberts v. City of New York, 1:14-CV-5198 (GHW), 2016 WL 4146135, at *6 (S.D.N.Y. Aug. 2, 2016) (Where the plaintiff contended that the defendant misdiagnosed him with gas when he was experiencing elevated blood sugar levels as a result of diabetes, the Court noted, "even if [the defendant medical professional] was negligent in failing o properly diagnose Plaintiff's symptoms and failing to prescribe the proper medication, the complaint fails to state a claim for deliberate indifference" because negligence, even if it amounts to medical malpractice, does not, without more, rise to the level of a constitutional claim).

*15  As such, plaintiff has failed to demonstrate that Dr. Fricke "acted intentionally to impose the alleged condition or recklessly failed to act with reasonable care." Darnell, 849 F.3d at 35. For the reasons stated, plaintiff does not satisfy the requirements of the *mens rea* prong. Accordingly, as the undersigned concludes that there is no genuine dispute of material fact with respect to either the objective or *mens rea* prongs, plaintiff fails to establish a deliberate indifference claim. Accordingly, it is recommended that Dr. Fricke's motion for summary judgment be granted.

## III. CONCLUSION

**WHEREFORE**, for the reasons stated herein, it is hereby:

**RECOMMENDED**, that defendant's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 (Dkt. No. 47) be **GRANTED**; and it is

**RECOMMENDED**, that the John and Jane Doe defendants be *sua sponte* **DISMISSED** from this action without prejudice, due to plaintiff's failure to identify and serve these defendants, and it is further

**RECOMMENDED**, that plaintiff's submission, dkt. no. 62, be construed as supporting his response in opposition to defendant's Motion for Summary Judgment; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72. [12]

[12]   If you are proceeding pro se and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation and Order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

Taft v. Fricke, Not Reported in Fed. Supp. (2019)
2019 WL 5197180

Case 9:22-cv-00181-GTS-MJK    Document 96    Filed 07/24/24    Page 201 of 201

**All Citations**

Not Reported in Fed. Supp., 2019 WL 5197180

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.